# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

YOON DOELGER and
PETER DOELGER,

                Plaintiffs,

     v.

JPMORGAN CHASE BANK, N.A. and
CHICKASAW CAPITAL MANAGEMENT, LLC

             Defendants.

Civil Action No.:

## **COMPLAINT**

      Yoon K. Doelger and Peter W. Doelger (the "Doelgers"), by and through their attorneys,

for their complaint against Defendants JPMorgan Chase Bank, N.A. ("JP Morgan") and Chickasaw

Capital Management, LLC ("Chickasaw") (collectively, the "Advisers"), allege as follows:

<u>Table of Contents</u>

NATURE OF THE CLAIMS ........................................................................................ 1

PARTIES .................................................................................................................... 2

JURISDICTION AND VENUE .................................................................................. 3

FACTUAL BACKGROUND ...................................................................................... 4

I.      THE DOELGERS RELIED ON THE ADVISERS' EXPERTISE ................................... 4

    A.  The Advisers' Relationship with the Doelgers and the Opening
        of the Advisory Account .......................................................................... 4

    B.  The Advisers Owed Fiduciary Duties to the Doelgers Pursuant to
        the Advisory Agreements ........................................................................ 9

    C.  The Doelgers Increasingly Relied on the Advisers for Investment Advice as
        Mr. Doelger's Mental Health Declined .................................................... 12

    D.  JP Morgan Misled Mr. Doelger and Made Material Misrepresentations to Him
        in the 2015 Hedge Letter ......................................................................... 15

II.     THE ADVISERS WILLFULLY, RECKLESSLY AND IMPRUDENTLY BREACHED
      THEIR OBLIGATIONS TO THE DOELGERS .......................................................... 18

    A.  The Advisers Failed to Diversify the Doelgers' Portfolio and Encouraged the
        Doelgers to Remain Fully Invested in High Risk MLPs Even as Their Portfolio
        Declined Year After Year ......................................................................... 18

    B.  JP Morgan Made Misrepresentations in Order to Keep the Doelgers
        Invested in MLPs .................................................................................... 25

    C.  The Advisers Breached Their Duties to the Doelgers and Acted in Bad Faith by
        Putting Their Own Interests Ahead of the Doelgers ................................. 28

    D.  The Advisers Selected an Unseasoned Adviser as the Doelgers' Primary Contact ... 34

    E.  The Office of the Comptroller and Currency Recently Fined JP Morgan
        for Engaging in the Same Misconduct at Issue Here ................................ 35

III.    THE ADVISERS VIOLATED THE ADVISERS ACT ............................................. 36

    A.  Chickasaw Committed Multiple Violations of its Obligations Under the
        Advisers Act ........................................................................................... 36

    B.  JP Morgan Acted In Bad Faith By Involving Its Investment Advisory Affiliate
        and Failing To Ensure It Complied with SEC Regulations ....................... 37

CAUSES OF ACTION ............................................................................................... 40

PRAYER FOR RELIEF ............................................................................................. 49

## NATURE OF THE CLAIMS

1.     This complaint arises out of JP Morgan's and Chickasaw's breaches of their obligations to the Doelgers as their investment advisers.   In disregard of their duties and obligations, Defendants JP Morgan and Chickasaw willfully, recklessly and imprudently thrust the Doelgers' liquid assets under their care into undiversified and highly risky investments.   As a result, the Advisers engaged in breaches of fiduciary duty, breaches of contract, negligence and gross negligence, negligent misrepresentations, breaches of the covenant of good faith and fair dealing, unfair trade practices under Massachusetts General Laws, Chapter 93A ("Chapter 93A") and elder financial exploitation.

2.     The Advisers' failure to employ a reasonable and diversified investment strategy that best met the needs of the Doelgers, retired seniors who were seeking to invest their life savings, resulted in losses to the Doelgers in excess of $20 million.   For years, the Advisers kept nearly all the Doelgers' money invested in highly volatile Master Limited Partnerships ("MLPs") that declined substantially year after year.   Simultaneously, JP Morgan acted as a lender to Mr. Doelger for several loans, with balances as high as $17 million (the "Loans"), for which his investments in MLPs (the "MLP Investments") served as collateral.   JP Morgan never disclosed to the Doelgers its inherent conflict of interest in acting as a lender and an investment adviser.   In reckless disregard of their duties, the Advisers put their own interests ahead of the Doelgers' interests.   The Advisers knew that if the Doelgers sold the MLP Investments to pay off the Loans, the Advisers would lose millions of dollars in interest and fees.   For years, the Advisers did everything they could to prevent that from happening, including consistently misrepresenting the amount of income generated by the MLP Investments, misrepresenting the MLP Investments as low-risk and high-quality investments and taking advantage of the Doelgers' trust in the Advisers that they were giving advice that was in the Doelgers' best interest.

1

3.      In early 2020, after years of losses, the MLP Investments declined further at the onset of the Coronavirus pandemic.  The Advisers recklessly advised the Doelgers to hold their positions and the Doelgers followed their advice.  By March 2020, the value of the MLP Investments declined to the point where JP Morgan, looking out for its own interests, informed the Doelgers there would be a margin call.  Shortly thereafter, the Doelgers sold all their MLP Investments.  JP Morgan took nearly all the proceeds of the sales to pay off the Loans.  As a direct result of the Advisers' breaches and prioritization of their own interests ahead of the Doelgers, the Doelgers lost millions of dollars and nearly all of their liquid assets while the Advisers made millions of dollars from these actions.

## PARTIES

4.      Plaintiffs Peter and Yoon Doelger are natural persons who permanently reside at 144 Beacon Street, Boston, MA 02116 (the "Boston Home"), a home they have owned since 2004.

5.      The Doelgers permanently resided in Boston for decades until in or around 2012 when they became residents of Florida.  The Doelgers resided at 241 El Vedado Road, Palm Beach, FL 33480 (the "Florida Home") until March 2021, when they sold their Florida Home.

6.      Even when the Doelgers were Florida residents, they spent several months of the year at their Boston Home.

7.      Upon information and belief, Defendant JP Morgan is a national banking association, and has its principal place of business at 270 Park Avenue, New York, NY 10017.  JP Morgan has an office at 50 Rowes Wharf, Boston, MA 02110.

8.      JP Morgan regularly transacts business and contracts to perform services within the State of Massachusetts. As part of its business in Massachusetts, JP Morgan offers private bank and wealth management services.  JP Morgan provides services out of its Boston office to many Massachusetts residents.

9.      Upon information and belief, Defendant Chickasaw is a Delaware limited liability company, and has its principal place of business at 6075 Poplar Avenue Suite 720 Memphis, TN 38119 United States.  Chickasaw is a registered investment adviser (an "RIA") with the Securities Exchange Commission ("SEC").   Upon information and belief, Chickasaw's members are Geoffrey Mavar and Mathew Mead, both of whom permanently reside in Tennessee.  Chickasaw regularly transacts business and contracts to perform services within the State of Massachusetts.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000.

11.     This Court has specific personal jurisdiction over JP Morgan pursuant to G.L. c. 223A, because this action arises out of JP Morgan's transacting of business within the Commonwealth of Massachusetts.

12.     This Court has specific personal jurisdiction over Chickasaw pursuant to G.L. c. 223A, § 3, because this action arises out of Chickasaw's transacting of business within the Commonwealth of Massachusetts.

13.     Moreover, the transaction at issue was negotiated and entered into in the Commonwealth of Massachusetts.  In addition, the Doelgers' individual advisers and key contact for their accounts were located in the Commonwealth of Massachusetts.

14.     Venue is proper in this Court under 28 U.S. Code § 1391(b) because one or more of the parties reside in, and does business within, this judicial district.  Venue is also proper under 28 U.S. Code § 1391(b) because a substantial part of the events giving rise to this lawsuit occurred in this judicial district.

## FACTUAL BACKGROUND

I.   **THE DOELGERS RELIED ON THE ADVISERS' EXPERTISE**

A.   **The Advisers' Relationship with the Doelgers and the Opening of the Advisory Account**

15.   The Doelgers are married, elderly retirees; Mr. Doelger is 84 and Mrs. Doelger is 74.

16.   Neither Mr. Doelger nor Mrs. Doelger have a background in finance or investments.

17.   Mr. Doelger has a B.A. in English Literature and earned his wealth through an energy conservation and consulting business that he started in his youth and eventually sold to a large corporation.

18.   Mrs. Doelger is not a native English speaker.  She was born and raised in Korea and moved to the United States when she was in her 20s.  Mrs. Doelger has an M.F.A. and is a homemaker, artist and art historian.

19.   The Doelgers are clients of JP Morgan Private Bank and have had a relationship with the bank and its Boston office since the 1980s.  According to JP Morgan's 2014 privacy notice, "[t]he Private Bank is part of J.P. Morgan Asset Management (the marketing name for the asset management business of JP Morgan Chase & Co.) and provides banking services for the private bank clients."  Over the last 20 years or more and until 2021, most of the Doelgers' financial accounts were held by JP Morgan and the bank periodically prepared personal financial statements for the Doelgers, listing all their assets and liabilities.

20.   As a result, JP Morgan was intimately involved in the Doelgers' financial affairs, even prior to becoming their investment adviser in 2015.

4

21.     In or around 2009, JP Morgan approved Mr. Doelger for a $6 million line of credit, for which his investment portfolio was used as collateral.

22.     The Loans were short term interest only loans (at a rate of LIBOR plus 1.10%), with the principal balance due upon maturity, typically in one year.   However, JP Morgan consistently "renewed" or extended the maturity date on the Loans every year.

