**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| YOON DOELGER, and PETER DOELGER, <br><br> *Plaintiffs,* <br><br> vs. <br><br> JPMORGAN CHASE BANK, N.A., and CHICKASAW CAPITAL MANAGEMENT, LLC, <br><br> *Defendants.* | No. 1:21-cv-11042-AK <br><br> Leave To File Granted On September 7, 2023 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 4

I.  AFTER SELLING THE ENERGY CONSERVATION COMPANY THAT HE FOUNDED AND RAN
    FOR NEARLY TWO DECADES, MR. DOELGER WAS AN ACTIVE SENIOR FOCUSED ON
    MANAGING HIS COMPLEX INVESTMENT PORTFOLIO .................................................... 4

II. MR. DOELGER'S LONG HISTORY WITH MLP INVESTMENTS ..................................... 4

    A.  The Neuberger (2005-2012) And Atlantic Trust (2012-2015) Accounts ................... 5

    B.  The Brokerage Account ............................................................................................. 5

    C.  The Line of Credit .................................................................................................... 6

    D.  The Outperformance Years For Mr. Doelger's MLP Investments ............................ 6

III. IN 2015, MR. DOELGER HIRED DEFENDANTS TO REPLACE ATLANTIC TRUST AND
     REJECTED JPMC'S ADVICE TO "DIVERSIFY" AND "REDUCE" HIS MLP EXPOSURE ............... 7

    A.  In The Spring Of 2015, Mr. Doelger Raised The Topic Of Switching Managers ....... 7

    B.  In August 2015, Mr. Doelger Decided To Move Forward With Transferring His
        MLP Portfolio To JPMC And Chickasaw ................................................................ 7

    C.  Mr. Doelger Signed The Advisory Agreement On August 10, 2015 ......................... 7

    D.  Over The Next Two Months, JPMC Worked To Collect Information About Mr.
        Doelger's Investment Objectives And Financial Circumstances .............................. 10

    E.  To Accommodate Mr. Doelger's Desire To Continue His MLP-Focused Strategy
        Despite JPMC's Recommendation That He Diversify And Reduce MLP
        Exposure, JPMC Requested That Mr. Doelger Sign A Letter Acknowledging His
        Net Worth, His Financial Sophistication, JPMC's Views, And His Decision .......... 11

IV. BETWEEN 2015 AND 2019, MR. DOELGER REPEATEDLY REFUSED TO SELL HIS MLP
    INVESTMENTS OR TO REDUCE HIS DEBT ................................................................. 12

V.  IN JUNE 2019, WHEN MRS. DOELGER WISHED TO GUARANTEE A MORTGAGE LOAN FOR
    MR. SERRITELLA AND MS. KIM BUT LACKED SUFFICIENT INCOME IN HER NAME, THE
    DOELGERS ADDED MRS. DOELGER AS JOINT OWNER OF THE ADVISORY ACCOUNT ............ 13

VI. ALONG WITH THE BROADER STOCK MARKET, MLP VALUES DECLINED RAPIDLY IN THE
    WAKE OF THE COVID PANDEMIC ........................................................................... 14

LEGAL STANDARD ........................................................................................................ 14

i

**ARGUMENT** ................................................................................................................ **15**

I.   THE MLPEI LETTER CLAIMS FAIL AS A MATTER OF LAW (COUNTS VI-VII) ...................... 15

    A.   As An Initial Matter, Plaintiffs' Claims Against The MLPEI Letter Cannot Negate The Existence Of That Letter And Mr. Doelger's Representations ...........................15

    B.   Plaintiffs Cannot Rescind The Letter Under 15 U.S.C. § 80b-15 (Count VII) ..........15

        1.   15 U.S.C. § 80b-15 Does Not Apply To JPMC ...........................................15

        2.   The Statute of Limitations Bars Plaintiffs' Rescission Claim ..................16

        3.   The MLPEI Letter Is Not A Hedge Clause ................................................16

    C.   Plaintiffs Have No Legal Basis For Asserting That The MLPEI Letter Is An Invalid Or Unenforceable Contract (Count VI) ........................................................17

        1.   The MLPEI Letter Was Supported By Consideration—The Consideration Of Permitting Mr. Doelger To Proceed With The MLPEI Program ....................................................................................................17

        2.   The MLPEI Letter Is Not An Unenforceable Hedge Clause ....................18

        3.   The MLPEI Letter Is Not Unconscionable ...............................................18

        4.   The Complaint Fails To State A Claim Of Fraudulent Inducement, And There Is No Evidentiary Support For Any Such Claim ............................19

II.  DEFENDANTS DID NOT BREACH ANY CONTRACT-BASED OBLIGATIONS TO THE DOELGERS (COUNTS II, V) ................................................................................................................ 20

    A.   Plaintiffs' Contract-Based Claims Are Subject To New York Law ...........................20

    B.   Plaintiffs' Breach Of Contract Claim Fails As A Matter Of Law (Count II) ............20

        1.   Plaintiffs Fail To Identify Any Contractual Provisions That Defendants Breached ...................................................................................................20

        2.   Plaintiffs Have Neither Pled Nor Proven A Breach Of The Advisory Agreements ..............................................................................................21

        3.   Plaintiffs Lack Any Evidence Showing Any Purported Breach Caused Them Damages, As Plaintiffs Would Have Remained Invested In MLPs Regardless Of What Defendants Did ...............................................24

    C.   Plaintiffs' Good Faith And Fair Dealing Claim Also Fails (Count V) ......................25

1.  The Good Faith And Fair Dealing Claim Is Duplicative Of The Breach Of Contract Claim ...................................................................................25

2.  Plaintiffs' Good Faith And Fair Dealing Claim Must Be Connected To Plaintiffs' Contractual Benefits; It Cannot Create Contractual Rights That Do Not Otherwise Exist ....................................................................25

3.  No Evidence Supports Any Alleged Breach Of The Good Faith And Fair Dealing Covenant ...............................................................................27

4.  Plaintiffs' Good Faith And Fair Dealing Claim Fails For Lack Of Causation ....................................................................................................28

III.  PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM FAILS AS A MATTER OF LAW (COUNT I)...................................................................................................................................... 28

    A.  Plaintiffs' Breach Of Fiduciary Duty Claim Regarding The Advisory Account Fails As A Matter Of Law ...................................................................................28

        1.  Plaintiffs' Breach of Fiduciary Duty Claim As To The Advisory Account Is Duplicative Of Their Breach of Contract Claim And Must Be Dismissed ...............................................................................................28

        2.  Plaintiffs Do Not Allege, And There Is No Evidence Of, A Relationship Of Higher Trust Beyond That Set Forth In The Advisory Agreements ....29

        3.  Even If Defendants Had Owed A Separate Fiduciary Duty, There Is No Evidence Of Breach ...................................................................................32

        4.  There Is No Evidence Of Any Breach of Any Fiduciary Duties Owed By Chickasaw .........................................................................................33

        5.  Defendants' Actions Did Not Cause The Doelgers Any Injury, And Therefore Plaintiffs Cannot Establish The Causation Element Of Their Fiduciary Duty Claim ...........................................................................36

    B.  JPMC Did Not Owe A Fiduciary Duty To The Doelgers Concerning Their Loans 36

    C.  JPMC Did Not Owe A Fiduciary Duty Related To The Swap Transactions .............37

IV.  PLAINTIFFS' NEGLIGENCE/GROSS NEGLIGENCE AND NEGLIGENT MISREPRESENTATION CLAIMS FAIL AS A MATTER OF LAW (COUNTS III, IV) ......................................................... 37

    A.  The Negligence/Gross Negligence Claim Is Not Viable (Count III) ........................37

        1.  Multiple Threshold Issues Preclude Plaintiffs' Negligence/Gross Negligence Claim ..................................................................................37

2.      Any Remaining Negligence/Gross Negligence Claim Lacks Admissible Support ......................................................................... 39

3.      Plaintiffs Lack Evidence Of Causation For Their Negligence/Gross Negligence Claims ............................................................ 40

B.   The Negligent Misrepresentation Claim Also Fails (Count IV) ............................... 40

     1.      The Negligent Misrepresentation Claim Has The Same Flaws As The Negligence Claim ...................................................................... 41

     2.      The Claim Also Fails Because Plaintiffs Have Not Identified An Actual Misrepresentation ............................................................... 41

     3.      There Is No Evidence That Plaintiffs Relied On Any Purported Misrepresentation ............................................................................... 43

     4.      There Are No Allegations Of Fact Or Evidence Sufficient To Show Any Misrepresentations Caused The Doelgers Any Injury ................... 43

V.   DEFENDANTS DID NOT ENGAGE IN ANY UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF MASS. GEN. L. C. 93A § 2(A) (COUNT VIII) ................................................... 44

A.   Chapter 93A Does Not Apply ................................................................................. 44

B.   Plaintiffs Cannot Prove An Unfair Or Deceptive Act or Causation .......................... 45

     1.      Defendants Did Not Commit An Unfair Or Deceptive Act ...................... 45

     2.      Plaintiffs Have Failed To Establish Causation .......................................... 46

C.   Plaintiffs' 93A Claim Is Substantially Time-Barred ................................................. 46

VI.   PLAINTIFFS' ELDER ABUSE CLAIM IS BASELESS AND FAILS AS A MATTER OF LAW (COUNT IX) ................................................................................................................................ 47

A.   Plaintiffs Cannot Simultaneously Pursue Statutory Claims Under Massachusetts And Florida Law Based On The Same Nucleus Of Facts .......................................... 47

B.   There Are No Factual Allegations Or Evidence Sufficient To Satisfy The High Bar Set By The Elder Financial Exploitation Statute .................................................. 47

     1.      Mr. Doelger Was Not A "Vulnerable Adult" .......................................... 48

     2.      Mr. Doelger Was Not Abused Or Neglected By Defendants ................... 48

     3.      Mr. Doelger Was Not Exploited By Defendants ...................................... 49

**CONCLUSION** ...................................................................................................................... **50**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abercrombie v. Andrew Coll.*,
    438 F. Supp. 2d 243 (S.D.N.Y. 2006)..............................................................................30, 31

*Aisenberg v. Hallmark Mktg. Corp.*,
    337 F. Supp. 2d 257 (D. Mass. 2004) .....................................................................................20

*Alantra LLC v. Apex Indus. Techs. LLC*,
    636 F. Supp. 3d 223 (D. Mass. 2022) .....................................................................................28

*Am. Bankers Ass'n v. S.E.C.*,
    804 F.2d 739 (D.C. Cir. 1986)................................................................................................16

*Am. Food Sys. Inc. v. Fireman's Fund Ins. Co.*,
    530 F.Supp.3d 74 (D. Mass. 2021) .........................................................................................26

*Anand v. Wilson*,
    32 A.D.3d 808 (N.Y. 2d App. Div. 2006) ..............................................................................17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).........................................................................................................14, 15

*Anoush Cab, Inc. v. Uber Techs., Inc.*,
    8 F.4th 1 (1st Cir. 2021).........................................................................................................45

*Ansam Assoc., Inc. v. Cola Petroleum, Ltd.*,
    760 F.2d 442 (2d Cir. 1985)...................................................................................................40

*Arberman v. PNC Bank, Nat'l Ass'n*,
    2022 WL 18402402 (S.D. Fla. 2022) .....................................................................................50

*Arberman v. PNC Bank, Nat'l Ass'n*,
    2023 WL 3910573 (11th Cir. 2023) .......................................................................................49

*Babeu v. Apple, Inc.*,
    2022 WL 3586078 (D. Mass. 2022) .......................................................................................20

*Bachini v. Edwards*,
    2008 WL 2359727 (Mass. Super. 2008)................................................................................46

*Baker v. Goldman, Sachs & Co.*,
    771 F.3d 37 (1st Cir. 2014).....................................................................................................46

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
    969 F. Supp. 2d 339 (S.D.N.Y. 2013)......................................................................24

*In re Basic Food Grp., LLC*,
    2018 WL 5805943 (Bankr. S.D.N.Y. 2018) ...........................................................25

*Beaconsfield Townhouse Condo. Tr. v. Zussman*,
    49 Mass. App. Ct. 757 (Mass. App. Ct. 2000).......................................................41

*Behrman v. Allstate Ins. Co.*,
    388 F. Supp. 2d 1346 (S.D. Fla. 2005) ...................................................................41

*Behrman v. Allstate Life Ins. Co.*,
    178 F. App'x 862 (11th Cir. 2006) .........................................................................41

*Est. of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.*,
    2015 WL 5660945 (S.D.N.Y. 2015).......................................................................32

*Bich v. Bich*,
    2023 WL 2819453 (N.Y. Sup. Ct. 2023) .........................................................38, 41

*Black Radio Network, Inc. v. Nynex Corp.*,
    14 F. App'x 111 (2d Cir. 2001)..............................................................................38

*Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*,
    983 So. 2d 717 (Fla. Dist. Ct. App. 2008) .............................................................48

*Bradman v. Mental Health Network, Inc.*,
    2008 WL 5110525 (S.D. Fla. 2008) .......................................................................25

*Brandt v. Davis*,
    98 Mass. App. Ct. 734 (Mass. App. Ct. 2020).......................................................39

*Broder v. Cablevision Sys. Corp.*,
    418 F.3d 187 (2d Cir. 2005)....................................................................................26

*C-Mart Herald St., Inc. v. AmTrust Fin. Servs., Inc.*,
    2020 WL 375937 (D. Mass. 2020) .........................................................................47

*Canstar v. J.A. Jones Const. Co.*,
    212 A.D.2d 452 (N.Y. 1st App. Div. 1995)............................................................25

*Carmania Corp., N.V. v. Hambrecht Terrell Int'l*,
    705 F. Supp. 936 (S.D.N.Y. 1989).........................................................................38

*Castorino v. Citibank N.A.*,
    2008 WL 5114482 (S.D.N.Y. 2008)..................................................................20, 21

*CEA Bromfield LLC v. Maxi Drug, Inc.*,
  2010 WL 344096 (D. Mass. 2010) ..................................................................18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................14

*Centurian Air Cargo, Inc. v. United Parcel Serv. Co.*,
  420 F.3d 1146 (11th Cir. 2005) ......................................................................26

*Chang v. Citigroup Inc.*,
  2010 WL 520511 (N.D. Cal. Feb. 6, 2010) .....................................................16

*Church & Tower of Fla., Inc. v. Bellsouth Telecomm., Inc.*,
  936 So. 2d 40 (Fla. Dist. Ct. App. 2006) ........................................................17

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
  70 N.Y.2d 382 (N.Y. 1987) .............................................................................38

*Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers*, Release
  No. 5248, 2019 WL 3779889, at n.31 (June 5, 2019)......................................16

*Cordero v. Transamerica Annuity Serv. Corp.*,
  71 F.4th 843 (11th Cir. 2023) .........................................................................49

*CRA Int'l, Inc. v. Painter*,
  2017 WL 2292737 (Mass. Super. 2017)...........................................................19

*Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*,
  918 N.E.2d 36 (Mass. Super. 2009) ................................................................40

*Daniel v. Aizenberg*,
  2023 WL 2541888 (S.D.N.Y. 2023)................................................................29

*Davidowitz v. Patridge*,
  2010 WL 5186803 (S.D.N.Y. Dec. 7, 2010) ...................................................17

*Daynard v. MRRM, P.A.*,
  335 F. Supp. 2d 156 (D. Mass. 2004) .............................................................44

*Dep't of Revenue v. Gen. Motors LLC*,
  104 So. 3d 1191 (Fla. Dist. Ct. App. 2012) ....................................................26

*Deutsche Bank Sec., Inc. v. Rhodes*,
  578 F. Supp. 2d 652 (S.D.N.Y. 2008)..............................................................18

*Doe v. Seacamp Ass'n, Inc.*,
  276 F. Supp. 2d 222 (D. Mass. 2003) .............................................................28

*Doelger v. JPMorgan Chase Bank, N.A.*,
2022 WL 1805479 (D. Mass. 2022) ................................................................17, 18

*Druckers', Inc. v. Pioneer Elecs. (USA), Inc.*,
1993 WL 431162 (D.N.J. 1993) ....................................................................37

*EchoMail, Inc. v. Am. Express Co.*,
529 F. Supp. 2d 140 (D. Mass. 2007) .........................................................20

*Edelman Arts, Inc. v. Art Int'l (UK) Ltd.*,
841 F. Supp. 2d 810 (S.D.N.Y. 2012).........................................................18

*Edwards v. City of Bos.*,
65 N.E.3d 32 (Mass. App. Ct. 2016) ...........................................................25

*Elalouf v. Sch. Bd. of Broward Cnty.*,
311 So. 3d 863 (Fla. Dist. Ct. App. 2021) ..................................................39

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
837 F. Supp. 2d 162 (S.D.N.Y. 2011).........................................................30

*Evanston Ins. Co. v. Fireman's Fund Ins. Co.*,
2011 WL 4953023 (M.D. Fla. 2011) ...........................................................17

*Far E. Aluminium Works Co. v. Viracon, Inc.*,
27 F.4th 1361 (8th Cir. 2022) .....................................................................18

*Ferreira v. Sterling Jewelers, Inc.*,
130 F. Supp. 3d 471 (D. Mass. 2015) .........................................................46

*Ferro Corp. v. Solutia Inc.*,
588 F. Supp. 2d 1022 (E.D. Mo. 2008)........................................................21

*Ferro Fabricators v. 1807-1811 Park Ave. Development Corp.*,
127 A.D.2d. 479 (N.Y. 1st App. Div. 2015)................................................41

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
305 A.D.2d 268 (N.Y. 1st App. Div. 2003)................................................26

*Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*,
552 F. App'x. 13 (2d Cir. 2014) ............................................................29, 38

*Fragrance Express Dot Com, Inc. v. Standard & Poor's Corp.*,
314 F. Supp. 2d 189 (S.D.N.Y. 2003)........................................................40

*Franke v. State*,
188 So. 3d 886 (Fla. Dist. Ct. App. 2016) ..................................................49

*Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*,
 156 A.D.3d 464 (N.Y. 1st App. Div. 2017)...................................................................32

*Friedman v. N.Y. Life Ins. Co.*,
 985 So. 2d 56 (Fla. Dist. Ct. App. 2008) ......................................................................20

*Garcia v. Steele*,
 211 N.E.3d 602 (Mass. 2023) ........................................................................................17

*Geo. Knight & Co. v. Watson Wyatt & Co.*,
 170 F.3d 210 (1st Cir. 1999)...........................................................................................47

*Gordon v. Aizenberg*,
 2022 WL 4660499 (S.D.N.Y. 2022)...............................................................................29

*Gregor v. Rossi*,
 120 A.D.3d 447 (N.Y. 1st App. Div. 2014) ...................................................................19

*Grieco v. Daiho Sangyo, Inc.*,
 344 So. 3d 11 (Fla. Dist. Ct. App. 2022) .......................................................................39

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
 748 F.2d 729 (2d Cir. 1984)............................................................................................31

*Guerrand Hermes v. J.P. Morgan & Co. Inc.*,
 2 A.D.3d 235, 237 (N.Y. 1st App. Div. 2003)...............................................................33

*Habberstad v. Revere Sec. LLC*,
 183 A.D.3d 532 (N.Y. 1st App. Div. 2020) ...................................................................39

*Hahamovitch v. Delray Prop. Invs., Inc.*,
 165 So. 3d 676 (Fla. Dist. Ct. App. 2015) .....................................................................26

*Hanover Ins. Co. v. N. Bldg. Co.*,
 751 F.3d 788 (7th Cir. 2014) ..........................................................................................18

*Henneberry v. Sumitomo Corp. of Am.*,
 532 F. Supp. 2d 523 (S.D.N.Y. 2007)............................................................................30

*Hoffart v. Wiggins*,
 406 F. App'x 834 (5th Cir. 2010) ...................................................................................47

*Houri v. Boaziz*,
 196 So. 3d 383 (Fla. Dist. Ct. App. 2016) .....................................................................19

*Hydro Invs., Inc. v. Trafalgar Power Inc.*,
 227 F.3d 8 (2d Cir. 2000) .........................................................................................40, 43

*Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*,
   44 F.3d 40 (1st Cir. 1995) ............................................................................30, 31

*Infanti v. Scharpf*,
   570 F. App'x 85 (2d Cir. 2014) ...........................................................................36

