## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

YOON DOELGER and
PETER DOELGER,

*Plaintiffs,*

vs.

JPMORGAN CHASE BANK, N.A., and
CHICKASAW CAPITAL MANAGEMENT,
LLC,

*Defendants.*

No. 1:21-cv-11042-AK

Leave to file 50-page brief granted on
October 11, 2023

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

   I.   Yoon and Peter Doelger ................................................................... 2

   II.   Peter's Investments in MLPs ............................................................ 5

   III.   Chickasaw Comes On Board, and Peter is Targeted ........................... 7

   IV.   The August 10 Meeting and the Account Opening Documents ............ 8

   V.   JP Morgan Employees Make False Statements to Get Peter's New Account Approved ............................................................................... 10

      A.   JP Morgan's Internal Suitability Policies ....................................... 10

      B.   To Get Past Suitability Roadblocks, Baker Falsely Told His Superiors that Peter was Worth $100 Million, and then Modified the Account Opening Documents to Reflect This Falsehood .............................................. 11

      C.   This Was Not Even the Only Document Baker Modified to Obtain Approval ....................................................................................... 14

   VI.   These Lies Made Their Way to the Big Boy Letter ........................... 16

   VII.   Defendants Had Fiduciary Duties to Plaintiffs (Which They Breached) ........ 17

      A.   Baker was Plaintiffs' Investment Advisor ...................................... 17

      B.   JP Morgan Admits it is a Fiduciary (But Ignored its Own Policies) ............... 18

      C.   JP Morgan Also Ignored OCC Regulations ................................... 20

      D.   JP Morgan Was Incentivized to Keep Plaintiffs in MLPs and Encourage Usage of the LOC, in Conflict of Plaintiffs' Interests ................................ 21

      E.   Chickasaw Completely Disregarded Its Fiduciary Obligations ...................... 22

   VIII.   Despite its Status as a Fiduciary, JP Morgan Advised Plaintiffs to Stay in MLPs as they Declined, all the Way to the End ........................................... 22

ARGUMENT ................................................................................................. 25

   I.   Legal Standards .......................................................................... 25

      A.   General Standard ....................................................................... 25

      B.   Massachusetts Law Governs this Dispute ...................................... 26

   II.  There Are – at the Very Least – Multiple Disputes of Material Fact Concerning Defendants' Fiduciary Duties to Plaintiffs ..................................................... 29

      A.   The Nature and Creation of Defendants' Fiduciary Duties ........................... 29

      B.   Any Arguments as to the Circumstances of Breach or Plaintiffs' Damages are at Best Factual ......................................................................... 35

III.  The Breach of Contract and Good Faith/Fair Dealing Causes of Action Need to be Tried ................................................................................................................ 37

    A.  JP Morgan Breached Several of its Contractual Obligations to Plaintiffs ...... 38

    B.  JP Morgan Transparently Failed to Comply with the Advisory Agreement in Good Faith ...................................................................................................... 39

    C.  What Terms Control Has Become an Issue of Fact .......................................... 40

IV.  Defendants' Negligence and Negligent Misrepresentation Causes of Action are Timely and not Barred by the Economic Loss doctrine. ...................................... 41

V.  JP Morgan Now Concedes, After Two Years of Stating the Opposite, that the Big Boy Letter Cannot Be Used To Shield It From Liability for Breaches of its Fiduciary Duties ..................................................................................................... 43

VI.   Plaintiffs Have Properly Stated a Claim Under 93A .......................................... 46

VII.  Plaintiffs Have Established a Claim Under Florida's Adult Protective Services Act ....................................................................................................................... 47

**CONCLUSION** ......................................................................................................... 49

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahern v. Scholz,*
   85 F.3d 774 (1st Cir. 1996)........................................................................................47

*Ahmed v. Johnson,*
   752 F.3d 490 (1st Cir. 2014)......................................................................................26

*Akamai Techs., Inc. v. Deutsche Bank AG,*
   764 F.Supp.2d 263 (D. Mass. 2011) ..........................................................................30

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...................................................................................................26

*Archer v. Grubhub, Inc.,*
   490 Mass. 352 (2022) ................................................................................................27

*Aronstein v. Mass. Mut. Life Ins. Co.,*
   2016 U.S. Dist. LEXIS 54190 (D. Mass. Apr. 22, 2016) ..........................................26

*Arthur D. Little, Inc. v. Dooyang Corp.,*
   147 F.3d 47 (1st Cir. 1998)........................................................................................47

*Aspinwall v. Philip Morris Cos., Inc.,*
   442 Mass. 381 (2004) ................................................................................................47

*Baker v. Goldman, Sachs & Co.,*
   771 F.3d 37 (1st Cir. 2014)........................................................................................47

*Blank v. Chelmsford Ob/Gyn, P.C.,*
   420 Mass. 404 (1995) ................................................................................................32

*Blueradios, Inc. v. Hamilton,*
   2022 U.S. Dist. LEXIS 7428 (D. Mass. Jan. 14, 2022) ............................................29

*Bose Corp. v. Ejaz,*
   732 F.3d 17 (1st Cir. 2013)........................................................................................38

*BourgeoisWhite, LLP v. Sterling Lion, LLC,*
   91 Mass. App. Ct. 114 (2017) ...................................................................................45

*Brennan v. Carvel Corp.,*
   929 F.2d 801 (1st Cir. 1991)......................................................................................26

*Broomfield v. Kosow,*
  349 Mass. 749 (1965) ..................................................................................34

*Brown v. Quest Diagnostics, LLC,*
  2008 U.S. Dist. LEXIS 101678 (D. Mass. Dec. 8, 2016) .........................42

*Bullmore v. Banc of Am. Sec. LLC,*
  485 F. Supp. 2d 464 (S.D.N.Y. 2007)......................................................32

*Clark v. Rowe,*
  428 Mass. 339 (1998) ................................................................................42

*Clinical Tech., Inc. v. Covidien Sales, LLC,*
  192 F. Supp. 3d 223 (D. Mass. 2016) .......................................................40

*Cochran v. Quest Software, Inc.,*
  328 F.3d 1 (1st Cir. 2003) .........................................................................45

*Collins v. Huculak,*
  783 N.E.2d 834 (2003)..........................................................................34, 45

*Commonwealth Care Alliance, Inc. v. Babel Health, Inc.,*
  2020 U.S. Dist. LEXIS 160109 (D. Mass. Sept. 2, 2020) ........................42

*Craig v. Everett M. Brooks Co.,*
  351 Mass. 497 (1967) ................................................................................43

*Erb v. Javaras,*
  2018 Mass. Super. LEXIS 84 (Sup. Ct. Suffolk Cty. 2018)................41, 46

*Flesner v. Tech. Comm. Corp.,*
  410 Mass. 805 (1991) ................................................................................40

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,*
  376 F. Supp. 2d 385 (S.D.N.Y. 2005)......................................................32

*GPIF-I Equity Co., Ltd. v. HDG Mansur Inv. Servs., Inc.,*
  2014 U.S. Dist. LEXIS 55193 (S.D.N.Y. Apr. 21, 2014)........................33

*Gr. Boston Cable Corp. v. White Mountain Cable Constr. Corp.,*
  414 Mass. 76 (1992) ..................................................................................45

*Grace v. Bd. Of Trs.,*
  __ F.4th __, 2023 U.S. App. LEXIS 27843 (1st Cir. Oct. 19, 2023)............25, 26

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,*
  748 F.2d 729 (2d Cir. 1984)..................................................................34, 35

*Hays v. Ellrich*,
    471 Mass. 592 (2015) ..................................................................................................30

*Hsu v. UBS Fin. Servs.*,
    2011 U.S. Dist. LEXIS 86664 (N.D. Cal. Aug. 5, 2011).........................................45

*Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*,
    560 N.E.2d 122 (Mass. App. Ct. 1990) ....................................................................41

*Johansen v. Liberty Mut. Grp., Inc.*,
    2016 U.S. Dist. LEXIS 170027 (D. Mass. Dec. 8, 2016) .........................................42

*Kauders v. Uber Techs., Inc.*,
    486 Mass. 557 (2021) .........................................................................................27, 28

*Kaufman* v. *Richmond*,
    442 Mass. 1010 (2004) ..............................................................................................28

*Lifespan Corp. v. New Eng. Med. Ctr., Inc.*,
    731 F. Supp. 2d 232 (D.R.I. 2010)...............................................................32, 42, 45

*Lowe v. SEC*,
    472 U.S. 181 (1985)...................................................................................................30

*Marram v. Kobrick Offshore Fund, Ltd.*,
    442 Mass. 43 (2004) ..................................................................................................47

*Nat'l Amusements, Inc. v. Town of Dedham*,
    43 F.3d 731 (1st Cir. 1995).......................................................................................26

*Nota Constr. Corp. v. Keyes Assocs.*,
    695 N.E.2d 401 (Mass. App. Ct. 1998) ....................................................................43

*Patsos v. First Albany Corp.*,
    433 Mass. 323 (2001) ................................................................................................30

*Pearce v. Duchesneau Grp., Inc.*,
    392 F. Supp. 2d 63 (D. Mass 2005) ..........................................................................30

*PMP Assocs. v. Globe Newspaper Co.*,
    366 Mass. 593 (1975) ................................................................................................46

*PRCM Advisers LLC v. Two Harbors Inv. Corp.*,
    2023 U.S. Dist. LEXIS 140700 (S.D.N.Y. Aug. 10, 2023)......................................33

*Resorb Networks, Inc. v. YouNow.com*,
    51 Misc. 3d 975 (Sup. Ct. N.Y. Cty. 2016) .............................................................28

*Robert & Ardis James Found. v. Meyers*,
    474 Mass. 181 (2016) ...........................................................................................39

*Robinhood Fin. LLC v. Sec'y of the Commonwealth*,
    492 Mass. 696 (2023) ...........................................................................................29

*Rosenblatt v. Christie, Manson & Woods Ltd.*,
    195 Fed. Appx. 11 (2d Cir. 2006) ........................................................................38

*Roth v. Goldman Sachs & Co.*,
    2011 U.S. Dist. LEXIS 171286 (D. Mass. Mar. 1, 2011) .....................................28

*SEC v. Capital Gains Research Bur., Inc.*,
    375 U.S. 180 (1963) .............................................................................................30

*Shedd v. Sturdy Mem. Hosp.*,
    2022 Mass. Super. LEXIS 7 (Mass. Super. Ct. Apr. 5, 2022) ..............................29

*Singarella v. City of Boston*,
    342 Mass. 385 (1961) ...........................................................................................38

*Smith v. Jenkins*,
    718 F. Supp. 2d 155 (D. Mass. 2010) ..................................................................34

*Speakman v. Allmerica Fin. Life Ins.*,
    367 F. Supp. 2d 122 (D. Mass. 2005) ..................................................................40

*Strategic Energy, LLC v. W. Mass. Elec. Co.*,
    529 F.Supp.2d 226 (D. Mass. Jan. 4, 2008) .........................................................42

*Taite v. Bridgewater State Univ., Bd. of Trs.*,
    999 F.3d 86 (1st Cir. 2021) ..................................................................................26

*Targus Grp. Int'l, Inc. v. Sherman*,
    76 Mass. App. Ct. 421 (App. Ct. 2010) ...............................................................40

*Taylor v. Eastern Connection Operating, Inc.*,
    465 Mass. 191 (2013) ...........................................................................................27

*Transamerica Mortg. Advisors (TAMA) v. Lewis*,
    444 U.S. 11 (1979) ...............................................................................................30

*Tri-City Concrete Co. v. A.L.A. Constr. Co.*,
    343 Mass. 425 (1962) ...........................................................................................45

*UBS Financial Services, Inc.* v. *Aliberti*,
    483 Mass. 396 (2019) ...........................................................................................28

*Viscito v. Nat'l Planning Corp.*,
   2021 U.S. Dist. LEXIS 21761 (D. Mass. Jan. 22, 2022) ........................................28

*Wahlstrom v. Hoey*,
   2023 U.S. Dist. LEXIS 181811 (D. Mass. Oct. 10, 2023).....................................46

*Walsh v. TelTech Sys. Inc.*,
   821 F.3d 155 (1st Cir. 2016)...................................................................................46

*Wartski v. Bedford*,
   926 F.2d 11 (1st Cir. 1991)...............................................................................32, 42

*Zorbas v. United States Trust Co., N.A.*,
   48 F. Supp. 3d 464 (E.D.N.Y. 2014) ................................................................31, 33

**Statutes**

12 C.F.R. § 9.101 ......................................................................................................30

15 USC § 80b-1 *et seq*. ...................................................................................... *passim*

Fla. Stat § 415.101 *et seq*. ...............................................................................47, 48

Mass. Gen. L. 93A ..............................................................................................46, 47

**Other Authorities**

Fed. R. Civ. P. 56.................................................................................................25, 26

FINRA Rule 2111 ...................................................................................................36

Plaintiffs Yoon and Peter Doelger ("Yoon" and "Peter"; collectively "Plaintiffs"), by and through their undersigned counsel, submit this memorandum of law in opposition to Defendants JP Morgan Chase Bank, N.A. ("JP Morgan") and Chickasaw Capital Management, LLC ("Chickasaw"; together with JP Morgan "Defendants")' motion for summary judgment (the "Motion").