23.     By 2015, the balance on the Loans was approximately $17 million.

24.     From 2012 to 2015, Mr. Doelger was invested in MLPs for which Atlantic Trust Private Wealth Management ("Atlantic Trust") served as Mr. Doelger's investment adviser (the "Atlantic Trust Investments").

25.     MLPs purport to combine the tax benefits of limited partnerships with the liquidity of common stock.  To qualify for such tax benefits, MLPs must earn 90 percent or more of their gross income from a qualifying source, such as natural resource production activities, including energy production.  As pass through entities, MLPs enable investors to avoid double taxation on dividends, while receiving distributions.

26.     For the entire period for which Atlantic Trust was Mr. Doelger's investment adviser, JP Morgan acted as the custodian for the Atlantic Trust Investments.  Mr. Doelger had an "Asset Account" at JP Morgan in connection with the Atlantic Trust Investments and JP Morgan issued monthly statements detailing the value of the Atlantic Trust Investments and any transactions and activity, such as trades, distributions and transfers.

27.     From 2014 to 2015, the value of the Atlantic Trust Investments decreased significantly.  As the custodian, JP Morgan was aware of the losses and took advantage of Mr. Doelger's concern over them by convincing Mr. Doelger to switch to JP Morgan as his investment adviser.

28.     In 2015 and thereafter, Mr. Doelger looked to JP Morgan for advice on how to handle his investments.

29.     The main purpose of the investments was to fund the Doelgers' retirement.

30.     JP Morgan arranged for Mr. Doelger to meet with JP Morgan and their business partner, Chickasaw.

31.     In the summer of 2015, Mr. Doelger met with JP Morgan and Chickasaw.

32.     James Baker, an unseasoned JP Morgan employee, Geoffrey Mavar, Chickasaw's co-founder, and one or more principals or employees from Chickasaw were present at the meeting.

33.     At or shortly before the 2015 Meeting, the Advisers presented Mr. Doelger with a marketing presentation (the "Presentation"), a copy of which is attached as Exhibit 1.

34.     JP Morgan and Chickasaw jointly prepared the Presentation.

35.     Chickasaw pitched itself as the Portfolio Advisor and touted that its Portfolio Managers averaged "19 years of MLP related experience."

36.      The Presentation touted how the Advisers thought MLPs remained an attractive investment for the Doelgers.

37.     The Advisers convinced Mr. Doelger to remain invested in MLPs by promoting the "stable cash flows" generated from MLPs and the tax benefits associated with such investments.

38.     In the Presentation the Advisers mischaracterized a significant portion of the "stable cash flows", and quarterly distributions as "income."

39.     According to the Presentation, "[a] portion of quarterly distributions is generally considered return of capital, so taxes due *on that portion of income* may be deferred until the MLP is sold."  Presentation, Exhibit 1, at 8 (emphasis added).  This statement is a misrepresentation. Return of capital is not income, but rather it is a return of an investor's principal investment.

40.     In the Presentation, the Adviser also mischaracterized MLP Investments as providing inflation protection, predictable cash flow and attractive characteristics in both inflationary and deflationary environments.

41.     In the Presentation, the Advisers touted the construction of a tailored portfolio that involved "careful consideration of risk/reward," which included "Dashboard Risk Control."  The Advisers also promised an "Investment Process with a Focus on Risk Control."  These statements are intentionally misleading as they portray MLPs as low risk investments consistent with Mr. Doelger's investment goals, which they were not.

42.     In the Presentation, the Advisers characterized their "Opportunistic Advisory Program – MLP & Energy Infrastructure" (the "Advisory Program") as "constructed with the goal of having less risk and a higher expected return than the average MLP."  This statement is intentionally misleading as the Advisers portray MLPs as low risk investments, consistent with Mr. Doelger's investment goals, which they were not.

43.     The Advisers made the misrepresentations and misleading statements in the Presentation in order to convince Mr. Doelger that MLPs were low risk investments that provided a stable source of income to meet his retirement investment goals.

44.     After the 2015 Meeting, Mr. Doelger engaged JP Morgan and Chickasaw as his new and sole investment advisers.

45.     Mr. Baker became the Doelgers' key contact for their accounts and regularly provided the Doelgers with investment advice.  Douglas Moon and Trey Eppes, JP Morgan employees, also advised the Doelgers.  All three of these individuals worked in JP Morgan's Boston office.

46.    In or around September 2015, Mr. Doelger opened an "Investment Advisory Account" (hereafter, the "Advisory Account") with JP Morgan.  The account was opened in JP Morgan's Boston branch.  JP Morgan acted as an investment adviser and custodian for the Advisory Account.  JP Morgan issued monthly statements detailing the value of the MLP Investments in the Advisory Account and any transactions and activity, such as trades, 'dividends' and transfers.

47.    In or around October 2015, at the direction of the Advisers, the Doelgers invested $37 million in the Advisory Program.

48.    JP Morgan maintained a small portion of the MLP Investments in an account separate from the Advisory Account for tax reasons (the "Separate Account").  JP Morgan and Chickasaw advised the Doelgers in connection with the Separate Account and treated the assets in it as part of the MLP Investments.  Generally, whenever JP Morgan discussed or gave advice in connection with the MLP Investments, it included information from both the Advisory Account and the Separate Account.

49.    JP Morgan engaged in investment activity related to the MLP Investments through itself, and its affiliate, JP Morgan Securities LLC ("JP Morgan Securities"), an investment adviser registered with the SEC.

50.    Chickasaw was intimately involved in activity in connection with the MLP Investments.  Chickasaw was involved in selecting which MLPs to invest in and executed trades for the Advisory Account.

51.    According to the Advisers, the Advisory Program was intended to "focus on midstream energy infrastructure businesses" that were "expected to deliver stable, attractive and growing distributions."

52.     The Advisers frequently mischaracterized the distributions as 100% "income", "dividends" or "yield."

**B.      The Advisers Owed Fiduciary Duties to the Doelgers Pursuant to the Advisory Agreements**

53.     Prior to opening the Advisory Account, on or about August 10, 2015, Mr. Doelger signed various agreements in connection with opening the account (the "2015 Advisory Agreements").  A copy of the 2015 Advisory Agreements is attached hereto as Exhibit 2.

54.     On June 21, 2019, Mrs. Doelger was added to the Advisory Account as a joint account holder pursuant to a "Title Change Request" and signed a similar set of agreements (the "2019 Advisory Agreements", together with the 2015 Advisory Agreements, the "Advisory Agreements").  Mr. Doelger also signed the 2019 Advisory Agreements, which are attached hereto as Exhibit 3.

55.     Given that JP Morgan had a complete record of the Doelger's financial information, including the Doelgers' annual income and net worth, the Doelgers relied on JP Morgan to complete all the requested information in the Advisory Agreements.  JP Morgan filled in all of the information in the Advisory Agreements, including on the applications.  JP Morgan only requested that the Doelgers sign the Advisory Agreements.  JP Morgan did not highlight or explain to the Doelgers any of the provisions in the Advisory Agreements or any documents referenced in such agreements.

56.     JP Morgan also signed the Advisory Agreements.

57.     Chickasaw signed the Advisory Program document titled "Opportunistic Advisory Program – MLP & Energy Infrastructure", pursuant to which it agreed to be bound by the same exact terms of the Advisory Agreements as JP Morgan.

58.     The Advisory Program was included in each set of the Advisory Agreements that were obtained from JP Morgan.  *See* Advisory Agreements, Exhibits 2 and 3.

59.     Pursuant to the Advisory Agreements, Chickasaw was referred to as the "Outside Portfolio Manager" and a "third-party investment advisor".

60.     Section F of the Advisory Program, titled "Agreement for Investment Management", provided that "by signing, the outside portfolio manager acknowledges that it has read and agreed to the provisions and responsibilities in the agreement for investment management services and the product term sheet(s)."  *See* document titled "Opportunistic Advisory Program - MLP & Energy Infrastructure | Investment Guidelines."  Exhibit 2, at 1.

61.     JP Morgan received fees as compensation for the services it provided in connection with the Advisory Program.

62.     Chickasaw also received fees as compensation for the services it provided in connection with the Advisory Program.

63.     The Advisory Account was a managed account and the Advisory Agreements expressly provided that the Advisers had discretionary authority to make investment decisions.

64.     The Advisory Agreements provided that "Client appoints the Bank as investment manager for the Assets and for each Portfolio with full discretion to make purchases, sales, exchanges or investments, or take any other action that it deems necessary or desirable as to each Portfolio and the Assets invested in any Portfolio."  *See*, *e.g.*, document titled "J.P. Morgan Advisory Program | Advisory Account Agreement", Exhibit 2, at 1, 1D(i).

65.     The Advisory Agreements provided that "Portfolio investments will be determined by the Bank with considerations of availability and applicable fiduciary standards."  *See id.*

10

66.     Given the express provisions in the Advisory Agreements, the nature of the investments and the Advisers' roles and obligations, the Advisers unquestionably owed fiduciary duties to the Doelgers.

67.     As fiduciaries, the Advisers were required to put the Doelgers interests ahead of their own, avoid conflicts of interest with the Doelgers, and provide disinterested advice to the Doelgers.

68.     As fiduciaries, the Advisers had an obligation to recommend and implement an investment strategy that took into account the Doelgers' needs, goals, age, risk tolerance, and asset size.

69.     As fiduciaries, and pursuant to the Advisory Agreements, the Advisers also had an ongoing obligation to perform portfolio reviews to determine whether their recommended investment strategy was in the best interest of the Doelgers.

70.     The Advisory Agreements provided that "[o]n an ongoing basis, the Bank will respond to Client inquires, periodically consult with Client to update Client's financial information and investment objectives, periodically review the activity in and investment results of each Portfolio with Client, and assist Client in determining whether to make any changes to Client's selection of Portfolios."  *See*, *e.g.*, document titled "J.P. Morgan Advisory Program | Advisory Account Agreement", Exhibit 3, at 2,1E.