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*,
   785 So. 2d 1232 (Fla. Dist. Ct. App. 2001) .......................................................26

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
   970 F.2d 1030 (2d Cir. 1992) ..............................................................................16

*Katz v. Belveron Real Est. Partners*,
   LLC, 28 F.4th 300 (1st Cir. 2022) .......................................................................19

*King v. Wells Fargo Bank, N.A.*,
   2019 WL 3717677 (D. Mass. 2019) .....................................................................46

*Koung v. Giordano*,
   346 So. 3d 108 (Fla. Dist. Ct. App. 2022) ..........................................................17

*Kozikowski v. Toll Bros.*,
   246 F. Supp. 2d 93 (D. Mass. 2003) ....................................................................47

*Kriegel v. Bank of Am., N.A.*,
   2010 WL 3169579 (D. Mass. 2010) .....................................................................28

*Krinsk v. SunTrust Banks, Inc.*,
   2010 WL 11475608 (M.D. Fla. 2010) ..................................................................48

*Krishnan v. Blueprint Healthcare LLC*,
   2021 WL 4255359 (D. Mass. Sept. 17, 2021) .....................................................44

*Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*,
   276 A.D.2d 673 (N.Y. 2d App. Div. 2000) ..........................................................26

*Lambert v. Kysar*,
   983 F.2d 1110 (1st Cir. 1993) ..............................................................................37

*Lee Dodge, Inc. v. Sovereign Bank, N.A.*,
   148 A.D.3d 1007 (N.Y. 2d App. Div. 2017) ........................................................26

*Lewis Tree Serv. Inc. v. Lucent Techs., Inc.*,
   2000 WL 1277303 (S.D.N.Y. 2000) .....................................................................21

*Lindo v. Sec'y, U.S. Dep't of Homeland Sec.*,
   766 F. App'x 897 (11th Cir. 2019) .......................................................................49

*Litton Indus. Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
  1989 WL 162315 (S.D.N.Y. 1989) .................................................................36

*Lustig v. Bear Stearns Residential Mortg. Corp.*,
  2010 WL 11519401 (S.D. Fla. 2010) .............................................................19

*M. DeMatteo Const. Co. v. A.C. Dellovade, Inc.*,
  652 N.E.2d 635 (Mass. App. Ct. 1995) .........................................................16

*M/A-COM Sec. Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990).........................................................................28

*Marantz Co. v. Clarendon Indus., Inc.*,
  670 F. Supp. 1068 (D. Mass. 1987) .............................................................39

*McAdams v. Mass. Mut. Life Ins. Co.*,
  2002 WL 1067449 (D. Mass. 2002), *aff'd*, 391 F.3d 287 (1st Cir. 2004) ..............28

*Morris v. Watsco, Inc.*,
  433 N.E.2d 886 (Mass. 1982) ......................................................................20

*Narvaez v. 4518 Assocs.*,
  250 A.D.2d 436 (N.Y. 1st App. Div. 1998).....................................................16

*Ne. Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*,
  986 F.2d 607 (1st Cir. 1993).........................................................................44

*NPS, LLC v. Ambac Assur. Corp.*,
  706 F. Supp. 2d 162 (D. Mass. 2010) ...........................................................44

*Off. Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  2002 WL 362794 (S.D.N.Y. 2002).................................................................41

*OrbusNeich Med. Co., Ltd. v. Bos. Sci. Corp.*,
  694 F. Supp. 2d 106 (D. Mass. 2010) ...........................................................20

*Ostreyko v. B. C. Morton Org., Inc.*,
  310 So. 2d 316 (Fla. Dist. Ct. App. 1975) .....................................................41

*Petitt v. Celebrity Cruises, Inc.*,
  153 F. Supp. 2d 240 (S.D.N.Y. 2001).............................................................24

*Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc.*,
  2009 WL 855648 (S.D.N.Y. 2009).................................................................30

*PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*,
  2003 WL 22118977 (S.D.N.Y. 2003).........................................................38, 41

*Procter & Gamble Co. v. Bankers Tr. Co.*,
    925 F. Supp. 1270 (S.D. Ohio 1996) ...................................................37

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ...................................................................44

*Rosenblatt v. Christie, Manson & Woods Ltd.*,
    2005 WL 2649027 (S.D.N.Y. 2005) ...................................................30

*Ross v. F.S.G. PrivatAir, Inc.*,
    2004 WL 1837366 (S.D.N.Y. 2004) ...................................................20

*Roswell Cap. Partners LLC v. Alternative Const. Techs.*,
    638 F. Supp. 2d 360 (S.D.N.Y. 2009) ................................................36

*Ryan v. IM Kapco, Inc.*,
    88 A.D.3d 682 (N.Y. 2d App. Div. 2011) ...........................................39

*S.S. v. Dep't of Child. & Fam. Servs.*,
    805 So. 2d 879 (Fla. Dist. Ct. App. 2001) .........................................48

*Santos v. U.S. Bank Nat. Ass'n*,
    54 N.E.3d 548 (Mass. App. Ct. 2016) .................................................39

*Sapir v. Dispatch Techs., Inc.*,
    2019 WL 7707794 (Mass. Super. 2019) .............................................41

*Schnitzer Steel Indus., Inc. v. Dingman*,
    2023 WL 246594 (D.R.I. 2023) ..........................................................19

*Shave v. Stanford Coins & Bullions, Inc.*,
    2009 WL 1748084 (S.D. Fla. 2009) ....................................................48

*Shri Gayatri, LLC v. Days Inns Worldwide, Inc.*,
    2018 WL 1542376 (D. Mass. 2018) ....................................................45

*Silver v. Countrywide Home Loans, Inc.*,
    760 F. Supp. 2d 1330 (S.D. Fla. 2011), *aff'd*, 483 F. App'x 568 (11th Cir.
    2012) .............................................................................28, 30, 36

*Solar Travel Corp. v. Nachtomi*,
    2001 WL 641151 (S.D.N.Y. 2001).......................................................44

*Sommer v. Fed. Signal Corp.*,
    593 N.E.2d 1365 (N.Y. 1992)..............................................................39

*Source Assocs., Inc. v. Valero Energy Corp.*,
    273 F. App'x 425 (6th Cir. 2008) .......................................................18

*Spenlinhauer v. Kane*,
    1998 Mass. App. Div. 155 (Mass. App. Ct. 1998) .................................................46

*Staffenberg v. Fairfield Pagma Assocs., L.P.*,
    95 A.D.3d 873 (N.Y. 2d App. Div. 2012) .................................................26

*Stat. Phone Philly v. NYNEX Corp.*,
    116 F. Supp. 2d 468 (S.D.N.Y. 2000) .................................................38

*Stratton Grp., Ltd. v. Sprayregen*,
    458 F. Supp. 1216 (S.D.N.Y. 1978) .................................................22

*Superior Glass Co. v. First Bristol Cnty. Nat. Bank*,
    380 Mass. 829 (Mass. 1980) .................................................30

*Swenson v. Yellow Transp., Inc.*,
    317 F. Supp. 2d 51 (D. Mass. 2004) .................................................45

*T.W. Nickerson, Inc. v. Fleet Nat. Bank*,
    924 N.E.2d 696 (Mass. 2010) .................................................26

*Tasco Const., Inc. v. Town of Winchendon*,
    1994 WL 879613 (Mass. Super. 1994) .................................................38

*Thomas v. Metro. Life Ins. Co.*,
    631 F.3d 1153 (10th Cir. 2011) .................................................16

*Tingley Sys., Inc. v. CSC Consulting, Inc.*,
    152 F. Supp. 2d 95 (D. Mass. 2001) .................................................47

*Toledo Fund, LLC v. HSBC Bank USA, Nat. Ass'n*,
    2012 WL 2850997 (S.D.N.Y. 2012) .................................................22

*Tomasella v. Nestle USA, Inc.*,
    962 F.3d 60 (1st Cir. 2020) .................................................45

*U.S. Bank Nat. Ass'n v. Ables & Hall Builders*,
    696 F. Supp. 2d 428 (S.D.N.Y. 2010) .................................................37

*U.S. Engine Prod., Inc. v. AGCS Marine Ins. Co.*,
    769 F. Supp. 2d 626 (S.D.N.Y. 2011) .................................................17

*Util. Servs. Contracting, Inc. v. Monroe Cnty. Water Auth.*,
    90 A.D.3d 1661 (N.Y. 4th App. Div. 2011) .................................................25

*Vacca v. Brigham & Women's Hosp., Inc.*,
    156 N.E.3d 800 (Mass. App. Ct. 2020) .................................................20

*Value Partners S.A. v. Bain & Co.*,
   245 F. Supp. 2d 269 (D. Mass. 2003) ...................................................44

*Vieira v. First Am. Title Ins. Co.*,
   668 F. Supp. 2d 282 (D. Mass. 2009) ...................................................45

*Waterscape Resort LLC v. McGovern*,
   107 A.D.3d 571 (N.Y. 1st App. Div. 2013) ...........................................30

*Weller v. Reitz*,
   419 So. 2d 739 (Fla. Dist. Ct. App. 1982) ............................................39

*Winter Panel Corp. v. Reichhold Chemicals, Inc.*,
   823 F. Supp. 963 (D. Mass. 1993) ........................................................18

*Woodson Elec. Sols., Inc. v. Port Royal Prop., LLC*,
   271 So. 3d 111 (Fla. Dist. Ct. App. 2019) ............................................40

*Wright v. Marjem Recovery, LLC*,
   2014 WL 4274528 (D. Mass. 2014) ......................................................19

*York v. Zurich Scudder Invs., Inc.*,
   849 N.E.2d 892 (Mass. App. Ct. 2006) .................................................26

*Zielinski v. Citizens Bank, N.A.*,
   552 F. Supp. 3d 60 (D. Mass. 2021) ......................................................45

*Zimmer Inc. v. Beamalloy Reconstructive Med. Prod., LLC*,
   2017 WL 3315135 (N.D. Ind. 2017) .....................................................29

*Zorbas v. U.S. Tr. Co.*,
   48 F. Supp. 3d 464 (E.D.N.Y. 2014) ............................................. *passim*

**Statutes**

12 C.F.R. § 1.1 ...........................................................................................16

15 U.S.C. § 80b ..........................................................................................15

28 U.S.C. § 2201 ........................................................................................17

Fed. R. Civ. P. 9(b) ....................................................................................27

Fed. R. Civ. P 56(a) ...................................................................................14

Fla. Stat. § 95 .............................................................................................38

Fla. Stat. § 415 .............................................................................47, 48, 49, 50

Mass. Gen. L. c. 260 § 2a ........................................................................................................38

N.Y. C.P.L.R § 5 .....................................................................................................................18

## PRELIMINARY STATEMENT

This is a case of investor's remorse.  Peter and Yoon Doelger (collectively "Plaintiffs" or the "Doelgers"), two ultra-high-net-worth individuals, amassed a substantial fortune from: (i) Mr. Doelger's 1995 sale of an energy company he founded in 1978, and (ii) investing a large proportion of their assets in the energy sector through Master Limited Partnerships ("MLPs").  (56.1 ¶ 3.[1]) From 2009 to 2014, the Doelgers' leveraged bet on MLPs outperformed the S&P 500 and yielded them tens of millions of dollars in profits.  (56.1 ¶¶ 65, 67.)  This wealth afforded them: (i) a multi-million-dollar Boston townhouse; (ii) a Palm Beach mansion ("Twin Banyans"); (iii) a Paris apartment; (iv) a family attorney and family accountant whom they regularly paid over $100,000 per year combined; and (v) memberships at four exclusive private clubs.  (56.1 ¶¶ 7, 20, 29.)  To fund this lavish lifestyle, the Doelgers relied on substantial cash distributions from their MLP investments, which regularly exceeded ███████ per year and were largely tax deferred.  (56.1 ¶ 64.)

The Doelgers happily kept the substantial profits they made from 2009 through 2014, but now they seek to shift their 2015-2020 losses to Defendants JPMorgan Chase Bank, N.A. ("JPMC") and Chickasaw Capital Management, LLC ("Chickasaw," and collectively, "Defendants").  Rather than complain about any particular alleged misdeed, the Doelgers take a "kitchen sink" approach, asserting a hodgepodge of nine claims based on purported conduct harking back to 2015, even though Plaintiffs never once complained about Defendants' work in the years before their lawsuit.  The record conclusively refutes Plaintiffs' allegations and reveals their claims for what they are: a post-hoc, "heads-I-win-tails-you-lose" theory of investing.  This is precisely the type of case that calls for summary disposition under Rule 56.

---

[1] Citations to "56.1 ¶ _" refer to Defendants' Statement of Material Facts Not in Dispute submitted concurrently with this memorandum.

First, Plaintiffs assert claims seeking to "rescind" or declare unenforceable a 2015 letter agreement entitled "Request to Invest in Chickasaw Capital Management LLC" (the "MLPEI Letter" or "Letter"), which Mr. Doelger signed after it was emailed to both him and his wife (Yoon Doelger), as well as to his family attorney (Paul Roberts).  (56.1 ¶ 114.)  The MLPEI Letter documents JPMC's understanding and Mr. Doelger's representations concerning his request to invest in JPMC's Master Limited Partnership Energy & Infrastructure ("MLPEI") portfolio, an MLP-only strategy managed by a subadvisor, Chickasaw.  Those facts and representations include the following:

> • JPMC told Mr. Doelger that "[t]he size of your proposed investment, relative to your overall net worth is not recommended and raises concerns which we wish to share with you…. Instead of your suggested approach, ***we would recommend that you diversify your portfolio*** with asset allocations commensurate with your investment objectives."

> • JPMC told Mr. Doelger that, "[a]s we have done so in the past, ***we urge you to reduce your overall exposure to the MLP structures***."

> • "Notwithstanding the foregoing, [JPMC] note[s] that you have represented to us that you (a) were a professional in the utility/energy industry, (b) are financially knowledgeable and sophisticated, and capable of making your own assessment of the investment risks associated with an investment in the MLPEI offering without relying on us, and (c) understand the unique liquidity profiles and risk considerations of the proposed MLPEI offering.  Furthermore, you have informed us that you are ***fully aware of the concentration risk created by your existing investment in MLPs and by your proposed investment in the MLPEI offering***."

(56.1 ¶¶ 118(a), 118(e), 120.[2])  Now that the "concentration risk" of their MLP strategy has materialized, the Doelgers cannot simply "rescind" their written representations any more than they can "rescind" other evidence that undermines their allegations.  As a matter of law, summary judgment should be granted on the claims attacking the MLPEI Letter (Counts VI and VII).

Second, Plaintiffs assert claims for breach of contract (Count II) and breach of the covenant

---

[2] Unless otherwise noted, in quoted material all emphasis is added and all quotation marks and citations are omitted.

of good faith and fair dealing ("GFFD") (Count V), claiming Defendants breached the advisory agreements governing the Doelger's MLP account (the "Advisory Agreements").  Summary judgment also should be granted on these claims: Chickasaw is not a party to these agreements, and Plaintiffs cannot even *identify* any contractual provisions that JPMC breached, much less marshal admissible evidence of any breach or any causal connection to their claimed damages.

Third, Plaintiffs assert various tort and statutory claims hoping to impose extra-contractual obligations on Defendants, including claims for breach of fiduciary duty, negligence, negligent misrepresentation, consumer protection under Massachusetts law, and "elder abuse" under Florida law (Counts I, III-IV, VIII-IX).  Defendants are entitled to summary judgment on these claims because, *inter alia*, (i) they are barred by the terms of the Advisory Agreements, (ii) they are premised on duties that do not exist, and (iii) Plaintiffs have no admissible evidence to support these claims.  Given the Doelgers' ultra-high-net worth and their legal representation (by their family attorney) throughout the entire relevant period, Plaintiffs' consumer protection and elder abuse claims border on frivolous.  Summary judgment is warranted on these claims.

Plaintiffs' attacks on Defendants are unfounded.  But their attack on James Baker, the dedicated JPMC banker assigned to their account at the end of 2015, is profoundly unfair.  Before February 2021, the Doelgers never once complained about Mr. Baker—instead, they repeatedly praised his hard work on their behalf.  (56.1 ¶¶ 192, 193.)  After the risks related to their chosen investment strategy materialized, however, the Doelgers not only sought to recant the explicit written representations in the MLPEI Letter, but also to throw Mr. Baker under the proverbial bus.

The Doelgers are legally and factually incapable of justifying their baseless allegations against Defendants.  Summary judgment should be granted on all of Plaintiffs' claims.

## FACTUAL BACKGROUND

I.   **AFTER SELLING THE ENERGY CONSERVATION COMPANY THAT HE FOUNDED AND RAN FOR NEARLY TWO DECADES, MR. DOELGER WAS AN ACTIVE SENIOR FOCUSED ON MANAGING HIS COMPLEX INVESTMENT PORTFOLIO**

The scion of a legendary brewing family, Mr. Doelger made a fortune in the energy sector through DMC Services, a company he founded in 1978 and ran until 1995, when he sold it to Honeywell for an eight-figure payout.[3]  (56.1 ¶¶ 3-5.)  After selling DMC Services, Mr. Doelger focused his energies on managing and investing his assets.  (56.1 ¶ 6.)  The portfolio he assembled over the next two decades included illiquid, pre-IPO shares in biotechnology companies, an MIT professor's high-frequency trading fund, municipal bonds, Korean real estate, and MLPs.  (56.1 ¶ 18.)

Mr. Doelger was social and active in the 2009-2020 period, splitting his (and Mrs. Doelger's) time between their homes in Boston, Palm Beach, and Paris.  (56.1 ¶ 7.[4])  His exercise regimen included swimming and a ███████████ for rowing.  (56.1 ¶ 9.)  Mr. Doelger also kept up to date with geo-politics and current events, such as Middle Eastern oil production and China's impact on the global economy.  (56.1 ¶ 14.)  He was also in frequent contact with those helping him with his investments.[5]

II.   **MR. DOELGER'S LONG HISTORY WITH MLP INVESTMENTS**

Mr. Doelger's relationship with the MLP asset class began long before he considered moving his MLP account to JPMC and Chickasaw in 2015.  At that point, he had been investing in MLPs continuously since the 1990s.  (56.1 ¶ 17.)

---

[3] *See* https://www.nytimes.com/1973/06/24/archives/peter-doelger-weds-miss-milbank.html.
[4] The Doelgers were also active in four private clubs: the Country Club, Sommerset, and St. Botolph in Massachusetts and the Palm Beach Bath and Tennis Club in Florida.  (56.1 ¶ 13.)  The Doelgers are both well educated: Mr. Doelger holds a bachelor's from Middlebury College and Mrs. Doelger has a master's from Boston University.  (56.1 ¶ 12; https://www.nytimes.com/1973/06/24/archives/peter-doelger-weds-miss-milbank.html.)
[5] (56.1 ¶¶ 45-46 (noting Mr. Doelger called Paul McPheeters, his investment manager at Atlantic Trust, approximately once per week, whereas Mr. McPheeters's other clients only called approximately once per quarter.).)

### A. The Neuberger (2005-2012) And Atlantic Trust (2012-2015) Accounts

In 2005, Mr. Doelger opened an MLP-focused account with Neuberger Berman, LLC ("Neuberger").[6] (56.1 ¶ 35.) In March 2012, Mr. Doelger transitioned his MLP assets to Atlantic Trust Private Wealth Management ("Atlantic Trust"). (56.1 ¶ 38.) At that time, the value of Mr. Doelger's MLP account was over ████████ (56.1 ¶ 40.)

To open his Atlantic Trust account, Mr. Doelger signed a Subscription Agreement in which he made representations about his investment knowledge and experience, understanding of the investment, and the overall suitability of the MLP-focused investment. (56.1 ¶ 39.) During the 2012-2015 period he maintained this account, Mr. Doelger often overruled Atlantic Trust's recommendations, including by insisting the account hold less cash and more MLP investments (and thus, more risk).[7] (56.1 ¶¶ 48-50.) At its peak in September 2014, the value of Mr. Doelgers' Atlantic Trust MLP account custodied at JPMC exceeded ████████ (56.1 ¶ 42.[8])

### B. The Brokerage Account

In April 2009, Mr. Doelger opened a self-directed brokerage account (ending in account number *1000, the "Brokerage Account") with J.P.Morgan Securities LLC ("JPMS"). (56.1 ¶ 30.) Mr. Doelger used the Brokerage Account (titled "Peter Doelger – MLP Earnings") to hold certain MLP positions outside of his managed portfolios with Neuberger and Atlantic Trust for, *inter alia*, tax reasons. (56.1 ¶ 32.) In his application for the account, Mr. Doelger represented that his annual income was $1,000,000, the source of his income was "Investments," and he had decades of

---

[6] In 2008, after the collapse of Neuberger's parent company, Lehman Brothers, Mr. Doelger began using JPMC as the custodian of his MLP assets managed by Neuberger. (56.1 ¶ 37.)