## PRELIMINARY STATEMENT

"Peter Doelger will sign any letter that we draw up." – John Beggans (JP Morgan Private Bank Managing Director)

████████ – Daniel Curtin (Head of the Boston Private Bank) (upon signing Peter)

Plaintiffs are an elderly couple who entrusted Defendants with their life savings, only to lose everything to Defendants' greed and deceit.  Defendants, including JP Morgan – an institution that has risen to become one of the largest banks in the world by projecting an image of trustworthiness – targeted Plaintiffs and took shocking advantage of them, and in the process repeatedly ignored their basic fiduciary duties, violated internal and external regulations and policies, forged documents and repeatedly lied about Peter's net worth to get around internal compliance controls, and repeatedly encouraged Plaintiffs to run up debt and urged them to stay in losing investments so as to squeeze out nearly every dollar they possibly could.

And after losing over 90% of Peter's liquid assets in less than 5 years, Defendants now ask this Court to make the consequences for their actions go away.

Defendants argue that their fiduciary duties go no further than applicable contractual provisions, while also arguing that those contractual provisions somehow have not been breached.  They ignore applicable law and claim that some of Plaintiffs' claims are time-barred, despite Plaintiffs still discovering the full extent of Defendants' wrongdoing.  They object to rescission of the Big Boy Letter despite apparently acknowledging it has no legal effect.  And

they seek to assert choice-of-law provisions that Plaintiffs never agreed to over causes of action that are not even arguably covered thereby.

These and other meritless and often absurd arguments are offered in a transparent attempt to disguise material factual disputes as matters of law. Plaintiffs are entitled to their day in court, and Defendants must face their day of reckoning. Summary judgment must be denied.

## STATEMENT OF FACTS

As set forth in detail in Plaintiffs' Response to Defendants' Statement of Material Facts ("Response") and Plaintiffs' Statement of Additional Material Facts ("Statement"), there are myriad material facts in dispute in this matter. For the purposes of this memorandum, Plaintiffs present their version of the facts, noting discrepancies with Defendants' Statement of Material Facts or other facts as alleged or argued by Defendants as applicable.[1] Plaintiffs respectfully refer the Court to the Response and Statement for a more fulsome listing and discussion of material facts than can be set forth herein.

### I.   Yoon and Peter Doelger

Plaintiffs are an elderly married couple that have been together for over 40 years. *See* SOF ¶¶ 198-201. Yoon is presently 76 years old and Peter is 86. *See id.* ¶¶ 199-200.

Yoon is a native Korean speaker, is neither fluent in nor particularly comfortable with English, and has no business or finance education, training, or experience. *See* Declaration of Yoon Doelger ("Yoon Decl.") ¶¶ 2-9, 18; *see also* SOF ¶¶ 12, 199, 204. Yoon worked briefly in retail, but otherwise has spent her adult life as a stay-at-home wife and mother, and has not worked outside of the house in over 40 years. *See* Yoon Decl. ¶ 18. She was added to the

---

[1] All citations herein to the parties' statement of material facts (including Defendants' statement as well as the Response and Statement) shall be in the form "SOF ¶¶ XX."

applicable accounts in 2019, but never signed the Big Boy Letter.  *See* SOF ¶¶ 365-74.

Peter founded a company with two other partners which performed energy audits for homeowners.  *See* Affidavit of Paul Roberts ("Roberts Aff.") ¶ 2; Yoon Decl. ¶ 15.  It was not an "energy" company, and Peter never worked in the energy or gas industries.  *See* Yoon Decl. ¶ 15. The company was sold in the 1990s, after which Peter retired.  *See id.* ¶¶ 16-17.  Peter does not have an educational or professional background in finance or investing, nor does he have a working understanding of most modern technology – he does not know how to use text messages, use a computer, or check his email, for example.  *See id.* ¶¶ 11, 15, 19.

Starting sometime in 2014, Peter began showing signs of significant cognitive decline and increased forgetfulness.  *See* SOF ¶ 208; Yoon Decl. ¶ 28.  In mid-2014, Peter was hospitalized, during which time clinicians noted Peter was exhibiting indications of confused altered mental status, cognitive defects, and recent rapidly progressive dementia.  *See* SOF ¶ 210. Scans conducted in 2014 showed atrophy and brain infarctions resulting from atrial fibrillation that were consistent with progressive dementia.  *See* SOF ¶ 211; Declaration of Dr. Dale Panzer ("Panzer Decl.") ¶ 47.  Peter's symptoms were such that his physicians found it necessary to prescribe serious antipsychotics, which Peter began taking in 2014.  *See* SOF ¶ 212.  Even with the medication, Peter's problems continued.  *See* SOF ¶ 213; Ex. 221.

By the end of 2015, Peter's paranoid delusions had worsened, and his cognitive state had significantly diminished, resulting in two incidents involving the police, one of which nearly resulted in his commitment for in-patient psychiatric care.  *See* SOF ¶¶ 214-16.  At the hospital, the supervising doctor confirmed diagnoses of paranoia, cognitive defects, and dementia.  *See id.*; *see also* Ex. 274 at MGB-000170.  Peter was nearly committed for in-patient psychiatric care due to this episode.  *See* SOF ¶ 216.

Plaintiffs' medical expert, Dr. Panzer, opined that as of 2012 to 2014 it would have been reasonable for those close to Peter to notice "a significant decline in Peter's cognition," as well as "heightened paranoia." Ex. 525 at 18. By September 2015 "if not sooner," Dr. Panzer opined that it "should have been apparent" that Peter was "cognitively impaired" to medical professionals and others with knowledge of senior cognitive decline. *Id.* at 19. According to Dr. Panzer: "While it has been argued that Peter was a 'big boy' in 2015 and could make his own decisions to accept substantial risk, ***he was clearly more vulnerable***, *more demented and persistently paranoid, and* ***not demonstrating through his actions*** *that he was reasonably addressing the substantial risk to his life savings that resulted from his financial decisions*." *Id.* at 20-21 (emphasis added). By at least mid-2019, "Peter's advisors should have observed significant changes in his cognition and behavior that would have alerted them to his vulnerable state." *Id.* at 21. For her part, Yoon believes that it would have been very hard for anyone who had regular interaction with Peter not to notice that he had memory problems or other mental or behavioral issues from as early as 2014. *See* Yoon Decl. ¶¶ 28-29.

Peter's condition continued to worsen year after year. By the time Peter visited neuropsychiatrist Angela Scicutella, M.D., Ph.D. in 2020, Peter's cognition had deteriorated to the point that he had difficulty recalling the month or the town he was residing in, was unable to recall a short story after hearing it or draw the face of a clock, and struggled to alphabetize letters. *See* SOF ¶¶ 217-18; Ex. 482 at SCI_000032-4. Leila Bender Laitman, M.D., acting as an independent medical examiner, determined that ███████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████ *See* SOF ¶ 219; Ex. 524 at 2. He is unable to provide for his own care in several respects, struggles to speak, cannot write checks or

manage financial or investment matters by himself, and needs help with basic day-to-day things like showering, putting in his hearing aids, keeping himself and his clothes clean, preparing his own food, and other similar tasks.  *See* Yoon Decl. ¶ 31.

Defendants dispute Peter's condition on the grounds that neither Plaintiffs nor "their family or representatives" ever told JP Morgan that Peter was suffering from dementia or the other conditions set forth above, and that the multiple doctors who personally examined and diagnosed Peter did not offer opinions as to his ability to manage his finances, despite such conclusions not normally being within the concern of a medical examination, particularly one performed on a man brought to the hospital because he thought he was being attacked by radio waves.  *See* SOF ¶¶ 158-62; Ex. 532 at 8.

## II.   Peter's Investments in MLPs

Peter has banked with JP Morgan since at least the 1990s.  *See* SOF ¶ 234; Ex. 192.  In or around 2004, Peter began investing in master limited partnerships ("MLPs").  *See* SOF ¶ 235. Until 2010, Peter's investment portfolio prior was diversified, with 67% of his money in investments other than MLPs.  *See id.* ¶ 236.

In or around 2009, Doug Moon ("Moon") became Peter's adviser at JP Morgan.  *See* SOF ¶ 238.  Moon presented Peter with a line of credit secured against his MLP holdings.  *See* SOF ¶ 239.  Later that year, Peter opened a line of credit (the "LOC") with JP Morgan.  *See id.*

Moon set his sights on getting more business from Peter immediately.  Moon listed Peter's ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████  Ex. 192.  JP Morgan also encouraged Peter to use the LOC to fund new investments and to purchase additional MLPs.  *See* SOF ¶ 241.  By 2015, the LOC balance was already $17 million, with JP Morgan making money off of the interest on the balance.  *See* Ex. 296.  Monetizing the client relationship at all costs was

5

the culture at JP Morgan.  *See* SOF ¶¶ 220-233.  JP Morgan ████████████████

████████████████████████████████████████████████████████████████████

███████████    *See id.*; *see also* Exs. 325, 258.

From 2012 to 2015, Peter's MLP portfolio was managed by Atlantic Trust.  *See* SOF ¶ 242.  JP Morgan was the custodian for this account (the "AT Account") and sent Plaintiffs monthly account statements.  *See id*; *see also* Exs. 265, 270.  In 2013, Atlantic Trust moved certain MLP positions into an existing brokerage account at JP Morgan (the "Brokerage Account").  *See* SOF ¶ 243.

In or around 2013, Plaintiffs were introduced to James Baker ("Baker"), an Investor Associate at JP Morgan.  *See* SOF ¶ 245.  By January 2014, Baker had targeted Peter as an additional source of revenue for JP Morgan, stating that he had ████████████████

███████████████████████████████████████████████████████  and attached█

████████████████████████████████████████████████████████████████████

████████████████████████████  Ex. 203.  Baker and Moon gave Peter investment advice in connection with his MLP investments at JP Morgan (hereinafter "MLP Investments"), as well as other investments Peter had that were held by JP Morgan.  *See* SOF ¶¶ 247-48.  Baker also gave investment advice to Peter in connection with foreign currency transactions and other investments.  *See id.* ¶ 249.  Plaintiffs thought of Baker as a friend, and trusted and relied upon him to look out for them.  *See* Yoon Decl. ¶¶ 37, 39.  According to Dr. Panzer, paranoiacs such as Peter are "more vulnerable than others to over-rely" on existing trust relationships "since trust is so hard for them," which may explain why Peter "at times accepted Mr. Baker's advice but not others."  Ex. 525 at 11.

In September 2014, Peter told JP Morgan that, in regard to his MLP Investments, he

████████████████████████████████████████████████████████████████

████████████████████████████████████ Exs. 217; 218.  Moon asked Market

Manager Daniel Curtin ("Curtin") ████████████████████████████████████

███████████████████████████ Ex 218.  Defendants falsely assert that it was they

who wanted Peter to diversify his holdings, which they claim Peter refused to do.  *See, e.g.,* SOF

¶ 100.

### III.   Chickasaw Comes On Board, and Peter is Targeted

In December 2014, JP Morgan entered into an agreement with Chickasaw to offer an

MLP investment strategy called "J.P. Morgan Opportunistic Advisory Program: Master Limited

Partnerships & Energy Infrastructure 'OAP MLPEI'" (the "MLP Program").  Exs. 30, 226, 223.

On May 19, 2015, Ed Kelly ("Kelly") of Chickasaw emailed Baker ███████████████████

████████████████████████████████████████████████████████████ *See*

Ex. 237.  The next day, ████████████████████████████████████████████

████████████████████████████████████ *See* SOF ¶ 258; Exs. 237, 234.

Thereafter, both Baker specifically and JP Morgan in general ████████████████████

████████████████████████████████████ *See* SOF ¶¶ 259-60.  Prior

to this, Peter had never heard of Chickasaw.  *See id.* ¶ 259.