71.     The Advisory Agreements were standard form contracts, which the Doelgers were unable to negotiate.

72.     Mr. Doelger provided his accountant, Bruce Haverberg, with inquiry authorization on the Advisory Account ("Inquiry Authorization").  Pursuant to the Inquiry Authorization, Mr.

Haverberg was able to access information regarding the Advisory Account.  The Doelgers did not provide Inquiry Authorization to anyone other than Mr. Haverberg.

73.     After the Doelgers signed the Advisory Agreements, the Advisers did not provide the Doelgers with copies of the Advisory Agreements until their counsel requested them in October 2020.

74.     The Doelgers had a lawyer, Paul Roberts ("Mr. Roberts"), who provided legal advice to them primarily in connection with their business affairs.  From time to time, Mr. Roberts also provided legal advice to the Doelgers in connection with their personal affairs, but he was not intimately involved in their finances or investments.  He did not review various key documents in connection with the Advisory Account and he did not provide advice to the Doelgers prior to the execution of such documents.

**C.     The Doelgers Increasingly Relied on the Advisers for Investment Advice As Mr. Doelger's Mental Health Declined**

75.     MLP Investments have intricate structural and complex tax implications that few individual investors understand.  The Doelgers relied heavily on the Advisers to explain the consequences of their investment decisions in a transparent manner.

76.     After opening the Advisory Account, JP Morgan, primarily through Mr. Baker, communicated frequently with the Doelgers.

77.     The Advisers were aware of the Doelgers inability to understand the complexities of the MLP Investments and encouraged the Doelgers to rely on Mr. Baker's "expertise."

78.     The Doelgers relied on Mr. Baker's advice and purported expertise in making all decisions in connection with the MLP Investments and the Loans.  Initially, in 2015, Mr. Doelger had a more active role in communications with JP Morgan and Mr. Baker.

79.    Since at least 2014, Mr. Doelger had begun suffering from cognitive decline and he increasingly needed assistance in making financial decisions.

80.    As Mr. Doelger's mental and cognitive health grew progressively worse, his ability to make investment-related decisions was impaired and Mrs. Doelger took an increasingly active role in communicating with Mr. Baker about the MLP Investments.



84.    Mr. Doelger has been receiving treatment for his mental illness since in or around 2014.

85.     JP Morgan was aware of Mr. Doelger's cognitive decline.

86.    During the course of the Doelgers' relationship with JP Morgan, Mr. Baker became aware that Mr. Doelger's ability to make investment-related decisions had declined substantially.

87.    As early as 2017, Mrs. Doelger consistently informed Mr. Baker that Mr. Doelger was suffering from memory loss and that he often needed information repeated or re-explained to him.

88.     Mr. Baker was aware that Mr. Doelger's involvement and participation in activities related to the Doelgers' financial affairs was diminishing.  Mr. Baker began more frequently having calls directly with Mrs. Doelger without Mr. Doelger, during which he often asked how Mr. Doelger was and Mrs. Doelger reiterated to Mr. Baker that Mr. Doelger continued to suffer from memory loss.

89.     Mr. Doelger often remained quiet or spoke minimally or in a confused manner when he attended meetings or calls with Mr. Baker.

90.     Mrs. Doelger speaks English as a second language and often struggles to fully understand conversations, especially involving complex financial terms.  JP Morgan was aware of this.

91.     Whenever Mr. Baker discussed investment strategy with the Doelgers or explained activity in connection with the Advisory Account, Mr. Baker failed to confirm with either Mr. Doelger or Mrs. Doelger whether they understood Mr. Baker's advice.

92.     Both Mr. Doelger and Mrs. Doelger often expressed to Mr. Baker that they believed Mr. Baker was the expert and that they were relying on Mr. Baker's expertise on how their investments should be structured.

93.     Mrs. Doelger relied almost exclusively on Mr. Baker in making any investment decisions.  Mrs. Doelger almost always followed Mr. Baker's advice.

94.     JP Morgan knew that Mrs. Doelger had no finance or investment experience and did not understand MLPs.

**D.     JP Morgan Misled Mr. Doelger and Made Material Misrepresentations to Him in the 2015 Hedge Letter**

95.     At the time he signed the 2015 Advisory Agreements, Mr. Doelger was not informed that there would be any hold harmless or indemnity provisions included in the Advisory Agreement.

96.     More than a month after Mr. Doelger and JP Morgan signed the 2015 Advisory Agreements, and the Advisers agreed to become Mr. Doelger's investment adviser, JP Morgan and JP Morgan Securities sent Mr. Doelger a letter dated September 24, 2015 (the "2015 Hedge Letter") requesting that he make certain acknowledgements that JP Morgan knew were untrue.  A copy of the Hedge Letter is attached as Exhibit 4.

97.     In the 2015 Hedge Letter, JP Morgan and JP Morgan Securities made the following false statements regarding Mr. Doelger's income and financial acumen:  that as of September 24, 2015, Mr. Doelger had "a liquid net worth of approximately $100,000,000" and "total assets of at least $50 million"; and that Mr. Doelger had "concluded that the investment, including with respect to the size of the investment objectives and [his] financial capabilities, that [he had] such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the investment…."  *See* 2015 Hedge Letter, Exhibit 4.  They also pressured Mr. Doelger to acknowledge that he was capable of making investment decisions in connection with JP Morgan's proprietary investment program entirely on his own.  *Id.*

98.     At the time of execution of the 2015 Advisory Agreements, Mr. Doelgers' net worth was in fact substantially less than $100 million.  JP Morgan and JP Morgan Securities made these misrepresentations with knowledge that they were false given that JP Morgan had ready access to the Doelgers' financial records, which included information regarding most of the Doelgers'

financial accounts and periodically prepared financial statements listing all the Doelgers' assets and liabilities.

99.     JP Morgan and JP Morgan Securities were also aware that Mr. Doelger had always previously relied on investment advisers when making investment decisions regarding MLPs and was not capable of making investment decisions on his own.  In fact, they convinced Mr. Doelger to leave his then investment adviser by holding themselves out, along with Chickasaw, as experts on MLPs and they expressly agreed to provide guidance and advice to Mr. Doelger on the investments he would make.

100.     The 2015 Hedge Letter did not include a non-waiver disclosure and neither JP Morgan nor JP Morgan Securities explained the import of the hedge clauses to Mr. Doelger before he agreed to the acknowledgments contained therein.  Accordingly, JP Morgan and JP Morgan Securities misled Mr. Doelger into believing that by signing the 2015 Hedge Letter, he had waived non-waivable rights of actions against JP Morgan and JP Morgan Securities.

101.     The acknowledgements in the 2015 Hedge Letter constituted "hedge clauses", the sole purpose of which were intended to exculpate JP Morgan and JP Morgan Securities from regulatory liability.  The SEC has condemned such hedge clauses as running afoul of Section 206 (the "Anti-Fraud Provisions") of the Investment Advisers Act of 1940 (the "Advisers Act"), stating "there are few (if any) circumstances in which a hedge clause in an agreement with a retail client would be consistent with those antifraud provisions, where the hedge clause purports to relieve the adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law."  Interpretive Release Regarding Standard of Conduct for Investment Advisers, Advisers Act Release No. 5248 at 11, n. 31 (Jul. 12, 2019).  *See also Heitman Capital Management, LLC, et al.*, SEC Staff No-Action Letter, No. 801-15473 at 3 (Feb.

12, 2007) ("Those antifraud provisions may be violated by the use of a hedge clause or other exculpatory provision in an investment advisory agreement which is likely to lead an investment advisory client to believe that he or she has waived non-waivable rights of action against the adviser that are provided by federal or state law.")

102.    Upon information and belief, after Mr. Doelger signed the 2015 Advisory Agreements, JP Morgan's internal compliance department learned that JP Morgan was about to engage in the reckless management of Mr. Doelger's assets.

103.    As a result, JP Morgan and JP Morgan Securities sent Mr. Doelger the 2015 Hedge Letter for the sole purpose of protecting themselves and attempting to limit their obligations under the Rule 2111 of the Financial Industry Regulatory Authority ("FINRA").  However, FINRA Rules do not even apply here given that the parties did not agree to a FINRA arbitration and JP Morgan was not acting as a broker-dealer but as an investment adviser with heightened obligations.

104.    JP Morgan breached its fiduciary duties to Mr. Doelger by knowingly making misrepresentations in the 2015 Hedge Letter and getting him to sign a purported disclaimer that JP Morgan used to protect itself and its affiliate, in an attempt to hedge its liability under federal securities laws and inapplicable FINRA Rules.

105.    As part of retitling the Advisory Account in 2019, JP Morgan did not request that Mr. Doelger sign another letter similar to the 2015 Hedge Letter, even though it requested that Mr. Doelger sign a new set of advisory agreements, which included all the same material terms and agreements as the 2015 Advisory Agreements.

106.    JP Morgan did not present Mrs. Doelger with the 2015 Hedge Letter or a similar letter and Mrs. Doelger never signed any such letter.

107.    Chickasaw was not a party to the 2015 Hedge Letter.

## II.   THE ADVISERS WILLFULLY, RECKLESSLY AND IMPRUDENTLY BREACHED THEIR OBLIGATIONS TO THE DOELGERS

### A.   The Advisers Failed to Diversify the Doelgers' Portfolio and Encouraged the Doelgers to Remain Fully Invested in High Risk MLPs Even As Their Portfolio Declined Year After Year

108.   Given the Doelgers' age, retirement status and needs, mental and cognitive health decline and reliance on the Advisers for investment advice, the Advisers had a fiduciary duty to propose and implement a diversified investment strategy that substantially included safe and low risk investments.