[7] Specifically, Mr. Doelger wanted to keep a lower cash balance (*i.e.*, more risk) in the account than Atlantic Trust recommended, went against Atlantic Trust's advice not to add an additional $ million "to the [MLP] sector" in January 2013, and ordered Mr. McPheeters to sell MLPs on December 14, 2014, before ordering him to buy them back on December 17, 2014. (56.1 ¶¶ 49-50.)

[8] At the same time, Mr. Doelger's self-directed brokerage account had an account value of over ████████ (56.1 ¶ 43.)

investment experience.  (56.1 ¶ 16.[9])  In 2010, Mr. Doelger changed the account objective from ███████████████████████████ with speculation allowed, *i.e.*, the highest risk objective option for the account.  (56.1 ¶ 33.)  Mr. Doelger maintained that investment objective through March 2020.  (56.1 ¶ 34.)

### C.  The Line of Credit

Beginning in October 2009, Mr. Doelger took out a line of credit (the "LOC") with JPMC, secured by Mr. Doelger's MLPs.  (56.1 ¶ 56.)  Mr. Doelger first borrowed ██████ under the LOC in October 2009.  (56.1 ¶ 57.)  Over time, Mr. Doelger continued drawing on the LOC to fund more MLP purchases and to cover his lifestyle expenses, with his LOC balance reaching a peak of nearly ████████ in the fall of 2014.  (56.1 ¶¶ 58-59.[10])  When opening and renewing the LOC over time, Mr. Doelger signed a series of loan documents that disclosed, *inter alia*, the potential conflict of interest that may arise from JPMC acting as lender and holding collateral that consists of assets in an account managed by JPMC or an affiliate.[11]

### D.  The Outperformance Years For Mr. Doelger's MLP Investments

Mr. Doelger's MLP-focused and leveraged investment strategy proved wildly successful from 2009 to 2014: his MLP investments increased by over ████████ and annually generated an average of nearly ████████ in tax-deferred income.  (56.1 ¶¶ 63-64.)  From October 2009 to October 2014, Mr. Doelger's strategy generated a total gain (*i.e.*, gain in investment value, plus distributions and less debt) to Mr. Doelger of about ████████  (56.1 ¶ 65.)

---

[9] Specifically, Mr. Doelger attested that he had: "20+" years of experience in stocks and bonds; "15+" in options; and "10+" in structured products, emerging markets, and hedge funds / private placements.  (56.1 ¶ 16.)

[10] The largest jump in the amount drawn on the LOC—from about ████████ to about ████████—coincided with the Doelgers' purchase of Twin Banyans in May 2012.  (56.1 ¶ 60).

[11] *See, e.g.*, (56.1 ¶ 62 (providing that JPMC ████████████████ that JPMC's rights as a secured party may conflict with any investment manager duties, ████████ ██████████████ and that in the event of a Collateral liquidation or similar transaction, ████████ ██████████████).

### III.   IN 2015, MR. DOELGER HIRED DEFENDANTS TO REPLACE ATLANTIC TRUST AND REJECTED JPMC'S ADVICE TO "DIVERSIFY" AND "REDUCE" HIS MLP EXPOSURE

#### A.   In The Spring Of 2015, Mr. Doelger Raised The Topic Of Switching Managers

In late 2014 through 2015, MLP prices began to decline after a long run outperforming the stock market.  (56.1 ¶ 68.)  Mr. Doelger began discussions with JPMC about potentially switching MLP managers again, this time to JPMC's MLPEI portfolio strategy managed by Chickasaw. (56.1 ¶ 69.)

#### B.   In August 2015, Mr. Doelger Decided To Move Forward With Transferring His MLP Portfolio To JPMC And Chickasaw

On July 31, 2015, Mr. Doelger discussed his MLP portfolio with Mr. Baker during an in-person meeting where Mr. Doelger asked Mr. Baker to set up a follow-up meeting with Chickasaw. (56.1 ¶ 71.)  Mr. Baker did so, for August 10, 2015, in JPMC's New York City offices.  (56.1 ¶ 72.)  The two-hour meeting included Mr. and Mrs. Doelger, Mr. Baker, and (for a portion) Chickasaw representatives Ed Kelly and Geoffrey Mavar.  (56.1 ¶ 73.)  At the end of the meeting, Mr. Doelger gave JPMC the green light to begin the MLP account transition process.  (56.1 ¶ 77.)

#### C.   Mr. Doelger Signed The Advisory Agreement On August 10, 2015

During the August 10, 2015 meeting, Mr. Doelger signed the Advisory Agreement shown at pages 2 of 20 through 18 of 20 of Exhibit 2 to the Complaint (the "2015 Advisory Agreement" or "Advisory Agreement").  (56.1 ¶ 79.[12])  This agreement sets forth the terms that would govern

---

[12] Almost two years after commencing their action, Plaintiffs' counsel James Serritella contradicted the Complaint's own allegations and asserted instead that the Advisory Agreement attached to the Complaint was not what Mr. Doelger signed, and instead he signed an identical document that had different values listed for net worth ($50 million) and investment amount ($1 million) in Portfolio Schedule portion of the agreement.  (56.1 ¶ 88.)  Plaintiffs rely on a pre-filled, auto generated draft of the application that was provided to the investment team to update for the client's use. (56.1 ¶ 89.)  But this draft was unsigned; there is no signed copy of the agreement referencing the $50 million net worth amount.  (56.1 ¶¶ 89-90.)  Moreover, every JPMC witness who has been asked about the 2015 Advisory Agreement signing at deposition has testified that they have no knowledge of the agreement being changed after Mr. Doelger signed it.  (56.1 ¶ 92.)  Indeed, every signed copy of the 2015 Advisory Agreement is identical to the version Plaintiffs attached to their Complaint.  (56.1 ¶ 91.)  Thus, there is no evidence supporting Plaintiffs' theory of a second Advisory Agreement.  In any event, (i) this baseless theory is not reflected in the operative Complaint; and (ii) for purposes of this motion, the Complaint does not suggest the Advisory Agreement is unenforceable.

the MLP account (with a number ending in *3005) (the "Advisory Account") and the obligations

of JPMC and Mr. Doelger.

Under the 2015 Advisory Agreement, JPMC agreed to "collect information about [Mr.

Doelger's] financial circumstances, investment objectives, risk tolerance, and requirements for the

Account," but Mr. Doelger had to provide complete, correct, and up-to-date information:

> Client shall notify the Bank promptly, in writing, of any changes to the information
> provided to the Bank.  Client will provide the Bank with additional information as
> the Bank may request from time to time to assist in providing services under this
> Agreement.  *The Bank has relied, and will continue to rely, on the information
> provided by Client.  The Bank will have no liability for Client's failure to provide
> the Bank with accurate or complete information or to inform the Bank promptly of
> any change in the information previously provided.*

(56.1 ¶ 81(a).)   Next, JPMC agreed to assist Mr. Doelger in formulating his investment

objectives—but again, the duty to determine the investment objectives lay with him:

> The Bank will assist Client in the review, evaluation and/or formulation of Client's
> investment objective for the Account based on the information that Client has
> provided to the Bank.  *Client is solely responsible for making all decisions
> regarding the adoption and implementation of all investment objectives.  Client
> further acknowledges that a change in the information provided by Client or other
> circumstances may warrant a change to Client's investment objectives.  Client is
> solely responsible for monitoring its investment objectives.*

(56.1 ¶ 81(b).)  Finally, JPMC agreed to present Mr. Doelger with possible opportunistic portfolio

strategies, but it was Mr. Doelger's decision whether and how much to invest:

> Based upon the information provided by Client and Client's investment objectives
> with respect to the Assets, the Bank will identify and present to Client one or more
> possible opportunistic portfolio strategies (each, a "Portfolio") available through
> the Program for investment of the Assets.  Client understands that the Bank will
> only identify and present Portfolios that the Bank has developed for the Program.
> *Client shall select Portfolios and determine the dollar value of Assets to be invested
> in each Portfolio as set forth on the annexed Portfolio Schedule.  Client
> acknowledges that Client is solely responsible for selecting Portfolios and
> determining the amount to be invested in each Portfolio, and Client retains final
> decision-making authority and responsibility with respect thereto.*

(56.1 ¶ 81(c).)   Once Mr. Doelger selected a strategy, JPMC's discretionary investment

management power was limited to the assets Mr. Doelger decided to allocate to the strategy, and

was further limited by the parameters of the Portfolio Schedule:

> Client appoints the Bank as investment manager for the Assets and for each
> Portfolio with full discretion to make purchases, sales, exchanges or investments,
> or to take any other action that it deems necessary or desirable as to each Portfolio
> and the Assets invested in any Portfolio.  The Bank will manage each Portfolio
> following its own judgment and discretion, *subject to the annexed Portfolio*
> *Schedule* but without other instructions from Client.  Portfolio investments will be
> as determined by the Bank with considerations of availability and applicable
> fiduciary standards.

(56.1 ¶ 81(d).)  Mr. Doelger selected the MLPEI strategy, which the Portfolio Schedule specified

was "to invest in publicly traded partnerships, limited liability companies and corporations [*i.e.*,

MLPs], predominantly in the energy sector."  (56.1 ¶ 82.)

> The Advisory Agreement also expressly informed Mr. Doelger that:

> any advice the Bank gives pursuant to this Agreement *is limited to the Assets* and
> does not take into consideration any other assets owned by Client, including assets
> held or managed by the Bank or its affiliates in accounts outside the Program, or
> any information not provided to the Bank in connection with the Client's
> investment in a Portfolio.

(56.1 ¶ 81(f).)  The Advisory Agreement further disclosed that JMPC "do[es] not provide tax

advice and the Client should consult his or her own tax advisor" as to such issues, and that "Clients

are advised to consult with their own legal, tax, financial and accounting advisers to the extent

deemed necessary and are expected to rely upon their own evaluation of information they receive

when making investments decisions."  (56.1 ¶ 81(g).[13]

> Regarding ongoing services, the Advisory Agreement provided:

---

[13] The Advisory Agreement contained various disclosures about investment risk.  "Portfolio investments are subject
to the risks associated with investments in Securities, and will not necessarily be profitable…. The Bank does not
guarantee the future performance of any Portfolio, guarantee any specific level of performance or guarantee that the
Bank's investment decisions, strategies or overall management will be successful or that the Client's investment
objectives will be met.  The investment decisions the Bank will make with respect to Portfolios and for Client are
subject to various market, currency, economic, political and business risks, and will not necessarily be profitable."
(56.1 ¶ 81.h.; *see also* ¶ 81.i. ("Portfolios may be implemented with types of investments that involve risks that should
be evaluated carefully before a decision is made to invest in a particular Portfolio.").)

> On an ongoing basis, the Bank will respond to Client inquiries, periodically consult with Client to update Client's financial information and investment objectives, periodically review the activity in and investment results of each Portfolio with Client, and assist Client in determining whether to make any changes to Client's selection of Portfolios. *Client may modify the selection of Portfolios at any time.*

(56.1 ¶ 84.)  Finally, the Advisory Agreement incorporated JPMC's General Terms for Accounts and Services (the "General Terms"), which, *inter alia*, stipulated that the Advisory Agreement is governed by New York law and that JPMC's legal liability shall be limited to acts of "gross negligence or willful misconduct."  (56.1 ¶ 86.)

### D.  Over The Next Two Months, JPMC Worked To Collect Information About Mr. Doelger's Investment Objectives And Financial Circumstances

After Mr. Doelger signed the Advisory Agreement, JPMC took steps to collect information about him.  This process included speaking to Mr. Doelger about topics such as his financial information and investment objectives.  (56.1 ¶ 99.)  Through these conversations, Mr. Doelger represented to JPMC that his net worth was about $100,000,000.  (56.1 ¶ 99.)  This net worth amount was consistent with what JPMC knew about assets held at JPMC, though JPMC understood that Mr. Doelger also had assets held elsewhere.[14]  (56.1 ¶¶ 104-105.)  Notably, JPMC gathered financial information about both the Doelgers, not just Mr. Doelger.  (56.1 ¶ 101.)  JPMC policy states that spouses should be considered when opening a new account.  (56.1 ¶ 102.)

JPMC also collected information about Mr. Doelger's investment objectives.  During this process, Mr. Doelger made clear that maintaining his MLP-focused strategy was the central aim for the portfolio.  (56.1 ¶ 107.)  He told JPMC that if JPMC did not approve the transfer, he would keep his MLP investment strategy with Atlantic Trust.  (56.1 ¶ 109.)

---

[14] The information was also consistent with an account application Mr. Doelger had completed over a year previous. (56.1 ¶ 105.)

**E. To Accommodate Mr. Doelger's Desire To Continue His MLP-Focused Strategy Despite JPMC's Recommendation That He Diversify And Reduce MLP Exposure, JPMC Requested That Mr. Doelger Sign A Letter Acknowledging His Net Worth, His Financial Sophistication, JPMC's Views, And His Decision**

Before accepting the transfer of his MLP account from Atlantic Trust, JPMC requested that Mr. Doelger sign the MLPEI Letter. (56.1 ¶ 110.) JPMC discussed the need for a letter with Mr. Doelger on several occasions, and Mr. Doelger asked JPMC to fax the letter to his attorney, Paul Roberts, on September 24, 2015. (56.1 ¶¶ 111-113.) JPMC sent a second copy of the letter to the Doelgers and Mr. Roberts by email on September 30, 2015. (56.1 ¶ 114.) Mr. Doelger signed the 3-page letter the next day at an in-person meeting with Mr. Baker at JPMC's Boston office. (56.1 ¶ 117.)

In signing the letter, Mr. Doelger confirmed the following:

- his experience in "the utility/energy industry";
- he was "financially knowledgeable and sophisticated, and capable of making your own assessment of the investment risks";
- he understood "the unique liquidity profiles and risk considerations of the proposed MLPEI offering";
- he was "fully aware of the concentration risk created by [his] existing investment in MLPs and by [his] proposed investment in the MLPEI offering";
- he was "an 'institutional account' as defined by FINRA Rule 4512(c) in that [he had] total assets of at least $50 million"; and
- his "liquid net worth [was] approximately $100,000,000."

(56.1 ¶ 118(a), (c), (d), (g).)

The MLPEI Letter also required Mr. Doelger to acknowledge that JPMC "cannot recommend" Mr. Doelger's chosen investment size of $33,000,000, and instead "recommend[ed] that [he] diversify [his] portfolio." (56.1 ¶ 119.) The Letter went on:

As we have done so in the past, we urge you to reduce your overall exposure to the MLP structures, and remind you that while we do not expect material liquidity issues to arise with the proposed investment, you may have little to no ability to sell or transfer these assets to limit losses in a severe correction, as has occurred with

this sector in the past.

(56.1 ¶ 120.)  Finally, the MLPEI Letter required Mr. Doelger to indemnify JPMC from liabilities arising out of "any of the confirmations, statements or agreements made by [Mr. Doelger] as reflected in this letter [being] incomplete or incorrect in any respect."  (56.1 ¶ 121.[15])

## IV.  BETWEEN 2015 AND 2019, MR. DOELGER REPEATEDLY REFUSED TO SELL HIS MLP INVESTMENTS OR TO REDUCE HIS DEBT

Each year after 2015, JPMC performed annual account reviews on the Advisory Account. (56.1 ¶ 125.)  JPMC also made performance information regarding the account available to the Doelgers through various means: (i) JPMC's online portal (which Mrs. Doelger testified to checking daily); (ii) monthly statements and quarterly reviews mailed to the Doelgers' home; (iii) in-person, phone, and email conversations between JPMC and the Doelgers; and (iv) quarterly performance reports mailed to the Doelgers.  (56.1 ¶ 126(a)-(d).)  Further, between October 2015 and March 2020, JPMC had various discussions with Mr. Doelger in which they discussed investment objectives, reviewed the activity in the Advisory Account, responded to Mr. Doelger's questions, and updated the Doelgers' financial information.  (56.1 ¶ 127.)

From October 2014 to 2019, MLPs generally declined in value and underperformed the stock market.  (56.1 ¶ 120.)  At various points during phone conversations, emails, and in-person meetings with Mr. Doelger or both Doelgers, JPMC suggested the Doelgers consider reducing their exposure to MLPs and paying down their LOC.[16]

Due to the decline in the MLP sector, at various times between 2015 and 2019 the Doelgers

---

[15] The MLPEI Letter explicitly stated that the consideration provided by JPMC for the obligations therein was JPMC "making the MLPEI offering available to [Mr. Doelger]."  (56.1 ¶ 118(h).)

[16] *See, e.g.*, (56.1 ¶ 129 (email summarizing February 2016 meeting with Mr. Baker and the Doelgers in which they discussed selling MLPs and paying down the LOC); ¶ 131(b) (August 2017 email from Mr. Baker to the Doelgers encouraging them to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); ¶ 131(c) (October 2018 email from Mr. Baker to the Doelgers acknowledging the Doelgers' plan to sell the Palm Beach home and use proceeds to pay down the LOC and urging them to consider selling MLPs if the house is not sold); ¶ 131(d) (April 2019 email from Mr. Baker to the Doelgers discussing selling MLPs).)

nearly faced a margin call on their LOC secured by the assets in the Advisory Account.  (56.1 ¶ 132.)  Despite JPMC making the Doelgers aware of the margin call risk, the Doelgers still declined to sell MLPs and reduce debt.  (56.1 ¶ 133.[17])

**V.     IN JUNE 2019, WHEN MRS. DOELGER WISHED TO GUARANTEE A MORTGAGE LOAN FOR MR. SERRITELLA AND MS. KIM BUT LACKED SUFFICIENT INCOME IN HER NAME, THE DOELGERS ADDED MRS. DOELGER AS JOINT OWNER OF THE ADVISORY ACCOUNT**

In June 2019, Mr. Doelger's step-daughter, Hee-Jean Kim, emailed JPMC to see if she, her husband James Serritella, and/or Mrs. Doelger could secure mortgage financing for a potential home purchase.  (56.1 ¶ 135.)  JPMC determined that ████████████████████████████ ████████████████████████████████████, ████████████████████████████████████ █████████████████████████████████.  (56.1 ¶¶ 136-137.)  Shortly thereafter, the Doelgers chose to add Mrs. Doelger to the income-producing Advisory Account as a joint owner.  (56.1 ¶ 138.)

To add Mrs. Doelger to the Advisory Account, both Doelgers signed retitling documents on June 21, 2019, including a new Advisory Agreement with substantially identical provisions to the 2015 Advisory Agreement.  (56.1 ¶¶ 141-144.)  At no point did Mr. Doelger indicate to JPMC (in writing or otherwise) that his investment objectives had changed.  (56.1 ¶ 148.)  Similarly, when Mrs. Doelger joined the Advisory Account, she did not inform JPMC in writing that she wished to change the investment objectives for the account.  (56.1 ¶ 148.)

---

[17] The Complaint also mentions certain non-MLP transactions during the 2015-2019 time period.  In late 2016, Mr. Doelger approached JPMC about entering into a cross-currency swap that would functionally convert his U.S. dollar-denominated debt into Euros, which would reduce his loan interest payments and generate profit if the Euro value dropped.  (56.1 ¶ 165.)  Mr. Doelger signed several agreements in connection with this transaction, including the ISDA agreement, which explicitly stated that "[t]he other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction."  (56.1 ¶ 166.)  Ultimately, the Euro rose and Mr. Doelger lost ██████████—an amount more than offset by the approximately $1.9 million gain he obtained from a similar 2014-15 Euro transaction.  (56.1 ¶¶ 167-172.)  In March 2018, Mr. Doelger entered into a rate cap transaction with JPMC in which he purchased an option relating to hedging the interest rate costs on his LOC.  (56.1 ¶ 173.)  As with the 2016 cross-currency swap, Mr. Doelger signed an agreement with JPMC acknowledging that JPMC was not acting as a fiduciary or adviser to Mr. Doelger in connection with the transaction.  (56.1 ¶ 174.)