Obtaining Peter's business was a goal shared by both Defendants.  *See* SOF ¶¶ 261, 263.

The typical JP Morgan investor with Chickasaw had assets of perhaps ████████████, while

Peter had assets of approximately $40 million, and would be in the top 3 to 5% of JP

Morgan/Chickasaw clients in terms of asset size.  *See* SOF ¶ 72; Ex. 430 208:13-209:16.

Geoffrey Mavar ("Mavar") of Chickasaw in particular was ████████████████████████

████████████     *See* SOF ¶¶ 261, 263.

Ultimately, Baker arranged for a lunch meeting at JP Morgan's offices on August 10,

2015.  *See* SOF ¶ 264.  Five days before the meeting, Baker emailed Kelly ███████████

████████████████████████████████████████████████████████████████████████████

███████  Exs. 250, 251.

## IV.     The August 10 Meeting and the Account Opening Documents

On Monday, August 10, 2015, Peter and Yoon attended a lunch meeting with Baker, Kelly, and Mavar at JP Morgan's offices (the "August 2015 Meeting").  *See* SOF ¶ 269.  This was the first time Plaintiffs met anyone from Chickasaw.  *See id.* ¶ 270.  Kelly and Mavar gave a one-hour presentation to Plaintiffs on MLPs, and then left them with Baker.  *See id.* ¶ 271.  At the meeting, Kelly and Mavar did not ask Peter any questions about his investment objectives or why he was invested in MLPs, or attempt to ascertain his financial picture, and Baker did not tell him that he was overconcentrated or that he should diversify his portfolio.  *See id.* ¶¶ 272-75.  Rather than caution Peter about these matters, Baker encouraged Peter to invest in MLPs with Chickasaw – Kelly testified that Baker was trying to secure Peter's account and that it was important for him to do so.  *See id.* ¶¶ 272, 276.

Five days before the August 10 Meeting, a set of "prefill" account opening documents was requested for Peter for a new MLP Program, showing an investment size of $1 million.  *See* Ex. 41; *see also* Ex. 278 107:12-111:18.  This was a standard accounting opening process at JP Morgan.  *See* SOF ¶ 266.  For existing clients, the "prefilled" information was to be "pulled from existing systems"; i.e., information JP Morgan already had on file for that customer.  Ex. 247 86:5-17.  In Peter's case, the information would have been based in whole or part on Peter's already-opened Brokerage Account, for which JP Morgan was required to exercise reasonable diligence in maintaining their accounting of Peter's total and liquid net worth.  *See* Ex 502 at 36.

Two days later, the requested account opening documentation ("Account Opening Documents") were produced, showing the size of Peter's investment as **_$1 million_**, and his liquid

net worth as **$50 million**.  *See* Ex. 41 at JPMC00066410, JPMC00066425.  The $50 million number likely came from application documents Peter provided in June 2014.  *See* Ex. 20. Baker was copied on these emails and never responded with any corrections.  *See* SOF ¶ 268.

At the end of the August 10 Meeting, after Kelly and Mavar left, Baker had Peter sign the Account Opening Documents.  *See* SOF ¶ 277; Exs. 46, 47.  The Account Opening Summary – a detailed log of all steps taken during the account opening process – shows no log or record of any changes to the Account Opening Documents between Friday, August 7 (when they were produced showing Peter's liquid net worth as $50 million) and Monday, August 10, 2015 (when Peter signed them).  *See* SOF ¶ 279; Ex. 252.  Furthermore, Baker, Moon, and Dylan Dittrich ("Dittrich") (who initiated the prefill document process) all testified that no changes were made to the Account Opening Documents between their generation and when Peter signed them.  *See* SOF ¶ 278.  Baker did not provide a copy of the Account Opening Documents to Plaintiffs at the August 10 Meeting after Peter signed them.  *See id.* ¶ 280.

The Account Opening Documents included five pages bearing the heading "J.P. Morgan Advisory Program | Advisory Account Agreement" (the "Advisory Agreement").  Ex. 41 at JPMC00066417-21.  Pursuant to the Advisory Agreement, JP Morgan was to (*inter alia*):

- "identify and present to Client one or more possible opportunistic portfolio strategies (each, a 'Portfolio') available through the Program for investment of the Assets";

- respond to client inquiries;

- periodically consult with clients to update their financial information and investment objectives;

- periodically review the activity in and investment results of each Portfolio with clients; and

- assist clients in determining whether to make any changes to their Portfolios.

Ex. 41 at JPMC00066417-18 (§§ 1 (A)-(E)).  The Advisory Agreement also stated that clients

may modify the selection of Portfolios at any time.  *See id.* at § 1(E).  Although JP Morgan offered ███████ through its advisory program, Baker only ever presented the MLP Program to Plaintiffs.  *See* SOF ¶¶ 283-84.  This despite Baker testifying that Peter could have achieved his investment objectives through investments other than MLPs.  *See* 247 216:14–19.  Despite not being shown any alternatives, Defendants assert that Peter "selected" the MLP Program. SOF ¶ 82.

Several of Defendants' defenses and arguments rely upon the J.P. Morgan General Terms for Accounts and Services ("General Terms") being incorporated with or into the Advisory Agreement.  Defendants maintain that the General Terms are additional terms that were "incorporated" into the Advisory Agreement.  SOF ¶ 85.  The General Terms JP Morgan claim are applicable were first produced to Plaintiffs after this litigation commenced; Plaintiffs never saw the terms prior to this time, and never agreed (or even had the opportunity to review) to anything therein at any time relevant to this dispute.  *See* Yoon Decl. ¶ 88.  Defendants state that it is JP Morgan's "practice" to provide Form ADVs to clients at the time of account opening, although Plaintiffs maintain that they did not receive Form ADVs from JP Morgan at that time or indeed ever.  SOF ¶ 78.

## V. JP Morgan Employees Make False Statements to Get Peter's New Account Approved

### A. JP Morgan's Internal Suitability Policies

Pursuant to the JP Morgan Advisory Program schedule (the "Advisory Schedule"), the MLP Program ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ *See*

SOF ¶¶ 285, 288.  Accordingly, whenever an adviser began the process for opening a new

account, JP Morgan would ███████████████████████████████████████████

██████████████████ Ex. 242. ██████████████████████████████████████

███████████████████████████████████ *See* SOF ¶ 288. ██████████████

█████████████████████████ *See id.* ¶ 291.

Thus, whether Peter's liquid net worth was $50 million or $100 million, Peter's proposed $33 million investment in the MLP Program far exceeded the ████████████████, and would require further scrutiny to go forward (which would be unlikely). *See generally* SOF ¶¶ 334-37. If Peter's liquid net worth was $50 million, a $33 million investment in the MLP Program would ████████████████████████████████████████

Baker was aware of these suitability restrictions. *See* SOF ¶ 289. Accordingly, immediately after the August 2015 Meeting, Baker told Chickasaw that he needed to ████████ ████████████████████████████████████████████████████

████████   Ex. 47. Baker continued to tell Chickasaw he needed ████████████████ ██████████████████████████████ as the process continued. Ex. 264 (emphasis added).

Baker also communicated to Dittrich and Moon that ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 46. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ *See* SOF ¶ 287; Exs. 242, 241.

**B.**   **To Get Past Suitability Roadblocks, Baker Falsely Told His Superiors that Peter was Worth $100 Million, and then Modified the Account Opening Documents to**

**Reflect This Falsehood**

The day after the August 2015 Meeting, ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ Either valuation would be substantially in line with the documentation JP Morgan was then in possession of concerning Peter's net worth, which included at least 7 documents from 2009 to 2014 showing net worth ranging from $20 to $50 million. *See* SOF ¶ 295.  Moreover, Baker had reason to suspect (and by October 2015 knew) that JP Morgan held ████████████████████████████████████████████ ████████████████████████ Ex. 304.  Peter's holdings in the AT Account and the Brokerage Account at the time amounted to a total of approximately ██████████. *See* Ex. 253.

Perhaps because of all this, at no point in August or September 2015 did Baker obtain a balance sheet or personal financial statement from Peter.  *See* Ex. 247 180:23-185:10.  Instead, Baker simply called Peter.  In an August 27, 2015 email, in response to a request from his supervisor for Peter's ████████████ Baker stated that ████████████████████████ ████████████████████████████████████████████████████████████████ Ex. 49.  Baker added that Peter ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Ex. 49 (emphasis added).  A (liquid) net worth of $80 million or more would remove Peter's investment from ██████████████, which Baker knew.  Moon, who was on the call, testified that Peter never said that he was worth $80 million or more.  *See* Ex. 536 147:19-150:4.

Despite Peter's direction and telling his supervisor he would, Baker never called

Haverberg to confirm Peter's net worth.  *See* Haverberg Aff., ¶¶ 5-6.  According to Haverberg, Peter was never worth close to $100 million.  *See* Ex. 542 158:23-159:8, 178:14-18; *see also* Haverberg Aff. ¶ 4.  Defendants' expert Palzer acknowledged that Baker not calling Haverberg to confirm Peter's net worth would have been a "boo boo."  Ex. 539 210:17-212:2.

Peter's actual liquid net worth as of August/September 2015 is, at best, in dispute.  The account application from June 2014 claims a liquid net worth of ███████.  *See* Ex. 20.  The calculation above suggests a liquid net worth of approximately $37 million.  Documentation from the prior year shows a liquid net worth of ██████.  *See* Ex. 199.  As of December 2015, Plaintiffs' actual estimated total net worth was $35.5 million and estimated liquid net worth (subtracting real estate and mortgage) was $21.5 million.  *See* Ex. 159 at 12-13 of 19 (Plaintiffs' Supplemental Response to Defendant JPMorgan Chase Bank, N.A.'s First Set of Interrogatories to Yoon Doelger, October 6, 2022, attached excel spreadsheet).  Meanwhile, Defendants assert that Peter represented to JP Morgan that his net worth was ████████ $100 million, which Plaintiffs (along with their witnesses and all available documentary evidence) dispute.  *See* SOF ¶ 103.  Defendants also cite to Peter's son Matt Doelger ("Matt") testifying that Peter had told him his net worth was $100 million, but leave out that Matt expressly stated that this conversation happened "in the time frame of spring of 2001," and not at any time relevant to this dispute.  Ex. 547 123:9-16.  Defendants make no statement or argument as to whether that number is supposed to be liquid or total net worth.  *See* SOF ¶ 106.

Indeed, the only apparent source of the $100 million valuation appears to be from Baker himself, ████████████████████████████████████████████████████ despite the available documentary evidence all saying otherwise.  *See* SOF ¶ 302; Exs 259, 49, 281 at JPMC00067142-3.

In any event, on September 10, 2015 – 

*Compare* Ex. 41, at JPMC00066425 *with* Ex. 44, at JPMC00067158.

Plaintiffs maintain that the Account Opening Documents were changed after Peter signed them to fraudulently modify Peter's liquid net worth upward from $50 to $100 million, so as to get around the ████████. Defendants' witnesses testified that the documents were not changed between the time they were generated and when Peter signed them. The Account Opening Summary does not record any changes made to the documents during this time. No documents have been produced to show a digital record of the Modified Account Opening Documents prior to September 10, 2015. *See* SOF ¶ 305. And Baker stated that he had Peter sign the documents before he knew the size of the investment, indicating an anticipation or at least a willingness to change them accordingly. *See* Ex. 46. No contemporaneous documents show Peter's liquid net worth to be $100 million or anywhere near that high, and his accountant testified it was never that high. The only person who claimed that Peter's net worth was $100 million at the time was Baker, who coincidentally also had access to the documents and stood to personally benefit from having the investment approved. Defendants dispute this factual issue. *See id.* ¶¶ 88-92, 103-06.

**C.     This Was Not Even the Only Document Baker Modified to Obtain Approval**

With the investment in peril, on August 18, 2015, Baker emailed Chad Kramer ("Kramer") of the Manager Selection team (at the instruction of Jeff Burke ("Burke") (East Region head of JP Morgan's investment practice)) to "see if there is any precedent here for

getting an exception to [the 5% liquid net worth maximum bite size] restriction."  Exs. 259; *see also* 246 157:22-158:10.   Baker represented to Kramer that Peter had $30 million invested in MLPs managed by Atlantic Trust and custodied at JP Morgan and that Peter was considering "moving his entire MLP portfolio to Chickasaw (via the OAP)."  Ex. 259.