109.   The Advisers failed to recommend and implement an investment strategy that took into account the Doelgers' needs, goals, age, risk tolerance and asset size.

110.   The Advisers breached their fiduciary duties and the Advisory Agreements by failing to perform routine portfolio reviews to determine whether their recommended investment strategy was in the best interest of the Doelgers.

111.   The Advisers failed to consult the Doelgers regarding their investment goals and needs.

112.   The Advisers failed to consult the Doelgers regarding their actual income needs.

113.   In a reckless disregard of their duties, the Advisers insisted on keeping all the Doelgers's assets under management fully invested in MLPs, despite their knowledge that the MLP Investments were not suitable for the Doelgers and not in their best interests.

114.   Yet, by JP Morgan's own admission, the Doelgers should have invested "no larger than 5% of [their] net worth in the MLPEI offering."

115.   In addition, the Advisers' failure to advise the Doelgers to maintain an adequate cash reserve, a standard industry practice, greatly increased the Doelgers' financial vulnerability.

116.    For years and beginning prior to becoming Mr. Doelger's investment adviser, JP Morgan encouraged Mr. Doelger to keep borrowing more money to fund additional investments, even as Mr. Doelger incurred substantial losses in some of these investments, including investments in MLPs.  JP Morgan emphasized the low interest rates and how Mr. Doelger could cover the interest on the loans through the income generated from his investments.

117.    Although the MLP Investments did not generate sufficient income to cover the interest payments on the Loans and fees and living expenses, JP Morgan continuously urged the Doelgers to keep high balances on the Loans and to borrow more money to fund additional investments.

118.    From 2015 through 2020, the Advisers acted recklessly by failing to present the Doelgers with diversified investments options and by misrepresenting the condition of the MLP Investments.

119.    Instead of cautioning the Doelgers against the risks associated with the MLP Investments, the Advisers consistently insisted that MLP Investments were "strong", "attractive" and "high quality" and convinced the Doelgers to keep their portfolio fully invested in the MLP Investments, even as they were declining substantially year after year.

120.    JP Morgan sent the Doelgers quarterly portfolio performance reports ("Portfolio Reports").  The Portfolio Reports often referred to commentary and analyses provided by Chickasaw.  Upon information and belief, JP Morgan prepared the Portfolio Reports jointly with Chickasaw and JP Morgan Securities.

121.    Each Portfolio Report provided that "[t]he portfolio is constructed with the goal of having less risk and higher expected return than the average MLP."

122.    Even when the MLP Investments were performing poorly, in every Portfolio Report, JP Morgan and Chickasaw touted "[t]he portfolio remains high quality due to its primarily fee-based cash flows, high levels of distribution coverage, and lower than average balance sheet leverage (on a weighted average basis)."

123.    The Advisers always gave a positive outlook on the MLP Investments, regardless of their performance.

124.    Between October 2015, when the Advisory Account was first opened, and December 31, 2015, the MLP Investments declined in value from $37 million to $30 million, a decline of $7 million or 19%.

125.    In the 2015 year-end Portfolio Report, the Advisers stated that the outlook for the MLP Investments was positive and that the market was significantly undervaluing the MLP Investments.  Specifically, the Advisers stated "[t]he holdings' current market prices represent a 46% weighted average discount to Chickasaw's calculations of intrinsic value."

126.    In 2016, the MLP Investments regained most of the losses from the fourth quarter of 2015, increasing in value from $30 million to $36 million.

127.    In the 2016 year-end Portfolio Report, the Advisers stated that the outlook for the MLP Investments was "strong".  Specifically, the Advisers stated that "[a]fter substantially answering several overriding questions throughout 2016, the outlook for Midstream energy companies is strong going in to 2017 due to several factors."  However, beginning in 2017, the MLP Investments declined drastically and never returned to their original value as of the date when the Advisory Account was first opened in October 2015.

128.     In 2017, the MLP Investments declined in value from $36 million to $30 million, a decline of $6 million or 17% from the previous year.  Yet, the Advisers encouraged the Doelgers to remain invested in MLPs.

129.     In August 2017, when the MLP Investments were a 3% decline away from a margin call, JP Morgan did not recommend that the Doelgers get out of the MLP Investments or present the Doelgers with diversification options, as JP Morgan was obligated to do.  Instead, JP Morgan recommended that the Doelgers transfer all the funds in their savings account, or $1.5 million, to a JP Morgan money market account (the "Money Market Account") so that the money could be used as additional collateral on the Loans.  The Doelgers followed JP Morgan's advice and authorized the transfer.

130.     In the 2017 year-end Portfolio Report, despite the substantial losses that year, the Advisers stated that the outlook for the MLP Investments was "strong".  Specifically, the Advisers stated "[d]espite recent performance both absolutely and relatively, MLPs offer an interesting opportunity for potentially strong total returns in 2018.  Valuations remain attractive…."

131.     In 2018, the MLP Investments continued to perform poorly, declining in value from $30 million to $22 million, a decline of $8 million or 27% from the previous year.  Yet, the Advisers encouraged the Doelgers to remain invested in MLPs.

132.     In October 2018, as the Doelgers' losses were mounting, Mr. Baker informed the Doelgers that JP Morgan was "comfortable keeping equity risk on for now, do think MLPs are still an attractive investment for the long-term."

133.     On multiple occasions in 2018, the loan to value ratios ("LTV") on the Loans increased due to declines in the MLP Investments.   In response, JP Morgan did not recommend that the Doelgers sell MLPs to pay off the Loans or present the Doelgers with diversification

options, as JP Morgan was obligated to do.  Instead, JP Morgan froze the Money Market Account for extended periods of time, even though the Doelgers used this account to cover living expenses. JP Morgan froze the Money Market Account to protect its own interests to the detriment of its clients.

134.    The Advisers' main recommendation as a "solution" to fend off potential margin calls or future freezes to the Money Market Account was for the Doelgers to borrow more money from JP Morgan through a $2 million home equity line of credit (the "HELOC") on their Boston home.

135.    In the 2018 year-end Portfolio Report, despite the substantial losses that year, the Advisers stated that the outlook for the MLP Investments was "solid".  Specifically, the Advisers stated "[t]he manager believes that business fundamentals remain solid with stable and growing cash flows, healthy balance sheets, visible growth opportunities, and low equity capital needs."

136.    In 2019, the MLP Investments continued to perform poorly.  By the end of 2019, the MLP Investments were worth $20 million and the balance on the Loans was $9.8 million.  In addition, the MLP Investments became extremely volatile, with significant daily swings in value and the Advisers were aware of the high likelihood of additional MLP market declines.

137.    The Advisers failed to inform the Doelgers of the risks created by the volatility of the MLP Investments and the warning signs of a market downturn and did not recommend that the Doelgers get out of the MLP Investments or present the Doelgers with diversification options, as they were obligated to do.  Instead, the Advisers encouraged the Doelgers to remain invested in MLPs.

138.    In the 2019 year-end Portfolio Report, the Advisers stated that the outlook for the MLP Investments was "solid".  Specifically, the Advisers stated "business fundamentals remain

solid with stable and growing cash flows, healthy balance sheets, and visible growth opportunities."

139.     The ongoing decline in the MLP Investments, the daily, wild fluctuations in value and the constant threat of an impending margin call caused Mrs. Doelger extreme stress.  JP Morgan was aware of the stress the MLP Investments were causing Mrs. Doelger.

140.     The Advisers failed to make a reasonable inquiry into Mrs. Doelger's investment objectives, including her comfort and tolerance for the MLP Investments. Therefore, the Advisers could not have reasonably believed that the investment advice they provided to Mrs. Doelger was in her best interest.

141.     By the end of February 2020, as the Coronavirus pandemic was setting in and the stock market was declining rapidly, the value of the MLP Investments had declined from $20 million to $16 million, a decline of $4 million or 25% in just a two-month period.  The balance on the Loans remained at $9.8 million.

142.     As she had done previously, in February 2020, Mrs. Doelger expressed her concerns to JP Morgan regarding the declining value of the MLP Investments and the potential for a margin call.  She asked Mr. Baker for advice on whether the Doelgers should sell their MLP Investments or take immediate steps to protect their assets.  On several occasions, Mr. Baker told Mrs. Doelger that it was the Advisers' recommendation that the Doelgers hold their positions.  The Doelgers followed JP Morgan's advice.

143.     During the first week of March 2020, the MLP Investments had declined from $16 million to $14.7 million, a decline of $1.3 million or 8% in one week.  Mrs. Doelger continued to seek Mr. Baker's advice on taking actions to protect the Doelgers's assets.  During a phone call on Friday, March 6, 2020, Mr. Baker again advised the Doelgers to hold their positions.

144. On Monday, March 9, 2020, the oil market was crashing and the MLP Investments were in free fall, declining by $3.6 million or 24% that day. As a result, Mr. Baker informed the Doelgers that there would be a margin call on Tuesday, March 10, 2020 and JP Morgan would force the Doelgers to sell $2.5 million worth of MLP Investments at a massive loss.

145. To avoid the margin call, Mr. Baker proposed the Doelgers consider taking "defensive action" by selling $7.1 million worth of MLP Investments on that very day (March 9, 2020). The Doelgers followed Mr. Baker's advice and approved the sales (the "March 9 Sales"). JP Morgan used the entire proceeds from the sale of the MLPs to pay down the balance on the Loans to $2.7 million. The value of the MLP Investments was now down to $4.1 million (the "Remaining Investments").