## VI.   ALONG WITH THE BROADER STOCK MARKET, MLP VALUES DECLINED RAPIDLY IN THE WAKE OF THE COVID PANDEMIC

In February and March 2020, as the Covid outbreak was spreading across the globe, the Doelgers' Advisory Account declined along with the MLP market (and broader stock market). (56.1 ¶ 150.)  Faced with projected margin calls, the Doelgers sold off their MLPs in two tranches on March 9 and 17, 2020, and used the proceeds to pay off their LOC.  (56.1 ¶¶ 151, 155.)  A few months later, the Doelgers moved in with their children and counsel, Ms. Kim and Mr. Serritella. (56.1 ¶ 186.)  The Doelgers commenced this lawsuit on June 23, 2021, after Mr. Doelger reviewed the Complaint and approved its filing.  (56.1 ¶ 197.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and…the moving party is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P 56(a).  A party may show there is no genuine issue of material fact through affirmative evidence or by pointing to the lack of evidence for an essential claim element.[18]  The opposing party may not rest upon mere pleading allegations or on conclusory or speculative assertions, but must set forth specific facts showing a genuine issue for trial.  *See id.* 56(c)(1); *Celotex*, 477 U.S. at 324.

"[T]he mere existence of *some* alleged factual dispute" cannot defeat summary judgment; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  The substantive law determines which facts are material.  *See id.* at 248. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

---

[18] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'").

When evaluating the evidence, the Court asks not whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. The "mere existence of a scintilla of evidence" is not enough to create a genuine issue of fact that might defeat summary judgment; rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

## ARGUMENT

### I. THE MLPEI LETTER CLAIMS FAIL AS A MATTER OF LAW (COUNTS VI-VII)

Recognizing that the MLPEI Letter devastates their case, Plaintiffs raise rescission and declaratory judgment claims attacking that agreement. These fail on multiple grounds.[19]

#### A. As An Initial Matter, Plaintiffs' Claims Against The MLPEI Letter Cannot Negate The Existence Of That Letter And Mr. Doelger's Representations

Plaintiffs' claims challenging the MLPEI Letter are focused on the enforceability of the Letter as a contract, separate from the Letter's status as evidence of Mr. Doelger's intent and his representations to JMPC. To be clear, the claims challenging the Letter should be dismissed—but as a separate matter, the MLPEI Letter still undermines the other claims Plaintiffs raise to try to hold Defendants responsible for Mr. Doelger's own choices.

#### B. Plaintiffs Cannot Rescind The Letter Under 15 U.S.C. § 80b-15 (Count VII)

##### 1. *15 U.S.C. § 80b-15 Does Not Apply To JPMC*

In Count VII, Plaintiffs seek to rescind the entire MLPEI Letter (but not the related 2015 Advisory Agreement) under 15 U.S.C. § 80b-15. This claim fails because 15 U.S.C. § 80b-15, a provision of the Investment Advisors Act ("IAA"), does not apply to banks. 15 U.S.C. § 80b-2 (a)(11). Courts have consistently dismissed IAA claims against defendants who are not subject to

---

[19] The Complaint fails to specify which claims are asserted against which Defendants, but as Chickasaw was not party to the MLPEI Letter, Counts VI and VII state no claims against Chickasaw. (*See generally* Docket No. 1 ¶¶ 300-313.) Instead, Plaintiffs admit in the Complaint that "Chickasaw was not a party" to the MLPEI Letter. (*Id.* at ¶ 107.) As such, Counts VI and VII must fail as a matter of law to the extent they are asserted against Chickasaw.

the IAA.[20]   As a bank, JPMC is regulated by the Office of the Comptroller of the Currency ("OCC"), not the Securities and Exchange Commission ("SEC").   *See* 12 C.F.R. § 1.1.[21] Therefore, an IAA rescission claim is not available to Plaintiffs.

### 2. *The Statute of Limitations Bars Plaintiffs' Rescission Claim*

Even if JPMC were subject to the IAA, Plaintiffs are well past the applicable statute of limitations, which is no more than five years.[22]  Because the MLPEI Letter was executed over five years before Plaintiffs filed their Complaint, the rescission claim is time-barred.

### 3. *The MLPEI Letter Is Not A Hedge Clause*

Even setting aside the two preclusive points above, as a matter of law the MLPEI Letter is not a hedge clause because it did not lead Mr. Doelger to believe he waived unwaivable rights.[23] The Letter simply provides that Mr. Doelger will indemnify Defendants if "any of the confirmations, statements or agreements made by [him]…are incomplete or incorrect in any respect."  (56.1 ¶ 121.)   This language is not focused on waiving any claims, but rather on indemnifying JPMC should any of Mr. Doelger's representations prove false.  Courts routinely enforce such provisions, and Plaintiffs' rescission claim fails.[24]

---

[20] *See, e.g.*, *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1167 (10th Cir. 2011) (holding the IAA "excludes a broker-dealer who provides advice that is attendant to, or given in connection with, the broker-dealer's conduct as a broker or dealer").  If Plaintiffs seek to rescind the MLPEI Letter as to JPMS, they cannot do so because JPMS is not a party here.  Further, Plaintiffs cannot rescind the MLPEI Letter as to JPMS for the separate reason that JPMS's relationship to Plaintiffs was as a broker-dealer.  *See id.*

[21] Congress has expressly carved out banks from the IAA.  *See, e.g.*, *Am. Bankers Ass'n v. S.E.C.*, 804 F.2d 739, 747 (D.C. Cir. 1986) (noting "Since the 1934 Act, Congress has repeatedly exempted banks from the jurisdiction of the SEC….  In 1940, when Congress enacted the Investment Company and [IAA], Congress repeated the same bank exemption….").

[22] The circuits apply different limitation periods, but all are less than five years.  *See Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir. 1992) (limitations period of a one year from the wrong (or discovery of the wrong)); *Chang v. Citigroup Inc.*, 2010 WL 520511, at *3 (N.D. Cal. Feb. 6, 2010) (in rescission claims based on fraud, the limitations period is two years from the wrong (or the discovery thereof), and is capped at five years).

[23] "Hedge Clauses" are those that mislead an investor to believe they have waived unwaivable rights.  *See Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers*, Release No. 5248, 2019 WL 3779889, at n.31 (June 5, 2019).  Notably, the MLPEI Letter predated this guidance from the SEC by several years.

[24] *See, e.g.*, *M. DeMatteo Const. Co. v. A.C. Dellovade, Inc.*, 652 N.E.2d 635, 636 (Mass. App. Ct. 1995) (upholding clause indemnifying a party from harm caused by counterparty); *Narvaez v. 4518 Assocs.*, 250 A.D.2d 436, 437 (N.Y.

### C. Plaintiffs Have No Legal Basis For Asserting That The MLPEI Letter Is An Invalid Or Unenforceable Contract (Count VI)

Plaintiffs assert a hodge podge of reasons that the MLPEI Letter purportedly is not an enforceable contract. None of those reasons pass muster under governing law.[25]

#### 1. The MLPEI Letter Was Supported By Consideration—The Consideration Of Permitting Mr. Doelger To Proceed With The MLPEI Program

Because consideration is sufficient even if "grossly unequal or of dubious value," and the adequacy of the consideration "is not a proper subject for the court's review," Plaintiffs' claim that the MLPEI Letter is unenforceable for lack of consideration is frivolous. *U.S. Engine Prod., Inc. v. AGCS Marine Ins. Co.*, 769 F. Supp. 2d 626, 628 (S.D.N.Y. 2011).[26] The MLPEI Letter was unequivocally supported by consideration from JPMC, as referenced in the Letter itself: the "consideration of making the MLPEI offering available to [the Doelgers]." (56.1 ¶ 118(d).[27])

Plaintiffs' allegation that consideration is inadequate because Mr. Doelger had signed the Advisory Agreement before the MLPEI Letter is wrong.[28] Both parties took on additional

---

1st App. Div. 1998); *Church & Tower of Fla., Inc. v. Bellsouth Telecomm., Inc.*, 936 So. 2d 40, 41 (Fla. Dist. Ct. App. 2006).

[25] While federal law applies to any issue concerning the Declaratory Judgment Act itself (*see* 28 U.S.C. § 2201; *cf.*, *e.g.*, *Evanston Ins. Co. v. Fireman's Fund Ins. Co.*, 2011 WL 4953023, at *1 (M.D. Fla. 2011)), state law governs the underlying substantive issues. Here, New York law applies because the MLPEI Letter is a modification of the 2015 Advisory Agreement, which contains a New York choice-of-law provision. *See Davidowitz v. Patridge*, 2010 WL 5186803, at *9 (S.D.N.Y. Dec. 7, 2010) (enforcing a New York choice-of-law provision present in the original contract after it was modified). That said, here and elsewhere in this Memorandum, Defendants provide parallel citations to case law from other jurisdictions. This is done for the Court's convenience to assist the Court in case it (a) reaches a different choice-of-law determination, or (b) wishes to bypass the choice-of-law analysis entirely in cases where the law of the various jurisdictions is the same.

[26] *Anand v. Wilson*, 32 A.D.3d 808, 809 (N.Y. 2d App. Div. 2006) ("Consideration consists of either a benefit to the promisor or a detriment to the promisee."); *Koung v. Giordano*, 346 So. 3d 108, 115 (Fla. Dist. Ct. App. 2022) (consideration may be "any labor, detriment, or inconvenience, however small); *Garcia v. Steele*, 211 N.E.3d 602, 611 (Mass. 2023) (consideration is "any act" conveying a benefit or advantage); WILLISTON ON CONTRACTS § 7:21, "Adequacy of Consideration" (4th ed. 2019) ("[T]he law will not inquire into the adequacy of consideration as long as the consideration is otherwise valid or sufficient to support a promise.").

[27] In a prior decision, this Court noted that Plaintiffs' argument was that the MLPEI Letter was unsupported by consideration because, by the time of its signing, Plaintiffs "had already invested in the account." *Doelger v. JPMorgan Chase Bank, N.A.*, 2022 WL 1805479, at *4 (D. Mass. 2022). The uncontroverted record, however, shows that the Advisory Account was not opened and funded until *after* Mr. Doelger signed the Letter. (56.1 ¶ 124.)

[28] Notably, the term sheet associated with the 2015 Advisory Agreement was not signed by Defendants until a later date and the account was not opened and approved for funding until after the MLPEI Letter was signed. (56.1 ¶ 96.)

17

detriments in signing the Letter: JPMC agreed to make the MLPEI offering available and to let
Mr. Doelger go forward with funding the Advisory Account.  Mr. Doelger agreed to indemnify
JPMC for losses resulting from his misstatements.[29]  (56.1 ¶ 121.)

Even if there were no consideration (and there was), the MLPEI Letter would still be
enforceable as a modification of the 2015 Advisory Agreement.  N.Y. C.P.L.R § 5-1103.[30]

### 2.   *The MLPEI Letter Is Not An Unenforceable Hedge Clause*

As explained in Argument Section I.B.1, *supra*, the IAA does not apply here, and even if
it did, the MLPEI Letter is not an impermissible hedge clause under the IAA.

### 3.   *The MLPEI Letter Is Not Unconscionable*

Plaintiffs next allege that the MLPEI Letter is unconscionable.  (Docket No. 1 ¶ 303.)  But
as discussed above, courts routinely uphold indemnification clauses like the one in the Letter.[31]

The record shows that the MLPEI Letter was not the product of unfair surprise, nor were
its terms unfair, hallmarks of unconscionability.[32]  Plaintiffs were not surprised by the Letter and

---

[29] *See, e.g.*, *Source Assocs., Inc. v. Valero Energy Corp.*, 273 F. App'x 425, 428 (6th Cir. 2008) (holding that a letter agreement which required a party to take on an additional detriment did not involve past consideration), *see also CEA Bromfield LLC v. Maxi Drug, Inc.*, 2010 WL 344096, at *5 (D. Mass. 2010) (finding that a second agreement was supported by new consideration when, among other things, one party agreed to assume the others' liabilities).

[30] *See also, e.g.*, *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008) (under New York law, "Modifications to a contract…need not be supported by additional consideration when the modification is in writing and signed by the party against whom it is sought to be enforced.").  Further, in its 2022 opinion denying Plaintiffs' motion to dismiss, this Court observed, "Plaintiffs do not compellingly rebut JPMC's assertion that the [MLPEI] Letter may be construed as a modification of the prior contract, for which no independent consideration would be required."  *Doelger*, 2022 WL 1805479, at *4.  The Advisory Agreement documentation also supports this conclusion.  For example, the General Terms define "Agreement" as including "any supplemental forms you are asked to complete," and other "amend[ments] or supplement[s]."  (56.1 ¶ 87.)  Relevant law also provides that the MLPEI Letter is properly considered as part of the contract.  RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1979) ("[A]ll writings that are part of the same transaction are interpreted together."); *Edelman Arts, Inc. v. Art Int'l (UK) Ltd.*, 841 F. Supp. 2d 810, 823 (S.D.N.Y. 2012) (same).

[31] *See* Argument Section I.B.3 *supra*; *see also, e.g.*, *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 794 (7th Cir. 2014) (upholding an indemnification agreement requiring reimbursement of fees incurred because of plaintiff's actions); *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1366 (8th Cir. 2022) (bar on consequential damages was not unconscionable where the parties had relatively equal bargaining power and agreed to allocate the risk of loss in the contract); *Winter Panel Corp. v. Reichhold Chemicals, Inc.*, 823 F. Supp. 963, 973 (D. Mass. 1993) (holding that a damages limitation clause is not unconscionable as a reasonable allocation of risk between two sophisticated parties).

[32] The Complaint does not specify whether it relies on procedural or substantive unconscionability—but neither

they, along with their counsel, were able to review it in full before signing it.  (56.1 ¶¶ 112-116.)

4.  *The Complaint Fails To State A Claim Of Fraudulent Inducement, And There Is No Evidentiary Support For Any Such Claim*

Plaintiffs allege that Defendants "fraudulently induced Mr. Doelger to sign the letter through their misrepresentations" (Docket No. 1 ¶ 303), but they identify no misrepresentations. Rule 9(b) requires fraud claims to be pled with particularity, specifying "what the underlying misrepresentation was, who made it, and when and where it was made." *Katz v. Belveron Real Est. Partners*, LLC, 28 F.4th 300, 308 (1st Cir. 2022).  Plaintiffs' failure to identify the alleged misrepresentations dooms their claim.  *Lustig v. Bear Stearns Residential Mortg. Corp.*, 2010 WL 11519401, at *3 (S.D. Fla. 2010) (dismissing a fraudulent inducement claim where plaintiff could not identify the misrepresentations made or people who allegedly made them).[33]

Plaintiffs further allege that "JP Morgan and JP Morgan Securities requested Mr. Doelger make certain acknowledgements that they knew were untrue."  (Docket No. 1 ¶ 303.)  There is no evidence to support this allegation and no logical reason for JPMC to have done this.  Setting that aside, the purportedly untrue acknowledgements are about Mr. Doelger himself—for example, that he had assets of at least $50 million and that he had made his own analysis of the MLPEI offering before investing.  (56.1 ¶ 118(a), (d).)  These allegations of falsity (even if true) cannot support a claim that JPMC fraudulently induced Mr. Doelger, because *Mr. Doelger* was best positioned to know the truth of his representations, not Defendants.  Plaintiffs' claim that Mr. Doelger relied on

---

concept applies here.  *See Wright v. Marjem Recovery, LLC*, 2014 WL 4274528, at *5 (D. Mass. 2014) (defining unfair surprise and unfair terms as procedural and substantive unconscionability, respectively).

[33] *See also Houri v. Boaziz*, 196 So. 3d 383, 393 (Fla. Dist. Ct. App. 2016) (fraud claim "must not only specifically identify a misrepresentation of fact but also identify when, where, or the manner in which it was made"); *Gregor v. Rossi*, 120 A.D.3d 447, 447 (N.Y. 1st App. Div. 2014) (dismissing fraudulent inducement claim where "the words use" and date were not set forth); *CRA Int'l, Inc. v. Painter*, 2017 WL 2292737, at *1 (Mass. Super. 2017) (same where identity of speaker, content of statement, where, and when were not included); *Schnitzer Steel Indus., Inc. v. Dingman*, 2023 WL 246594, at *4 (D.R.I. 2023) (same where plaintiff "d[id] not point to specific statements or representations").

19

these allegedly false representations must be denied.

## II.   DEFENDANTS DID NOT BREACH ANY CONTRACT-BASED OBLIGATIONS TO THE DOELGERS (COUNTS II, V)

### A.  Plaintiffs' Contract-Based Claims Are Subject To New York Law

The Advisory Agreements incorporate the General Terms,[34] including its New York choice-of-law provision.[35]  Under Massachusetts conflict-of-law principles, New York law applies to Plaintiffs' breach of contract[36] and breach of GFFD claims.[37]

### B.  Plaintiffs' Breach Of Contract Claim Fails As A Matter Of Law (Count II)

To prove breach of contract, Plaintiffs must show: "(1) formation of a contract between the parties; (2) performance by plaintiff; (3) defendants' failure to perform; and (4) resulting damage." *Castorino v. Citibank N.A.*, 2008 WL 5114482, at *2 (S.D.N.Y. 2008).[38]  As a matter of law, Plaintiffs cannot make the required showing under elements (3) and (4).[39]

#### 1.  *Plaintiffs Fail To Identify Any Contractual Provisions That Defendants Breached*

"[W]here a breach of contract claim fails to denote the 'essential terms of the parties' purported contract, *including the specific provisions of the contract upon which liability is predicated*,' it will be dismissed."  *Ross v. F.S.G. PrivatAir, Inc.*, 2004 WL 1837366, at *3

---

[34] (*See, e.g.*, 56.1 ¶ 114.)

[35] (*See* 56.1 ¶ 86 ("[T]his Agreement shall be governed by the law of the State of New York without giving effect to its choice of law or conflict of laws provisions (other than Section 5-1401 of the New York General Obligations Law).").)

[36] *See, e.g.*, *Morris v. Watsco, Inc.*, 433 N.E.2d 886, 888 (Mass. 1982) (applying Massachusetts conflict-of-laws analysis to enforce contractual choice-of-law clause).  *OrbusNeich Med. Co., Ltd. v. Bos. Sci. Corp.*, 694 F. Supp. 2d 106, 113 (D. Mass. 2010) (same); *Babeu v. Apple, Inc.*, 2022 WL 3586078, at *3 (D. Mass. 2022) (same).

[37] *See, e.g.*, *Aisenberg v. Hallmark Mktg. Corp.*, 337 F. Supp. 2d 257, 261 (D. Mass. 2004) (applying choice-of-law provision to GFFD claim); *EchoMail, Inc. v. Am. Express Co.*, 529 F. Supp. 2d 140, 146 (D. Mass. 2007) (same).

[38] Florida and Massachusetts also require a contract, breach, and causation.  *See Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008); *Vacca v. Brigham & Women's Hosp., Inc.*, 156 N.E.3d 800, 806 (Mass. App. Ct. 2020).

[39] Further, Chickasaw is entitled to judgment as a matter of law as to Count II because Chickasaw was not a party to the contracts Plaintiffs allege Chickasaw breached giving rise to Count II, the Advisory Agreements (Docket No. 1 ¶¶ 263, 261-262, 264-267), and therefore, Plaintiffs cannot prove element (1).  It is undisputed that Chickasaw was not a party to the Advisory Agreements.  (56.1 ¶ 145.).  Plaintiffs also admit this fact in their motion for jury trial (Docket No. 231-1 at 3 ("Plaintiffs learned in discovery… that *Chickasaw is not a party to the JPM Advisory Agreements*." (emphasis in original)).).  Therefore, Plaintiffs' breach of contract claim against Chickasaw must be dismissed.

(S.D.N.Y. 2004).[40]  Plaintiffs do not identify the provisions on which their claim relies.  (Docket No. 1 ¶¶ 261-267.)  Thus, the Complaint does not satisfy the minimum requirement of "set[ting] forth the terms of the agreement upon which liability is predicated."  *Castorino*, 2008 WL 5114482, at *2.