On August 26, 2015, Baker ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████   *See* SOF ¶ 310.  The next day, Baker emailed Curtin (copying Beggans) and stated

that ███████████████████████████████████████████████████████████

██████████████████████████████  Ex. 49.

The following day, August 28, 2015, Baker emailed Supervisory Manager Jeff Lee ("Lee") (copying Curtin and Baker's supervisor John Beggans ("Beggans")), stating that ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████  Ex. 265 (emphasis added).  Baker and Curtin subsequently

████████████████████████████████████████████████████████████████

█████████████████████████  *Id.*

Hours after his email to Lee, Baker ██████████████████████████████████

████████████████████████  *See* Ex. 269.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*See* SOF ¶ 314; Exs. 266, 265, 267.

Others at JP Morgan made similar false statements about the total amount of Peter's holdings at Atlantic Trust and what portion Peter would be transferring to further the investment's approval.  *See* SOF ¶¶ 316-19.

## VI.   These Lies Made Their Way to the Big Boy Letter

Based on all of the information provided to that point – accurate, arguable, and otherwise – by September 3, 2015 it was determined that Baker's team would ███████████████ ██████████████████████████████████████████  Ex. 272; *see also* Ex. 291. The same day, Beggans bragged to Burke that "Peter Doelger will sign any letter that we draw up."  Ex. 273.

For the next 3 weeks, at least 7 people within JP Morgan worked on drafting the Big Boy Letter.  *See* SOF ¶ 321.  However, all of the representations contained therein came from Baker and Moon, including information that Baker not only knew was untrue, but which he had personally fabricated: █████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████  *See id.* ¶¶ 330, 332.  Moreover, by this time the applicable investments were worth just █████████████  less than the representations in the Big Boy Letter.  *See id.* ¶ 331.

On or about September 24, 2015, ██████████████████████████████ █████████████████████████████████████  *See* SOF ¶ 345.  Baker never faxed the Big Boy Letter to Roberts; instead, he emailed it – 6 days later, at 4:56 P.M., the evening before Baker was already scheduled to meet Peter for breakfast to present him with the letter.  *See id.* ¶¶ 346-47.  Baker did not inform Roberts of his upcoming meeting with Peter or that the Account Opening Documents had already been signed.  *See id.* ¶ 348.  For their part, Defendants contend that the Big Boy Letter was indeed faxed to Roberts, and that this fax was

sent on September 24, 2015.  *See* SOF ¶ 113.[2]

It is unclear if Baker presented Peter with the entire Big Boy Letter, or just the signature page.  *See* SOF ¶¶ 117, 351-52.  Baker could not say whether Peter read the letter before signing it.  *See* SOF ¶ 352.  Yoon was not present.  *See* Yoon Decl. ¶ 64.  The signing of the Big Boy Letter was hailed as a big win at JP Morgan, and Baker later received a promotion and a substantial raise.  *See* SOF ¶¶ 353-64.  Moon noted in a congratulatory email how "Jimmy spins a great yarn."  Ex. 308.  Curtin simply responded ██████████  Ex. 301.

## VII.  Defendants Had Fiduciary Duties to Plaintiffs (Which They Breached)

### A.  Baker was Plaintiffs' Investment Advisor

While working for Plaintiffs, Baker was an "investment specialist" ████████████
█████████████████████████████████████████████████████████████████████████
███████████████████  SOF ¶ 375; Ex. 415.  JP Morgan told clients Investment Specialists are ███████████████████████████████████████████████████████████  SOF ¶ 375. Baker "give[s] clients his opinion on what he thinks they should do in their portfolios and across other things: deposits, CDS, those type of things."  *Id.* ¶ 377.  Despite his role, Baker was not registered as an investment adviser representative.  *See* SOF ¶ 397.

JP Morgan understood Plaintiffs looked only to them for financial advice.  In a 2015 self-evaluation, Baker bragged that he ████████████████████████████████████████████
███████████████████████████████████████████████  Ex. 310 at 6 (emphasis added).  Baker acknowledged that Peter had ███████████████████████████

---

[2] Defendants also contend that Roberts has a time entry for September 30, implying he reviewed the Big Boy Letter at that time.  This is demonstrably false.  The time entry is for September 24, not September 30.  *See* Ex. 71.  To the extent Defendants may argue that Roberts reviewed the Big Boy Letter on September 24, Roberts testified that he had a call with Peter wherein Peter mentioned a transaction, and Roberts asked him to have any agreement faxed to him first before signing.  *See* Ex. 546 98:9-99:5.

████████████████████ and told colleagues that JP Morgan was Plaintiffs' ████████

███████████████████████ Exs. 402, 461 (emphasis added).  Moon acknowledged

that Peter ███████████████████████████████████████ Ex. 204.  And

Peter's "Lending Adviser" touted JP Morgan's investment advice as early as 2014.  *See* Ex. 207.

## B.   JP Morgan Admits it is a Fiduciary (But Ignored its Own Policies)

JP Morgan understood that it owed Plaintiffs fiduciary duties.  Pursuant to the Advisory

Agreements, "Portfolio investments will be as determined by the Bank with considerations of

availability and ***applicable fiduciary standards***." Ex. 41 at § 1.D(i) (emphasis added).   JP

Morgan also acknowledged that ███████████████████████████████

████████████████████████████████████████████████ thereby

incurring duties of loyalty and care.  Ex. 480.  Baker himself understood that once JP Morgan

opened Peter's investment management account in 2015, JP Morgan "had a duty of loyalty and a

duty of care specifically in regards to the investments that were contracted."  Ex. 205 14:1-22.

He understood that his duty of loyalty meant "a responsibility to disclose and manage conflicts

that may arise" and "to act in the client's best interest." *Id.* at 42:21-43:20; 75:4-20.

JP Morgan had several internal policies in place concerning obligations to clients,

including a suitability policy, conflict policy, elder exploitation policy, and many others.  *See*

SOF ¶ 391; Exs. 514, 517; 512 at 8-9 (listing ██████████████████████

██████.  JP Morgan's policies state that it is acting in a ████████████ when it acts

as an investment adviser or in ████████████████████████████████

████████ Ex. 512.  Not coincidentally, the Advisory Agreements expressly provide that JP

Morgan has "***full discretion*** to make purchases, sales. exchanges or ***investments***, or to take any

other action that it deems necessary or desirable…" Ex. 41 at § 1.D(i) (emphasis added).  Baker

testified that, as part of its fiduciary duty to Plaintiffs, JP Morgan had to follow its own policies.

*See id.* 20:18-23.

Experts on behalf of both Defendants confirmed that JP Morgan is a fiduciary, and that it must follow its own policies when acting as such.  *See* SOF ¶ 399.  Palzer stated that the duty of care requires the fiduciary to ███████████████████████████████████████ ███████████████  Ex. 531 at 28-29.  Gillespie confirmed that investment advisers must have written policies which they are expected to follow.  *See* SOF ¶ 399.  Gillespie also confirmed that despite the Big Boy Letter, JP Morgan had a "continuing suitability obligation."  Ex. 540 252:13-254:17; *see generally* SOF ¶ 400.  Indeed, JP Morgan had a ███████ ████████████████████████████████████████████████████████████ ███████████████  *See* SOF ¶ 401; Ex. 489.

JP Morgan also violated ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████  Indeed, Baker expressed ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████  *See* SOF ¶¶ 556, 561, 564.  Meanwhile, Yoon told Baker multiple times that Peter had memory and cognitive problems.  *See id.* ¶ 562.  Despite all of the foregoing, Baker did not ████████████████████████████████████████████████  *See id.* ¶ 565.  Baker also repeatedly recommended that Plaintiffs encumber their home to finance investments, in violation of JP Morgan's internal policies.  *See id.* ¶¶ 587-88.

JP Morgan also violated ████████████████████████████████████████████

████████████████████   *See* SOF ¶¶ 589-97.

## C.     JP Morgan Also Ignored OCC Regulations

The OCC requires that banks have an information barrier to prevent the passage of information between a bank's fiduciary department and areas of the bank that perform activities such as commercial lending and investment banking.  *See* Ex. 504 at 51.  OCC regulations, ████ ████, and JP Morgan's fiduciary obligations prohibit JP Morgan from intermixing (fiduciary) advisory services with (non-fiduciary) lending services.  *See* SOF ¶ 508.  Despite this, there was regular exchange of Plaintiffs' material nonpublic information between fiduciaries and non-fiduciaries, ████████████████████████████████████  and other information as set forth supra.  *See id.* ¶¶ 570-71.

The OCC also requires that JP Morgan perform an Initial Investment Review within 60 days of the account being funded, and an annual account review ("AAR") every year.  *See* SOF ¶¶ 572, 574.  JP Morgan never performed an Initial Investment Review on the Advisory Account, and its AARs were not performed in accordance with OCC regulations.  *See id.* ¶¶ 573, 575-586.  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████   *See id.* ¶ 583.

JP Morgan's failure to adhere to applicable regulations and its own internal policies was largely a function of poor supervision, as the supervisors for individuals such as Baker were not aware of their duties, had interests in conflict with JP Morgan's clients, were solely revenue focused, and (in some cases) were unqualified to be supervising fiduciary advisors.  *See* SOF ¶¶

598-660.  Similar violations led to an OCC consent order being entered into against JP Morgan in 2020.[3]

### D.   JP Morgan Was Incentivized to Keep Plaintiffs in MLPs and Encourage Usage of the LOC, in Conflict of Plaintiffs' Interests

The LOC was comprised of interest-only loans that matured every year, but JP Morgan regularly renewed them to keep them active.  *See* SOF ¶ 402.  ███████████████████

███████████████████   *See id.* ¶ 403.  By the time the Advisory Account was opened, Peter could not pay down the LOC without selling assets (such as MLPs); however, if Peter sold MLPs to pay down his debt, Defendants would make less in interest and advisory fees.  *See id.* ¶¶ 404-07.  JP Morgan never explained this to Plaintiffs.  *See id.* ¶ 408.

JP Morgan had two primary goals with the LOC: 1) to increase (or at least maintain) Peter's usage; and 2) to increase the interest Peter paid.  *See* SOF ¶¶ 411-15.  With the loan values steadily climbing and the MLP values dropping, Peter was constantly at margin call, and Baker and others ████████████████████████

████████████████████████

███████████   *See id.* ¶¶ 416-18.

Peter's overleveraged position led to two transactions that resulted in significant losses to Plaintiffs (and gains to JP Morgan): a cross-currency swap entered into in January 2017 (the "Swap") and an interest rate cap entered into in or around March 2018 (the "Rate Cap"; together with the Swap, the "Transactions").  *See* SOF ¶¶ 423-56.  Baker and others sold these transactions to the Plaintiffs as ways to hedge debt and interest rates.  *See id.*  JP Morgan did not materially disclose the risks of the Transactions, or that JP Morgan was a counterparty and would

---

[3] Available at https://www.occ.gov/static/enforcement-actions/ea2020-067.pdf (last accessed October 31, 2023).

profit directly off of any losses Plaintiffs incurred.  *See id.*  Six months after entering into the Swap, Plaintiffs owed JP Morgan $1.2 million (drawn from the LOC); a year after entering into the Rate Cap, Plaintiffs lost another $114,000.  *See id.*

Notably, the Swap required Peter to complete a new personal financial statement (the "2016 PFS"), which he did with Baker.  *See* SOF ¶ 425.  The 2016 PFS showed Peter's liquid net worth as of November 2016 to be $20.9 million, nearly $80 million less than what Baker had represented internally a year earlier.  *See id.* ¶¶ 426-27.  If Peter had in fact lost 80% of his wealth, Baker presumably should have alerted multiple people to this fact (not to mention immediately reassessed Peter's portfolio, among other actions); however, Baker did not seem surprised or tell anyone about this apparent loss.  *See id.* ¶ 427; *see also* 540 254:18-262:1, 293:3-15.

### E.     Chickasaw Completely Disregarded Its Fiduciary Obligations

Chickasaw also had extensive fiduciary obligations to Plaintiffs, which it repeatedly acknowledged.  *See* SOF ¶¶ 509-19, 526-33.  However, Chickasaw made little if any effort to comply with these obligations, relying on JP Morgan to perform all required tasks without confirming that they did so.  *See id.* ¶¶ 520-25, 528-30, 536-550.  All or nearly all communications with Plaintiffs went through JP Morgan, and Chickasaw negligently relied upon them for information and assurances that were necessary to fulfill their fiduciary duties.  *See id.* ¶¶ 509-50.