146. In recommending that the Doelgers sell $7.1 million worth of MLP Investments on March 9, 2020, only after the Doelgers had lost millions of dollars in 2020, in addition to the millions of dollars they had lost in previous years, JP Morgan was acting in its own interest. This was the only time JP Morgan advised the Doelgers to pay down such a large portion of the Loans. Given the market volatility, JP Morgan was concerned that had the Doelgers not sold a majority of their MLP Investments, then the value of the collateral would not be enough to cover the balance on the Loans. Had the Advisers been acting in the Doelgers' best interest, they would have advised the Doelgers years earlier to get out of the MLP Investments, pay off the Loans entirely, and would not have misrepresented return of principal as income.

147. By Friday March 13, 2020, the Remaining Investments had declined further from $4.1 million to $3.4 million. Notwithstanding the further decline, JP Morgan advised the Doelgers to hold the Remaining Investments and did not advise the Doelgers to pay down the remaining $2.7 million balance on the Loans. To persuade the Doelgers to maintain the status quo, Mr. Baker

informed them that "it would require a 43% drop in MLP values from yesterday's close to trigger a margin call" and falsely stated the MLP Investment should produce income of "$550k per year".

148.     After further substantial declines, on March 17, 2020, under immense stress, Mrs. Doelger told Mr. Baker to sell the Remaining Investments, then worth approximately $3.1 million. JP Morgan used $2.7 million from the proceeds of the sales (the "March 17 Sales") to pay off the remaining balance on the Loans, leaving the Doelgers with less than $400,000 from such proceeds.

149.     The securities that made up the Remaining Investments declined further on March 18, 2020.   Had the Doelgers followed JP Morgan's self-interested advice and not sold the Remaining Investments, they would have lost another $500,000 and there would have been another margin call.

**B.     JP Morgan Made Misrepresentations in Order to Keep the Doelgers Invested in MLPs**

150.     Despite substantial declines in the value of the MLP Investments, one of the ways the Advisers encouraged the Doelgers to stay invested in MLPs was by misleading them into believing the income from the investments remained stable and that they were earning significantly more income than they were actually earning.

151.     The Doelgers trusted the Advisers, and based on statements the Advisers made, believed that they were earning nearly $2 million in income annually.   JP Morgan's misrepresentations regarding the amount of income the Doelgers were earning had a direct and substantial impact on the Doelgers' investment decisions.

152.     In various emails and phone calls, the Advisers regularly and knowingly made inaccurate statements about supposed high "yields" and "income" from the MLP distributions.   A large portion of the distributions the Doelgers received were actually not "income," but rather, a return of the Doelgers' capital or principal investment.

153.    For example, on October 5, 2018, as the MLP Investments were declining, Mr. Baker sent the Doelgers a summary of "the current state of your balance sheet," in which he neglected to mention the $2 million in losses through the first three quarters of 2018.  Instead, in an attempt to encourage the Doelgers to remain invested in MLP Investments, Mr. Baker made several false and misleading statements promoting MLPs.  Mr. Baker emphasized how the current holdings were "$28,400,000 of MLPS (producing $1,988,615 per year income, a ~7% yield)."  Mr. Baker further stated that "[d]ividends have grown +5% over the last 12 months and +2.3% over the last quarter" and that "[c]urrent trading [is] at a Price/Cash Flow metric 27% below the historical average."

154.    On December 31, 2018, Mr. Baker sent the Doelgers a year end summary of the state of their portfolio.  Mr. Baker neglected to inform the Doelgers that the MLP Investments declined by $8 million in 2018, but instead emphasized that the Doelgers' current holdings were "$21,603,610.23 of MLPS (producing $1,857,895.61 per year in income, a ~8.5% yield)."

155.    JP Morgan's monthly statements for the Advisory Account also misrepresented the entire distributions as "income" and as "yield".

156.    JP Morgan's statements regarding income and dividends were false and were an attempt to prevent the Doelgers from getting out of the MLP Investments.  Only a fraction of the distributions the Doelgers received in 2018 was actual income, with the remainder of the distributions consisting mostly of a return of capital.  The distributions on the MLP Investments in 2018 may have been 7% or 8.5%, but the actual dividends or income was much less.

157.    The main reason the percentage of cash distributions relative to the MLP Investments increased was because the distributions generally remained constant, regardless of

fluctuations in value, based on the quantity of the holdings.  As the value of the assets declined, the percentage representing the generally constant distributions thereby increased.

158.    JP Morgan's attempt to spin the increased percentage as a positive factor was completely misleading and an act of bad faith intended to keep the Doelgers invested in MLPs so that the Advisers could continue to charge exorbitant fees and interest on the Loans.

159.    The Portfolio Reports also contained various misrepresentations.

160.    In the Portfolio Reports, the Advisers consistently misrepresented the percentage decline of the MLP Investments "since inception" or October 5, 2015.  For example, in the 2019 year-end Portfolio Report, the Advisers misrepresented the decline as "3.8%" when by that time the portfolio had actually declined by more than 50%.

161.    Each Portfolio Report touted the low risk, high expected return and "higher than average distribution growth rate, high levels of distribution coverage, and lower than average balance sheet leverage" of the MLP Investments.  However, the MLP Portfolio Strategy provided high risk, a consistently negative rate of return, and low distributions.  JP Morgan's statements regarding portfolio positioning and portfolio strategy were misrepresentations.

162.    On several occasions, JP Morgan misrepresented the Doelgers' financial circumstances.  For example, in the self-serving 2015 Hedge Letter, JP Morgan overstated the then value of the MLP Investments, substantially overstated Mr. Doelger's net worth and intentionally misstated Mr. Doelger's ability to make independent investment decisions in connection with the Advisers' own proprietary MLP investment strategy.

163.    JP Morgan also misstated the Doelgers' net worth, income and investment experience in various other documents, including without limitation, the Advisory Agreements, the account application and other documents related to the swap transactions.

C.    **The Advisers Breached Their Duties to the Doelgers and Acted in Bad Faith by Putting Their Own Interests Ahead of the Doelgers**

1.    **The Advisers Prioritized the Interest JP Morgan Was Earning on the Loans and the Advisory Fees They Were Charging**

164.    The Advisers failed to disclose to the Doelgers the material conflict of interest arising from JP Morgan's own pecuniary interest in the Loans and its duty to act in the best interests of the Doelgers.

165.    The Advisers failed to disclose to the Doelgers that having the Loans in place meant that the principal value of investments was higher and thereby the Advisers earned additional advisory fees.

166.    JP Morgan failed to render advice to the Doelgers that was disinterested.

167.    Mr. Doelger made monthly interest payments to JP Morgan, which were automatically directly debited out of one of his accounts with JP Morgan.

168.    Even at an average annual interest rate of less than 4%, the amount of interest on the Loans the Doelgers paid JP Morgan annually was exorbitant, often exceeding $400,000.  Over a period of more than 10 years, the Doelgers paid JP Morgan millions of dollars in interest on the Loans.

169.    The amount of advisory fees on the MLP Investments the Doelgers paid the Advisers annually was also substantial, often exceeding $250,000.  In addition, keeping the Loans in place directly led to double the amount of fees because the Loans enabled the Advisers to double the size of the assets under management.

170.    On an annual basis, after accounting for interest on the Loans and fees the Doelgers paid the Advisers, the Doelgers' net income or dividends from the MLP Investments was either a minimal gain or a net-loss.  Nonetheless, to induce Mr. Doelger to stay indebted to JP Morgan, JP

Morgan misrepresented the Doelgers' actual income on the MLP Investments by mischaracterizing what was actually a return of the Doelgers' capital or principal investment.

171.    For years, the loan balance increased or remained high while the value of the Doelgers' investments decreased.

172.    Rather than formulating a plan for the Doelgers to divest their MLP Investments and pay off the Loans, JP Morgan consistently encouraged them to keep the Loans in place and borrow more money so that JP Morgan could reap the benefit of even more interest, on top of the millions of dollars it had already collected.  JP Morgan did so even as the MLP Investments were declining in value and margin calls were imminent.

173.    According to JP Morgan, the maximum LTV ratio it allowed on the Loans ranged from approximately 50% to 60% of the MLP Investments, with JP Morgan adjusting the ratio upwards at certain points in time when the value of the MLP Investments declined.

174.    For example, on February 12, 2019, Mr. Baker informed the Doelgers that JP Morgan had made such an adjustment to the LTV rate, "[p]lease note that as we discussed last fall, we have a temporary exception through the end of March to increase the lending value on your MLP portfolio from 50% to 60% for the purpose of margin calls."

175.    To the extent JP Morgan advised the Doelgers to pay down the Loans, JP Morgan only advised the Doelgers to pay down the Loans in small amounts, mainly through taking out a HELOC from JP Morgan, but never advised the Doelgers to pay down the Loans substantially or to pay off the Loans completely.  JP Morgan's suggestions to pay down the Loans with more debt were self-interested and were made to ensure that the declining in value MLP Investments could still cover a potential margin call.

176.    In failing to advise the Doelgers to pay off the Loans substantially or completely, JP Morgan put its own interests ahead of the Doelgers.

177.    By recommending that the Doelgers borrow even more money from JP Morgan, at higher interest rates, to cushion against potential margin calls, JP Morgan was looking out for its own interest and not the interest of the Doelgers.

178.    At the end of 2018, when the MLP Investments declined substantially, and Mr. Doelger was close to a margin call, Mr. Baker advised the Doelgers to apply for a $2 million HELOC on their Boston home so that they could use the proceeds to pay down the balance on the Loans.  In late 2018, the balance on the Loans was approximately $14 million.

179.    On January 9, 2019, Mr. Baker reiterated that JP Morgan was "still recommending [the Doelgers] persue [sic] one of the home lending options and our recommendation is a HELOC on the Boston property."  Despite JP Morgan's insistence on borrowing more money, in early February 2019, the Doelgers decided to pay down the Loan balance by $1 million, using funds in their Money Market Account.