2. *Plaintiffs Have Neither Pled Nor Proven A Breach Of The Advisory Agreements*

To the extent Plaintiffs' contract claims can be deciphered at all, they misinterpret the plain language of the Advisory Agreements.

a.  Defendants Invested The Doelgers' Advisory Account As Contractually Required

The contract claim first asserts that Defendants breached the Advisory Agreements by "failing to invest the Doelgers' funds in accordance with the Doelgers' investment objectives." (Docket No. 1 ¶ 264.)  But the Complaint does not identify the investment objectives referenced. Moreover, it was Mr. Doelger, *not Defendants*, who was "solely responsible for making all decisions regarding the adoption and implementation of all investment objectives." (56.1 ¶ 81(b).) He was also "solely responsible for selecting Portfolios and determining the amount to be invested," and he "retain[ed] final decision-making authority and responsibility with respect thereto." (56.1 ¶ 81(c).)  Because JPMC's (and subadvisor Chickasaw's) investment discretion was "subject to the annexed Portfolio Schedule" that Mr. Doelger had dictated—which only allowed MLP investments—Defendants were not free to "employ a…diversified investment strategy" for the Doelgers.  (56.1 ¶ 81(d); Docket No. 1 ¶ 2.)  The theory that Defendants had a unilateral duty to diversify the Doelgers' assets in breach of the agreement fails as a matter of law.[41]

---

[40] *See also, e.g.*, *Lewis Tree Serv. Inc. v. Lucent Techs., Inc.*, 2000 WL 1277303, at *5 (S.D.N.Y. 2000) (dismissing claim as "plaintiffs fail to identify any particular contractual provision that the defendants have allegedly breached").
[41] *See, e.g.*, *Ferro Corp. v. Solutia Inc.*, 588 F. Supp. 2d 1022, 1027 (E.D. Mo. 2008) ("Under New York law, …a

Separately, Mr. Doelger's selected strategy incontrovertibly adhered to his investment objectives.  Mr. Doelger's position in the MLPEI program was entirely consistent with his pre-2015 investment history,[42] comfort with the risks,[43] belief in MLPs as an investment,[44] and conviction to continue the MLP strategy with or without Defendants.[45]  It also followed the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ objective for the Brokerage Account (which held significant MLP assets).[46]  Most important, Mr. Doelger signed off on the Portfolio Schedule, which mandated an investment in MLPs *only*.  (56.1 ¶¶ 81(c)-(d), 82-83.)

If there were any doubt about whether the MLPEI investment met Mr. Doelger's investment objectives, Mr. Doelger represented in writing that he had "concluded that the investment, including with respect to the size of the investment when compared to [his] overall net worth, [wa]s suitable for [him] in light of [his] investment objectives and financial capabilities." (56.1 ¶ 118(b).)  This representation alone defeats Plaintiffs' claim.[47]

Separately, the Complaint conclusorily alleges that "[t]he Advisers failed to make a reasonable inquiry into Mrs. Doelger's investment objectives."  (Docket No. 1 ¶ 140.)  Besides having no supporting factual allegation,[48] this assertion suffers from two fatal flaws.

---

party is liable for breach of contract only insofar as that party has a contractual obligation to perform.  [I]f there is no contractual obligation to perform an act, the failure to perform the act cannot be a breach of the contract."); *Stratton Grp., Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978) ("Clearly a breach can only occur when one is under an obligation to perform in the first instance.").

[42] (56.1 ¶¶ 3-4, 6, 16-18, 22-27, 30-51, 63-68.)

[43] (56.1 ¶ 66 (in response to 2014 suggestion that Mr. Doelger consider selling down MLPs, Mr. Doelger responded James Baker spoke to Mr. Doelger and suggested he might consider selling some of the MLPs to reduce his risk; in response, Mr. Doelger said he was ▮▮▮▮▮▮▮▮▮▮▮▮); ¶ 100 (discussing JPMC suggestion that his asset allocation was too high, Mr. Doelger responded that ▮▮▮▮▮▮▮▮▮; ¶ 118(a), (c) (references in MLPEI Letter of Mr. Doelger's understanding of risks).)

[44] (56.1 ¶¶ 66, 100.)

[45] (56.1 ¶ 109.)

[46] (56.1 ¶¶ 33-34.)

[47] *See, e.g.*, *Toledo Fund, LLC v. HSBC Bank USA, Nat. Ass'n*, 2012 WL 2850997, at *7 (S.D.N.Y. 2012) (granting summary judgment and holding that comparable language showed, "[a]t a minimum," the investment agreed to "could not be in breach of the [investment] agreement").

[48] Indeed, Plaintiffs' allegations seem to contradict this assertion because it states in the preceding paragraph that the MLP Investments were causing Mrs. Doelger stress and that "JP Morgan was aware of the stress the MLP Investments were causing Mrs. Doelger."  (Docket No. 1 ¶ 139.)

First, it ignores the extensive information JPMC gathered about Mrs. Doelger in the years 2015-2019 from many interactions with one or both of the Doelgers.[49]  Such a spousal inquiry was consistent with JPMC policy.[50]  Moreover, nothing in the record suggests that the Doelgers' investment objectives changed in 2019 when the account was retitled.[51]

Second, the Complaint does not show how purportedly "fail[ing] to make a reasonable inquiry into Mrs. Doelger's investment objectives" (presumably in connection with the 2019 account retitlement) violated any contractual obligations.  The Advisory Agreements' pre-investment procedures had already been fulfilled in 2015, when Mr. Doelger had exercised his "sole[] responsibility" to select his desired portfolio (the MLPEI program) and the investment amount.  (56.1 ¶ 81(c).)  Retitling that pre-existing account in 2019 did not contractually oblige JPMC to unwind and then redo the Advisory Account opening, especially since the Doelgers were "solely responsible for making all decisions regarding the adoption and implementation of all investment objectives."  (56.1 ¶ 81(b).)  Once invested in the MLPEI program, it was incumbent on Mr. Doelger (and, later, Mrs. Doelger) to "notify the Bank promptly, in writing, of any changes to the[ir] information," to "monitor[ their] investment objectives," and to exercise their "final decision-making authority and responsibility" for "selecting Portfolios and determining the amount to be invested in each Portfolio."  (56.1 ¶ 81(b)-(c).)  Thus, the Complaint's allegations about the 2019 account retitling fail as a matter of law to identify a breach of contract.[52]

### b.  Periodic Reviews Were Performed As Required On The Advisory Account

The only other substantive allegation is that Defendants "fail[ed] to perform routine

---

[49] (56.1 ¶¶ 101-102.)

[50] (56.1 ¶ 102.)

[51] To the contrary—and while Plaintiffs' industry expert, David Tilkin, is not capable of providing factual evidence— it is notable that Mr. Tilkin acknowledged the Doelgers' investment objectives were the same in 2019.  (56.1 ¶ 149.)

[52] *See, e.g.*, *Zorbas v. U.S. Tr. Co.*, 48 F. Supp. 3d 464, 477 (E.D.N.Y. 2014) (summary judgment was appropriate on breach-of-contract claim where Plaintiff did not request or instruct bank to change their investment objective).

portfolio reviews to determine whether their recommended investment strategy was in the best interest of the Doelgers."  (Docket No. 1 ¶ 265.)  Assuming this allegation concerns JPMC's ongoing services, the Advisory Agreement requires only that JPMC "periodically review the activity in and investment results of each Portfolio with Client."  (56.1 ¶ 84.)  The uncontroverted record shows that JPMC fulfilled this requirement through, *inter alia*, the provision of monthly performance reports and the frequent meetings, phone calls, and emails through which James Baker (and JPMC banker Doug Moon) engaged the Doelgers about their Advisory Account.  (56.1 ¶¶ 126-127.[53])  Also, while this was not a duty owed *to the Doelgers* under the Advisory Agreements, the record shows that JPMC also completed annual reviews of the Doelgers' Advisory Account under OCC regulations.  (56.1 ¶ 125.)  To the extent Plaintiffs suggest that JPMC did not perform its periodic performance reviews, the allegation has no evidentiary support.

3. *Plaintiffs Lack Any Evidence Showing Any Purported Breach Caused Them Damages, As Plaintiffs Would Have Remained Invested In MLPs Regardless Of What Defendants Did*

Defendants are also not liable for breach of contract because Plaintiffs cannot prove causation.[54]  Specifically, there is no reason to believe Mr. Doelger would have abandoned his MLP investment strategy had Defendants refused to make the MLPEI program available. Mr. Doelger committed himself to a leveraged, concentrated MLP strategy long before 2015, and he stayed the course even when Atlantic Trust recommended he reduce risk and MLP concentration.  (56.1 ¶¶ 48-50;  *see generally* 56.1 ¶¶ 17-18, 30-68.)  And even when JPMC

---

[53] As to the remaining portions of Complaint paragraph 265: (a) there is no evidence Defendants "recommended" the Doelgers' chosen investment strategy (56.1 ¶¶ 108, 119-120), and (b) the contract does not require Defendants to determine *themselves* whether the Doelgers' strategy was in their best interest—rather, the *Doelgers* had the "sole responsib[ility]" and "final decision-making authority" for making such determinations."  (56.1 ¶ 81(b)-(c).)

[54] *See, e.g.*, *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 346 (S.D.N.Y. 2013) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and *proximately caused* his or her damages."); *Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 264 (S.D.N.Y. 2001) (granting summary judgment where "plaintiffs have failed to raise an issue of material fact that would enable a reasonable jury to conclude that their injuries were sustained as a result of Celebrity's actions").

recommended diversification, Mr. Doelger indicated in writing that he still had concluded that the investment was suitable and consistent with his investment objectives.  (56.1 ¶ 118(b).)  Mr. Doelger specifically told JPMC that if the MLPEI program were unavailable, he ███████ ████████████████████████  (56.1 ¶ 109.)  Nor is there any evidence that this attitude toward MLPs changed after the Advisory Account was opened.  There is simply no evidence that shows Mr. Doelger would have changed course and become less dedicated to keeping his MLP investments if Defendants acted differently.[55]  Accordingly, Plaintiffs cannot carry their burden to show that Defendants' purportedly culpable actions directly and proximately caused Plaintiffs injury.

### C.  Plaintiffs' Good Faith And Fair Dealing Claim Also Fails (Count V)

#### 1.  *The Good Faith And Fair Dealing Claim Is Duplicative Of The Breach Of Contract Claim*

First, Plaintiffs' GFFD claim can be rejected because it duplicates the contract claim.  *Canstar v. J.A. Jones Const. Co.*, 212 A.D.2d 452, 453 (N.Y. 1st App. Div. 1995) (dismissing GFFD claim "intrinsically tied to the damages allegedly resulting from a breach of the contract").[56] The GFFD claim seeks the same damages based on the same essential allegations as the contract claim.  (Docket No. 1 ¶¶ 261-67, 289-99.)  Thus, the GFFD claim should be dismissed.

#### 2.  *Plaintiffs' Good Faith And Fair Dealing Claim Must Be Connected To Plaintiffs' Contractual Benefits; It Cannot Create Contractual Rights That Do Not Otherwise Exist*

A GFFD claim requires a showing that "defendant sought to prevent performance of the contract or to withhold benefits under the contract from the plaintiff."  *In re Basic Food Grp., LLC*,

---

[55] Indeed, there is every reason to believe Mr. Doelger might have maintained a higher MLP concentration and more debt without Defendants' assistance.  (*See, e.g.*, 56.1 ¶¶ 48-50, 118-120, 129, 131.)

[56] *See also, e.g.*, *Util. Servs. Contracting, Inc. v. Monroe Cnty. Water Auth.*, 90 A.D.3d 1661, 1662, (N.Y. 4th App. Div. 2011) (contract and GFFD claims duplicative where they involved overlapping breach allegations).  Florida and Massachusetts law is equivalent.  *Edwards v. City of Bos.*, 65 N.E.3d 32 (Mass. App. Ct. 2016) (affirming dismissal of GFFD claim that was duplicative of breach of contract claim); *Bradman v. Mental Health Network, Inc.*, 2008 WL 5110525, at *2 (S.D. Fla. 2008) ("a breach of the implied covenant of [GFFD] cannot be advanced when the allegations underlying that claim are duplicative of the allegations supporting the breach of contract claim").

2018 WL 5805943, at *7 (Bankr. S.D.N.Y. 2018).[57]  Plaintiffs cannot use a GFFD to give themselves extra-contractual rights or transform the obligations found in the Advisory Agreements.  "The implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add [] to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005).[58]

The Complaint tries to establish a GFFD claim by listing purported "bad faith" acts by Defendants and then asserting these acts "undermined [the Advisers'] ability to act in the best interests of the Doelgers."  (Docket No. 1 ¶ 298.)  But these allegations do not show how Plaintiffs were deprived of actual benefits or performance to which they were entitled.[59]  For example, none of the purported GFFD breaches are related to JPMC's contractual obligation to manage the portfolio investments "subject to the [MLP] Portfolio Schedule" and "with consideration[] of…fiduciary standards" of MLPs within the MLPEI portfolio.  (56.1 ¶ 81(d); *see* Docket No. 1

---

[57] *Accord, e.g.*, *Lee Dodge, Inc. v. Sovereign Bank, N.A.*, 148 A.D.3d 1007, 1008 (N.Y. 2d App. Div. 2017) ("The cause of action alleging breach of [GFFD] does not allege any facts tending to show that the bank defendants sought to prevent performance of a contract or to withhold its benefits from the plaintiffs."); *see also T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 924 N.E.2d 696, 704 (Mass. 2010) ("The covenant of [GFFD] requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract."); *Hahamovitch v. Delray Prop. Invs., Inc.*, 165 So. 3d 676, 686 (Fla. Dist. Ct. App. 2015) ("This covenant is intended to protect the reasonable expectations of the contracting parties in light of their express agreement."). *Dep't of Revenue v. Gen. Motors LLC*, 104 So. 3d 1191, 1197 (Fla. Dist. Ct. App. 2012) ("There can be no cause of action for a breach of the implied covenant absent an allegation that an express term of the contract has been breached.").

[58] *Accord, e.g.*, *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (N.Y. 1st App. Div. 2003) ("While the covenant of [GFFD] is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."); *Staffenberg v. Fairfield Pagma Assocs., L.P.*, 95 A.D.3d 873, 875 (N.Y. 2d App. Div. 2012) (no GFFD duty can be implied that "would be inconsistent with other terms of the contractual relationship").  Massachusetts and Florida law are similar on this issue.  *See, e.g.*, *York v. Zurich Scudder Invs., Inc.*, 849 N.E.2d 892, 898 (Mass. App. Ct. 2006) ("The scope of the covenant is only as broad as the contract that governs the particular relationship"); *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001) ("the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties").

[59] As to Chickasaw, Count V, like Count II, fails because the claim stems from the Advisory Agreements (Docket No. 1 ¶ 290 ("The covenant of [GFFD] is implied in the Advisory Agreements")) to which Chickasaw was not a party.  *See* note 39 *supra*.  There can be no GFFD claim where there is no contract.  *Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*, 276 A.D.2d 673, 676 (N.Y. 2d App. Div. 2000); *Centurian Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151-52 (11th Cir. 2005); *Am. Food Sys. Inc. v. Fireman's Fund Ins. Co.*, 530 F.Supp.3d 74, 81 (D. Mass. 2021).  It is undisputed that Chickasaw was not a party to the Advisory Agreements.  Chickasaw could not have breached a GFFD covenant in those agreements, and Count V should be dismissed as to Chickasaw.

¶¶ 292-97.)  Rather, it appears Plaintiffs are trying to use the GFFD claim to create independent extra-contractual rights that would not otherwise exist.  (*See, e.g.*, Docket No. 1 ¶ 296 (suggesting that alleged failure to follow regulatory disclosure requirements is a GFFD breach).)  The GFFD claim should be dismissed for this reason as well.

   3. *No Evidence Supports Any Alleged Breach Of The Good Faith And Fair Dealing Covenant*

        Finally, Plaintiffs lack any evidence to show that JPMC breached any GFFD covenant, even assuming Plaintiffs were able to identify one.  Specifically:

- The Complaint asserts that Defendants "recklessly advis[ed] the Doelgers to remain invested in MLP Investments" (Docket No. 1 ¶ 292).  However, there is no evidence of Defendants affirmatively providing this advice, much less in a reckless way causing the Doelgers to be deprived of any contractual benefits.  (56.1 ¶¶ 108, 119-120.)

- Plaintiffs also claim Defendants "ma[de] various misrepresentations regarding the MLP Investments" (Docket No. 1 ¶ 293).  This assertion is too vague to pass muster under Fed. R. Civ. P. 9(b).  In any event, as discussed below, Plaintiffs' claim regarding purported negligent misrepresentations fails.  *See* Argument Section IV.B.

- The assertion that Defendants "acted in bad faith by putting their own interests ahead of the Doelgers' interests" (Docket No. 1 ¶ 294) is conclusory and nonactionable.

- The Complaint references a failure to follow regulatory disclosure requirements (Docket No. 1 ¶¶ 295-296), but there is no evidence that Defendants violated any disclosure regulations,[60] or that they were contractually required fulfill them.

- Plaintiffs also complain that JPMC "sen[t] Mr. Doelger the 2015 Hedge Letter" (Docket No. 1 ¶ 297), but the Advisory Agreements do not preclude use of the MLPEI Letter, and sending that letter did not frustrate any benefits the Doelgers

---

[60] The Complaint references Chickasaw's purported obligation to provide Plaintiffs an initial Form ADV in 2015 and updated Form ADVs thereafter.  (Docket No. 1 ¶¶ 221-224.)  As an initial matter, it is JPMC's practice to provide Form ADVs at account opening (even though as a national bank JPMC itself is not obligated to do so), and Plaintiffs cannot show otherwise.  (56.1 ¶ 78.)  In any event, the Advisory Agreements provide that JPMC "may, at its option, deliver [a] prospectus or other offering document[s] to Client" but it is not required to do so" without client request.  (56.1 ¶ 81(j).)  The performance reports similarly provided that JPMC "will provide a copy of the advisor's Form ADV II or brochure upon written request."  (56.1 ¶ 134.)  Providing Form ADVs on request does not violate SEC regulations, even if those regulations did apply to JPMC (which they do not).  *See* https://www.sec.gov/divisions/investment/noaction/2013/goldman-sachs-062013-iarule204-3.htm.

might have expected under the Advisory Agreements.

The lack of a genuine issue of material fact also justifies dismissal of the GFFD claim.

4. *Plaintiffs' Good Faith And Fair Dealing Claim Fails For Lack Of Causation*

For the same reasons that Plaintiffs cannot prove loss causation for their contract claim,

Plaintiffs' GFFD claim also fails due to lack of causation.[61]

## III.   PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM FAILS AS A MATTER OF LAW (COUNT I)

Plaintiffs' breach of fiduciary duty claim targets Defendants' actions concerning (1) the

Advisory Account (*see* Docket No. 1 ¶¶ 251-54, 257, 259); (2) the LOC (*id.* ¶¶ 255-56); and (3)

the currency swap (*id.* ¶ 258).  The fiduciary duty claim fails on all three fronts.

### A.   Plaintiffs' Breach Of Fiduciary Duty Claim Regarding The Advisory Account Fails As A Matter Of Law

A fiduciary duty claim requires proof of: "(i) the existence of a fiduciary duty; (ii) a

knowing breach of that duty; and (iii) damages resulting therefrom."[62]   *Zorbas*, 48 F. Supp. at 464.

For the Advisory Account, Plaintiffs' claim falls short on all three of these elements.

1. *Plaintiffs' Breach of Fiduciary Duty Claim As To The Advisory Account Is Duplicative Of Their Breach of Contract Claim And Must Be Dismissed*

Where, as here, there is a "formal written agreement covering the precise subject matter of

---

[61] *See* Argument Section II.B.3 *supra*; *see also, e.g.*, *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 137 (2d Cir. 1990) (affirming summary judgment on breach of [GFFD] claim where "the chain of causation" was "simply too attenuated").