### VIII.  Despite its Status as a Fiduciary, JP Morgan Advised Plaintiffs to Stay in MLPs as they Declined, all the Way to the End

On November 21, 2017, Plaintiffs met with Baker, Moon, Roberts and others to discuss their finances (the "2017 Meeting").  *See* SOF ¶ 457.  At the 2017 meeting, Plaintiffs expressed concern about the underperformance of the MLPs and their high amount of debt, and were still

open to investment alternatives to MLPs and were looking to JP Morgan for guidance and advice. *See id.* ¶ 458.  In notes written shortly after the meeting, Moon stated that ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ and that Plaintiffs ████████ included insuring that they ████████████████████████████████████ Ex. 362.

In October 2020, nearly three years later and on the eve of this lawsuit, ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ *See* SOF ¶ 459.  Among other false statements, JP Morgan did not inform Plaintiffs that ████████████████████████ ████████ JP Morgan did not recommend that Plaintiffs reduce the LOC down to less than $5 million, and Peter did not refuse to sell MLPs; moreover, █████████████████████████ ██████████████████████████ *See id.*

In any event, at no point after the 2017 Meeting (or before for that matter) did JP Morgan present Plaintiffs with alternative advisory programs or Portfolio Schedules other than the MLP Program. *See* SOF ¶ 460.  This despite the fact that as of March 2018, the Advisory Account had been outperformed by the S&P 500 by 30.8% in 2017, and 15.4% annually since it was opened in October 2015. *See* Ex. 373.  Baker ████████████████████████████████████████ ████████████████████████████ *See* SOF ¶¶ 464-68.

As the MLPs lost value, JP Morgan did everything it could to keep Plaintiffs in the LOC sweet spot and discourage divesting the MLPs.  *See* SOF ¶¶ 469-73.  In October 2018, Baker told Plaintiffs that █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ Ex. 109 (emphasis added).  Such a strange email to send after

supposedly pleading with Peter for all these years to relent and finally sell his beloved MLPs.

Meanwhile, the MLPs continued to decline.  By the end of 2018, the MLP Investments declined in value from $29.9 million to $22 million, a decline of $8 million or 27% from the previous year.  *See* Exs. 412, 413.  Plaintiffs were now at a million-dollar deficit in the lending value of their LOC.  *See* SOF ¶ 476.

Rather than divest, Baker's solution was for Plaintiffs █████████████████████ ████████████████████████████████████████ *See* SOF ¶ 477. ██████ █████████████████████████████████████████████████ *See* Ex. 514 at 72; 515 at 23. ███████████████████████████████ ████████████████████████████████████████████████████████ ██████████████ *See id.* ¶¶ 478-80.  Plaintiffs were worried, and told Moon (who had now left JP Morgan) that they were "interested in lowering their exposure," and "very open to alternative means of future returns and income to supplement or replace" MLPs.  Ex. 421.  Their "key goals" – which they had also previously shared with JP Morgan – were "to lower their debt, keep high income, lower their burn rate, and to organize their administration better."  *Id.*; *see also* SOF ¶ 483.  According to Moon, Plaintiffs also "could use more peace of mind."  Ex. 421.

Around the same time, Baker was informed internally that ████████████████████ ███████████████████████  *See* SOF ¶ 484.  No one ever told Plaintiffs this.  *See id.* ¶ 485.

Plaintiffs decided not to take out a HELOC at that time, and instead sold off more MLPs to pay down the LOC.  *See* SOF ¶¶ 486-87.  However, by August 2019 the MLP Investments had declined still further, leading Baker to once again recommend Plaintiffs ████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████  *See id.* ¶¶ 488-90.



24

In early 2020, as the MLP Investments continued to decline, Baker repeatedly reassured Yoon even as he told colleagues that ███████████████████████ *See* SOF ¶¶ 492-93. On March 8, 2020, Baker told Plaintiffs that ████████████████████████████████ ████████████████████████ Ex. 457.  The next day, Baker told Plaintiffs that ████████████████████████████████████████████████ ███████████████████████████████████████████████████*See* SOF ¶ 495.  Even after finally recommending Plaintiffs ██████████████████████ Baker still equivocated, stated that ████████████████████████████████ ██████████████████ Ex. 137 (emphasis added).  After these sales, the portfolio and the LOC reduced to $4.1 million (the "Remaining MLPs") and $2.7 million respectively.  *See* SOF ¶ 496.

On March 13, 2020, the Remaining MLPs declined to $3.4 million, losing nearly another $1 million in value in less than a week.  *See* SOF ¶ 504.  To add insult to injury, ████ ████████████████████████████████████████████████ ████████████████████████████ Ex. 467.

On March 17, 2020, Plaintiffs sold the Remaining MLPs, and used the proceeds of the sales ($3.1 million) to pay off the balance of the LOC ($2.7 million).  See SOF ¶ 508.  Of Peter's $33 million investment from 2015, only $400,000 was left; this plus $1.1 million in an unrelated market account were all that remained of their liquid assets.  *See id.*

## ARGUMENT

### I.   Legal Standards

#### A.   General Standard

Under the familiar standard, a motion for summary judgment pursuant to Rule 56 is proper only when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Grace v. Bd. Of Trs.*, __ F.4th __, 2023

U.S. App. LEXIS 27843 at *20 (1st Cir. Oct. 19, 2023) (quoting Rule 56(a)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A genuine dispute as to a material fact exists if a rational factfinder, viewing the evidence in the light most flattering to the party opposing summary judgment, could resolve the dispute in that party's favor." *Grace*, 2023 U.S. App. LEXIS 27843 at *20 (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995)). When determining whether a genuine dispute of material fact exists, the court looks to "all of the record materials on file, including the pleadings, depositions, and affidavits," without evaluating "the credibility of witnesses []or weigh[ing] the evidence." *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (alterations in original) (quoting *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014)).

### B.    Massachusetts Law Governs this Dispute

Defendants have asserted (erroneously) that New York rather than Massachusetts law applies to Plaintiffs' breach of contract, breach of fiduciary duty, and 93A claims, based on a choice-of-law provision in the disputed General Terms; and that alternatively, Florida rather than Massachusetts law would somehow apply to the 93A claim if New York law did not.  "In diversity cases, federal courts must apply the choice of law rules of the state in which the court sits." *Brennan v. Carvel Corp.*, 929 F.2d 801, 806 (1st Cir. 1991).  Further, "in Massachusetts, the court must apply the law of the state with the 'most significant relationship' with the suit." *Id*.  Factors to consider in determining which state's law to apply include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Aronstein v. Mass. Mut. Life Ins. Co.*, 2016 U.S. Dist. LEXIS 54190, at *17 (D. Mass. Apr. 22, 2016) (quoting

Restatement 2d Conflict of Laws § 145 (1971)).

Considering these factors in the present case, the conduct causing the injury occurred entirely within the Commonwealth of Massachusetts, which is also where the relationship between the parties was centered and where the injury occurred.  Plaintiffs maintained domiciles in both Massachusetts and the State of Florida, while Chickasaw is a Delaware limited liability company with a principal place of business in the State of Tennessee, and JP Morgan is a New York corporation with hundreds of locations across the country, including the Boston office in which almost every relevant event in this dispute occurred.  Accordingly, Massachusetts law should and must apply.

Any deference to the choice-of-law clause of the General Terms would put the cart before the horse in this analysis, as it is (at best) a matter of disputed fact whether Plaintiffs ever saw or had a chance to review the General Terms, let alone agreed to them.[4]  Under Massachusetts law, a valid contract requires both "reasonable notice of the terms and a reasonable manifestation of assent to those terms."  *Archer v. Grubhub, Inc.*, 490 Mass. 352, 361 (2022) (quoting *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 571 (2021)).  Actual notice exists only "where the party has reviewed the terms."  *Id.*  "Where, as here, there is a dispute whether the [parties] actually reviewed the agreement, a court must evaluate the totality of the circumstances to determine whether reasonable notice has been given."  *Id.*  (quoting *Kauders*).  While reasonable notice of the terms may be found even if a party has not actually reviewed the contract, the law requires at the very least that they have the opportunity to do so:

---

[4] A choice of law provision should also not be upheld where the there was no meaningful choice to negotiate the term, which is especially true here where there is (at best) a matter of disputed fact that Plaintiffs even saw the document containing that term.  *See Taylor v. Eastern Connection Operating, Inc.*, 465 Mass. 191, 195 n.8 (2013).

> Instead of requiring its users to review those terms and conditions as it appears to do with its drivers, Uber has designed an interface that allows the registration to be completed **without reviewing or even acknowledging the terms and conditions**. In these circumstances, Uber has **failed to show that it provided the plaintiffs with reasonable notice** of the terms and conditions.
>
> As we conclude that there was not reasonable notice of the terms, **a contract cannot have been formed here**.

*Kauders*, 486 Mass. at 579 (emphasis added).  For what it might be worth, New York law on this issue is not significantly different.  *See, e.g., Resorb Networks, Inc. v. YouNow.com*, 51 Misc. 3d 975, 980 (Sup. Ct. N.Y. Cty. 2016) (discussing how a valid contract requires evidence of "actual or constructive notice of the terms" and whether they were "reasonably communicated" to the party).  And finally, any choice-of-law analysis is only necessary when the choice will affect the outcome of the case – "[o]nly actual conflicts between the laws of different jurisdictions must be resolved."  *UBS Financial Services, Inc.* v. *Aliberti*, 483 Mass. 396, 405 n.12 (2019) (quoting *Kaufman* v. *Richmond*, 442 Mass. 1010, 1012 (2004)).

Finally, even if Defendants' choice of law provision is applicable, it would only apply to the breach of contract claim and not the remaining claims.  *See Roth v. Goldman Sachs & Co.*, 2011 U.S. Dist. LEXIS 171286, *23-24 (D. Mass. Mar. 1, 2011) (choice of law provision in letter agreement applies only to the that specific agreement "as opposed to extra-contractual rights or non-contract tort based claims"); *Viscito v. Nat'l Planning Corp.*, 2021 U.S. Dist. LEXIS 21761, *8 (D. Mass. Jan. 22, 2022).

In seeking to assert the choice-of-law clause in the General Terms, Defendants ask this Court to ignore the dispute as to whether Plaintiffs were on notice of these terms (in the context of a motion for summary judgment, no less) and accept without question that these terms are validly included in the parties' agreement, all to cite substantially-similar contract law.  Nobody has time for this.  Massachusetts law should and must apply.

## II.    There Are – at the Very Least – Multiple Disputes of Material Fact Concerning Defendants' Fiduciary Duties to Plaintiffs

### A.    The Nature and Creation of Defendants' Fiduciary Duties

Under Massachusetts law, a fiduciary duty may arise in two ways: "as a matter of law, where parties to the subject relationship are cast in archetypal roles"; or "as determined by the facts established…upon evidence indicating that one person is in fact dependent on another's judgment in business affairs…"  *Blueradios, Inc. v. Hamilton*, 2022 U.S. Dist. LEXIS 7428, at *15 (D. Mass. Jan. 14, 2022) (citations omitted).  "The circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case.  It is for this reason that the determination of ***whether a fiduciary duty exists is <u>largely</u> <u>fact</u> <u>specific</u>***."  *Shedd v. Sturdy Mem. Hosp.*, 2022 Mass. Super. LEXIS 7, at *24 (Mass. Super. Ct. Apr. 5, 2022) (citations and internal quotation marks omitted; emphasis added).

Here, Plaintiffs have demonstrated <u>three</u> <u>separate</u> <u>grounds</u> by which fiduciary relationships were created between Plaintiffs and Defendants, or at the very least such relationships are a matter of disputed fact:  1) by-law fiduciary duties arising from Defendants' role as investment advisers and other regulations; 2) Defendants' fiduciary duties arising out of the Advisory Agreement and their own internal policies; and 3) fiduciary duties arising from the nature of the relationship between JP Morgan and Plaintiffs.