180.    On February 12, 2019, Mr. Baker continued to urge the Doelgers to apply for a HELOC on their Boston home advising the Doelgers to use, "a mortgage or HELOC to improve your collateral position prior to a future downturn in MLP prices."

181.    Mr. Baker stated that JP Morgan's "recommendation is to move forward with the mortgage as it lowers your annual interest expense, reduces your risk of margin call and frees up more cash for you to use for personal cash flow needs."

182.    Mr. Baker explicitly discouraged the Doelgers from getting out of debt, stating that "[c]urrently would require a ~19% decline in MLPs to result in a margin call (a level not seen on the index not seen since Q1 2009, although we got very close in December)."  He further stated

that if the Doelgers took out a $2 million mortgage and used the proceeds to pay down the balance on the Loans then "[w]ould require a ~32.5% decline in MLPs to result in a margin call (a level on the index not seen since Q1 2003)."

183.    In or around April 2019, instead of applying for a $2 million HELOC as JP Morgan had advised, Mrs. Doelger inquired with JP Morgan as to the implications on their income if the Doelgers were to sell up to $2 million worth of MLP Investments and use the proceeds to pay down the Loans.  In response, Mr. Baker informed Mrs. Doelger that doing so would reduce the Doelgers' net "annual dividends" after paying interest on the Loans (but not including fees) from $1.37 million to $1.3 million.  Mr. Baker's statement was false.  A large portion of what he characterized as a "dividend" was a return of capital and not income.

184.    Mr. Baker's misrepresentations notwithstanding, on or about May 7, 2019, the Doelgers decided to sell $2 million worth of MLP Investments and used all the proceeds to pay down the then principal balance on the Loans.  Subsequently, in the second half of 2019, the Doelgers paid down another $1 million on the principal balance of the Loans, reducing it to approximately $10 million.

185.    By the end of 2019, as the value of the MLPs declined further, rather than advising the Doelgers to diversify or pay off the Loans completely, JP Morgan once again recommended that the Doelgers take out a HELOC on their Boston home.

186.    Ultimately, the Doelgers followed JP Morgan's advice and applied for the HELOC and in an act of bad faith, JP Morgan denied the application because JP Morgan failed to process the application in a timely manner sufficient to meet a regulatory deadline.

187.    Chickasaw was aware of the Loans and how JP Morgan and it were benefiting from them at the expense of the Doelgers.

188.     Chickasaw failed to advise the Doelgers as to JP Morgan's conflict of interest and that the Loans were not in the Doelgers' interest.

189.     Chickasaw failed to disclose its own conflict of interest regarding the Loans. Chickasaw benefited directly from the Loans because having them in place meant that Chickasaw was managing more assets and thereby collecting more fees.

## 2. JP Morgan Directly Profited from Mr. Doelger's Losses in Swaps that JP Morgan Recommended

190.     JP Morgan pressured Mr. Doelger to invest in currency swaps whereby Mr. Doelger would supposedly benefit from lower interest rates in foreign currencies, but JP Morgan failed to disclose or explain to him the extent of the risk of loss on the swaps, which was limitless.

191.     JP Morgan did not inform Mr. Doelger that when the swaps terminated, if he was down, then he would have to make a direct payment to JP Morgan to cover the shortfall.

192.     Mr. Doelger did not have any familiarity or expertise in swap transactions and relied on JP Morgan's advice and guidance on them.  Relying on JP Morgan's advice, Mr. Doelger engaged in currency swap transactions involving the British Pound and the Euro.

193.     In or around November 2016, JP Morgan arranged for Mr. Doelger to speak with a JP Morgan adviser (the "Swap Adviser") whom it promoted as an expert on foreign currencies.

194.     JP Morgan advised Mr. Doelger to invest in a 14.8 million Dollars to Euros debt swap transaction (the "Euro Swap"), where he would swap the then debt on the Loans for the equivalent debt in Euros.  JP Morgan portrayed the transaction as attractive by promoting how Mr. Doelger's monthly interest carrying costs would decrease from $23,000 to €3,500.

195.     Following JP Morgan's advice, Mr. Doelger entered into the Euro Swap on or about January 23, 2017.  In a brazen breach of its fiduciary duties, JP Morgan acted both as a swap dealer and/or counterparty on the Euro Swap, meaning that JP Morgan stood to gain directly from the

Doelgers' losses.  JP Morgan failed to disclose to Mr. Doelger its conflict of interest in acting as the swap dealer and/or counterparty and Mr. Doelger's investment adviser.

196.    In 2017, the value of the Euro was increasing significantly against the Dollar, meaning Mr. Doelger's losses were mounting.  There was no limit to Mr. Doelger's potential losses.

197.    By July 2017, the Doelgers were concerned the losses would continue to increase and asked JP Morgan's advice on what actions to take.

198.    The Swap Adviser advised Mr. Doelger that she believed the Dollar would rebound in value against the Euro and that he should stay invested in the Euro Swap through the "terminations date", which was on January 18, 2018.

199.    Ultimately, on or about July 19, 2017, Mr. Doelger terminated the Euro Swap, which led to Mr. Doelger owing JP Morgan $1.18 million.

200.    To cover the balance due, JP Morgan unilaterally drew down on the line of credit for the Loans to pay itself without explaining to Mr. Doelger what it was doing or obtaining his permission.

201.    Had Mr. Doelger remained invested in the Euro Swap through maturity, as JP Morgan advised, he would have lost substantially more money.

202.    In or around March 2018, JP Morgan pressured Mr. Doelger to engage in an interest rate cap swap with JP Morgan (the "Rate Swap") as a hedge against the interest rates on the Loans going above 3%.  JP Morgan failed to disclose to Mr. Doelger its conflict of interest in acting as both the Rate Swap counterparty and Mr. Doelger's investment adviser.

203.     Relying on JP Morgan's advice, Mr. Doelger engaged in the Rate Swap and paid JP Morgan $114,000.  Shortly thereafter, interest rates began dropping substantially and remained low for years, leading to JP Morgan earning $114,000 at Mr. Doelger's expense.

204.     JP Morgan's actions in connection with the Euro Swap and the Rate Swap were a breach of its fiduciary duties and a violation of the Advisers Act.

**D.     The Advisers Selected an Unseasoned Adviser As the Doelgers' Primary Contact**

205.     On various documents, JP Morgan promoted Mr. Baker as an "investment specialist" and a "CFA", or a Chartered Financial Analyst.

206.     Mr. Baker graduated college in 2010 with a B.S. in Finance, Leadership and Management.  Following graduation, Mr. Baker joined JP Morgan as a Private Banking Analyst and in 2013, he transitioned to the role of an Investor Associate.  Upon information and belief, Mr. Baker had only two years of investment related experience at JP Morgan when he became the main adviser on the Doelgers' account.

207.     Mr. Baker held himself out to the Doelgers as an expert in MLP Investments and the Doelgers believed he was an expert.  The Doelgers also trusted that Mr. Baker was providing disinterested and sound advice.

208.     However, Mr. Baker's actions and his communications with the Doelgers demonstrated a lack of expertise relating to complex MLP Investments, including their tax consequences, and Mr. Baker often sought advice from Chickasaw.

209.     Mr. Baker's correspondence with the Doelgers was often misleading, convoluted and confusing.  In addition, Mr. Baker and other advisers from JP Morgan and Chickasaw knowingly made false statements regarding the quality of the MLP Investments and the income being generated therefrom.

210.     Given that the Doelgers did not fully understand the complexities of the MLP Investments, they relied on Mr. Baker's judgment and had no reason to believe he was providing advice that was flawed or putting the Advisers' interests over the Doelgers.

211.     Mr. Baker's supervisors were complicit in his recklessness in advising the Doelgers.  They failed to oversee Mr. Baker and ensure that he was giving sound and disinterested investment advice.

212.     JP Morgan incentivized Mr. Baker's failure to give the Doelgers' sound and interested investment advice.  Upon information and belief, Mr. Baker's compensation and/or advancement within the bank was directly impacted by the amount of money JP Morgan was making off the Doelgers.

213.     After becoming an adviser to the Doelgers, Mr. Baker received several promotions. In January 2016, Mr. Baker was promoted from Investor Associate to Vice President, Investment Specialist. In January 2019, Mr. Baker was promoted again to his current position as Executive Director, Investment Specialist.   Upon information and belief, Mr. Baker received these promotions in large part due to the money JP Morgan was earning at the expense of the Doelgers.

214.     The Advisers knew the limits of Mr. Baker's MLP related expertise, but recklessly selected him as the Doelgers' primary contact on the Advisory Account in breach of the Advisers' fiduciary duties to act in the best interests of the Doelgers.

### E.     The Office of the Comptroller and Currency Recently Fined JP Morgan for Engaging in the Same Misconduct at Issue Here

215.     In a consent order dated November 24, 2020 (the "Consent Order"), the Office of the Comptroller of Currency (the "OCC") determined that JP Morgan "engaged in unsafe or unsound practices that were part of a pattern of misconduct" in connection with its fiduciary activities.  Consent Order at 2.  As a result, the OCC fined JP Morgan $250 million.

216.    The OCC found that "[f]or several years, the Bank maintained a weak management and control framework for its fiduciary activities and had an insufficient audit program for, and inadequate internal controls over, those activities."  Consent Order at 2.

217.    The OCC Further noted that "[a]mong other things, the Bank had deficient risk management practices and an insufficient framework for avoiding conflicts of interest."  *Id.*

218.    JP Morgan's breaches of its fiduciary duties and its conflict of interest at issue in this action is part of the same misconduct at issue in the Consent Order.