[62] New York substantive law applies to Plaintiffs' breach of fiduciary duty claim because, as discussed herein, the duty arose from the Advisory Agreements, which are governed by New York law.  *See, e.g.*, *McAdams v. Mass. Mut. Life Ins. Co.*, 2002 WL 1067449, at *12 (D. Mass. 2002) ("[A] choice of law provision should apply to non-contract claims where the basic source of any duty owed by defendants to the plaintiff is derived from the contractual relationship structured by the underlying agreement"), *aff'd*, 391 F.3d 287 (1st Cir. 2004); *Alantra LLC v. Apex Indus. Techs. LLC*, 636 F. Supp. 3d 223, 238 n.5 (D. Mass. 2022) (applying Engagement Letter's New York choice-of-law clause to breach of contract and breach of fiduciary duty claims that "derive from the confidentiality provisions in the Engagement Letter"); *Doe v. Seacamp Ass'n, Inc.*, 276 F. Supp. 2d 222, 228 (D. Mass. 2003) (forum-selection clause applied to tort claims as "[a]bsent the contract…, no duty would have been owed").  Regardless, however, the elements of a breach of fiduciary claim are the same under New York, Massachusetts, and Florida law.  *See Kriegel v. Bank of Am., N.A.*, 2010 WL 3169579, at *12 (D. Mass. 2010); *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1338 (S.D. Fla. 2011), *aff'd*, 483 F. App'x 568 (11th Cir. 2012).

the alleged fiduciary duty"—*i.e.*, the Advisory Agreements—"there is no actionable tort for a breach of fiduciary duty." *Id.* (citing *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x. 13, 17 (2d Cir. 2014)).   "[N]ormally where there is a contract between the parties, no fiduciary duty beyond the terms of the contract will be found." *Id.* at 479.

The Complaint expressly acknowledges that the fiduciary relationship with the Doelgers was "established…*in accordance with the Advisory Agreements*" and that JPMC's fiduciary duties arose "[a]s a result" of "the Advisory Agreements."  (Docket No. 1 ¶ 248-49.)  Plaintiffs' breach of fiduciary duty allegations regarding the Advisory Account are nearly identical to their breach of contract allegations.[63]  Because the Advisory Account fiduciary duty claims are wholly derived from (and duplicative of) their breach of contract claims, "there is no actionable tort for a breach of fiduciary duty." *Zorbas*, 48 F. Supp. 3d at 478.[64]

### 2.   *Plaintiffs Do Not Allege, And There Is No Evidence Of, A Relationship Of Higher Trust Beyond That Set Forth In The Advisory Agreements*

To avoid having the Advisory Agreements bar their fiduciary duty claims, Plaintiffs need to show that a "special circumstance" existed in which "a relationship of higher trust than would arise from the…agreement alone" was established with either Defendant. *Zorbas*, 48 F. Supp. 3d at 479.[65]  Plaintiffs cannot do so.

At most, Plaintiffs make certain allegations speaking to their *subjective belief* that JPMC

---

[63] *Compare, e.g.*, Count I (Breach of Fiduciary Duty) Docket No. 1 ¶¶ 250, 253 *with* Count II (Breach of Contract) ¶¶ 264-265 (asserting virtually identical allegations regarding investment objectives and portfolio reviews).

[64] *See also, e.g.*, *Fillmore E.*, 552 F. App'x at 17 (dismissing fiduciary duty claims because "plaintiff has failed to allege any fiduciary duty owed by CFI that was independent of and separate from the Servicing Agreement"); *Daniel v. Aizenberg*, 2023 WL 2541888, at *3 (S.D.N.Y. 2023) ("no fiduciary duty arises—in normal circumstances—when there is a contract between the parties"); *Zimmer Inc. v. Beamalloy Reconstructive Med. Prod., LLC*, 2017 WL 3315135, at *4 (N.D. Ind. 2017) ("Defendants have not proffered factual material suggesting that the Plaintiff breached a duty owed to the Defendants beyond the obligations of the contract term").

[65] *See also, e.g.*, *Fillmore E.*, 552 F. App'x at 17 ("Fillmore must allege that, apart from the terms of the contract, the parties created a relationship of higher trust than would arise from [their contracts] alone, so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties."); *Gordon v. Aizenberg*, 2022 WL 4660499, at *4 (S.D.N.Y. 2022) ("to show Defendants had a fiduciary duty distinct from an express contract, Plaintiff must sufficiently allege that Defendants occupied a position of trust or special confidence").

owed them special fiduciary duties, but "subjective beliefs and conclusory allegations that a 'special' relationship existed are insufficient to establish a fiduciary duty." *See id.* at 487. Plaintiffs base their special relationship claim on a purported lack of investment sophistication; the length of their relationship with JPMC; their other transactions with JPMC as a lender and swap counterparty; and Mr. Doelger's alleged declining mental health.[66] As *Zorbas* explained, however, such allegations indicating that the plaintiff "came to rely on" the advice of, and "repose[d] great confidence" in, the defendant—even if true—are "insufficient to establish a fiduciary duty." *Id.* at 486-87.[67] To create a fiduciary duty based on "trust or confidence" the purported fiduciary must affirmatively "assume[] control and responsibility over another." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006).[68]

There is no evidence (or even an allegation) showing that Defendants agreed to take on, or took on, control and responsibility beyond that provided for in the Advisory Agreements. The

---

[66] (*See, e.g.*, Docket No. 1 ¶ 16 ("Neither Mr. Doelger nor Mrs. Doelger have a background in finance or investments."); ¶ 19 ("The Doelgers are clients of JP Morgan Private Bank and have had a relationship with the bank and its Boston office since the 1980s."); ¶ 20 ("JP Morgan was intimately involved in the Doelgers' financial affairs, even prior to becoming their investment adviser in 2015."); ¶ 21 ("In or around 2009, JP Morgan approved Mr. Doelger for a $6 million line of credit, for which his investment portfolio was used as collateral."); ¶ 12 ("The Doelgers Increasingly Relied on the Advisers for Investment Advice As Mr. Doelger's Mental Health Declined").)

[67] *See, e.g.*, *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 195 (S.D.N.Y. 2011) (finding the allegation that "[t]he owners repose their confidence and trust in the servicer" insufficient to give rise to a fiduciary relationship between certificate holders and trustees of a commercial securitization trust); *Waterscape Resort LLC v. McGovern*, 107 A.D.3d 571, 571 (N.Y. 1st App. Div. 2013) ("Plaintiff's subjective claims of reliance on defendants' expertise do not give rise to a confidential relationship"); *Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc.*, 2009 WL 855648, at *10 (S.D.N.Y. 2009) ("plaintiffs' allegation that they reposed complete confidence and trust in GSC…does not lead us to conclude" there is a fiduciary relationship outside of the contract); *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 554 (S.D.N.Y. 2007) ("a fiduciary obligation will not be imposed on a party merely because it possesses relative expertise as compared to the other"); *Rosenblatt v. Christie, Manson & Woods Ltd.*, 2005 WL 2649027, at *9 (S.D.N.Y. 2005) (that "the plaintiff had engaged in business transactions with Christie's, in his personal capacity…and that he had a longstanding personal relationship with Christie's Chairman, does not transform the contractual relationship at issue here into a fiduciary one").

[68] The result is the same under Massachusetts and Florida law. *See Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995) ("[T]he plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature." (quoting *Superior Glass Co. v. First Bristol Cnty. Nat. Bank*, 380 Mass. 829, 832 (Mass. 1980))); *Silver*, 760 F. Supp. 2d at 1339 ("[O]ne may not unilaterally impose a fiduciary responsibility on another simply by reposing trust; absent some conscious acceptance of such duties, no fiduciary relationship is created.").

General Terms expressly state that JPMC "shall be responsible for the performance of only those duties that are set forth in this Agreement." (56.1 ¶ 87.[69])  Because JPMC never "assume[d] control and responsibility" beyond this, the Doelgers' purported "subjective" reliance does not create a fiduciary duty.  *See Zorbas*, 48 F. Supp. 3d at 487; *Indus. Gen. Corp.*, 44 F.3d at 44; *Abercrombie*, 438 F. Supp. 2d at 274.

In addition to being insufficient as a matter of law, the Doelgers' bare claims of subjective reliance on JPMC for "all decisions in connection with the MLP Investments and the Loans" (Docket No. 1 ¶ 78) are belied by the uncontested factual record.  In reality, (i) Mr. Doelger acknowledged that he was "expected to rely on [his] own evaluation of information received when making [his] decisions" regarding the Advisory Account[70]; (ii) he was advised to consult his own "legal, tax, accounting, and financial advisors,"[71] and did so through his personal attorney, Paul Roberts, and accountant, Bruce Haverberg[72]; (iii) the record is replete with examples of the Doelgers receiving and choosing not to follow advice from JPMC and others[73]; and (iv) Mr. Doelger himself had decades of experience in the energy business and with MLPs to rely on.[74] There was no reliance as a matter of law.  *See, e.g.*, *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 739 (2d Cir. 1984) (no fiduciary duty claim where contract disclaimed reliance and plaintiff confirmed he relied on "advice and counsel" of their own professional advisors).

Finally, Plaintiffs argue that JPMC's purported knowledge of Mr. Doelger's mental decline created a fiduciary duty.  First, Mrs. Doelger's bare interrogatory assertion that she told Mr. Baker

---

[69] On top of this, the Advisory Agreement expressly stated that "any advice the Bank gives pursuant to this Agreement is limited to the [Portfolio] Assets."  (56.1 ¶ 81(f).)

[70] (56.1 ¶ 81(g).)

[71] (56.1 ¶ 81(g).)

[72] (56.1 ¶ 19-29, 112-115.)

[73] (56.1 ¶¶ 48-50, 118-120, 129, 131-133.)  In fact, Mr. Doelger's maverick and headstrong approach to investing was also evident with his prior MLP investment manager, Paul McPheeters of Atlantic Trust.  (56.1 ¶¶ 48-50.)

[74] (56.1 ¶¶ 3-4, 6, 16-18, 22-27, 30-51, 63-68.)

that Mr. Doelger ▮▮▮▮▮▮▮▮▮▮▮ (which JPMC disputes) is not enough to create a material issue of fact about JPMC's knowledge of Mr. Doelger's purported mental decline.  (56.1 ¶ 164.)  Regardless, JPMC being told that Mr. Doelger ▮▮▮▮▮▮▮ does not result in JPMC "h[olding] itself out as being willing or able to" take on a special fiduciary role apart from the Advisory Agreements.  *Zorbas*, 48 F. Supp. 3d at 486-87.  Fiduciary duty claims have been dismissed with far greater evidence of a bank's awareness of mental impairment.  *See, e.g.*, *Est. of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.*, 2015 WL 5660945, at *11 (S.D.N.Y. 2015) (no fiduciary duty despite client being "incapable of communicating and [having] comprehension skills [that] were severely impaired").

### 3. *Even If Defendants Had Owed A Separate Fiduciary Duty, There Is No Evidence Of Breach*

Even if Defendants had owed a separate fiduciary duty (though they did not), there is no evidence it was breached.[75]  The Advisory Agreements limited JPMC's (and Chickasaw's) discretion (and any fiduciary capacity) to "manag[ing] the portfolio investments subject to the annexed Portfolio Schedule," which only allowed MLP investments.  (56.1 ¶ 81(d).)

Plaintiffs do not allege (and there is no evidence) that Defendants breached a duty in the way they managed investments within the MLPEI strategy.  Rather, Plaintiffs' central premise is that Defendants "breached their fiduciary duties by failing to diversify the Doelgers' investments" *away* from MLPs.  (*See, e.g.*, Docket No. 1 ¶ 252.)  Just as this allegation does not support a breach of contract claim (*see* Argument Section II.B.2.a), Plaintiffs cannot state a claim based on the premise that Defendants had a fiduciary duty to violate the express terms of the Advisory

---

[75] The General Terms limit JPMC's liability to actions of "gross negligence or willful misconduct."  (56.1 ¶ 86.)  Therefore, to succeed on any breach of fiduciary duty claim they may have, Plaintiffs must show that any breach was willful or grossly negligent.  *See Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*, 156 A.D.3d 464, 465 (N.Y. 1st App. Div. 2017) (dismissing a breach of fiduciary duty claim premised on conclusory assertions of bad faith because an "exculpatory provision…bar[red] breach of fiduciary duty claims except in cases of fraud, bad faith, willful misconduct, or gross negligence").

Agreements.

Courts have rejected similar claims from plaintiffs who hired bank defendants to manage leveraged investment portfolios limited by mandate to particular securities. In *Zorbas*, an investor who had chosen a portfolio that was "managed almost exclusively in equities" faulted the bank defendant for not "rebalancing" his portfolio out of equities during the 2008 financial crisis when Mr. Zorbas faced margin calls and was forced to sell. *Zorbas*, 48 F. Supp. 3d at 469, 471, 489-90. The *Zorbas* court found that, because the bank "did not fail to manage the Investment Account in accordance with [the contract and] Plaintiff's selected investment objective," it "did not breach its fiduciary duty as manager of a discretionary Investment Account." *See* 48 F. Supp. 3d at 489. Similarly, in *Guerrand Hermes v. J.P. Morgan & Co. Inc.*, an ultra-high-net-worth and experienced investor claimed a breach of fiduciary duty because the bank invested his leveraged portfolio in in high-risk emerging markets securities that declined in value and triggered a margin call. 2 A.D.3d 235, 237 (N.Y. 1st App. Div. 2003). Because "the very purpose of the investment strategy" was to concentrate investments in that sector, and because the Investor (like Mr. Doelger) affirmed the bank was not responsible for proposing the leveraged investment strategy, the court rejected his fiduciary duty claim on summary judgment. *Id.*

The same analysis applies here. Because Defendants invested the assets consistent with Mr. Doelger's mandate, and because the Advisory Agreements did not give Defendants the discretion to unilaterally diversify the assets out of MLPs, as a matter of law Defendants did not breach a fiduciary duty owed to the Doelgers.

### 4.   *There Is No Evidence Of Any Breach of Any Fiduciary Duties Owed By Chickasaw*

Plaintiffs' fiduciary duty claim against Chickasaw also fails as a matter of law as Chickasaw's duties and obligations were limited to managing the assets consistent with its MLPEI strategy, and there is no allegation or evidence that Chickasaw did not do so properly. Plaintiffs

appointed JPMC as investment manager, and under the authority granted to JPMC in the Advisory Agreements, JPMC appointed Chickasaw sub-advisor.[76]   Chickasaw's role was to select MLP investments for Plaintiffs' MLPEI portfolio in the Advisory Account, and its relationship to Plaintiffs wholly depended on the primary relationship of JPMC to Plaintiffs.[77]   Thus, the relationship of Chickasaw to Plaintiffs could not exist without the Advisory Agreements between Plaintiffs and JPMC.[78]

As sub-advisor, Chickasaw undertook certain delegated tasks.   The limited scope of its obligations and duties were set by the AIMS and the term sheet associated with the Advisory Account (the "Term Sheet").[79]   The only duties to Plaintiffs related to the investment and management of the "Assets"[80]—Chickasaw's sole duty was to manage its MLPEI strategy.   (56.1 ¶¶ 95(i)-(k), 95(m).[81])   Chickasaw did not undertake to determine the needs of Plaintiffs, the

---

[76] (56.1 ¶¶ 81(d)-(e), 95(g).)

[77] The SEC recognizes the broader idea of advice has three parts: (1) determination of "the needs of the particular client"; (2) determination of "the portfolio strategy that would lead to meeting the client's needs"; and (3) "the choice of securities that the portfolio would contain," and that an adviser's fiduciary duties are limited to the "services undertaken on the client's behalf." *Commission Interpretation Regarding the Standard of Conduct for Investment Advisers*, SEC Release No. IA-5248 (the "2019 SEC Interpretation") at 12 n.32 (June 5, 2019); *see also Subagent*, *Black's Law Dictionary* (11th ed. 2019) ("A person to whom an agent has delegated the performance of an act for the principal; a person designated by an agent to perform some duty *relating to the agency*." (emphasis added)); Tracy Bateman, *et al.*, 2A N.Y. Jur. 2d Agency § 167 (2d ed. 2023) ("Where the agent has the power to appoint a subagent, the agent can delegate no greater authority than the agent possesses."). Chickasaw only undertook to select individual MLP investments under its MLPEI strategy. *See, e.g.*, Agreement for Investment Management Services ("AIMS") §§ 2.02, 2.03, 2.08, 4.03, Appendix A (56.1 ¶¶ 95, 98).

[78] Thus, Plaintiffs' claim for breach of fiduciary duty against Chickasaw relating to the Advisory Agreements fails for the same reasons Plaintiffs' claim against JPMC fails.  (*See* Argument Sections III.A.1-2 *supra*.)

[79] (*See* 56.1 ¶¶ 95, 97-98.)

[80] The AIMS defines "Assets" as "the investments and cash of the Client held by the Custodian and *designated by the Advisor [i.e., JPMC] to be managed by the Outside Portfolio Manager*."  (56.1 ¶ 95(h)) (emphasis added).

[81] AIMS § 2.08(a) provides, Chickasaw "acknowledges that it is a fiduciary of the Client *with respect to the investment and management of the Assets*. Except as otherwise provided in this Agreement, the Outside Portfolio Manager shall discharge all of *its duties and exercise all of its powers hereunder*...(i) in good faith in the interest of client…, and avoiding conflicts of interest, (ii) consistent with its fiduciary duty under the Adviser's Act which requires Outside Portfolio Manager to act in good faith and to provide full and fair disclosure of potential conflicts of interest, and (iii) otherwise in accordance with documents and instruments governing the Client's Account, to the extent that such documents and instruments have been provided by the Advisor or the Client and *acknowledged by the Outside Portfolio Manager*."  (56.1 ¶ 95) (emphasis added).

strategy to meet those needs or the size of the Assets invested in its MLPEI strategy.[82]

According to the SEC, an investment adviser's fiduciary duty is determined by the scope of the relationship:

> The fiduciary duty follows the contours of the relationship between the adviser and its client, and the adviser and its client may shape that relationship by agreement, provided there is full and fair disclosure and informed consent…. Although all investment advisers owe each of their clients a fiduciary duty under the Advisers Act, that fiduciary duty must be viewed in the context of the agreed-upon scope of the relationship between the adviser and the client.   In particular, the specific obligations that flow from the adviser's fiduciary duty depend on the functions the adviser, as agent, has agreed to assume for the client, its principal.

2019 SEC Interpretation at 9-10; *see also id.* at 12 n.32.  The delegation by JPMC to Chickasaw was disclosed and agreed to by Plaintiffs in the Advisory Agreements (56.1 ¶¶ 81(e), 142) and Portfolio Schedules (56.1 ¶¶ 82, 142), and the scope of duties delegated to Chickasaw was detailed in the AIMS (56.1 ¶¶ 95, 98) and Terms Sheets (56.1 ¶¶ 97-98, 146-147).

Plaintiffs' Complaint does not allege Chickasaw mismanaged the investments within the MLPEI strategy (Docket No. 1 at ¶¶ 247–260), and Plaintiffs have offered no proof that Chickasaw mismanaged the MLPEI strategy, the management of which was the only service it undertook to provide to Plaintiffs.  Rather, Plaintiffs allege that Chickasaw and JPMC breached fiduciary duties to Plaintiffs by investing in the MLPEI strategy at all.  (Docket No. 1 at ¶¶ 250–255).  Because Plaintiffs have offered no proof of any breach of a duty owed in connection with the service Chickasaw undertook to provide, the fiduciary duty claim against Chickasaw fails and must be dismissed.

---

[82] *See supra* note 77*;* 56.1 ¶¶ 95(h); 95(l).  Instead, the AIMS also provided that JPMC had reviewed the Plaintiffs' investment objectives with Plaintiffs in accordance with its standard procedures with respect to investment product suitability.  (56.1 ¶ 95(n).)