### 1.    As Investment Advisers Entrusted with Discretion, Defendants Were Fiduciaries By Law

"***Investment advisers***, because of their trusted advisory role, ***generally must comply with the full complement of fiduciary duties*** of 'utmost good faith, and full and fair disclosure of all material facts,' and shoulder an 'affirmative obligation to 'employ reasonable care to avoid misleading' clients."  *Robinhood Fin. LLC v. Sec'y of the Commonwealth*, 492 Mass. 696, 700

(2023) (quoting *SEC v. Capital Gains Research Bur., Inc.*, 375 U.S. 180, 194 (1963)) (emphasis added).   In addition, the Advisers Act "establishes 'federal fiduciary standards' to govern the conduct of investment advisers.   Indeed, the Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations." *Transamerica Mortg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (internal citations omitted); *see also Lowe v. SEC*, 472 U.S. 181, 207-08 (1985) ("The Act was designed to apply to those persons engaged in the investment-advisory profession – those who provide personalized advice attuned to a client's concerns, whether by written or verbal communication."); *SEC v. Capital Gains Research Bur., Inc.*, 375 U.S. 180, 194 (1963) ("Congress recognized the investment adviser to be" a fiduciary); *Hays v. Ellrich*, 471 Mass. 592, 601 (2015) ("Ellrich, as Hays's investment advisor, did owe her such a [fiduciary] duty.").

In addition to federal laws, SEC regulations, and long-established industry standards, the Office of the Comptroller of the Currency ("OCC") – the primary regulator of banks in the United States – has established that individuals and institutions acting as investment advisers have fiduciary duties to their clients:  "***if a bank is providing investment advice for a fee, then it is acting in a fiduciary capacity***."  12 C.F.R. § 9.101(a) (emphasis added).

Further, "where the account is discretionary…the broker assumes broad fiduciary obligations that extend beyond individual transactions." *Patsos v. First Albany Corp.*, 433 Mass. 323, 333-34 (2001); *see also Akamai Techs., Inc. v. Deutsche Bank AG*, 764 F.Supp.2d 263, 267 n. 34 (D. Mass. 2011) (finding a "broad" fiduciary duty owed where the defendant "served as Plaintiffs' investment advisor and broker"); *Pearce v. Duchesneau Grp., Inc.*, 392 F. Supp. 2d 63, 70 (D. Mass 2005) ("Further, *Patsos* instructs that a fact finder may consider as evidence of a discretionary account whether 'a broker has acted as an investment advisor….'").

Pursuant to both OCC regulations (as to JP Morgan) and the Advisers Act (as to Chickasaw), Defendants were fiduciaries to Plaintiffs. Here, fiduciary duties arose as a matter of law (i) under the Investment Advisers Act of 1940 (the "Advisers Act") and the National Bank Act and the OCC's regulations promulgated thereunder, and (ii) due to archetypal roles – in particular, JP Morgan as an investment adviser and discretionary investment manager.

As set forth in detail in Sections VII.A and B *supra*, Defendants repeatedly acknowledged that they were investment advisers and that they had fiduciary duties to Plaintiffs.

- ████████████████████████████████████████████ Ex. 531 at 27. ████████████████████ *Id.* at 38.  Palzer also referred to Plaintiffs ████████████ *Id.* at 19.

- Gillespie repeatedly confirmed that both Defendants were investment advisers and fiduciaries: Chickasaw has "fiduciary obligations."  Ex. 540 118:7-18.  "There's no question that [Chickasaw] would be treated as a fiduciary for purposes of regulation." *Id.* 137:13-138:2.  JP Morgan was "functionally acting as an investment advisor … in a fiduciary capacity." *Id.* 85:4-18.  *See generally* Ex. 529 at 6, 8, 9, 21.

- JP Morgan knew it acted as a fiduciary, noting that activities that ███████████ ██████████████ " include serving as an ██████████████████ or ███████████████ Ex. 480.

- Chickasaw, as a registered investment adviser, is unquestionably a fiduciary.

- Baker repeatedly acknowledged that he was Plaintiffs' investment advisor and that he owed them fiduciary duties.  *See generally* Sections VII.A and B *supra*.

Importantly, Defendants' by-law fiduciary obligations pursuant to state and federal law, applicable regulations, and their own policies and procedures are wholly separate and apart from any obligations they agreed to undertake in the Advisory Agreements, and as such cannot be duplicative as a matter of fact, law, reason, and logic.  *See, e.g., Zorbas v. United States Trust Co., N.A.*, 48 F. Supp. 3d 464, 487-88 (E.D.N.Y. 2014) (noting that plaintiffs concede that "U.S. Trust was not acting in an advisory capacity with respect to the Investment Account" and "[t]herefore, any fiduciary duties that may apply to professional investment advisors. . . do not

apply to U.S. Trust."); *cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 408 (S.D.N.Y. 2005) ("it is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract ***but which is independent of the contract itself***") (emphasis added); *Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007) (finding that breach of contract and breach of fiduciary duty claims arise from independent duties because "***it is policy, not the parties' contract***, that gives rise to a duty of care") (emphasis added).

Nor can these duties be limited by contract. *See, e.g.*, *Lifespan Corp. v. New Eng. Med. Ctr., Inc.*, 731 F. Supp. 2d 232, 241 (D.R.I. 2010) ("under Massachusetts law, 'the fact that [the parties] entered into an … agreement … does not relieve [Lifespan] of the high fiduciary duty' imposed by tort law.") (quoting *Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 408 (1995)) (vacated on other grounds, 2010 U.S. Dist. LEXIS 98377 (D.R.I. Sept. 20, 2010)); *Wartski v. Bedford*, 926 F.2d 11, 20 (1st Cir. 1991) (agreement "cannot nullify" fiduciary duty; duty "cannot be negated" by words of agreement); *cf. In the Matter of Comprehensive Cap. Mgmt., Inc.*, Advisers Act Release No. 3-20700 at 4 (Jan. 11, 2022) (Ex. 519) (a hedge clause limiting adviser liable to acts of gross negligence violated the Advisers Act and is unenforceable). Accordingly, Defendants' contention that a gross negligence standard applies to Plaintiffs' claims must be rejected, regardless of whether the General Terms are enforceable.

## 2.     JP Morgan Has Fiduciary Duties as a Party to the Advisory Agreement

The Advisory Agreement expressly provides that JP Morgan had a fiduciary duty to the Doelgers: "Portfolio investments will be as determined by the Bank with considerations of availability and ***applicable fiduciary standards***." Ex. 41 at § 1.D(i) (emphasis added).

Defendants[5] have argued that any breach of these fiduciary duties is duplicative of Plaintiffs' breach of contract claims and therefore legally invalid, relying on *Zorbas*.  This issue does not appear to have arisen under Massachusetts law, but under New York law (which Defendants have argued applies), it is well established that a fiduciary relationship established pursuant to a contract such as the Advisory Agreement imposes on the adviser "a duty to act with care and loyalty independent of the terms of the contract."  *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2023 U.S. Dist. LEXIS 140700, at *31-32 (S.D.N.Y. Aug. 10, 2023) (citation and quotation marks omitted).  Also, as set forth *supra*, JP Morgan regularly placed its financial interests ahead of Plaintiffs' by (*inter alia*) encouraging Peter to use the LOC, keeping him in failing MLPs, not presenting Plaintiffs with alternative investments, and profiting off of Plaintiffs' losses without telling them, which in and of itself makes these claims for breach of fiduciary duty non-duplicative.  *See GPIF-I Equity Co., Ltd. v. HDG Mansur Inv. Servs., Inc.*, 2014 U.S. Dist. LEXIS 55193, at *16-17 (S.D.N.Y. Apr. 21, 2014) (where evidence tends to show breach of duties by placing own financial interests ahead of clients, claim is non-duplicative of breach of contract claim).

3.   **There Are Significant Issues of Fact as to Whether the Parties' Relationship Gave Rise to a Common-Law Fiduciary Relationship**

Finally, separate from fiduciary relationships that arise by law or by contract, a fiduciary duty arises where a "special trust relationship" has developed between the parties such that "a plaintiff reposes trust and confidence in a defendant, and the defendant knows of the plaintiff's

---

[5] Chickasaw simultaneously maintains that it is not a party to the Advisory Agreement, but that the breach of fiduciary duty claims against it are still somehow duplicative of that cause of action.  Chickasaw also argues that it can get the benefit of a limitation of liability provision in the General Terms (whose valid incorporation into the Advisory Agreement is a disputed fact).  Chickasaw's position that it is not a party is fatal to both arguments.

reliance." *Smith v. Jenkins*, 718 F. Supp. 2d 155, 169 (D. Mass. 2010). "Whether a relationship of trust and confidence exists ***is a question of fact***. . . . The relationship may be found on evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters." *Collins v. Huculak*, 783 N.E.2d 834, 841 (2003) (internal quotation marks and citations omitted; emphasis added). Factors to consider in this analysis include "the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge." *Broomfield v. Kosow*, 349 Mass. 749, 755 (1965).

Plaintiffs have set forth how they had little or no experience in investing (Yoon) or always relied on advisers (Peter) and trusted and relied upon Baker in guiding their investment decisions, that Plaintiffs readily followed Baker's guidance, and that Defendants had specialized knowledge in the investments (particularly in contrast to Plaintiffs). Defendants also advised on several matters outside the scope of the Advisory Agreement, including (*inter alia*) how Plaintiffs should manage the LOC and whether they should apply for a HELOC to pay down their debt. Moreover, Baker knew Plaintiffs trusted and relied upon him, which is another element of such a relationship. *See Broomfield*, 349 Mass. at 755. Such reliance went beyond the Advisory Account and extend to other assets, including to those held Brokerage Account and other JP Morgan accounts. *See, e.g.,* SOF ¶¶ 247-49.

In particular, Plaintiffs have adduced sufficient evidence of their reliance on JP Morgan to support the cause of action for breach of fiduciary duty, or at the very least give rise to a dispute of fact on the point. Defendants have cited *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir. 1984) for the proposition that there can be no reliance here as a

matter of law.  However, unlike the corporate purchaser plaintiff in *Grumman*, neither Peter nor Yoon were "armed with an arsenal of seasoned negotiators" involved in the drafting of any alleged disclaimer of reliance.  *Grumman Allied,* 748 F.2d at 730.  Indeed, the *Grumman* plaintiff created the first draft of the agreement disclaiming its reliance, whereas JP Morgan's agreements are contracts of adhesion to which neither Plaintiffs nor their attorneys had the opportunity to contribute or even negotiate.  Moreover, in contrast to the facts of *Grumman* (where plaintiffs' attorneys advised on the transaction at issue), Peter's attorney never dispensed investment advice regarding MLPs.  *See* Roberts Aff. ¶ 6.

In short, whatever disputes Defendants may have regarding their relationship with Plaintiffs is entirely factual in nature, and cannot be decided on a motion for summary judgment.

### B. Any Arguments as to the Circumstances of Breach or Plaintiffs' Damages are at Best Factual

As set forth in detail *supra*, Plaintiffs have established the myriad ways the duties owed to them by Defendants were breached, including (*inter alia*) all of the following:

- The Account Opening Documents were altered after Peter signed them.  *See* SOF ¶ 277; Exs. 46, 47; SOF ¶ 279; Ex. 252; SOF ¶ 278.

- Despite Peter's direction and telling his supervisor he would, Baker never called Haverberg to confirm Peter's net worth – something that Defendant's expert called a "boo-boo."  Ex. 539 210:17-212:2; *see also* SOF 299; Haverberg Aff. ¶¶ 5-6.

- ████████████████████████████████████████████████████████████ which Baker knew was untrue. *See* SOF ¶ 314; Exs. 265, 266, 267, 269.

- Multiple compliance officers within JP Morgan did not approve or seriously questioned the MLP Investments; JP Morgan pressed ahead anyway.  *See, e.g.,* SOF ¶¶ 327, 334, 335 ████████████████████████████████████ ), 336 ███████████████████████████

- Baker never faxed the Big Boy Letter to Peter's attorney, Roberts, for his review; instead, he emailed it six days later, the evening before Baker was to have breakfast with Peter, and did not inform Roberts of the upcoming meeting or that the Account Opening

Documents had already been signed.  SOF ¶¶ 346-47.

- JP Morgan regularly shared Plaintiffs' material nonpublic information between fiduciaries and non-fiduciaries, including ███████████████████████████ ████████████████████████████████  *See* SOF ¶ 508; ¶¶ 570-71.

- JP Morgan's AARs were not performed in accordance with OCC regulations.  *See* SOF ¶¶ 573, 575-86.  Indeed, Baker repeatedly stated the wrong investment objectives and that the MLP Investments were suitable when he knew they were not.  SOF ¶¶ 580-83.

- JP Morgan recommended the Swap to Plaintiffs as a way to hedge debt and interest rates, without materially disclosing the risks of the Swap or that JP Morgan was a counterparty and would profit off of their losses.  *See* SOF ¶¶ 423-56.

- The 2016 PFS showed Peter's liquid net worth as of November 2016 to be nearly $80 million less than what Baker had represented internally a year earlier, but Baker did not alert anyone to this fact.  *See* SOF ¶ 425.  ¶¶ 426-27.