## III.    THE ADVISERS VIOLATED THE ADVISERS ACT

### A.    Chickasaw's Multiple Violations of its Obligations Under the Advisers Act

219.    Chickasaw acted as an investment adviser to the Doelgers.

220.    As an RIA, Chickasaw was required to adhere to fiduciary standards and comply with federal regulations, which included disclosure obligations and an affirmative obligation to avoid misleading the Doelgers.

221.    Chickasaw was required to deliver to the Doelgers, in accordance with reporting requirements prescribed under Rule 204-3 of the rules promulgated by the SEC (the "Rules") pursuant to the Advisers Act, a Form ADV Part 2A ("Brochure") and Part 2B ("Brochure Supplement") describing its business practices, conflicts of interest and background and its advisory personnel.

222.    Chickasaw was required to deliver the brochure to the Doelgers by the time they entered into the Advisory Agreements.

223.    Chickasaw was also required to deliver updated versions of the Brochure with a summary of any material changes.

224.    However, Chickasaw never sent such disclosures to the Doelgers nor corresponded with, called, or emailed the Doelgers regarding them.

225.    Chickasaw rarely communicated with the Doelgers and merely attended a handful of meetings with JP Morgan and the Doelgers.

226.    In failing to comply with mandatory disclosure requirements under the Advisers Act and the Rules, Chickasaw breached its fiduciary duties to the Doelgers and acted in bad faith.

227.    JP Morgan, which selected Chickasaw as a "third-party investment advisor", had an obligation to ensure that Chickasaw complied with the Advisers Act and the Rules.  In failing to ensure Chickasaw's compliance, JP Morgan breached its fiduciary duties to the Doelgers and acted in bad faith.

### B.      JP Morgan Acted in Bad Faith by Involving Its Investment Advisory Affiliate and Failing To Ensure It Complied with SEC Regulations

228.    JP Morgan is exempt from registration as an investment adviser under the Investment Advisors Act given that it is a federally chartered bank.  Nonetheless, JP Morgan attempted to use its exempt status to shield itself and its affiliate, JP Morgan Securities, from mandatory disclosures designed to protect investors like the Doelgers.

229.    According to JP Morgan's 2014 privacy notice, "[t]he Private Bank includes those units of JPMorgan Chase Bank, N.A., J.P. Morgan Trust Company of Delaware and J.P. Morgan Securities LLC dedicated to the Private Bank, as well as alternative investment funds offered through the Private Bank."

230.    JP Morgan Securities played a role in managing the Doelgers' Advisory Account.

231.    On several occasions, including for the March 9 Sales and March 17 Sales, JP Morgan, without the Doelgers' permission or prior knowledge, transferred assets from the Advisory Account into the Separate Account, wherein JP Morgan Securities executed the trades.

232.     However, JP Morgan consistently informed the Doelgers that Chickasaw would be conducting trades in connection with the Advisory Account and never disclosed to the Doelgers that JP Morgan Securities would conduct any trades.

233.     JP Morgan failed to disclose the conflict of interest that arose from using JP Morgan Securities, an affiliate, to execute trades in connection with assets held in the Advisory Account.

234.     Upon information and belief, JP Morgan Securities had direct involvement in providing investment advice to the Doelgers in connection with the MLP Investments.

235.     Upon information and belief, some or all of the individual advisers affiliated with JP Morgan who provided advice to the Doelgers (the "JP Morgan Advisers") were employed by either JP Morgan, JP Morgan Securities and/or the parent of both entities, JPMorgan Chase & Co.

236.     The JP Morgan Advisers held themselves out as acting on behalf of both JP Morgan and JP Morgan Securities.  On the JP Morgan Advisers' email signature blocks, "JP Morgan Securities LLC" was prominently displayed, followed by "JPMorgan Chase Bank, N.A."  Upon information and belief, JP Morgan and JP Morgan Securities jointly drafted the Portfolio Reports. In the Portfolio Reports, "J.P. Morgan" is prominently displayed as the author and "J.P. Morgan" is defined to include "JPM, its subsidiaries and affiliates worldwide."

237.     JP Morgan Securities was a signatory to the 2015 Hedge Letter, which specifies, "[s]ecurities are offered through J.P. Morgan Securities LLC, a member of NYSE, FINRA and SIPC."  *See* Hedge Letter, Exhibit 4.

238.     The indemnification provision included in the 2015 Hedge Letter provides, "you agree to indemnify and hold harmless J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, and their affiliates…."  *Id.* at 2.

239.    Given that JP Morgan Securities was involved in providing investment advisory services to the Doelgers in connection with the Advisory Account, JP Morgan Securities, an RIA, was required to provide mandatory disclosures to the Doelgers under the Advisers Act and rules thereunder.

240.    As an RIA, JP Morgan Securities had fiduciary duties to the Doelgers.

241.    As a fiduciary, JP Morgan Securities was required to avoid conflicts of interest with the Doelgers, act in the Doelgers' best interests and provide disinterested advice to the Doelgers.

242.    JP Morgan Securities also had disclosure obligations, including an affirmative obligation to avoid misleading the Doelgers.

243.    Pursuant to Rule 204-2, JP Morgan Securities was required to deliver to the Doelgers a Brochure and Brochure Supplement describing the adviser's business practices, conflicts of interest and background of the investment adviser and its advisory personnel.

244.    JP Morgan Securities never provided the Doelgers with a Brochure or a Brochure Supplement and therefore violated the Advisers Act and the Rules.

245.    JP Morgan is responsible for its affiliate's violations and failure to comply with the Advisers Act and SEC regulations.

246.    JP Morgan's attempt to use its exempt status to shield itself and JP Morgan Securities from mandatory disclosures is a breach of its fiduciary duties to the Doelgers and an act of bad faith.

## COUNT I
### (Breach of Fiduciary Duty)

247.    The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

248.    As investment advisers, JP Morgan and Chickasaw had a special relationship of trust and confidence with the Doelgers.  The Advisers established this relationship of trust and confidence when they agreed to act as investment advisers on behalf of the Doelgers and accepted their obligations to invest the liquid assets in the Advisory Account for the Doelgers' benefit, in accordance with the Advisory Agreements and the standards set forth under the Advisers Act.

249.    As a result, the Advisers owed the Doelgers fiduciary duties, which included the duties of loyalty and care.

250.    The Advisers had an obligation to manage the Advisory Account in accordance with the Doelgers' investment objectives and to make diversified investments in order to preserve capital.

251.    The Advisers breached their fiduciary duties by failing to recommend and implement an investment strategy that took into account the Doelgers' needs, goals, age, risk tolerance and asset size.

252.    The Advisers breached their fiduciary duties by failing to diversify the Doelgers' investments and making various intentionally false and misleading statements regarding the MLP Investments, including in connection with their risk profile, profitability and performance.

253.    The Advisers breached their fiduciary duties by failing to perform routine portfolio reviews to determine whether their recommended investment strategy was in the best interest of the Doelgers.

254.    The Advisers breached their fiduciary duties by failing to disclose the substantial risk associated with the MLP Investments to the Doelgers.

255.    The Advisers breached their fiduciary duties by putting their own interests ahead of the Doelgers' interests.

256.    The Advisers breached their duty of loyalty by prioritizing their role as lender over their role as a fiduciary, a conflict of interest they never disclosed to the Doelgers.

257.    The Advisers breached their fiduciary duties by failing to ensure the Doelgers understood the advice they provided.

258.    The Advisers also breached their duty of loyalty by prioritizing their role as a counterparty to swap transactions over their role as fiduciaries, a conflict of interest they never disclosed to the Doelgers.

259.    JP Morgan breached their fiduciary duties by sending Mr. Doelger the 2015 Hedge Letter.

260.    By reason of the foregoing willful misconduct and breaches of fiduciary duty, the Doelgers have incurred damages in an amount to be determined at trial.

## COUNT II
### (Breach of Contract)

261.    The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

262.    The Advisory Agreements are valid and enforceable contracts that give rise to obligations on the part of JP Morgan and Chickasaw.

263.    By their willful misconduct alleged above, JP Morgan and Chickasaw have breached their contractual obligations under the Advisory Agreements.

264.     The Advisers breached the Advisory Agreements by failing to invest the Doelgers'

funds in accordance with the Doelgers' investment objectives.

265.     The Advisers breached the Advisory Agreements by failing to perform routine

portfolio reviews to determine whether their recommended investment strategy was in the best

interest of the Doelgers.

266.     JP Morgan's and Chickasaw's breaches are material.

267.     By reason of the foregoing breaches, the Doelgers have incurred damages in an

amount to be determined at trial.

## COUNT III
### (Negligence/ Gross Negligence)

268.     The Doelgers repeat and re-allege the allegations contained in the paragraphs above

as if stated fully herein.

269.     The Advisers owed the Doelgers a duty of care to exercise that degree of skill

normally expected of investment advisers performing advisory services of the nature provided

here.

270.     The Advisers recklessly failed to exercise a duty of care in violation of the Advisers

Act.

271.     The Advisers failed to make a reasonable inquiry into Mr. Doelger's investment

objectives and therefore did not reasonably believe that the investment advice they provided to

Mr. Doelger was in his best interest.

272.     The Advisers failed to make a reasonable inquiry into Mrs. Doelger's investment

objectives and therefore did not reasonably believe that the investment advice they provided to

Mrs. Doelger was in her best interest.

273.     The Advisers failed to perform routine portfolio reviews to determine whether their recommended investment strategy was in the best interest of the Doelgers.

274.     The Advisers recklessly and imprudently invested the Doelgers' liquid assets into undiversified and highly risky investments.

275.      The Advisers knew or should have known that the Doelgers would foreseeably suffer injury as a result of the Advisers' reckless advice that the Doelgers maintain their position in the MLP Investments, rather than to safeguard the value of the liquid assets through diversification or sale of such assets.