5. *Defendants' Actions Did Not Cause The Doelgers Any Injury, And Therefore Plaintiffs Cannot Establish The Causation Element Of Their Fiduciary Duty Claim*

For the reasons stated in Argument Section II.B.3, there is no evidence that Defendants were a proximate or but for cause of the Doelgers' damages, which resulted from Mr. Doelger's own investment choices.  Thus, the fiduciary duty claim fails a matter of law for lack of causation.[83]

**B.  JPMC Did Not Owe A Fiduciary Duty To The Doelgers Concerning Their Loans**

Plaintiffs cannot base their breach of fiduciary duty claim on JPMC's role as the Doelgers' lender, because "[t]he relationship between a borrower and lender is normally conducted at an arm's length and governed solely by the contract between them."  *Zorbas*, 48 F. Supp. 3d at 480.[84]

If Plaintiffs argue that a special fiduciary duty arose from JPMC's dual role as lender and investment manager, that argument fails because the LOC agreements provided that JPMC had

██████████████████████████████████████████████████████

████████████████████ in the event of a collateral liquidation.  (56.1 ¶ 62.[85])  Like the plaintiff in *Zorbas*, the Doelgers cannot show that JPMC's dual role as lender and investment manager created in JPMC "an *unusual* advantage resulting from the confidence that [p]laintiff placed in" it or that JPMC "assum[ed] control and responsibility outside the terms provided for in the contract." *Zorbas*, 48 F. Supp. 3d at 481 (emphasis in original).  Moreover, Plaintiffs' claim that JPMC breached its duties by "never disclos[ing]" a "conflict of interest" to the Doelgers (Docket No. 1 ¶ 258) is refuted by the incontrovertible fact that they did so.  (*See* 56.1 ¶¶ 62, 81(f), 81(l)).)

---

[83] *See, e.g.*, *Litton Indus. Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 1989 WL 162315, at *2-3 (S.D.N.Y. 1989) (granting summary judgment on breach of contract, fiduciary duty, and negligence claims because no evidence of causation).
[84] *See also, e.g.*, *Infanti v. Scharpf*, 570 F. App'x 85, 88 (2d Cir. 2014) ("Under ordinary circumstances, a creditor-debtor relationship does not give rise to fiduciary duties."); *Roswell Cap. Partners LLC v. Alternative Const. Techs.*, 638 F. Supp. 2d 360, 368 (S.D.N.Y. 2009) ("[A]n arm's length borrower-lender relationship is not of a confidential or fiduciary nature."); *Silver*, 760 F. Supp. 2d at 1338 (under Florida law,"[t]he general rule is that the relationship between a bank and its borrower is that of a creditor-debtor and that a bank owes the borrower no fiduciary duty").
[85] *Zorbas*, 48 F. Supp. 3d at 481 ("[b]ecause any alleged control and dominance as a result of U.S. Trust's ability to execute a collateral call on the Investment Account is authorized by the Commercial Pledge Agreement, it cannot also serve as the extra-contractual source of fiduciary duty").

### C.  JPMC Did Not Owe A Fiduciary Duty Related To The Swap Transactions

Plaintiffs' fiduciary duty allegations regarding the currency swap fail because JPMC acted as a counterparty, not a fiduciary, to the Doelgers in connection with their swap transactions.  *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 442 (S.D.N.Y. 2010) (no fiduciary duty between swap counterparties).[86]  The ISDA agreements Mr. Doelger executed in connection with his swap transaction explicitly stated that "[t]he other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction."  (56.1 ¶ 166.[87])

### IV.  PLAINTIFFS' NEGLIGENCE/GROSS NEGLIGENCE AND NEGLIGENT MISREPRESENTATION CLAIMS FAIL AS A MATTER OF LAW (COUNTS III, IV)

### A.  The Negligence/Gross Negligence Claim Is Not Viable (Count III)

*1.  Multiple Threshold Issues Preclude Plaintiffs' Negligence/Gross Negligence Claim*

Plaintiffs' negligence and gross negligence claim (collectively the "Negligence Claim") fails for several independent reasons:

*Duplicative of Contract.*—First, the Negligence Claim duplicates the breach of contract claim.[88]  A negligence (or gross negligence) claim based on a contractual relationship cannot succeed unless there is "a legal duty independent of the contract itself."  *Zorbas*, 48 F. Supp. 3d at

---

[86] *See also Procter & Gamble Co. v. Bankers Tr. Co.*, 925 F. Supp. 1270, 1289 (S.D. Ohio 1996) (granting summary judgment under New York law because one party's "superior knowledge in the swaps transactions… does not convert their business relationship into one in which fiduciary duties are imposed").

[87] Any claim for breach of fiduciary duty stemming from the rate cap transaction Mr. Doelger entered with JPMC in March 2018 fails for the same reason: JPMC explicitly disclosed, and Mr. Doelger acknowledged, that JPMC ███████████████████████████████████ Mr. Doelger in connection with that transaction.  (56.1 ¶ 174.)

[88] For the same reasons that New York law applies to Plaintiffs' breach of fiduciary duty claim (as any duty arose from the Advisory Agreements), New York law applies to Plaintiffs' Negligence Claim and negligent misrepresentation claim.  *See* note 62 *supra*.  New York law applies to these claims for the separate reason that they are based on the same set of operative facts as Plaintiffs' breach of contract claim.  (*Compare, e.g.*, Docket No. 1 ¶¶ 264-265 *with* Docket No. 1 ¶¶ 272-273.)  *See also Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993) ("[C]ontract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties."); *Druckers', Inc. v. Pioneer Elecs. (USA), Inc.*, 1993 WL 431162, at *7 (D.N.J. 1993) (choice-of-law clause applied to tort claims where there was "no basis for [them] independent of the Agreement-absent the contractual relationship[,] [defendant]'s actions would not have occurred").

490.[89]  Moreover, "claims based on negligent or grossly negligent performance of a contract are not cognizable." *Fillmore E.*, 552 F. App'x at 19.  Because Defendants did not owe a duty to Plaintiffs outside of what was agreed to in the Advisory Agreement (*see* Argument Sections III.A.1-2), their Negligence Claim must be dismissed.[90]

*Economic Loss Rule.*—The Negligence Claim is also barred by the economic loss doctrine, because Plaintiffs only allege pecuniary damages and not any "personal or property injury." *PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*, 2003 WL 22118977, at *27 (S.D.N.Y. 2003) (dismissing tort claim "alleg[ing] only economic loss").[91]

*Time Barred.*—Claims as to negligent or grossly negligent conduct occurring before June 23, 2018 are also time-barred.  *See Bich v. Bich*, 2023 WL 2819453, at *4 (N.Y. Sup. Ct. 2023) (three-year statute of limitation from when the alleged negligent conduct occurred).[92]  For example, several Negligence Claim allegations reference conduct related to the 2015 Advisory Account opening.[93]  Claims arising out of such pre-June 23, 2018 conduct are time-barred.

*Limitation of Liability.*—Plaintiffs also waived negligence claims in the General Terms, which limit JPMC's liability to "direct damages" caused by "gross negligence or willful

---

[89] *See also, e.g., Fillmore E.*, 552 F. App'x at 19 (affirming dismissal of tort claims based on duty arising out of a contract); *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987) ("breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated").

[90] Plaintiffs' allegation that Defendants "failed to exercise a duty of care in violation of the Advisers Act" is meritless. (Docket No. 1 ¶ 270.)  First, that act does not apply to JPMC, a "bank."  *See* Argument Section I.B.1 *supra*.  Second, Plaintiffs do not state how the IAA creates a "duty of care" from independent of the Advisory Agreement.

[91] *See also, e.g., Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) ("New York law… restrict[s] plaintiffs who have suffered 'economic loss,' but not personal or property" to actions in contract law); *Tasco Const., Inc. v. Town of Winchendon*, 1994 WL 879613, at *2 (Mass. Super. 1994) ("Massachusetts follows the 'economic loss rule,' which rule precludes negligence claims for purely economic losses").

[92] *See also, e.g., Stat. Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 472 (S.D.N.Y. 2000), aff'd sub nom. *Black Radio Network, Inc. v. Nynex Corp.*, 14 F. App'x 111 (2d Cir. 2001) (applying three-year statute of limitation for gross negligence claim); Mass. Gen. L. c. 260 § 2a (three-year statute of limitations for tort actions); Fla. Stat. § 95.11(4)(a) (two-year statute of limitations for "action[s] founded on negligence").

[93] *See* Docket No. 1 ¶ 271 ("The Advisers failed to make a reasonable inquiry into Mr. Doelger's investment objectives…."); *id.* ¶ 274 ("The Advisers recklessly and imprudently invested the Doelgers' liquid assets into undiversified and highly risky investments.").

38

misconduct." *See* note 75 *supra*.  This waiver is binding and enforceable and forecloses Plaintiffs' simple negligence claim.[94]  Assuming the Negligence Claim survives at all, it is only viable if JPMC engaged in conduct "smack[ing] of intentional wrongdoing" and "fail[ed] to exercise even slight care."  *Ryan v. IM Kapco, Inc.*, 88 A.D.3d 682, 683 (N.Y. 2d App. Div. 2011).

### 2. *Any Remaining Negligence/Gross Negligence Claim Lacks Admissible Support*

To the extent the Negligence Claim remains after consideration of the threshold issues above, it fails because Plaintiffs cannot point to admissible evidence that Defendants engaged in gross negligence that caused Plaintiffs' alleged injuries.  To establish negligence, a plaintiff must show (1) a duty owed to the plaintiff; (2) a breach of the duty; and (3) resulting injury.  *Zorbas*, 48 F. Supp. 3d at 490.[95]  To rise to the level of gross negligence (and avoid the limitation-of-liability clause), a party's conduct must "smack[] of intentional wrongdoing or evince[] a reckless indifference to the rights of others."  *Ryan*, 88 A.D.3d at 683.[96]

Plaintiffs' Negligence Claim is grounded in five allegations that lack evidentiary support.[97] (Docket No. 1 ¶¶ 271-275.)  First, as with the equivalent contract claims (*see* Argument Section II.B.2.a *supra*), there is no basis to suggest Defendants did not inquire into the Doelgers' investment objectives or invest consistent with them.[98]  (Docket No. 1 ¶¶ 271-272.)  Second (*see*

---

[94] *See, e.g.*, *Habberstad v. Revere Sec. LLC*, 183 A.D.3d 532, 532 (N.Y. 1st App. Div. 2020) (enforcing a clause relieving a fiduciary "of liability for acts and omissions other than willful misconduct"); *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370 (N.Y. 1992) (stating that exculpatory clauses are enforceable unless they purport to limit liability for intentional wrongdoing or gross negligence).  Florida and Massachusetts also enforce such exculpatory clauses.  *See, e.g.*, *Elalouf v. Sch. Bd. of Broward Cnty.*, 311 So. 3d 863, 865 (Fla. Dist. Ct. App. 2021); *Marantz Co. v. Clarendon Indus., Inc.*, 670 F. Supp. 1068, 1073 (D. Mass. 1987).

[95] The Florida and Massachusetts elements of negligence are comparable.  *See, e.g.*, *Santos v. U.S. Bank Nat. Ass'n*, 54 N.E.3d 548, 558 (Mass. App. Ct. 2016); *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 22 (Fla. Dist. Ct. App. 2022).

[96] *Brandt v. Davis*, 98 Mass. App. Ct. 734, 741 (Mass. App. Ct. 2020) ("[G]ross negligence is… an act or omission respecting legal duty of an aggravated character."); *Weller v. Reitz*, 419 So. 2d 739, 741 (Fla. Dist. Ct. App. 1982) ("[G]ross negligence consists of a conscious and voluntary act or omission which is likely to result in grave injury when in the face of a clear and present danger of which the alleged tortfeasor is aware." (citation omitted)).

[97] As stated in Argument Section IV.A.1, claims based on the assertions in paragraphs 271 and 274 are time-barred.

[98] Plaintiffs' Negligence Claim (Count III) further fails to the extent asserted against Chickasaw because Chickasaw's duties to Plaintiffs were limited to management of its MLPEI strategy, as defined by the AIMS and Term Sheet.  (*See*

Argument Section II.B.2.b *supra*), no evidence supports Plaintiffs' attacks on Defendants' portfolio reviews. (Docket No. 1 ¶ 273.) Third, the attack on Defendants for investing the Doelgers' assets in "undiversified" MLPs fails because, as explained in Argument Sections II.B.2.a and III.A.3, the Doelgers chose the strategy and Defendants were powerless to invest elsewhere. (Docket No. 1 ¶ 274.) Finally (*see id.* ¶ 275), not only is there no evidence that JPMC suggested "the Doelgers [to] maintain their position in the MLP Investments," the record is replete with examples of JPMC doing the exact opposite.[99]

### 3. *Plaintiffs Lack Evidence Of Causation For Their Negligence/Gross Negligence Claims*

For the reasons provided above (*see* Argument Section II.B.3 *supra*), Plaintiffs cannot show that Defendants' purportedly negligent or grossly negligent actions caused them injury.[100]

## B. The Negligent Misrepresentation Claim Also Fails (Count IV)

To prevail on their negligent misrepresentation claim, Plaintiffs must show that: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).[101] Plaintiffs cannot satisfy these elements.

---

Argument Section III.A.4 *supra*). Chickasaw did not owe a duty to Plaintiffs outside of what was agreed to in the AIMS and the Term Sheet and Plaintiffs' Negligence Claim against Chickasaw must be dismissed.

[99] (*See, e.g.*, 56.1 ¶¶ 108, 119-120, 129, 131.)

[100] *Fragrance Express Dot Com, Inc. v. Standard & Poor's Corp.*, 314 F. Supp. 2d 189, 195 (S.D.N.Y. 2003) (dismissing complaint on summary judgment and holding that "no reasonable jury could find for the plaintiff on its claim of negligence when the plaintiff… failed to produce any evidence to support its theory of loss causation."); *Ansam Assoc., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446-447 (2d Cir. 1985) (affirming dismissal of negligence claim on summary judgment where plaintiff offered only conjecture in support of theory of causation).

[101] New York law applies to the negligent misrepresentation claim for the reasons given above. *See* notes 62, 88 *supra*. That said, Massachusetts and Florida law are comparable. *See also Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 47-48 (Mass. Super. 2009) (comparable elements under Massachusetts law); *Woodson*

1.  *The Negligent Misrepresentation Claim Has The Same Flaws As The Negligence Claim*

As a threshold matter, Plaintiffs' negligent misrepresentation claim fails for the same reasons their Negligence Claim fails.  *See* Argument Section IV.A *supra*.  Specifically, it is: (i) duplicative of their breach of contract claim[102]; (ii) barred by the economic loss rule[103]; (iii) time barred as to conduct before June 23, 2018[104]; and (iv) precluded by the General Terms.[105]

2.  *The Claim Also Fails Because Plaintiffs Have Not Identified An Actual Misrepresentation*

Plaintiffs' claim must also be dismissed because Plaintiffs have identified no false representations made by Defendants.  Plaintiffs' negligent misrepresentation claim alleges that[106]:

> 282.  The Advisers misrepresented the income the MLP Investments were generating.
>
> 283.  The Advisers misrepresented the performance of the MLP Investments.
>
> 284.  The Advisers misrepresented and mischaracterized the risks associated with the MLP Investments.
>
> 285.  The Advisers misrepresented and mischaracterized the MLP Investments as providing inflation protection, predictable cash flow and attractive characteristics in both inflationary and deflationary environments.

First, many of the purported misrepresentations relate to statements made in a presentation (defined as the "Presentation") given at a meeting with the Doelgers, JPMC, and Chickasaw in the

---

[102] *See, e.g.*, *Zorbas*, 48 F. Supp. 3d at 491 ("a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated"); *Behrman v. Allstate Ins. Co.*, 388 F. Supp. 2d 1346, 1349 (S.D. Fla. 2005), aff'd sub nom. *Behrman v. Allstate Life Ins. Co.*, 178 F. App'x 862 (11th Cir. 2006) (dismissing a tort claim where it was not independent from a breach of contract claim).

[103] *PPI Enters. (U.S.), Inc.*, 2003 WL 22118977, at *26 (negligent misrepresentation subject to economic loss rule).

[104] *Bich*, 2023 WL 2819453, at *4 (applying three-year statute of limitations to negligent misrepresentation claim); *Beaconsfield Townhouse Condo. Tr. v. Zussman*, 49 Mass. App. Ct. 757, 761 (Mass. App. Ct. 2000) (same); *Ostreyko v. B. C. Morton Org., Inc.*, 310 So. 2d 316, 318 (Fla. Dist. Ct. App. 1975) (same).

[105] *Off. Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 WL 362794, at *16 (S.D.N.Y. 2002) (exculpatory clause barring "ordinary negligence" claims bars negligent misrepresentation claims); *Sapir v. Dispatch Techs., Inc.*, 2019 WL 7707794, at *3 (Mass. Super. 2019) (holding that a general release provision barred claims for negligent misrepresentation).

[106] Paragraph 281, alleging Defendants "made various misrepresentations," is vague to the point of meaninglessness and cannot form the basis of a negligent misrepresentation claim.  *E.g.*, *Ferro Fabricators v. 1807-1811 Park Ave. Development Corp.*, 127 A.D.2d. 479, 470 (N.Y. 1st App. Div. 2015) (dismissing negligent misrepresentation claim for "failure to plead with requisite particularity").

"summer of 2015."[107]   (*See* Docket No. 1 ¶¶ 31-43.)  Even if these statements were false and otherwise satisfied the elements of a negligent misrepresentation claim—which they do not— Plaintiffs' claims as to the Presentation are time-barred.  *See* note 104 *supra*.

Second, paragraphs 282-283 relate in part to statements in the Presentation and various monthly/year-end Advisory Account summaries that allegedly mischaracterized MLP distributions as "entirely income" or "yield" instead of "consisting mostly of return of capital." (*See* Docket No. 1 ¶¶ 155-56.)  Plaintiffs quibble with the use of the terms "income" and "yield" and try to conflate the everyday use of term "income" with its specific meaning under the tax code. However, substantial evidence shows that the references to income and yield were accurate.[108]  In any event, in the Advisory Agreements JPMC expressly disclaimed providing tax or accounting advice to the Doelgers, and it did not do so.  (*See* 56.1 ¶ 81(g), (k).)

Third, Plaintiffs claim the "2019 year-end Portfolio Report" misrepresented the portfolio's performance "since inception" by "misrepresent[ing] the decline as '3.8%' when by that the time the portfolio had actually declined by more than 50%."  (Docket No. 1 ¶¶ 160, 283).  But the report is correct: Plaintiffs ignore the Doelgers' MLP distribution withdrawals, and that (as the reports state), ███████████████████████████████  (56.1 ¶ 128.)

Fourth, Plaintiffs target statements in the Presentation that the MLPEI strategy involved "careful consideration of risk/reward" and "Dashboard Risk Control," which they say were

---

[107] Plaintiffs have not and cannot offer proof of anything that Chickasaw represented to Plaintiffs outside of any representations at the August 10, 2015 meeting.  Plaintiffs have stipulated that Mr. Doelger will not provide any evidence, and it is undisputed that Chickasaw did not communicate with others, including Mrs. Doelger, aside from JPMC about Plaintiffs' account after that meeting.  (56.1 ¶¶ 74-76.)  Not only are there no additional allegations against Chickasaw, but each of these is time barred and should be dismissed.  *See* note 104 *supra*.

[108] For example, Plaintiffs' former MLP manager, Mr. McPheeters, testified that MLP distributions are commonly referred to as "yield" and disagreed with the proposition that MLP distributions are not income.  (56.1 ¶¶ 52, 54.) Moreover, Plaintiffs' longtime accountant, Mr. Haverberg, indicated that MLP distributions are a form of income. (56.1 ¶ 53.)  Finally, the Advisory Account statements expressly told Plaintiffs that estimates of "income" and "yield" in the statement ██████████████████████  (56.1 ¶ 55.)

"misleading" and falsely "portray[ed] MLPs as low risk investments."  (Docket No. 1 ¶ 41.)

Plaintiffs do not identify how these statements are false.  To state the obvious, these representations

would lead no reasonable investor to believe that the MLPEI portfolio was a "low risk

investment."[109]  Regardless, statements or promises of future conduct or expectations, puffery, or

opinions of value are not actionable as negligent misrepresentation.  *See Hydro Invs., Inc.*, 227

F.3d at 20-21.

Finally, Plaintiffs take issue with the presentation statement that "MLPs have

characteristics that are attractive in both inflationary and deflationary environments."  (Docket No.

1 ¶ 40; Docket No. 1-1 at 14.)  Again, Plaintiffs do not even bother to assert how this statement is

false.