- ██████████████████████████████████████████████████████████ *See* SOF ¶ 477.  *See* ¶¶ 478-80. ████████████████████████████████████████████ ██████████  *See* Ex. 514 at 72; Ex. 515 at 23.  Defendants maintain seniors, in general, are ██████████████  Ex. 531 ¶ 144.

- Baker was informed internally that Plaintiffs should reduce their MLP exposure by half; neither he nor anyone else at JP Morgan ever told Plaintiffs this.  *See* SOF ¶¶ 484-85.

- Baker's failure to inform supervisors of signs of Peter's diminished capacity.  *See* SOF ¶¶ 551-66.  Even Defendants' expert Gillespie, who is writing a paper on elder abuse, acknowledged the circumstances here could raise red flags and trigger escalation under bank policies.  Ex. 540 63:9 – 66:20.

- Chickasaw completely flouted its suitability obligations, even under its own manuals, instead relying on JP Morgan for information and to perform all required tasks without confirming that it did so.  *See* SOF ¶¶ 520-25, 528-30, 536-50.

Each of these actions constitutes a material breach of Defendant's fiduciary duties.

Plaintiffs' expert Tilkin opined that these and other actions were not industry standard for suitable and disinterested investment advice.  *See* 526 at 32, 42, 58-62; Tilkin Aff. ¶¶ 29, 31; *see also* Ex. 503 (the "RNDIP Handbook") at 61-62 (emphasizing that "[t]he suitability standard is fundamental to fair dealing with customers and is intended to promote ethical sales practices and high standards of professional conduct" and that FINRA Rule 2111 is an "appropriate reference

for a bank compliance program.").[6]

Importantly, an investment adviser has an ongoing obligation to ensure it is making suitable recommendations to clients, based on their changing needs, financial circumstances and investment objectives.  Ex. 526 at 65-66, 88-89; Ex. 529 at 18; Ex. 540 250:21-251:22.  It is undisputed that at least as of November 2016, Baker had accurate information showing Peter's liquid net worth to be $20.9 million instead of $100 million.  Instead of performing a complete suitability reevaluation, which even according to Defendants' expert would have been required under industry standards, Baker did nothing.  *See* Ex. 540 255:16-262:1, 293:3-15 ("I've said before, I will stand by it, it should have triggered a suitability analysis, a subsequent suitability analysis.").  Plaintiffs' expert Tilkin agrees.  *See* Tilkin Aff. ¶ 10. In addition, according to Gillespie, "the appropriate thing to [for Baker to] do, in my mind, would have been to elevate it to a supervisor, to say, we need to think about this. There's a significantly changed circumstance on the part of this client." Ex. 540 260:9-14.  Again, Baker did nothing.

Defendants appear to dispute that any duties were breached, and also appear to argue that despite their dishonest conduct and mismanagement costing Plaintiffs over 90% of Peter's liquid assets in less than 5 years, Plaintiffs have somehow not suffered any damages.  Such arguments are entirely factual, and accordingly inappropriate for summary judgment.

## III.   The Breach of Contract and Good Faith/Fair Dealing Causes of Action Need to be Tried

"Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages

---

[6] Defendants' expert Palzer cited to the RNDIP Handbook with approval.  *See* Ex. 531 at 39 n.119.

as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013) (citing *Singarella v. City of Boston*, 342 Mass. 385 (1961)).  Should it matter, New York law is substantially similar.  *See, e.g., Rosenblatt v. Christie, Manson & Woods Ltd.*, 195 Fed. Appx. 11, 12 (2d Cir. 2006).  In addition to disputing damages (discussed *supra*), Defendants argue that no breach of the Advisory Agreement can be found as a matter of law.  Defendants also argue that Plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing cannot be proven and is duplicative of the breach of contract claim.  Defendants are wrong.

A.     **JP Morgan Breached Several of its Contractual Obligations to Plaintiffs**

The Complaint alleges that JP Morgan breached Sections 1(A), (C), (D) and (E) of the Advisory Agreements, which required JP Morgan to (*inter alia*) identify and present investment Portfolios, respond to Plaintiffs' inquiries, periodically consult with Plaintiffs to update their information and objectives, periodically review the investment results, and assist Plaintiffs in determining whether to make changes.  As set forth herein, JP Morgan materially breached these provisions.

First, JP Morgan materially failed to identify and present Portfolios in line with Plaintiffs' stated investment objectives.  Conjuring the spirit of Henry Ford, Plaintiffs were presented with any investment plan they wanted so long as it was MLPs.  Perversely, JP Morgan presented the MLP Investments to Peter despite his initial approach being because he wished to diversify his assets.  Rather than diversify, JP Morgan had him invest even more fully into MLPs.  The parties tell drastically different versions of Plaintiffs' investment objectives and when and how they were communicated – in some cases, Baker disputes these facts with himself – and on this point alone these issues are not properly determinable on a motion for summary judgment.  SOF ¶ 580; Baker Aff. ¶ 25.

Similarly, JP Morgan materially failed to update Plaintiffs' information and objectives.

JP Morgan kept Plaintiffs in MLPs for years after it was clear that they were no longer appropriate.  JP Morgan also completely failed to update Plaintiffs' information in its own internal records, still showing Peter's net worth as $70 million years after his holdings had dwindled to almost nothing.  SOF ¶ 591.

To the extent JP Morgan monitored investment results, it failed to effectively communicate this information to Plaintiffs.  In fact, ███████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████  ¶¶ 464 - 466.

And finally, JP Morgan did not effectively assist Plaintiffs in determining whether to make changes to their investments.  On the contrary, JP Morgan kept advising Plaintiffs against making changes that would have saved them tens of millions of dollars, all to allow JP Morgan to keep enriching itself in interest and fees.  *See, e.g.,* Ex. 109 ███████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████  (emphasis added).

To the extent Defendants dispute JP Morgan's performance under the Advisory Agreement, it would be a dispute as to fact and inappropriate for determination at summary judgment.

**B.     JP Morgan Transparently Failed to Comply with the Advisory Agreement in Good Faith**

In determining whether a party has violated the covenant of good faith and fair dealing implied in every contract under Massachusetts law, courts look to "the party's manner of performance…[t]here is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith…inferred from the totality of the circumstances."  *Robert & Ardis James Found. v. Meyers*, 474 Mass. 181, 189 (2016) (citation omitted).  Instead, the

"essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  To make the claim, a plaintiff needs to show "evidence to demonstrate a lack of good faith, such as a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will."  *Clinical Tech., Inc. v. Covidien Sales, LLC*, 192 F. Supp. 3d 223, 237 (D. Mass. 2016) (quotation and citations omitted).  Such determinations as to a party's state of mind are "usually unsuited for summary judgment."  *Targus Grp. Int'l, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 435-36 (App. Ct. 2010) (*citing Flesner v. Tech. Comm. Corp.*, 410 Mass. 805, 809 (1991)).

Here, the record is replete with examples of JP Morgan's breach of the covenant of good faith and fair dealing.  JP Morgan failed to act in Plaintiffs' best interests and repeatedly put its own interests before theirs.  Baker fraudulently changed multiple documents and made multiple false representations to obtain Peter's business.  JP Morgan purposefully presented misleading reports of the MLPs' performance, and encouraged Plaintiffs to stay overleveraged so as to make more money in interest and fees.  These are all issues of fact going to JP Morgan's intent and purpose, and should not be decided on summary judgment.

### C.     What Terms Control Has Become an Issue of Fact

Finally, the very contractual terms that control the parties' respective obligations have become a matter of factual dispute.  When the Complaint was first filed, Plaintiffs believed that The Advisory Agreement was executed by and binding on Chickasaw because of representations made by Baker.  Chickasaw representatives subsequently claimed that they had never seen the Advisory Agreement, and that they understood Chickasaw's contractual obligations to be set forth by the Agreement for Investment Management Services ("AIMS") and an accompanying

term sheet.  *See* SOF ¶ 526.  Now Defendants have sought to enforce the General Terms, which Plaintiffs contend they have never seen or been presented with, let alone ever read or agreed to. While the interpretation of the various agreements may include questions of law, whether a party ever received, reviewed, or agreed to a contract is largely a question of fact.  Summary judgment is emphatically not appropriate under such conditions.

## IV.   Defendants' Negligence and Negligent Misrepresentation Causes of Action are Timely and not Barred by the Economic Loss doctrine.

As to Plaintiffs' claims of Negligence/Gross Negligence (Count III) and Negligent Misrepresentation (Count IV), Defendants claim that they are time-barred, and that Plaintiffs cannot recover pursuant to the economic loss doctrine.  Neither argument has merit.

First, under Massachusetts law, the statute of limitations for both torts and 93A claims does not begin to run until "the happening of an event likely to put the plaintiff on notice."  *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d 122, 124 (Mass. App. Ct. 1990).  Such notice refers to "discovery of the plaintiff's injury as causally connected to the defendant's negligence."  *Id.* (citations omitted).  The accrual date for 93A claims "is determined by the same principles dispositive of the accrual dates of general tort actions."  *Id.* at 125 (citations omitted); *see also Erb v. Javaras*, 2018 Mass. Super. LEXIS 84 at *2-3 (Sup. Ct. Suffolk Cty. 2018) ("a fiduciary would have a legal duty to disclose these products were unsuitable, and under Massachusetts law the failure to make that disclosure would constitute fraudulent concealment").

Plaintiffs had no reason to believe that they were being misused by Defendants until sometime after the divestiture of the MLP Investments in March 2020.  Indeed, the full extent of Defendants' misconduct was not known until after substantial document production had occurred in this case and Plaintiffs were able to review documents showing JP Morgan's failure to follow

its own policies, Baker's fraudulent modification of documents and false statements to get the investment approved, JP Morgan's conflicts of interest and self-serving actions in regard to Plaintiffs' investments, and myriad other issues.[7]  As the applicable statutes of limitations for all of Plaintiffs' 93A and negligence claims were tolled until at least March 2020, these causes of action were timely brought.

As for the economic loss doctrine, "Massachusetts courts have recognized exceptions to the economic loss doctrine arising from the negligent breach of contractual duties."  *Brown v. Quest Diagnostics, LLC*, 2008 U.S. Dist. LEXIS 101678 at *11 (D. Mass. Dec. 8, 2016) (citations omitted); *see also Commonwealth Care Alliance, Inc. v. Babel Health, Inc.*, 2020 U.S. Dist. LEXIS 160109 at *3 (D. Mass. Sept. 2, 2020).  Where a party is not free to allocate risks and responsibilities according to their own preferences in a contract because certain terms are mandated by law rather than negotiated – such as obligations conferred by state or federal laws or regulations as discussed *supra* – tort law provides protections that cannot be established by a matter of contract.  *See Strategic Energy, LLC v. W. Mass. Elec. Co.*, 529 F.Supp.2d 226, 236-37 (D. Mass. Jan. 4, 2008); *see also Johansen v. Liberty Mut. Grp., Inc.*, 2016 U.S. Dist. LEXIS 170027 at *35-36 (D. Mass. Dec. 8, 2016); *cf. Lifespan*, 731 F. Supp. 2d at 241; *Wartski*, 926 F.2d at 20; Ex. 519 (*CCM*, Advisers Act Release No. 3-20700) at 4.

The economic loss doctrine also does not apply to claims of negligence against a fiduciary, as fiduciary duties arise independently from the contract – even if they flow from a contract.  *See Clark v. Rowe*, 428 Mass. 339, 342 (1998) ("We have not applied the economic loss rule to claims of negligence by a fiduciary.").  Both JP Morgan and Chickasaw are

---

[7] Notably, should Defendants argue otherwise on reply, they would have to take the position that their conduct was sufficiently obviously dishonest by a prior date so as to put Plaintiffs on notice.

fiduciaries of the Doelgers, and thus the economic loss doctrine would not apply to claims sounding in negligence against JPM and Chickasaw.

Finally, the doctrine "permits recovery for economic losses resulting from negligent misrepresentation." *Nota Constr. Corp. v. Keyes Assocs.*, 695 N.E.2d 401, 405 (Mass. App. Ct. 1998) (internal footnote omitted) (citing *Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 499-501 (1967). Here, there are disputed issues of fact concerning several material misrepresentations and omissions Defendants made to Plaintiffs, including informing Plaintiffs that they were making all income on the MLP Investments when they were not and concealing warnings about Chickasaw. *See* Yoon Decl. ¶¶ 70, 72, 123; SOF ¶¶ 473, 478 484.