276.     The Advisers' negligence was the proximate cause of the Doelgers' harm and economic loss.

277.     By reason of the foregoing acts and omissions, the Doelgers have incurred damages in an amount to be determined at trial.

### COUNT IV
### (Negligent Misrepresentation)

278.     The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

279.     The Advisers owed the Doelgers a duty to exercise reasonable care, and comply with existing standards of care, in performing advisory services of the nature provided here.

280.     The Advisers failed to exercise reasonable care and comply with existing standards of care.

281.     The Advisers made various misrepresentations in connection with the MLP Investments.

282.     The Advisers misrepresented the income the MLP Investments were generating.

283.     The Advisers misrepresented the performance of the MLP Investments.

284.     The Advisers misrepresented and mischaracterized the risks associated with the MLP Investments.

285.     The Advisers misrepresented and mischaracterized the MLP Investments as providing inflation protection, predictable cash flow and attractive characteristics in both inflationary and deflationary environments.

286.     The Doelgers relied on the Advisers' misrepresentations in making investment decisions in connection with the MLP Investments.

287.     The Advisers' failure to exercise reasonable care and gross negligence in making the misrepresentations was the proximate cause of the Doelgers' harm and economic loss.

288.     By reason of the foregoing acts and omissions, the Doelgers have incurred damages in an amount to be determined at trial.

**COUNT V**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

289.     The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

290.     The covenant of good faith and fair dealing is implied in the Advisory Agreements. The covenant provides that neither party shall engage in any act which destroys or injures the right of the other party to receive the fruits of the contract.

291.     The Advisers' lack of good faith, alleged above, violated the Doelgers reasonable expectations and breached the covenant of good faith and fair dealing.

292.     The Advisers acted in bad faith by recklessly advising the Doelgers to remain invested in the MLP Investments.

293.     The Advisers acted in bad faith by making various misrepresentations regarding the MLP Investments.

294.     The Advisers acted in bad faith by putting their own interests ahead of the Doelgers' interests.

295.     Chickasaw acted in bad faith by failing to comply with mandatory disclosure requirements.

296.     JP Morgan acted in bad faith by attempting to use its exempt status to shield itself and JP Morgan Securities from mandatory regulatory disclosures.

297.     JP Morgan acted in bad faith by sending Mr. Doelger the 2015 Hedge Letter.

298.     The Advisers' bad faith undermined their ability to act in the best interests of the Doelgers.

299.     By reason of the foregoing breaches, the Doelgers have incurred damages in an amount to be determined at trial.

## COUNT VI
### (Declaratory Judgement that the 2015 Hedge Letter Is an Invalid Contract and/or Is Unenforceable)

300.     The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

301.     JP Morgan and JP Morgan Securities did not provide consideration in exchange for Mr. Doelgers' undertakings in the 2015 Hedge Letter.  JP Morgan executed the 2015 Advisory Agreement more than a month before sending the 2015 Hedge Letter and never informed Mr. Doelger that he would need to agree to any of the statements in the 2015 Hedge Letter in order to perform their obligations under the 2015 Advisory Agreement.  Accordingly, the 2015 Hedge Letter is not a validly formed contract.

302.     To the extent the 2015 Hedge Letter could be deemed a contract, it is unenforceable.

303.     JP Morgan and JP Morgan Securities fraudulently induced Mr. Doelger to sign the letter through their misrepresentations and therefore the 2015 Hedge Letter must be rescinded. JP

Morgan and JP Morgan Securities requested Mr. Doelger make certain acknowledgements that they knew were untrue and misled Mr. Doelger into believing that by signing the 2015 Hedge Letter, he waived non-waivable rights of actions against JP Morgan and JP Morgan Securities. Mr. Doelger justifiably relied on the misrepresentations made by JP Morgan and JP Morgan Securities as his fiduciaries.  JP Morgan and JP Morgan Securities made these misrepresentations with knowledge that they were false, given that they had ready access to the Doelgers' financial records.

304.     Further, the 2015 Hedge Letter contained exculpatory clauses.  These exculpatory provisions are unenforceable given that JP Morgan breached its fiduciary duties in bad faith and/or with reckless indifference to Mr. Doelger's interests and/or profited from Mr. Doelger's losses.

305.     JP Morgan has informed the Doelgers that it intends to use the 2015 Hedge Letter as a defense to this action. JP Morgan's defense lacks merit because the 2015 Hedge Letter is unenforceable.

306.     Pursuant to 28 U.S.C. § 2201, an actual controversy of sufficient immediacy exists between the parties as to whether the parties ever formed a purported indemnity agreement, the 2015 Hedge Letter.

307.     Should this Court find the parties formed an indemnity agreement, any waivers of liability contained in the purported indemnity agreement are unconscionable and the result of fraud.  Accordingly, the 2015 Hedge Letter is unenforceable and not binding on Mr. Doelger.

308.     By reason of the foregoing, Mr. Doelger is entitled to judgment declaring that the 2015 Hedge Letter is invalid, void and/or rescinded.

## COUNT VII
### (Rescission of the 2015 Hedge Letter Pursuant to 15 U.S.C. § 80b-15)

309.     The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

310.     To the extent the 2015 Hedge Letter could be deemed a contract, it is unenforceable under Section 215 of the Advisers Act.

311.     Contracts or provisions that violate the Anti- Fraud Provisions of the Advisers Act are void under Section 215.

312.     The 2015 Hedge Letter runs afoul of the Anti-Fraud Provisions for multiple reasons, including, without limitation, because JP Morgan and JP Morgan Securities (i) failed to provide Mr. Doelger with an explanation of the exculpatory clauses in the letter, (ii) failed to disclose or explain to Mr. Doelger the conflict of interest resulting from the use of such clauses and (iii) induced Mr. Doelger to sign the letter through their misrepresentations.

313.     By reason of the foregoing, Mr. Doelger is entitled to judgment declaring that the 2015 Hedge Letter is invalid, void and/or rescinded under Section 215(a) and (b) of the Advisers Act.

## COUNT VIII
### (Deceptive Trade Practices and Consumer Protection Act, M.G.L. c. 93A Violations)

314.     The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

315.     On February 18, 2021, pursuant to their obligation under G.L. c. 93A, § 3 and more than thirty (30) days prior to the commencement of this action, the Doelgers sent to the Advisers, by Fedex and email, a written demand for relief, identifying the claimants, and reasonably describing the unfair and deceptive acts or practices relied upon and injuries suffered therefrom (the "Demand Letter").   A copy of the Demand is attached hereto as Exhibit 5.

316.    On March 18, 2021 and March 19, 2021, JP Morgan and Chickasaw, respectively, responded to the Demand Letter with letters that did not include a settlement offer or any offer of redress for the Doelgers' injuries.  The Advisers' outright refusal of the Doelgers' demand for relief constitutes bad faith.

317.    The Advisers engaged in trade and commerce within the Commonwealth of Massachusetts.

318.    The Adviser' actions alleged herein, including its bad faith, various misrepresentations and self-interested advice and acts, and failure to comply with federal regulations, constitute violations of c. 93A.

319.    The Advisers willfully, wantonly, recklessly, and with gross negligence, engaged in the conduct described herein, which they knew was deceptive, in the course of retail business, trade and commerce, and had a deleterious impact on the public interest.

320.    By reason of the foregoing acts and omissions, the Doelgers have incurred damages and are entitled to treble damages, punitive damages and all reasonable attorneys' fees and other related costs, in an amount to be determined at trial.

## COUNT IX
### (Elder Financial Exploitation in Violation of Fla. Stat. §415)

321.    The Doelgers repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

322.    The Doelgers are qualifying elderly persons within the meaning of Fla. Stat. §415. Mr. Doelger is 84 and Mrs. Doelger is 74.

323.    Mr. Doelger was, at all times during his relationship with the Advisers, a "vulnerable adult", within the meaning of Fla. Stat. §415.  Mr. Doelger's ability to perform the

normal activities of daily living and to provide for his own care became increasingly impaired due to long-term mental illness, cognitive decline and the infirmities of aging.

324.    The Advisers violated the elder exploitation provisions of Fla. Stat. §415 by taking advantage of vulnerable elderly clients, one of whom suffers from mental illness.

325.    The Advisers abused, neglected and exploited the Doelgers by investing the Doelgers' assets in high-risk investments and misrepresenting the risk profile, profitability and performance of such investments.  By reason of the foregoing conduct, the Doelgers have incurred damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Yoon Doelger and Peter Doelger pray for judgment against Defendants JP Morgan and Chickasaw as follows:

(a)    Awarding damages in an amount to be determined at trial, including for all losses on the MLP Investments and other investments made at the direction of the Advisers, lost earnings and all interest and fees paid to the Advisers;

(b)    Rescinding, voiding and/or declaring the 2015 Hedge Letter invalid and unenforceable;

(c)    Awarding treble damages, consequential damages, punitive damages, in an amount to be determined at trial;

(d)    Awarding reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action, in an amount to be determined at trial;

(e)    Awarding pre-judgment and post-judgment interest; and

(f)    granting such other and further relief as the Court deems necessary and proper.

Dated:   June 23, 2021

Respectfully submitted,

YOON DOELGER and PETER DOELGER

By their attorneys,

 /s/ Josh Gardner

Joshua W. Gardner (BBO No. 657347)
GARDNER & ROSENBERG P.C.
One State Street, Fourth Floor
Boston, Massachusetts 02109
Tel. (617) 390-7570
josh@gardnerrosenberg.com


James R. Serritella (*pro hac vice*
forthcoming)
KIM & SERRITELLA LLP
3 Columbus Circle, 15th Floor
New York, NY 10019
Tel. (212) 960-8345
jserritella@kandslaw.com