### 3.   *There Is No Evidence That Plaintiffs Relied On Any Purported Misrepresentation*

Plaintiffs also cannot show reliance, an essential element of a negligent misrepresentation

claim.  As noted above, the Advisory Agreements expressly stated JPMC does not provide "tax,

legal, or accounting advice" and that clients should consult others for such advice.  (56.1 ¶ 81(g),

(k).)  Mr. Doelger had his own tax, legal, and accounting advisors, including Mr. Haverberg, on

whom he relied for such matters.[110]  For that reason alone, Plaintiffs' negligent misrepresentation

claim fails as a matter of law.  *See Hydro Invs., Inc.*, 227 F.3d at 21-22.

### 4.   *There Are No Allegations Of Fact Or Evidence Sufficient To Show Any Misrepresentations Caused The Doelgers Any Injury*

For the reasons stated *supra* at Argument Section II.B.3, Plaintiffs cannot show that any

---

[109] The Presentation extensively discussed the risks of MLP investments, including "regulatory risk," "tax law changes," "weak distribution coverage ratios and highly levered capital structures," and "energy risks such as changes in end-user demand."  (56.1 ¶ 73.)

[110] In fact, Mr. Haverberg testified that (i) Mr. Doelger relied on him for advice on the tax implications of MLPs and (ii) Mr. Doelger admittedly understood the tax consequences of MLP distributions.  (56.1 ¶¶ 22-23.)

purported misrepresentations from Defendants caused Plaintiffs' alleged damages.[111]

## V.   DEFENDANTS DID NOT ENGAGE IN ANY UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF MASS. GEN. L. C. 93A § 2(A) (COUNT VIII)

### A.  Chapter 93A Does Not Apply

As an initial matter, Plaintiffs' 93A claim must be dismissed because Massachusetts law does not apply here.  New York law—not 93A—governs claims premised on breaches of contractual promises.[112]  Plaintiffs' 93A claim arises principally from JPMC's role as the Doelgers' bank—a role defined by contracts governed by New York law.

That said, to the extent New York law does not apply, Florida law does.  For torts not premised on a contractual relationship or breach, Massachusetts applies a "functional approach" to determine which state bears the closest relationship to the parties and the issues.[113]  The Doelgers resided in Florida during the events at issue, received many of the allegedly deceptive statements in Florida, and suffered their injuries in Florida.  (56.1 ¶ 8.)  Florida, therefore, has the greatest interest in, and bears the most significant relationship to, the conduct underlying the Doelgers' 93A claim.[114]  Because the 93A claim "is not cognizable under [Florida] law," it must be

---

[111] *Solar Travel Corp. v. Nachtomi*, 2001 WL 641151, at *6 (S.D.N.Y. 2001) ("plaintiff is unable to demonstrate loss causation, which is an essential element of a claim for negligent misrepresentation"); *Revak v. SEC Realty Corp*., 18 F.3d 81, 89-90 (2d Cir. 1994) (affirming summary judgment because "[t]he absence of adequate causation is…fatal to a…[negligent misrepresentation claim] under New York law.").

[112] *See NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 168 (D. Mass. 2010) ("If a contract is governed by a particular state's law under a choice of law provision, then a party cannot bring a claim under another state's statute if that statutory claim is 'essentially duplicative' of a contract claim."); *Ne. Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 610 (1st Cir. 1993) (stating that Chapter 93A claims based on a willful or malicious breach of contract are "essentially duplicative of a traditional contract claim").

[113] *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 145 (1971); *Daynard v. MRRM, P.A*., 335 F. Supp. 2d 156, 163 (D. Mass. 2004).

[114] *See Value Partners S.A. v. Bain & Co.*, 245 F. Supp. 2d 269, 277 (D. Mass. 2003) (holding, in a suit against a Massachusetts citizen, that 93A did not apply where the plaintiff was domiciled in Brazil, was injured in Brazil, and a substantial portion of the relevant conduct occurred there); *Krishnan v. Blueprint Healthcare LLC,* 2021 WL 4255359, at *4 (D. Mass. Sept. 17, 2021) (holding, in a claim brought by a New Hampshire resident against a Massachusetts corporation, that New Hampshire had the strongest interest).  That Massachusetts does not have the most significant relationship to the conduct is particularly true as to Chickasaw where the 93A claim is asserted by Florida residents (Docket No. 1 at ¶ 5) against Chickasaw, which has its principal place of business in Tennessee (56.1 ¶ 70) and where the only alleged purported deceptive conduct occurred during an in-person meeting with Chickasaw

dismissed.  *See Shri Gayatri, LLC v. Days Inns Worldwide, Inc.*, 2018 WL 1542376, at *6 (D.

Mass. 2018).

### B.  Plaintiffs Cannot Prove An Unfair Or Deceptive Act or Causation

Plaintiffs' conclusory allegations make it virtually impossible to discern the basis of their

93A claim.[115]  To the extent their allegations are discernable, however, Plaintiffs can neither plead

nor adduce sufficient evidence of a deceptive (or unfair) act or of causation.

### 1.  *Defendants Did Not Commit An Unfair Or Deceptive Act*

Conduct is "deceptive" under 93A "if it possesses a tendency to deceive" and "could

reasonably be found to have caused a person to act differently from the way he [or she] otherwise

would have acted."  *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 70 (1st Cir. 2020).  "A violation

of the statute requires a 'material, knowing, and willful'" act of deception.  *See Vieira v. First Am.

Title Ins. Co.*, 668 F. Supp. 2d 282, 293 (D. Mass. 2009).  "Mere negligence" is not enough.  *See

Swenson v. Yellow Transp., Inc.*, 317 F. Supp. 2d 51, 54 (D. Mass. 2004); *Anoush Cab, Inc. v.

Uber Techs., Inc.*, 8 F.4th 1, 18 (1st Cir. 2021) ("something more and rising to the level of extreme

or egregious conduct is required").  In determining whether conduct is deceptive, courts look to

"the entirety of" the conduct, "not each action viewed in isolation."  *Zielinski v. Citizens Bank,

N.A.*, 552 F. Supp. 3d 60, 72 (D. Mass. 2021).  The Doelgers have offered no evidence that

Defendants acted in a deceptive or unfair way, let alone with the level of intent required by 93A.

---

discussing Plaintiffs' account on August 10, 2015 in New York.  (Docket No. 1 at ¶ 43; 56.1 ¶ 73.)  This was the sole
in-person meeting with Plaintiffs and Chickasaw where Plaintiffs' account was discussed.  (56.1 ¶¶ 74-76.)  Although
Plaintiffs also attended a Chickasaw investor conference in 2019, Plaintiffs did not specifically discuss their account
at that conference.  (56.1 ¶ 75.)  Further, Plaintiffs have not and cannot offer proof of anything that Chickasaw
represented to Plaintiffs outside of any representations at the August 10, 2015 meeting.  *See* note 107 *supra*.

[115] (*See* Docket No. 1 ¶¶ 318-319 ("318. The Adviser' actions alleged herein, including its bad faith, various
misrepresentations and self-interested advice and acts, and failure to comply with federal regulations, constitute
violations of c. 93A.  319.  The Advisers willfully, wantonly, recklessly, and with gross negligence, engaged in the
conduct described herein, which they knew was deceptive, in the course of retail business, trade and commerce, and
had a deleterious impact on the public interest.").)

Plaintiffs conclusorily assert that Defendants made "various misrepresentations" (the closest Plaintiffs come to alleging deceitful activity), but there is no evidence of this.[116]  (Docket No. 1 ¶ 318.)  Also, the alleged misstatements of the Doelgers' net worth or investment experience that Mr. Doelger confirmed in the MLPEI Letter are not actionable.  Because the Doelgers should readily know whether such statements are true, making them does not suggest bad faith.[117]  Finally, any alleged misrepresentations about the future performance of the Doelgers' investments are not actionable.  Mere "bad advice" (assuming there were any) is not actionable under 93A, and there is no evidence that Defendants made deliberately false statements about the investments' performance.  *See Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 54 (1st Cir. 2014).[118]  The Doelgers must do more than show Defendants gave mistaken advice, although they have not even done that.  No evidence supports the requisite finding of Defendants' wrongful intent.

2. *Plaintiffs Have Failed To Establish Causation*

Because Mr. Doelger committed to his MLP strategy long before he brought his business to Defendants, *see* Argument Section II.B.3, *supra*, Plaintiffs cannot show the required causal connection between Defendants' alleged conduct and the losses caused by that strategy.[119]

### C.  Plaintiffs' 93A Claim Is Substantially Time-Barred

Setting the above points aside, the 93A claim is also barred to the extent it arises from

---

[116] To the extent Plaintiffs' 93A claim is premised on the same purported bad acts underlying claims such as negligent misrepresentation (*see* Argument Section IV.B), failing to prove those claims means that they "would have no reasonable expectation of proving a violation of c. 93A."  *See Spenlinhauer v. Kane*, 1998 Mass. App. Div. 155, at *4 (Mass. App. Ct. 1998).

[117] *See Bachini v. Edwards*, 2008 WL 2359727, at *13 (Mass. Super. 2008) (holding that a banker's mere failure to "accurately record [the plaintiff's] experience" and "her net worth" did not give rise to a 93A claim).  Such statements are also nonactionable against Chickasaw for a separate reason: it is not a party to the MLPEI Letter.

[118] *See also, e.g.*, *see Bachini*, 2008 WL 2359727, at *13 (holding, in a case in which an unsophisticated investor "suffered catastrophic losses," her advisor was not liable because his advice "was based on his honest and reasoned judgment… that the market would turn around").

[119] *See, e.g.*, *Ferreira v. Sterling Jewelers, Inc.*, 130 F. Supp. 3d 471, 484 (D. Mass. 2015) ("Chapter 93A requires proof of but for causation and proximate causation."); *King v. Wells Fargo Bank, N.A.*, 2019 WL 3717677, at *4 (D. Mass. 2019) (dismissing Chapter 93A claim for lack of causation).

conduct before June 23, 2017.[120]  A 93A claim's accrual is determined "by the same principles

that govern…the underlying action."  *Kozikowski v. Toll Bros.*, 246 F. Supp. 2d 93, 99 (D. Mass.

2003).  Where the underlying conduct is deceptive in nature, a claim accrues "when the injured

party knew, or, in the exercise of reasonable diligence, should have known the factual basis for the

cause of action."  *Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 213 (1st Cir. 1999).

While the Doelgers' 93A claims are entirely conclusory,[121] if they are based on any of the alleged

"misrepresentations" that occurred before June 23, 2017,[122] they are time-barred.

## VI. Plaintiffs' Elder Abuse Claim Is Baseless and Fails As A Matter Of Law (Count IX)

### A. Plaintiffs Cannot Simultaneously Pursue Statutory Claims Under Massachusetts And Florida Law Based On The Same Nucleus Of Facts

If the Court determines that Massachusetts law governs Plaintiffs' statutory claims (*e.g.*,

Chapter 93A) because Massachusetts has the closest relationship to the parties and issues, the

Florida elder abuse claim cannot survive.[123]  Setting this possibility aside, the Doelgers' Florida

elder abuse claim is also necessarily precluded as a substantive matter.

### B. There Are No Factual Allegations Or Evidence Sufficient To Satisfy The High Bar Set By The Elder Financial Exploitation Statute

Neither allegations nor evidence support Plaintiffs' claim for financial exploitation under

Florida's Adult Protective Services Act ("FAPSA"), which provides a private cause of action for

a "vulnerable adult who has been abused, neglected, or exploited as specified in this chapter."  Fla.

---

[120] *See, e.g.*, *C-Mart Herald St., Inc. v. AmTrust Fin. Servs., Inc*., 2020 WL 375937, at *4 (D. Mass. 2020) (holding that 93A is subject to a four-year statute of limitation); Mass. Gen. L. c. 260 § 5A (stating that 93A actions must be filed four years after they accrue).

[121] (Docket No. 1 ¶ 318 ("actions alleged [in the Complaint], including [Defendants'] bad faith, various misrepresentations and self-interested advice and acts, and failure to comply with federal regulations, constitute violations of c. 93A").)

[122] (Docket No. 1 ¶ 39 (presentation given in August 2015); ¶ 98 (statements in connection with MLPEI Letter).)

[123] *Cf., e.g.*, *Hoffart v. Wiggins*, 406 F. App'x 834, 835 (5th Cir. 2010) ("The district court determined that the substantive law of Texas, not Oregon, applied, so the Hoffarts could not bring the claim for statutory [elder] financial abuse" under Oregon law); *see Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 115 (D. Mass. 2001) (holding plaintiff failed to state a claim under Florida law because Massachusetts law applied).

Stat. § 415.1111.  Under FAPSA's definitions of those terms, Plaintiffs' claim fails because Mr. Doelger was not a "vulnerable adult" and was not "abused, neglected or exploited" by Defendants. FAPSA is an ill-fitting framework for this case because it seeks to protect elders from abuse at the hands of family members or close friends, not from banks or finance professionals.  Courts have therefore found that FAPSA claims can be brought only against caregivers,[124] which dooms Plaintiffs' claim against the Defendants—*i.e.*, financial institutions.

### 1.  Mr. Doelger Was Not A "Vulnerable Adult"

Under FAPSA, a "vulnerable adult" is one "whose ability to perform the normal activities of daily living…is impaired" due to a disability, dysfunction, brain damage, "or the infirmities of aging."  Fla. Stat. § 415.102(28).  There is no evidence that Mr. Doelger's ability to perform the "normal activities of daily living" was impaired.  To the contrary, Mr. Doelger was an intelligent individual able to lucidly discuss investment strategies and current events, to exercise, and to travel.  (56.1 ¶¶ 7, 9-11, 13-14.)  Critically, none of Mr. Doelger's ███████████████ ████████████████████████████████████████████████████████████████.  (56.1 ¶¶ 158-164, 194.)  Thus, Mr. Doelger was not a vulnerable adult under FAPSA, and Plaintiffs' claim should be dismissed.[125]

### 2.  Mr. Doelger Was Not Abused Or Neglected By Defendants

Additionally, Plaintiffs' FAPSA claim fails under FAPSA's definitions of "abuse" and "neglect."  These terms are limited to actions taken by specific people: "'Abuse' means any willful act or threatened act by a *relative, caregiver, or household member*."  Fla. Stat. § 415.102(1).

---

[124] *See, e.g.*, *Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*, 983 So. 2d 717, 721 (Fla. Dist. Ct. App. 2008) ("To state a cause of action under section 415.1111, a complaint must set forth factual allegations which demonstrate… that the defendant was a 'caregiver.'"); *S.S. v. Dep't of Child. & Fam. Servs.*, 805 So. 2d 879, 880 (Fla. Dist. Ct. App. 2001) (daughter was not caregiver and therefore could not be liable under FAPSA).

[125] *See, e.g.*, *Shave v. Stanford Coins & Bullions, Inc.*, 2009 WL 1748084, at *4 (S.D. Fla. 2009); *Krinsk v. SunTrust Banks, Inc.*, 2010 WL 11475608, at *2 (M.D. Fla. 2010) (dismissing FAPSA claim where plaintiff failed to allege she could not perform normal activities).

Likewise, "'Neglect' means the failure or omission on the part of the *caregiver*…." *Id.* § 415.102(16). Because Defendants are not Mr. Doelger's relatives, caregivers, or household members, they could not have abused or neglected Mr. Doelger under FAPSA.

### 3. *Mr. Doelger Was Not Exploited By Defendants*

FAPSA defines "exploitation," in two ways, and neither applies here. According to the first definition, "exploitation" involves (1) an individual "in a position of trust and confidence," who (2) "knowingly, by deception or intimidation" (3) obtains a vulnerable adult's funds with the intent "to temporarily or permanently deprive a vulnerable adult" of funds. Fla. Stat. § 415.102(8)(a). None of the elements apply here. First, Defendants had contractual relationships with the Doelgers and did not stand in a general "position of trust and confidence."[126] *See* Argument Section III.A.2. Second, Defendants did not use "deception or intimidation" to obtain Mr. Doelger's funds.[127] No evidence suggests that Defendants made any false statements to, or otherwise deceived Mr. Doelger. *See* Argument Section IV.B.2. And there is no suggestion that Defendants intimidated Mr. Doelger. Finally, Defendants neither intended to nor did "deprive" Mr. Doelger of his money. Instead, they helped him implement his own investment strategy. That this strategy led to a loss does not mean Defendants "deprive[d]" Mr. Doelger of his assets.[128] Therefore, the first definition of "exploitation" cannot be met.

According to the second definition, "exploitation" occurs when (1) an individual who "knows or should know that the vulnerable adult lacks the capacity to consent" (2) intends to

---

[126] *Arberman v. PNC Bank, Nat'l Ass'n*, 2023 WL 3910573, at *5 (11th Cir. 2023) (law enforcement officer did not have position of trust and confidence on par with that of a "caregiver, court-appointed guardian, or attorney").

[127] "Deception" involves a false statement or "intentionally leading someone to believe something that is not true." *See Lindo v. Sec'y, U.S. Dep't of Homeland Sec.*, 766 F. App'x 897, 900 (11th Cir. 2019).

[128] *See, e.g., Cordero v. Transamerica Annuity Serv. Corp.*, 71 F.4th 843, 846 (11th Cir. 2023) (affirming dismissal of vulnerable adult claims where plaintiff failed to allege that defendant "*intended* to deprive him of the use of his funds" (emphasis in original)); *Franke v. State*, 188 So. 3d 886, 888 (Fla. Dist. Ct. App. 2016) (reversing conviction where there was no evidence the defendant attempted to deprive the victim of his funds).

deprive the vulnerable adult of his money.  Neither element applies.  The capacity to consent is defined as "sufficient understanding to make and communicate responsible decisions regarding the vulnerable adult's person or property."  Fla. Stat. § 415.102(4).  Here, there is no evidence that Mr. Doelger ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████.[129]  Relatedly, Defendants had no reason to believe ████████████████████████.  (56.1 ¶¶ 158-161, 164, 194-196.)  No one ever informed Defendants that there was any reason to believe that ████████████████████████████ ██████████████.[130]  (56.1 ¶¶ 158-161, 164, 194-196.)  As for element (2) of this second definition of exploitation, for the reasons given above, Defendants did not intend to deprive Mr. Doelger of his money.  Thus, Defendants cannot be liable for exploitation under FAPSA's second definition.[131]

## CONCLUSION

At bottom, Plaintiffs made a fortune through concentrated MLP investments from 2009 through 2014; hoped to repeat that experience from 2015 through 2020; and after the risk materialized, tried to shift their losses to Defendants.  Defendants are entitled to summary judgment on all claims.

---

[129] There is no allegation ████████████████████████████████████████████████████████████████████.  (56.1 ¶¶ 138, 141, 177-182, 197.)

[130] Plaintiffs claim they informed JPMC of ████████████████████████████████████████████████████.

[131] *See Arberman v. PNC Bank, Nat'l Ass'n*, 2022 WL 18402402, at *4 (S.D. Fla. 2022) (dismissing FAPSA claims because plaintiff had not alleged defendant "knew or had reason to know of any alleged lack of capacity").

Dated: September 28, 2023

Respectfully submitted,

**DONTZIN NAGY & FLEISSIG LLP**
Tibor L. Nagy, Jr.*
Tracy O. Appleton*
William H. LaGrange*
980 Madison Avenue
New York, New York 10075
Tel: 212.717.2900

**MANATT, PHELPS &
PHILLIPS LLP**
Joan A. Lukey
177 Huntington Ave.
Boston, MA 02115
Tel: 617.646.1448
jlukey@manatt.com

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

    /s/ Ryan R. Baker
**BASS, BERRY & SIMS PLC**
Ryan R. Baker*
Ann A. Agee*
100 Peabody Place, Suite 1300
Memphis, TN 38103
T: 901-543-5705
rbaker@bassberry.com

**FRENIERE LAW GROUP PLLC**
David J. Freniere (BBO No. 552273)
40 Grove Street, Suite 275
Wellesley, MA 02482
dfreniere@frenierelawgroup.com

*Attorneys for Chickasaw Capital Management, LLC*

**\***Admitted *pro hac vice*

51

**<u>CERTIFICATE OF SERVICE</u>**

I, Tracy O. Appleton, hereby certify that this document filed through the CM/ECF system was served electronically to the registered participants as identified on the Notice of Electronic Filing on September 28, 2023, and that paper copies will be sent to those indicated as non-registered participants on September 28, 2023.

/s/ <i>Tracy O. Appleton</i>      
Tracy O. Appleton