### V. JP Morgan Now Concedes, After Two Years of Stating the Opposite, that the Big Boy Letter Cannot Be Used To Shield It From Liability for Breaches of its Fiduciary Duties

Despite apparently abandoning the Big Boy Letter as a defense to any causes of action in this case (stating that it "is not focused on waiving any claims"), Defendants nevertheless argue that it should not be rescinded or declared null as a matter of law. However, if the Big Boy Letter no longer has any legal significance, these arguments are moot.

As an initial matter, whatever the Big Boy Letter is at this point, it has no impact on either Yoon or Chickasaw. As to Yoon, she is not a signatory to the Big Boy Letter, it was never presented to her, and she never read it. *See* Yoon Decl. ¶ 64. Defendants previously justified asserting it against her any way on the grounds that Yoon is "not an individual investor" and is "attached to her husband in every step of the way." Ex. 540 91:13-15. As to Chickasaw, it is also not a party to the Big Boy Letter, and thus cannot rely on it.

As Plaintiffs have maintained since the onset of this litigation, the Big Boy Letter was intended by JP Morgan to be an improper hedge clause against its own fiduciary duties. A "hedge clause" is an exculpatory provision in an investment advisory agreement that purports to

relieve an adviser from liability.  *See* Ex. 516 at 11, n. 31.[8]  According to the SEC, hedge clauses are almost always unenforceable under **both** state and federal law.  *See id.*

Accordingly, all experts for both Plaintiffs and Defendants agree that the Big Boy Letter did not in any way diminish JP Morgan's fiduciary duties to Plaintiffs.  Palzer stated that ███ ██████ Ex. 531 at ¶ 149. He further stated that ████████████████████████████████ ████████████████████████████ *Id.*  Palzer further acknowledged that Baker fraudulently modifying the account opening documents would be "a serious issue" notwithstanding the Big Boy Letter.  Ex. 539 227:16-228:19.  Defendants' expert Gillespie also acknowledged that the Big Boy Letter did not in any way diminish JP Morgan's fiduciary duties or negate its ongoing suitability obligations to Plaintiffs.  *See* Ex. 529 at 18; Ex. 540 250:21-251:22; *see also* Ex. 526 at 65-66, 88-89.

Despite this, in its Answer and numerous other filings with the Court, JP Morgan made clear that it viewed the Big Boy Letter to be a shield to liability in this litigation, going so far as to bring counterclaims against not just Peter but also Yoon, who is not even party to the letter or even mentioned anywhere in it.  *See* JP Morgan's Answer (Dkt. No. 25) at 93.  ("The Doelgers have breached the September 2015 Letter Agreement by, among other things, filing and maintaining the Complaint…").

After two years of litigation, JP Morgan now concedes that the Big Boy Letter "is not

---

[8] The SEC has condemned such hedge clauses, stating "there are few (if any) circumstances in which a hedge clause in an agreement with a retail client would be consistent with those antifraud provisions [of the Advisers Act], where the hedge clause purports to relieve the adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law."  *Id.*; *see also* Ex. 519 (the *CCM* Order).

focused on waiving any claims," and does not mention it in its arguments concerning Plaintiffs' claims at law, which would seem to moot the matter. And for good reason; JP Morgan knows that if it were to rely on the Big Boy Letter to disclaim its fiduciary duties, it would have to acknowledge the letter is an unenforceable hedge clause. To avoid this legal pitfall, JP Morgan now attempts to wash its hands clean of the Big Boy Letter and the lies it told to take advantage of an elderly man, while still somehow arguing that the rescission claims must be dismissed.

In any event, should JP Morgan revert its position on reply, there remain several issues of fact and law in connection with Plaintiffs recission claims as to the Big Boy Letter:

- Such hedge clauses are not enforceable under Massachusetts law. *See, e.g.*, *Lifespan*, 731 F. Supp. 2d at 241.

- JP Morgan cannot rely on the statute of limitations because Plaintiffs are using it as a "shield or defensively": "There is no statute of limitations restricting the ability of a client of an investment adviser to raise Section 80b-15 to defeat an exculpatory contract provision interposed by an investment adviser in response to a claim by the client not otherwise barred by a statute of limitations." *Hsu v. UBS Fin. Servs.*, 2011 U.S. Dist. LEXIS 86664, at *10-11 (N.D. Cal. Aug. 5, 2011).

- That JP Morgan is exempt from the Advisers Act is not dispositive given that its affiliate, JP Morgan Securities (a party to the letter) is not. The two entities are closely intertwined: as JP Morgan has previously admitted, "***JPMorgan employees often wear two hats.***" Doc. No. 234 at 7-8 n.21 (emphasis added).

- Whether there was justified reliance[9] on JP Morgan's multiple false statements in the Big Boy Letter and whether the Big Boy Letter is a modification of the Advisory Agreements and/or supported by adequate consideration[10] would all be issues of disputed fact.

---

[9] Reliance is an issue of fact, and a party cannot justifiably rely upon a supposed misrepresentation it knows to be false, or would be revealed as such upon "a cursory examination or investigation." *Collins*, 783 N.E.2d at 839 (internal citation and quotation omitted).

[10] If the Big Boy Letter is enforceable on its own or as a modification to another agreement, it must be supported by consideration. *See, e.g.*, *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 9 (1st Cir. 2003); *Tri-City Concrete Co. v. A.L.A. Constr. Co.*, 343 Mass. 425, 427 (1962). If Defendants argue on reply that the Big Boy Letter made the portfolio available, that consideration was already subsumed by the Advisory Agreement and the Term Sheet, executed weeks prior. Past consideration does not support a new contract or a modification of a contract. *See, e.g. Gr. Boston Cable Corp. v. White Mountain Cable Constr. Corp.*, 414 Mass. 76, 80 (1992); *BourgeoisWhite, LLP v.*

Moreover, Baker and others knew the Big Boy Letter contained inaccurate information as to Peter's net worth.   Baker and his team knew in October 2015, and certainly knew by November 2016 when the 2016 PFS (completed by Baker) showed Peter had a net worth of $39.4 million total and $20.9 million liquid.   *See* Ex. 327; SOF ¶ 426.   JP Morgan also knew Plaintiffs were not worth anywhere near $100 million in both prior and subsequent years as well. *See* SOF ¶¶ 295, 596.   JP Morgan cannot assert the Big Boy Letter against Plaintiffs knowing that it contains false information.   *See Wahlstrom v. Hoey*, 2023 U.S. Dist. LEXIS 181811 at *18 (D. Mass. Oct. 10, 2023); *see also Erb*, 2018 Mass. Super. LEXIS at *6 ("Where a release is obtained without a full disclosure of the relevant facts by one who is under a duty to reveal them, it can be set aside.").

Finally, all of the foregoing issues will need to be tried anyway in connection with JP Morgan's counterclaims, for which it is not seeking summary judgment.

## VI.   Plaintiffs Have Properly Stated a Claim Under 93A

Defendants next argue that Plaintiffs' 93A claims are time-barred (discussed in Section IV *supra*), and in any event Plaintiffs have not sufficiently shown that Defendants engaged in unfair or deceptive practices.

Chapter 93A is "broad."   *Walsh v. TelTech Sys. Inc.*, 821 F.3d 155, 160 (1st Cir. 2016). "Under Chapter 93A, an act or practice is unfair if it falls 'within at least the penumbra of some common-law statutory, or other established concept of unfairness' 'is immoral, unethical, oppressive, or unscrupulous,' and 'causes substantial injury to consumers.'"   *Id.* (quoting *PMP Assocs. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).   "Under Chapter 93A, an act or

---

*Sterling Lion, LLC*, 91 Mass. App. Ct. 114, 121 n. 12 (2017).

practice is deceptive 'if it possesses a tendency to deceive' or 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." *Id.* (quoting *Aspinwall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 394 (2004).   While negligence, standing alone, will not suffice, "'extreme or egregious' negligence" will.  *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014) (quoting *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 62 (2004)).  Finally, although the "boundaries of what may qualify" as a 93A violation is a question of law, "whether a particular set of acts, in their factual setting, is unfair or deceptive is *a question of fact*." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 54 (1st Cir. 1998) (emphasis added) (quoting *Ahern v. Scholz*, 85 F.3d 774, 797 (1st Cir. 1996)).

Plaintiffs have set forth a slew of unethical and unscrupulous conduct by Defendants, including false statements and fraudulent conduct by Baker and others, undisclosed conflicts of interest and several other breaches of fiduciary duties, breaches of the covenant of good faith and fair dealing, and a host more.  Any disputes Defendants have are factual and should not be determined on summary judgment.

## VII.   Plaintiffs Have Established a Claim Under Florida's Adult Protective Services Act

Defendants argue that Plaintiffs cannot invoke Florida law despite being domiciled and residing there for a substantial portion of the relevant period, and that in any event they cannot be liable because Plaintiffs have not shown that Peter is a vulnerable adult or was exploited by Defendants.  These arguments at best go to issues of fact that cannot be determined on summary judgment.

The Adult Protective Services Act, Fla. Stat § 415.101 *et seq.* (the "Act"), defines "Vulnerable adult" as an adult "whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the

infirmities of aging."  Fla. Stat. § 415.102(28).  "Activities of daily living" is defined as "functions and tasks for self-care, including ambulation, bathing, dressing, eating, grooming, toileting, and other similar tasks."  *Id.* § 415.102(2).  "Exploitation" has multiple meanings under the Act, including "a person who [s]tands in a position of trust and confidence with a vulnerable adult" and "knowingly, by deception or intimidation" obtains their "funds, assets, or property with the intent to temporarily or permanently" deprive them of their use "for the benefit of someone other than the vulnerable adult."  *Id.* § 415.102(8)(a)(1).  Exploitation as defined under the Act explicitly includes "[b]reaches of fiduciary relationships."  *Id.* § 415.102(8)(b)(1).

The Act provides for a civil cause of action for any vulnerable adult "who has been abused, neglected, or exploited" to recover actual and punitive damages, as well as attorney's fees.  *Id.* § 415.1111.  The Act explicitly provides that it may be brought "in any court of competent jurisdiction," and that the remedies provided "are in addition to and cumulative with other legal and administrative remedies available to a vulnerable adult."  *Id.*

Plaintiffs have established the grounds on which their cause of action under the Act was brought.  Peter is a vulnerable adult – he has suffered from mental disability or dysfunction and the infirmities of aging and cannot engage in several activities of daily living without assistance, such as bathing, putting in his hearing aids, grooming and cleaning himself and his clothes, and so forth.  *See* Yoon Decl. ¶ 31.  JP Morgan obtained access to Peter's funds by deception through several false representations as to Peter's worth, the appropriateness of the investments, their profitability, and so forth, and thereafter deprived Peter of their use to the benefit of others (including Defendants).

Defendants have not cited any meaningful authority as to why Plaintiffs – as residents of Florida – could not bring suit under the Act.  Nor are their arguments as to the elements of the

cause of action anything more than factual arguments in disguise as to Peter's impairment and ability, JP Morgan's deception and exploitation, and the damages Plaintiffs suffered as a consequence.  Summary judgment must be denied as to this cause of action.

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs respectfully request that Defendants' motion for summary judgment be denied.

Dated:  New York, New York           Respectfully submitted,
　　　　　October 31, 2023
                                                              YOON DOELGER and PETER DOELGER

                                                              By their attorneys,

                                                              /s/ James R. Serritella
                                                              James R. Serritella (*Pro Hac Vice*)
                                                              Justin Stone (*Pro Hac Vice*)
                                                              Hannah Freiman (*Pro Hac Vice*)
                                                              KIM & SERRITELLA LLP
                                                              110 W. 40th Street, 10th Floor
                                                              New York, NY 10018
                                                              T - (212) 960-8345
                                                              jserritella@kandslaw.com

                                                              Joshua W. Gardner (BBO No. 657347)
                                                              GARDNER & ROSENBERG P.C.
                                                              One State Street, Fourth Floor
                                                              Boston, Massachusetts 02109
                                                              T - (617) 390-7570
                                                              josh@gardnerrosenberg.com

## **CERTIFICATE OF SERVICE**

I certify that on this date the foregoing brief with all accompanying papers was filed electronically with the Clerk of the Court by CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of this Court's CM/ECF electronic filing system.  Parties may access this filing through the Court's system.

Date: October 31, 2023                                    /s/ James R. Serritella
                                                                         James R. Serritella, *pro hac vice*