UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
PETER DOELGER and YOON DOELGER,  )
                                                    )
         Plaintiffs,                          )          **Filed under seal.**
                                                    )
         v.                                      )          Civil No. 21-11042-AK
                                                    )
JPMORGAN CHASE BANK, N.A. et al.,  )
                                                    )
         Defendants.                       )
_____)

REPORT AND RECOMMENDATION ON THE PARTIES' MOTIONS TO STRIKE
AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]
[Docket Nos. 273, 323, 335]

March 25, 2024

Boal, M.J.

         This action arises from an investment relationship between Plaintiffs Peter and Yoon

Doelger and Defendants JPMorgan Chase Bank, N.A. ("JPMC") and Chickasaw Capital

Management, LLC. The Doelgers initially made and then lost money. They seek to hold

Defendants legally liable for their losses. Defendants have jointly moved for summary judgment

on all counts. Docket No. 273.[2] As discussed in greater detail below, the Doelgers have failed to

address properly and meaningfully Defendants' arguments. Indeed, with respect to many of the

claims, they fail to put forth a legally sound claim, let alone meet their burden to show a genuine

issue of material fact. Accordingly, and for the additional reasons discussed below, I recommend

that Judge Kelley grant Defendants' motion in its entirety.

_____
[1] On February 9, 2023, Judge Kelley referred the case to the undersigned for full pretrial
proceedings and report and recommendation on dispositive motions. Docket No. 170.
[2] Citations to "Docket No. ___" are to documents appearing on the Court's electronic docket.
They reference the docket number assigned by CM/ECF and include pincites to the page
numbers appearing in the top right corner of each page within the header appended by CM/ECF.

I.      PROCEDURAL BACKGROUND

On June 23, 2021, the Doelgers filed a nine-count complaint against JPMC and

Chickasaw. Docket No. 1. Those claims, based on conduct dating back to 2015, are: (1) breach

of fiduciary duty; (2) breach of contract; (3) negligence/gross negligence; (4) negligent

misrepresentation; (5) breach of the covenant of good faith and fair dealing; (6) declaratory

judgment; (7) rescission pursuant to 15 U.S.C. § 80b-15; (8) Chapter 93A violations; and (9)

elder financial exploitation in violation of Florida Statute § 415. Id. at 42-51. On October 1,

2021, JPMC filed counterclaims against the Doelgers for breach of contract and indemnification.

Docket No. 25 at 94-96.

On September 28, 2023, Defendants filed a consolidated motion for summary judgment

on all of the Doelgers' claims. Docket No. 273. The Doelgers filed an opposition on October 31,

2023. Docket No. 300. On November 28, 2023, Defendants filed a reply, Docket No. 321, and on

December 13, 2023, the Doelgers filed a sur-reply. Docket No. 338.

On November 28, 2023, Defendants filed a motion to strike various portions of Yoon

Doelger's declaration. Docket No. 323. On December 12, 2023, the Doelgers filed an opposition

to Defendants' motion to strike and their own motion to strike the declarations of James Baker

and Daniel Jacobs. Docket No. 335. Defendants filed an opposition to the Doelgers' motion to

strike on December 26, 2023, and the Doelgers filed a reply on January 13, 2024. Docket Nos.

349, 355. This Court heard oral argument on the above motions on January 10, 2024.[3]

---

[3] On March 18, 2024, the Doelgers filed a notice of supplemental authority based on a news
release from various federal agencies regarding consent orders with JPMC and affiliated entities
pertaining to "a pattern of unsafe or unsound practices related to trade surveillance." Docket No.
380 at 2. However, there is no indication that the consent orders are linked to the specific facts
and legal claims in this case. In addition, such evidence, to the extent it is relevant to the instant
case, is inadmissible and therefore cannot be considered in the summary judgment context.

II.     FACTS[4]

    A.     Scope Of The Record

As a preliminary matter, this Court addresses the parties' motions to strike.

    1.     The Doelgers' Motion To Strike

The Doelgers move to strike the declarations of JPMC employees James Baker (Docket No. 321-15) and Daniel Jacobs (Docket No. 321-16). Docket No. 335. The Doelgers argue that Baker's four paragraph declaration should be struck because it is not based on personal knowledge. In support, the Doelgers point to Baker's statement that he submits the declaration "based on my personal knowledge, except as to those matters that are stated upon information and belief." Docket No. 321-15 ¶ 2. The following two paragraphs contain substantive information. In those paragraphs, Baker explains that his understanding is "based on my experience at JPMC." Id. ¶¶ 3, 4. The text of these paragraphs alone rebuts the Doelgers' arguments that Baker lacked personal knowledge. The Doelgers' other arguments go to the weight, not the admissibility of the evidence contained in the declaration.[5] See Docket No. 355 at 5. For example, they maintain that Baker's statements are "contradicted by the record." Id. Accordingly, the Doelgers' motion to strike the Baker declaration is denied.[6]

---

[4] This Court construes the record in the light most favorable to the Doelgers, the non-moving parties, and resolves all reasonable inferences in their favor. See Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)). The facts are taken from Defendants' statement of material facts ("Def. SOF"), which incorporates the Doelgers' responses ("Pl. Resp.") and the Doelgers' statement of additional material facts ("Pl. SOF"), which incorporates Defendants' responses ("Def. Resp."). This Court cites to these various statements of fact as contained in the parties' unified statement of material facts. See Docket No. 331.

[5] For example, they do not dispute that Baker had personal knowledge as to his own beliefs about the subject investment limits, rather they dispute that he followed the policy. Docket No. 355 at 5. In addition, Defendants correctly challenge the factual basis on which the Doelgers make these assertions. Docket No. 349 at 12-13.

[6] It is unclear whether the Doelgers intended to move to strike the Baker declaration under the sham affidavit rule. For example, the motion asserts that Baker makes "what are effectively sham

The Doelgers move to strike the Jacobs declaration on the basis that it is made upon information and belief and because Jacobs was not disclosed during the course of discovery.[7] The Doelgers' arguments are misplaced. Jacobs makes his declaration as a custodian of records. Neither the cases cited by the Doelgers (Docket No. 335-1 at 10)[8] nor the Federal Rules of Civil Procedure require the automatic disclosure of such persons. See Fed. R. Civ. Pro. 26(a)(1)(A)(i).

The Doelgers also seek to strike the Jacobs declaration because he authenticates the documents based on information and belief. However, the cases cited by the Doelgers fail to show that custodial affidavits may not be made on information and belief. In any event, Defendants have submitted a revised Jacobs declaration (Docket No. 349-4) and also a declaration from Jesse Martinez (Docket No. 351-1) that authenticate the same documents. Accordingly, this Court denies the Doelgers' motion to strike the Jacobs (and Martinez) declarations. To the extent necessary, it will rely on the second Jacobs declaration and/or the Martinez declaration to avoid any confusion.

> 2.    Defendants' Motion To Strike

Defendants move to strike in whole or in part the declaration of Yoon Doelger. Docket No. 323. Defendants argue that certain statements should be struck because they are: (1) precluded by the Massachusetts spousal immunity statute, M.G.L. c. 233 § 20 or Fed. R. Evid. 802; (2) not made on the basis of personal knowledge; (3) otherwise hearsay; (4) inconsistent

---

statements." Docket No. 335-1 at 7. However, there is no analysis comparing Baker's statements to, for example, prior sworn testimony, nor any legal authority supporting the assertions. Accordingly, because the Doelgers did not develop a sham affidavit argument, it is waived.

[7] In their reply, the Doelgers make the same arguments with respect to the Martinez declaration discussed below. Docket No. 355 at 6. The arguments are similarly without merit with respect to that declaration.

[8] Rather, most of the cases cited by the Doelgers involve expert disclosures. The Doelgers also cite Burnett v. Ocean Properties, Ltd., 987 F.3d 57, 74 (1st Cir. 2021) which involves a decision to preclude a non-expert testifying about some undisclosed tests. That decision does not involve a custodian of records.

statements that trigger the sham affidavit rule; and/or (5) impermissible argument and not fact. Id. at 1-2. In many instances, however, Mrs. Doelger's declaration is not germane to resolving the summary judgment arguments presented by the parties. For that reason, many of Defendants' requests are moot. To the extent that this Court needs to resolve any of the issues raised by the motion to strike in order to reach a decision, this Court rules on the specific request at that time.

      B.    The Doelgers

Peter Doelger is currently eighty-six years old.[9] His wife, Yoon Doelger is currently seventy-seven years old.[10] Mrs. Doelger was born in Korea, and Korean is her native language.[11] While she has taken English classes, she asserts that is not comfortable speaking the language.[12] Mrs. Doelger earned a master's degree in fine arts from Boston University.[13] From August 2015 through March 2020, the Doelgers were residents of Florida, where they received mailings from JPMC.[14] They also had homes in Boston, Massachusetts, and Paris, France, in which they lived during that time period.[15] From 2015 through 2020, Mr. Doelger swam and rowed.[16] He kept up to date with geopolitics during that same time period.[17]

Along with two other partners, Mr. Doelger founded DMC Services, a company that performed energy audits for homeowners.[18] DMC Services was sold to the Honeywell company in 1995.[19] From that sale, Mr. Doelger netted approximately $12 million.[20] Mr. Doelger retired

---

[9] Pl. SOF ¶ 200; Def. Resp. ¶ 200.
[10] Pl. SOF ¶ 198; Def. Resp. ¶ 198.
[11] Id.; Pl. SOF ¶ 199; Def. Resp. ¶ 199.
[12] Pl. SOF ¶ 198; Def. Resp. ¶ 198.
[13] Def. SOF ¶ 12; Pl. Resp. ¶ 12.
[14] Def. SOF ¶ 8; Pl. Resp. ¶ 8.
[15] Def. SOF ¶ 7; Pl. Resp. ¶ 7.
[16] Def. SOF ¶ 9; Pl. Resp. ¶ 9.
[17] Def. SOF ¶ 14; Pl. Resp. ¶ 14.
[18] Pl. SOF ¶ 203; Def. Resp. ¶ 203.
[19] Def. SOF ¶ 4; Pl. Resp. ¶ 4.
[20] Def. SOF ¶ 5; Pl. Resp. ¶ 5.

after the sale of DMC Services, but took an active interest in his investments, which included master limited partnerships ("MLPs").[21] He started investing in MLPs beginning in at least the 2000s.[22]

C.     Peter Doelger's Initial Master Limited Partnership Investments

In 2005, Mr. Doelger opened an account with Neuberger Berman, LLC which primarily held MLP assets.[23] In 2008, after Neuberger's parent company collapsed, Mr. Doelger began using JPMC to hold MLP assets previously managed by Neuberger.[24] In March 2012, Mr. Doelger transitioned those MLP assets to an Atlantic Trust account.[25] The value of the transferred assets was more than $27 million.[26]

Mr. Doelger held assets in the Atlantic Trust account from 2012 until 2015.[27] In September 2014, the Atlantic Trust account reached its highest value of over $47 million.[28]

D.     Peter Doelger's Line Of Credit

In October 2009, Mr. Doelger opened a line of credit ("LOC") with JPMC which was secured by, inter alia, Mr. Doelger's MLPs held with Neuberger.[29] The LOC was comprised of interest-only loans that would mature every year, but JPMC regularly renewed the loans for successive one-year periods to keep them active.[30] In connection with opening the LOC and renewing it from time to time between 2009 and 2020, Mr. Doelger signed certain loan

---

[21] Def. SOF ¶ 6; Pl. Resp. ¶ 6.
[22] Def. SOF ¶ 17; Pl. Resp. ¶ 17.
[23] Def. SOF ¶¶ 35, 36; Pl. Resp. ¶¶ 35, 36.
[24] Def. SOF ¶ 37; Pl. Resp. ¶ 37.
[25] Def. SOF ¶ 38; Pl. Resp. ¶ 38.
[26] Def. SOF ¶ 40; Pl. Resp. ¶ 40.
[27] Def. SOF ¶ 41; Pl. Resp. ¶ 41; Pl. SOF ¶ 242; Def. Resp. ¶ 242.
[28] Def. SOF ¶ 42; Pl. Resp. ¶ 42.
[29] Def. SOF ¶ 56; Pl. Resp. ¶ 56; see also Pl. SOF ¶ 403; Def. Resp. ¶ 403.
[30] Pl. SOF ¶ 402; Def. Resp. ¶ 402.

documents, including a November 2016 collateral agreement and a May 2017 LOC renewal.[31]
Mr. Doelger initially borrowed $2 million.[32] Between 2009 and 2014, Mr. Doelger made
additional draws on the LOC, and his peak balance was almost $18 million in mid-2014.[33]

Mr. Doelger signed loan documents that disclosed a potential conflict of interest from
JPMC's action as a lender and holding collateral that consisted of assets in the account managed
by JPMC or an affiliate.[34] Specifically, the documents stated that "[i]f any Collateral is held in an
investment management account or investment advisory account which the Bank (or an affiliate
of the Bank) acts as investment manager or investment advisor, then the Bank's . . . duties . . .
may conflict with its rights as a secured party" and JPMC "does not assume any duty with
respect to the Collateral," and JPMC had "no obligation to act in accordance with any fiduciary
duty it (or its affiliates) may owe . . . as investment manager" in the event of a collateral
liquidation.[35]

E.      Peter Doelger's Initial Relationship With JPMC

Mr. Doelger banked with JPMC since at least the 1990s.[36] His long-time advisor at JPMC
was Bob Devens.[37] When Devens retired around 2009, Douglas Moon became the relationship
manager for Mr. Doelger.[38]

In April 2009, to open a brokerage account (the "Brokerage Account") with JPMorgan
Securities ("JPMS"), Mr. Doelger signed an application indicating, inter alia, that his personal
trading experience was as follows: 20+ years' experience trading stocks and bonds, 15+ years'

---

[31] Def. SOF ¶ 61; Pl. Resp. ¶ 61.
[32] Def. SOF ¶ 57; Pl. Resp. ¶ 57.
[33] Def. SOF ¶¶ 58, 59; Pl. Resp. ¶¶ 58, 59.
[34] Def. SOF ¶ 62; Pl. Resp. ¶ 62; Docket Nos. 276-84 at 5; 276-93 at 17-18.
[35] Id.
[36] Pl. SOF ¶ 234; Def. Resp. ¶ 234.
[37] Pl. SOF ¶ 235; Def. Resp. ¶ 235.
[38] Pl. SOF ¶ 238; Def. Resp. ¶ 238.

experience trading options, and 10+ years' experience trading structured products, emerging markets, and hedge funds/private placements."[39] The Brokerage Account was used, in part, to hold MLPs outside of the Doelgers' managed accounts for tax reasons.[40]

  F. Peter Doelger's Master Limited Partnership Investments With Defendants

  Over the five-year period beginning when Mr. Doelger first opened his LOC in October 2009 and ending in October 2014, Mr. Doelger's MLP investments increased in value by over $25 million.[41] During that period, the MLP sector outperformed the S&P 500.[42] Over that five-year period, Mr. Doelger's MLP investments generated an average of $1,500,000 in annual distributions.[43] During the same time period, those MLP investments generated approximately $32,500,000 in total gain to Mr. Doelger.[44]

  In late 2014, MLPs began to decline.[45] In December 2014, James Baker, a JPMC investment specialist, had a phone call with Mr. Doelger during which they discussed recent volatility in MLP prices.[46] Following the conversation, Baker wrote an email to Douglas Moon in which he stated:

> Peter mentioned he believed the fall in oil prices and MLPs would correct itself in the medium term as it would lead to a pickup in demand and a fall in supply. He explained he thought the recent weakness was being exasperated [sic] by hedge

---

[39] Def. SOF ¶ 16; The Doelgers do not dispute the contents of the document. However, they dispute that the information goes to Mr. Doelger's investment knowledge. Yet, Mr. Doelger's signature indicates his agreement to the content of the document. Mrs. Doelger lacks personal knowledge to dispute the contents of the document. Pl. Resp. ¶ 16. Docket No. 276-6 at 3.

[40] Def. SOF ¶¶ 31, 32; Pl. Resp. ¶ 31, 32.

[41] Def. SOF ¶ 63; The Doelgers do not dispute that there were gains, but dispute the value identified. In support, they assert that the account performance report is inadmissible. However, this court finds unpersuasive the Doelgers' arguments on admissibility. Because they have provided no facts or evidence of record to dispute Defendants' facts, Defendants' facts are deemed admitted for purposes of this motion. Pl. Resp. ¶ 63.

[42] Def. SOF ¶ 67; Pl. Resp. ¶ 67.

[43] Def. SOF ¶ 64; Pl. Resp. ¶ 64; see supra note 41.

[44] Def. SOF ¶ 65; Pl. Resp. ¶ 65 ; see supra note 41.

[45] Def. SOF ¶ 68; Pl. Resp. ¶ 68.

[46] Def. SOF ¶ 66; Pl. Resp. ¶ 66.

funds and fast money momentum traders just leaning on the current trend. He noted he had been through several similar drawdowns in the past and from his experience once the market turns it often moves higher as sharply as it moves down and he is concerned that if he reduced his position here he will miss a rebound in prices.

He explained he had help [sic] on to all of his investments in 2008 during the Lehman collapse and it was his general philosophy to not react to short term volatility. We reviewed his current excess margin and that it would take a $10 MM drop in the value of his collateral to cause a margin call, which he said made him feel more comfortable.

I mentioned our view is that while we remain positive long-term on energy and MLPs, it is our belief that oil could continue to drift lower from here and we expected a lot of volatility in the space in the next 6-9 months. Peter disagreed and thought the recovery in price (of both Oil and MLPs) would likely happen much faster than that. He asked if I thought there was the possibility of another 10% downside in MLPs from here and I said that was definitely a possibility and it could certainly even be a worse drawdown than that.

He mentioned that the last 24 hours was the first time he became nervous about these positions and I told him that regardless of what happens from here he has made an exceptional amount of profits in these positions and if it would give him piece of mind he should reduce risk in this portfolio. He then responded he was not THAT concerned.

He also mentioned he is going to have a significant tax bill from the Kinder Morgan mergers and as a result his accountant has advised he take some losses from his BIND position. He asked us to call Bruce together tomorrow to determine the magnitude of the gain that he was facing to help determine how much BIND should be sold. I warned him that due to low volume it could take a very long time to exit his 500k+ share position in the stock, so we would need to move very quickly if he wanted to make these transactions in 2014.[47]

In the spring of 2015, Mr. Doelger and JPMC discussed the idea of switching MLP

managers, specifically to JPMC's Master Limited Partnership & Energy Infrastructure

("MLPEI") portfolio strategy[48] which was managed by Chickasaw.[49] Chickasaw is a registered

---

[47] Docket No. 276-32 at 2.

[48] JPMC had a variety of advisory programs presented in the form of twenty-two different Portfolios Schedules that it offered to clients. Pl. SOF ¶ 283; Def. Resp. ¶ 283. The MLP Program was one of the Portfolio Schedules. Id.

[49] Def. SOF ¶ 71. The Doelgers dispute whether Mr. Doelger initiated the conversation, but they do not dispute that discussions occurred. Pl. Resp. ¶ 71.

investment advisor under the Investment Advisors Act ("the Advisors Act").[50]

On August 10, 2015, both Doelgers met with Baker and Chickasaw representatives Ed Kelly and Geoffrey Mavar in New York.[51] Chickasaw gave a presentation at the beginning of the meeting concerning MLPs.[52] The August 10, 2015, meeting was the only in-person meeting between Chickasaw and the Doelgers during which the Doelgers' new account (the "Advisory Account") was discussed.[53] Mr. Doelger indicated to Baker that he wanted to work with Defendants to begin transitioning his MLP investments to the MLPEI portfolio.[54]

      1.    <u>Master Limited Partnership Investments</u>

      a.    <u>The 2015 Advisory Agreement</u>

During the August 10, 2015, meeting, Mr. Doelger signed a personal account application (the "2015 Advisory Agreement") to open the Advisory Account.[55] The 2015 Advisory Agreement attached to the Doelgers' complaint indicates that Mr. Doelger's liquid and total net worth was $100 million, and the investment amount was $30 million.[56] Docket No. 1-2 at 15. As a general matter, the advisory fees that Defendants received from the Advisory Account were based on the assets under management in that account.[57]

---

[50] Pl. SOF ¶ 509; Def. Resp. ¶ 509.

[51] Def. SOF ¶ 73; Pl. Resp. ¶ 73; Pl. SOF ¶ 269; Def. Resp. ¶ 269.

[52] Pl. SOF ¶ 271; Def. Resp. ¶ 271.

[53] Def. SOF ¶ 74; Pl. Resp. ¶ 74.

[54] Def. SOF ¶ 77. Although the Doelgers dispute this statement, the document to which they cite does not provide contradictory evidence. Pl. Resp. ¶ 77.

[55] Def. SOF ¶ 79. While the Doelgers dispute the substance of the document that Mr. Doelger signed on August 10, 2015, they do not dispute that he signed a document to open a new account. Pl. Resp. ¶ 79; <u>see also</u> Docket No. 1-2.

[56] Def. SOF ¶ 79. The Doelgers dispute that the document cited (Docket No. 1-2), is the document that Mr. Doelger signed. Pl. Resp. ¶ 79. Specifically, the Doelgers assert that JPMC switched out pages in the 2015 Advisory Agreement after Peter Doelger signed it. <u>Id.</u> They point to various emails and account documents that contain net worth and investment amount numbers that do not match the numbers in the personal account application. <u>Id.</u> They have not, however, provided any evidence supporting their assertion that Defendants swapped out pages.

[57] Pl. SOF ¶ 405; Def. Resp. ¶ 405.

Prior to signing the 2015 Advisory Agreement, Mr. Doelger represented to Baker that his net worth was in the range of $100 million.[58] In addition to the Doelgers' assets held with JPMC, JPMC understood that Mr. Doelger held assets with other financial institutions.[59] Under the 2015 Advisory Agreement, JPMC agreed to collect information about Mr. Doelger's "financial circumstances, investment objectives, risk tolerance, and requirements for the Account."[60] Under that agreement, Mr. Doelger selected the MLPEI strategy, which the Portfolio Schedule specified was "to invest in publicly traded partnerships, limited liability companies and corporations [i.e., MLPs], predominantly in the energy sector," and was managed by Chickasaw.[61] With respect to ongoing services, the 2015 Advisory Agreement provided:

> On an ongoing basis, the Bank will respond to Client inquiries, periodically consult with Client to update Client's financial information and investment objectives, periodically review the activity in and investment results of each Portfolio with Client, and assist Client in determining whether to make any changes to Client's selection of Portfolios. Client may modify the selection of Portfolios at any time.[62]

The Advisory Agreement specifically incorporated JPMC's General Terms for Accounts and Services ("the General Terms").[63] The General Terms state, inter alia:

---

[58] Def. SOF ¶ 103. The Doelgers dispute this statement. However, the admissible evidence they cite to does not contradict this statement of fact. Pl. Resp. ¶ 103. For example, in paragraph 64 of the Yoon Declaration, Mrs. Doelger states that Mr. Doelger told her that it "was never true" that there was "a letter that said that he had $100 million." Docket No. 300-9 ¶ 64. It is unclear if "never true" refers to the letter, the $100 million, or both. In any event, the statement is hearsay and may not be considered. The document itself states Mr. Doelger's net worth was $100,000,000. He signed the document on August 15, 2015, and explicitly certified its accuracy. Docket No. 276-43 at 15, 18.

[59] Def. SOF ¶ 104; Pl. Resp. ¶ 104.

[60] Def. SOF ¶ 80; Pl. Resp. ¶ 80.

[61] Def. SOF ¶ 82. The Doelgers dispute this statement, but they do not dispute that, under the agreement, Mr. Doelger chose the MLPEI strategy (regardless of whether other strategies were offered). Pl. Resp. ¶ 82.

[62] Def. SOF ¶ 84; Pl. Resp. ¶ 84.

[63] Def. SOF ¶ 85. The Doelgers dispute this statement on the basis that it contains improper legal argument. Pl. Resp. ¶ 85. However, the Advisory Agreement states "[t]his Agreement is subject to and incorporates the J.P. Morgan General Terms for Accounts and Services." Docket No. 276-55 at 10 ¶ 8.

[T]his Agreement shall be governed by the law of the State of New York without giving effect to its choice of law or conflict of laws provisions (other than Section 5-1401 of the New York General Obligations Law) and JPMC's legal liability shall be limited to acts of "gross negligence and willful misconduct.[64]

Chickasaw is not a signatory to the 2015 Advisory Agreement.[65] JPMC and Chickasaw signed an Agreement for Investment Management Services ("AIMS") on November 18 and 19, 2014.[66] They also signed a term sheet associated with the Advisory Account on September 10 and 11, 2015 (the "2015 Term Sheet").[67] These documents set forth Chickasaw's duties with respect to its provision of investment management services to the Doelgers.[68]

After Mr. Doelger signed the 2015 Advisory Agreement, JPMC took steps to collect information from him, including financial information and investment objectives.[69]

In an August 28, 2015, email, Baker conveyed his understanding that Mr. Doelger had extensive investing experience with MLPs.[70] Specifically, Baker stated that Mr. Doelger "worked in the utility/energy business for 30 years before selling his business to Honeywell in the late 1990s" and "has extensive experience investing in MLPs" which started in the late 1990s. He further stated that Mr. Doelger "understands the sector and the industry very well and is comfortable holding a large portion of his portfolio in these type of assets." Mr. Doelger also

---

[64] Def. SOF ¶ 86; Docket No. 276-62 at 9-10 ¶¶ 11, 18. The Doelgers claim this statement contains improper legal argument. They do not dispute that the General Terms contain the quoted language. Pl. Resp. ¶ 86.

[65] Def. SOF ¶ 93; Pl. Resp. ¶ 93.

[66] Def. SOF ¶ 94; Pl. Resp. ¶ 94.

[67] Def. SOF ¶ 96; Pl. Resp. ¶ 96.

[68] Def. SOF ¶ 98; Pl. Resp. ¶ 98.

[69] Def. SOF ¶ 99. The Doelgers take issue with the extent to which JPMC collected information, but they do not actually dispute that JPMC took steps to gather the same. Pl. Resp. ¶ 99.

[70] Def. SOF ¶ 100; Pl. Resp. ¶ 100. The Doelgers do not dispute that Baker made the statements in the email. Rather they dispute that this email describes conversations between Mr. Doelger and Baker. In support, they rely on Yoon Doelger's declaration. The cited paragraphs, however, do not actually dispute the contents of the email. Even if they did, the paragraphs contain impermissible hearsay which this Court may not consider.

"had a large allocation to MLPS throughout the last decade, never reducing his position in 2008 or in the recent Oil market downturn."[71] Baker further stated that "we have told [Mr. Doelger] on multiple occasions that we believe his allocation to the asset class is too high" and that Mr. Doelger responded that "he is comfortable with the risks and believes in the opportunity in the [MLP] space long term."[72]

The Doelgers maintain that the MLP program was subject to, at least as of December 2014, two suitability limits: (1) for the MLP program, an investment limit equal to five per cent of the client's liquid net worth; and (2) across all Advisor program strategies, an investment limit of fifty per cent of the client's net worth.[73] JPMC would allow clients to exceed the five per cent suitability restriction.[74] Defendants dispute that a fifty per cent limit with respect to a client's net worth was universally applied.[75] Whether Mr. Doelger's net worth was $50 million or $100 million, his $33 million investment in MLPs exceed the five per cent suitability limit.[76]

b.    The MLPEI Letter

Before accepting the transfer of Mr. Doelger's MLP account from Atlantic Trust, JPMC requested that Mr. Doelger sign a letter confirming the representations he had made to JPMC and acknowledging that his requested investment amount was larger and more concentrated than what JPMC recommended for someone with his net worth (the "MLPEI Letter").[77] On September 30, 2015, Baker emailed a copy of the MLPEI Letter to Mr. Doelger's lawyer, Paul Roberts, which he received, printed, and filed in chronological order in his file folder.[78]

---

[71] Id.; Docket No. 276-50 at 2.
[72] Id.
[73] Pl. SOF ¶¶ 285, 288; Def. Resp. ¶¶ 285, 288.
[74] Pl. SOF ¶ 288.
[75] Def. Resp. ¶ 288.
[76] Pl. SOF ¶ 290; Def. Resp. ¶ 290.
[77] Def. SOF ¶ 110; Pl. Resp. ¶ 110.
[78] Def. SOF ¶¶ 114, 115; Pl. Resp. ¶¶ 114, 115.

On October 1, 2015, during an in-person meeting at JPMC's Boston office, Mr. Doelger signed the MLPEI Letter.[79] The MLPEI Letter states as follows:

Dear Mr. Doelger,

You have informed us that you currently hold approximately $45,000,000 in Master Limited Partnerships ("MLPs") managed by Atlantic Trust Group LLC ("Atlantic Trust"), and that you would like to diversify the "manager concentration risk" present in your existing MLP portfolio by transferring approximately $33,000,000 of your existing Atlantic Trust MLP holdings for an approximate $33,000,000 investment in a JPMorgan Chase Banking N.A. ("JPMCB") Opportunistic Advisory Program ("OAP") - specifically, the Master Limited Partnership & Energy Infrastructure ("MLPEI") offering managed by Chickasaw Capital Management LLC ("Chickasaw Capital').

As we have previously explained to you, while we generally recommend an investment in the MLPEI offering, we only do so to suitable clients, in suitable proportions. The size of your proposed investment, relative to your overall net worth is not recommended and raises concerns which we wish to share with you. Specifically, and given that you have a liquid net worth or approximately $100,000,000, we cannot recommend that you make a $33,000,000 investment in the MLPEI offering. For reference, when advising a client with a $100,000,000 net worth, we would generally recommend an investment no larger than 5% of such client's net worth in the MLPEI offering. Your proposed investment in MLPEI offering would result in an investment greater than 30% of your net worth. Instead of your suggested approach, we would recommend that you diversify your portfolio with asset allocations commensurate with your investment objectives. As we have done so in the past, we urge you to reduce your overall exposure to the MLP structures, and remind you that while we do not expect material liquidity issues to arise with the proposed investment you may have little to no ability to sell or transfer these assets to limit losses in a severe correction, as has occurred with this sector in the past.

Notwithstanding the foregoing, we note that you have represented to us that you (a) were a professional in the utility/energy industry, (b) are financially knowledgeable and sophisticated, and capable of making your own assessment of the investment risks associated with an investment in the MLPEI offering without relying on us, and (c) understand the unique liquidity profiles and risk considerations of the proposed MLPEI offering. Furthermore, you have informed us that you are fully aware of the concentration risk created by your existing investment in MLPs and by your proposed investment in the MLPEI offering. As such, and in consideration of JPMCB making the MLPEI offering available to you, you agree as follows:

1. You confirm that you are an "institutional account" as defined by FINRA Rule

---

[79] Def. SOF ¶ 117; Pl. Resp. ¶ 117.

4512(c) in that you have total assets of at least $50 million as of the date hereof and that you are (a) capable of evaluating investment risks independently both in general and with regard to all transactions and investment strategies involving a security or securities; and (b) will exercise independent judgment in evaluating the recommendations of any broker-dealer or its associated persons.

2. You confirm that prior to investing in the MLPEI offering you have received the applicable offering documentation and have made your own analysis and investigation and consulted such investment, legal, tax, accounting and other advisers as you have deemed necessary. You have concluded that the investment, including with respect to the size of the investment when compared to your overall net worth, is suitable for you in light of your investment objectives and your financial capabilities, that you have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the investment and you are making the investment with a full understanding of all of the terms, conditions and risks and are willing to assume those terms, conditions and risks.

To the fullest extent permitted by applicable law, you agree to indemnify and hold harmless JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and their affiliates (collectively "JPMorgan") from and against any and all liabilities, obligations, losses, damages. fines, penalties, claims, demands, actions, suits or proceedings, costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against JPMorgan in the event that any of the confirmations, statements or agreements made by you as reflected in this letter are incomplete or incorrect in any respect. To the fullest extent permitted by applicable law, you agree to pay the expenses (including legal fees and expenses and costs of investigation) covered by this indemnity and incurred by JPMorgan as such expenses are incurred.[80]

Chickasaw was not a signatory to the MLPEI Letter.[81] After Mr. Doelger signed the MLPEI Letter, JPMC agreed to open the Advisory Account.[82] Following Mr. Doelger's signing of the letter, JPMC employees exchanged congratulatory emails.[83]

c.    Investments Between 2014 and 2019

From 2014 to 2019, MLPs generally declined in value and underperformed versus the

---

[80] Docket No. 276-67 at 3-5.
[81] Def. SOF ¶ 122; Pl. Resp. ¶ 122.
[82] Def. SOF ¶ 124; Pl. Resp. ¶ 124.
[83] See, e.g., Pl. SOF ¶¶ 355, 357, 358; Def. Resp. ¶¶ 355, 357, 358.

broader stock market.[84] At various times between 2015 and 2019, the Doelgers came within a 10% decline in MLP prices from a margin call on their LOC secured by the assets in, inter alia, the Advisory Account.[85] During that time, JPMC repeatedly suggested that the Doelgers consider reducing their exposure to MLPs and pay down their LOC. For example, during a two-hour meeting at their Palm Beach home in February 2016, the Doelgers and Baker discussed selling MLPs and paying down the LOC.[86] In August 2017, October 2018, and April 2019 emails, Baker encouraged the Doelgers to sell MLPs and/or pay down the LOC.[87] Nevertheless, on a number of occasions, including in the face of a potential margin call, the Doelgers declined to sell MLPs and reduce debt.[88]

While the complaint and Defendants' opposition memorandum largely focus on the LOC and MLPs, Mr. Doelger also engaged in non-MLP transactions with JPMC during the 2014-2019 time period. In late 2014, Mr. Doelger executed a transaction with JPMC in which he converted his dollar-denominated LOC to euros.[89] Mr. Doelger would profit from this transaction if the dollar rose against the euro.[90] Mr. Doelger exited that transaction in late 2015 by converting the LOC back to dollars, realizing a gain of approximately $1.9 million.[91]

In late 2016, Mr. Doelger entered into a cross-currency swap with JPMC that would functionally convert his U.S. dollar-denominated debt into euros, which would reduce his loan interest payments and, if the value of the euro dropped against the dollar, would generate profit.[92]

---

[84] Def. SOF ¶ 130; Pl. Resp. ¶ 130.
[85] Def. SOF ¶ 132. The Doelgers dispute the use of the word "various", but they do not cite to any evidence contradicting it. Pl. Resp. ¶ 132.
[86] Docket No. 276-74 at 2.
[87] Docket No. 304 at 28; Docket Nos. 276-100; 276-109; 276-114.
[88] Def. SOF ¶ 66; Pl. Resp. ¶ 66. See, e.g., Docket Nos. 276-32 at 2; 276-135 at 2-3.
[89] Def. SOF ¶ 170; Pl. Resp. ¶ 170.
[90] Id.
[91] Def. SOF ¶¶ 171, 172; Pl. Resp. ¶¶ 171, 172.
[92] Def. SOF ¶ 165; Pl. Resp. ¶ 165.

JPMC was the counterparty to the swap.[93] Mr. Doelger signed several agreements in connection

with this transaction, including a December 8, 2016 agreement (the "ISDA Agreement") which

explicitly stated that "[t]he other party is not acting as a fiduciary for or an advisor to it in respect

of that Transaction."[94] Ultimately, the euro rose against the dollar while the cross-currency swap

was in place, and Mr. Doelger lost approximately $1.18 million on the trade when he closed out

the position in July 2017.[95]

Mr. Doelger also entered into a rate cap transaction with JPMC in March 2018 in which

he purchased an option relating to the interest rate on his LOC.[96] In connection with that rate cap

transaction, Mr. Doelger signed an agreement with JPMC which stated that JPMC was "not

acting as a fiduciary for or an adviser to" Mr. Doelger in connection with that transaction.[97]

G.    Yoon Doelger Is Added As Joint Owner Of The Advisory Account

In June 2019, Mrs. Doelger was added to the Advisory Account. As a result, both

Doelgers signed a June 21, 2019, Advisory Account Agreement ("2019 Advisory

Agreement").[98] Like the 2015 Advisory Agreement, the 2019 Advisory Agreement

incorporated the General Terms by reference.[99] As with the 2015 Advisory Agreement,

Chickasaw was not a signatory to the 2019 Advisory Agreement.[100] JPMC and

Chickasaw signed the term sheet associated with the 2019 Advisory Agreement on June

20, 2019 (the "2019 Term Sheet").[101]

---

[93] Pl. SOF ¶ 428; Def. Resp. ¶ 428.
[94] Def. SOF ¶ 166; Pl. Resp. ¶ 166.
[95] Def. SOF ¶ 167; Pl. Resp. ¶ 167.
[96] Def. SOF ¶ 173. The Doelgers dispute this statement, but they do not dispute that Mr. Doelger entered into the rate cap transaction. Pl. Resp. ¶ 173.
[97] Def. SOF ¶ 174; Pl. Resp. ¶ 174.
[98] Def. SOF ¶ 141; Pl. Resp. ¶ 141.
[99] Def. SOF¶ 144; Pl. Resp. ¶ 144; Docket Nos. 276-55; 276-126 at 11.
[100] Def. SOF ¶ 145; Pl. Resp. ¶ 145.
[101] Def. SOF ¶ 146; Pl. Resp. ¶ 146.

H.     Master Limited Partnership Sales

In February and March 2020, as the COVID-19 outbreak spread, the Doelgers MLP holdings declined along with the broader stock market.[102] The Doelgers sold off a portion of their MLP holdings on March 9, 2020.[103] On March 13, 2020, the MLPs declined to $3.4 million.[104] On March 17, 2020, the Doelgers sold the remaining portion of their MLPs.[105] The Doelgers thereafter paid off their LOC.[106]

I.     Peter Doelger's Mental Health

Mr. Doelger's mental health declined during the time he held investments with Defendants. For example, starting sometime between 2012 and 2014, Mr. Doelger became concerned that people were using radio frequencies or radiation to attack him.[107] A medical record with a result date of May 5, 2014, states that Mr. Doelger had a history of confusion, vertigo, and cognitive defects."[108] A June 10, 2014, MRI report for Mr. Doelger states that he had experienced recent and rapidly progressive dementia with an altered mental status.[109] On September 28, 2020, Dr. Angela Scicutella, M.D., Ph.D, examined Mr. Doelger and assessed him as having major depression with psychotic features and a suspected cognitive problem.[110] However, none of the doctors who evaluated Mr. Doelger from August 2015 through March 2020 recorded in his medical files any concerns about his ability to manage his own finances.[111]

---

[102] Def. SOF ¶ 150; Pl. Resp. ¶ 150.
[103] Def. SOF ¶ 151; Pl. Resp. ¶ 151.
[104] Pl. SOF ¶ 504; Def. Resp. ¶ 504.
[105] Def. SOF ¶ 155; Pl. Resp. ¶ 155.
[106] Def. SOF ¶ 156; Pl. Resp. ¶ 156; Pl. SOF ¶ 508; Def. Resp. ¶ 508.
[107] Pl. SOF ¶ 208; Def. Resp.¶ 208.
[108] Pl. SOF ¶ 210; Docket No. 301-2 at 2.
[109] Pl. SOF ¶ 211; Docket No. 301-4 at 2.
[110] Pl. SOF ¶ 218; Def. Resp.¶ 218; Docket No. 301-33 at 3.
[111] Def. SOF ¶ 162. The Doelgers dispute this statement, however they provide no contradictory evidence. Pl. Resp. ¶ 162.

Moreover, according to Mrs. Doelger's sworn testimony and the Doelgers' responses to JPMC's requests for admission, Mr. Doelger reviewed and understood the complaint in the instant case before approving its filing in 2021.[112]

Mrs. Doelger stated that on several occasions she told Baker that Mr. Doelger had memory problems.[113] However, prior to February 2021, neither the Doelgers nor their family or representatives told JPMC that Mr. Doelger was: (1) suffering from dementia or depression; (2) diagnosed with any mental health condition; or (3) receiving treatment for any mental health condition.[114]

III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when a rational factfinder could resolve it in either direction. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citation omitted). A fact is "material" when its (non) existence could change a case's outcome. Id. (citation omitted). This Court takes the facts from the parties' summary judgment filings and from the record at large where appropriate. See Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 4 n.2 (1st Cir. 2016).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324. "[T]he non-moving party 'may not

---

[112] Def. SOF ¶ 197; Pl. Resp. ¶ 197.
[113] Def. SOF ¶ 164; Pl. Resp. ¶ 164.
[114] Def. SOF ¶¶ 158-61; Pl. Resp. ¶¶ 158-61.

rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The non-moving party must produce evidence that is "significant[ly] probative." Borges, 605 F.3d at 5 (citing Anderson, 477 U.S. at 249).

The Court "must scrutinize the evidence in the light most agreeable to the nonmovants, who are entitled to the benefit of all reasonable inferences therefrom." Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004). "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Ahern, 629 F.3d at 54 (citations omitted). Indeed, "[a]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." McRory v. Spigel (In re Spigel), 260 F.3d 27, 31 (1st Cir. 2001) (citation omitted). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

IV.   ANALYSIS

A.   Choice-Of-Law

The parties disagree about whether Massachusetts, New York, or Florida law applies to the Doelgers' claims. Defendants assert that the 2015 and 2019 Advisory Agreements incorporate the General Terms, which include a New York choice-of-law provision. Docket No. 304 at 36, 60. Defendants argue that New York law therefore applies to the Doelgers' contract-

based claims, as well as any other claims arising out of a duty from those contracts. Id. at 36, 44 n.62, 53 n.88, 56 n.101, 60. Defendants further assert that to the extent that New York law does not apply, Florida law does. Id. at 60. The Doelgers contend that they did not see or agree to the General Terms and therefore Massachusetts law applies to both the contract-based claims and the remaining claims as well. Docket No. 309 at 34.

A federal court sitting in diversity applies the choice-of-law framework of the forum state. Hansen v. R.I.'s Only 24 Hour Truck & Auto Plaza, Inc., No. 12-10477-NMG, 2013 WL 2491054, *3 (D. Mass. June 7, 2013) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). In Massachusetts, a contract's choice-of-law provision is generally honored, provided that it does not conflict with public policy. NPS, LLC v. Ambac Assurance Corp., 706 F. Supp. 2d 162, 168 (D. Mass. 2010) (citing Feeney v. Dell Inc., 454 Mass. 192 (2009)).

However, under Massachusetts law, choice-of-law clauses are construed narrowly. Comp. Sales Int'l, Inc. v. Lycos, Inc., Civ. Act. No. 05-10017-RWZ, 2006 WL 1896192 (D. Mass. July 11, 2006). Massachusetts courts interpret even broad language encompassing "all matters of construction, validity, performance and enforcement" as "limit[ing] the scope of a choice of law provision to disputes arising out of the agreement[ ]." Id. at *2. Fraud claims, particularly those concerning the formation of the contract, "cannot be categorized as . . . involving the rights or obligations under the contract." Id.; see also Realty Finance Holdings, LLC v. KS Shiraz Manager, LLC, 86 Mass. App. Ct. 242, 247 (2014) (noting in dicta that "where the validity of the contract's formation is challenged, as with a claim of precontract misrepresentation or fraud in the inducement, . . . it is less likely that the contract's choice of law provision will be honored"). "Massachusetts courts have found that claims for fraudulent inducement fall outside the scope of [choice-of-law] provisions." Comp. Sales, 2006 WL 1896192 at *5.

When a choice-of-law provision does not apply, this Court's analysis defaults to

Massachusetts' choice-of-law rules to determine which state's law should apply. Comp. Sales

Int'l, Inc. v. Lycos, Inc., No. CIV.A.05-10017 RWZ, 2005 WL 3307507 (D. Mass. Dec. 6,

2005). "Massachusetts generally follows a functional approach to resolving choice of law

questions on substantive matters[.]" Lou v. Otis Elevator Co., 77 Mass. App. Ct. 571, 583

(2010). Massachusetts's choice-of-law inquiry is guided by "choice-influencing considerations"

in the Restatement (Second) of Conflict of Laws. Longtin v. Organon USA, Inc., 363 F. Supp. 3d

186, 191 (D. Mass. 2018). The Restatement in turn looks to the state with "the most significant

relationship to the occurrence and the parties[.]" Restatement 2d of Conflict of Laws § 145(1)

(2nd 1988).

As a final note, "[i]t is a well-established—and prudential—principle that when the result

in a case will not be affected by the choice of law, an inquiring court, in its discretion, may

simply bypass the choice." Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 46

(1st Cir. 2003) (internal punctuation and citation omitted).

This Court will analyze the choice-of-law issue with respect to individual claims in the

corresponding sections below.

B.    Declaratory Judgment - Count VI And
      Rescission Pursuant To 15 U.S.C. § 80b-15 - Count VII

The Doelgers seek a declaratory judgment that the MLPEI Letter is an invalid contract

and/or is unenforceable. Docket No. 1 at 47. If the MLPEI Letter is a contract, then they seek

rescission pursuant to 15 U.S.C. § 80b-15. Id. at 49.

1.    Declaratory Judgment

Under the Declaratory Judgment Act, a court has substantial discretion in deciding

whether to declare the rights of litigants. Penney v. Deutsche Bank Nat'l Trust Co., No. 16-cv-

10482-ADB, 2017 WL 1015002, at *9 (D. Mass. Mar. 15, 2017) (citation and internal quotation marks omitted). "The Act does not itself confer subject matter jurisdiction, but, rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 15-16 (1983)). Indeed, a declaratory judgment is not a cause of action, but instead, a form of relief. Buck v. Am. Airlines, 476 F.3d 29, 33 n.3 (1st Cir. 2007). "It is designed to enable litigants to clarify legal rights and obligations before acting upon them." Ernst & Young, 45 F.3d at 534.

a.    Choice-Of-Law

Both the analysis of the claim under Declaratory Judgment Act, 28 U.S.C. § 2201, and the 15 U.S.C. § 80b-15 claim are governed by federal law. With respect to the Declaratory Judgment Act, however, in diversity cases, state law governs the underlying substantive issues. Com. Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 772-73 (1st Cir. 1994).

Defendants assert that New York law applies because the MLPEI Letter is a modification of the Advisory Agreement which contains a New York choice-of-law provision. Docket No. 304 at 33 (citing Davidowitz v. Patridge, No. 08 CIV. 6962 NRB, 2010 WL 5186803, at *9 (S.D.N.Y. Dec. 7, 2010)). The Doelgers rely on Massachusetts contract law to oppose summary judgment for these claims. See, e.g., Docket No. 309 at 53. In any event, all parties agree that New York and Massachusetts law are substantially similar with respect to contract law. See, e.g., id. at 36.

b.    Analysis

i.    Consideration

The Doelgers contend that the MLPEI Letter is invalid or unenforceable because it was not supported by consideration. Docket No. 1 ¶ 301; Docket No. 309 at 53 n.10. Defendants

counter that the consideration was referenced explicitly in the MLPEI Letter. Docket No. 304 at 33. Specifically, in "consideration of making the MLPEI offering available to" Mr. Doelger, he had to confirm the statements contained in the MLPEI Letter. Id. at 33-34. In other words, given the risk involved, JPMC would open the account only if Mr. Doelger confirmed the accuracy of the representations in the MLPEI Letter.

Under either New York or Massachusetts law, to form a valid contract, there must be an "offer, acceptance, and an exchange of consideration or meeting of the minds." Flaherty v. Park Plus, Inc., No. 1:22-CV-11909-NMG, 2023 WL 4995337, at *5 (D. Mass. June 22, 2023) (citations omitted); Harris v. Reagan, 199 N.Y.S.3d 264, 267-68 (2023). "Consideration requires imposing a legal detriment on the promisee and legal benefit on the promisor." Hannigan v. Bank of Am., N.A., 48 F. Supp. 3d 135, 140 (D. Mass. 2014) (citing Ekchian v. Thermo Power Corp., N. 00–P–1826, 56 Mass. App. Ct. 1116, 2002 WL 31856404, at *3 n.8 (Mass. App. Ct. 2002)); Anand v. Wilson, 32 A.D. 3d 808, 809 (N.Y.2d App. Div. 2006). "Under Massachusetts law, past consideration is insufficient to support a new promise; a retroactive contract must be supported by present consideration." Flaherty, 2023 WL 4995337, at *6 (citing Greater Boston Cable Corp. v. White Mountain Cable Const. Corp., 604 N.E.2d 1315, 1317 (Mass. 1992)); see also Lebedev v. Blavatnik, 142 N.Y.S.3d 511, 517-18 (2021) (past consideration cannot support a new agreement).

As stated in the MLPEI Letter, JPMC had "concerns" about Mr. Doelger's continued investment in MLPs and recommended instead that he "diversify [his] portfolio." Docket No. 276-67 at 3. The letter urges Mr. Doelger "to reduce your overall exposure to the MLP structures." Id. It also states "you may have little to no ability to sell or transfer these assets to limit losses in a severe correction, as has occurred with this sector in the past." Id. Nevertheless, as indicated in the letter, given Mr. Doelger's representations about his financial knowledge and

sophistication, and his acknowledgement that he was fully aware of the risk, JPMC would provide consideration of "making the MLPEI offering available" to Mr. Doelger if he agreed that certain statements were accurate and that he had made his own analysis (including legal and tax implications). Id. at 4. In addition, Mr. Doelger agreed to indemnify and hold harmless JPMC, JPMS, and their affiliates "in the event that any of the confirmations, statements or agreements made by you as reflected in this letter are incomplete or incorrect in any respect." Id.

The Doelgers argue that the portfolio was made available for past consideration – namely the signing of the August 10, 2015, Advisory Agreement, and other documents. Docket No. 309 at 53 n.10. Any consideration in the MLPEI Letter, the Doelgers argue, was "subsumed by the Advisory Agreement and the Term Sheet." Id. However, it is undisputed that the Advisory Account was not opened until October 1, 2015, after Mr. Doelger signed the MLPEI Letter.[115] The MLPEI Letter enabled the transfer of Mr. Doelger's account from Atlantic Trust.[116]

Accordingly, this Court finds that there was adequate consideration to form a contract.

ii.   Hedge Clause

The Doelgers argue that the MLPEI Letter is an impermissible "hedge clause." Docket No. 309 at 51-52. The Doelgers' argument is legally and factually incorrect.

The Securities and Exchange Commission has expressed the opinion that there are few, if any, circumstances in which a hedge clause with a retail client would be consistent with its guidelines. Comm'n Interp. Regarding Standard of Conduct for Inv. Advisers, Rel. No. 5248, 2019 WL 3779889, at *4 n.31 (June 5, 2019). It defines a hedge clause as one that "purports to relieve an adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law". Id. The plain language of the MLPEI

---

[115] Def. SOF ¶ 124; Pl. Resp. ¶ 124.
[116] Def. SOF ¶ 110; Pl. Resp. ¶ 110.

Letter does not waive any non-waivable rights. Rather, it indemnifies JPMC from "incomplete or incorrect" representations from Mr. Doelger.[117] It is therefore not a hedge clause.

iii.    <u>Unconscionability</u>

The Doelgers contend that the MLPEI Letter is unconscionable and the result of fraud. Docket No. 1 ¶ 307. Defendants respond that nothing in the record shows that the MLPEI Letter was the product of surprise or that its terms were unfair. Docket No. 304 at 34.

In order to prove that a contract's terms are unconscionable, "a plaintiff must show both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise)." <u>Boursiquot v. United Healthcare Servs. of Delaware, Inc.</u>, 98 Mass. App. Ct. 624, 630 (2020) (citations and internal quotation marks omitted); <u>In re Conifer Realty LLC (EnviroTech Servs., Inc.)</u>, 964 N.Y.S.2d 735, 739 (2013).

Here, the letter asked Mr. Doelger, after consultation, to verify the accuracy of the letter's statements as to Mr. Doelger. Not only did Mr. Doelger sign, thereby agreeing to the accuracy of the statements, but did so after the opportunity to consult with his lawyer. Indeed, JPMC provided a copy of the letter to Mr. Doelger's lawyer by at least September 30, 2015.[118]

Accordingly, there is no evidence of record that shows that the circumstances surrounding the signing of the letter were unconscionable, nor was the letter itself.

---

[117] Docket No. 276-67 at 4.

[118] Defendants maintain that Baker faxed a copy of the MLPEI Letter to Mr. Doelger's lawyer, which the Doelgers dispute. Def. SOF ¶ 113; Pl. Resp. SOF ¶ 113. This dispute, however, is not one about a material fact. The Doelgers do not dispute that JPMC emailed a copy to Mr. Doelger's lawyer on September 30, 2015, the day before it was signed on October 1, 2015. Def. SOF ¶ 114; Pl. Resp. ¶ 114.

iv.      Fraudulent Inducement

Finally, the Doelgers seek a declaration that the MLPEI Letter is not enforceable because it was procured through fraudulent inducement. Docket No. 1 ¶ 303.

"A party who has been fraudulently induced by the defendant into entering a contract can rescind that contract." Griffin v. Coghill, No. 17-CV-11619-IT, 2018 WL 1122361, at *7 (D. Mass. Mar. 1, 2018) (citing Shaw's Supermarkets, Inc. v. Delgiacco, 575 N.E.2d 1115, 1117 (Mass. 1991)); Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher, 747 N.Y.S.2d 441, 446 (2002). "A contract induced by fraudulent misrepresentation is voidable." Griffin, 2018 WL 1122361, at *7 (citing Shaw's, 575 N.E.2d at 1117); VisionChina Media Inc. v. S'holder Representative Servs., LLC, 967 N.Y.S.2d 338, 343 (2013). "To show fraud in the inducement, a plaintiff must show 1) that the defendant made a false representation of material fact, 2) with knowledge of its falsity, 3) with the purpose of inducing the plaintiff to act thereon and 4) that the plaintiff relied upon the representation to his detriment." Id. (citations and internal quotation marks omitted).

The Doelgers have identified no such misrepresentations either in the complaint or their opposition. See Docket No. 309 at 53. To the extent they rely on allegations that there were false statements in the MLPEI Letter[119], that claim fails. The purpose of the letter was to have Mr. Doelger confirm the representations in the letter, and he was in the best position to know the truth of those representations.

Accordingly, summary judgment in favor of Defendants[120] should be granted with respect

---

[119] For example, the Doelgers allege that JPMC was in possession of other information that contradicted Mr. Doelger's net worth as stated in the MLPEI Letter. See Pl. SOF ¶ 295; Def. Resp. ¶ 295.

[120] The complaint does not specify which claims are asserted against which Defendants. However, Chickasaw was not a party to the MLPEI Letter. Count VI of the complaint contains

to this claim.

    2.    <u>Rescission</u>

The Doelgers claim that, to the extent that the MLPEI Letter is determined to be a contract, it is unenforceable under 15 U.S.C. § 80b-15, a provision of the Advisors Act. Docket No. 1 ¶ 310. Defendants argue that this claim fails because (1) JPMC is a bank, and the Advisors Act does not apply to banks; (2) even if the Advisors Act applied to JPMC, the statute of limitations bars rescission; and (3) the MLPEI Letter is not a hedge clause. Docket No. 304 at 31-32.

The Advisors Act does not apply to banks. Section 80b-15 provides for the rescission of investment advisors' contracts where they are created in violation of the Advisors Act. 15 U.S.C. §80b-15. The Advisors Act governs investment advisors. <u>See</u> 15 U.S.C. § 80b-1. The definition of investment advisors expressly excludes banks. 15 U.S.C. § 80b-2(a)(11); <u>see also</u> <u>Am. Bankers Ass'n v. S.E.C.</u>, 804 F.2d 739, 747 (D.C. Cir. 1986). It is undisputed that JPMC is a bank.[121] Accordingly, the Doelgers' claim under the Advisors Act to rescind the MLPEI Letter fails, and this Court recommends that summary judgment be granted in favor of Defendants[122] with respect to this claim.

---

no allegations against Chickasaw. Accordingly, Count VI fails as a matter of law against Chickasaw.

[121] The Doelgers argue that the Advisors Act applies because JPMS is an affiliate of JPMC and is covered by the Advisors Act. Docket No. 309 at 53. However, JPMS is not a party to this case. At a late stage in the proceedings, the Doelgers sought to add JPMS as a defendant. Docket No. 230. On September 21, 2023, this Court denied the corresponding motion to amend the complaint. Docket No. 271. Judge Kelley subsequently adopted this Court's report and recommendation. Docket No. 343.

[122] Summary judgment in favor of Chickasaw is appropriate because it was not a party to the MLPEI Letter.

C.    Breach Of Contract – Count II And Breach Of The
      Covenant Of Good Faith And Fair Dealing – Count V

The Doelgers assert claims for breach of contract and breach of the covenant of

good faith and fair dealing on the basis that Defendants breached the Advisory Agreements.

1.    Choice-Of-Law

The Advisory Agreements incorporate the General Terms,[123] including a New York

choice-of-law provision. The parties dispute whether New York or Massachusetts law should

apply to the resolution of these claims. This Court, however, will bypass the choice-of-law

analysis here because the parties agree that the law is similar in Massachusetts and New York.

Docket Nos. 304 at 36 n.38, 41 n.56; 309 at 46.

2.    Breach Of Contract

In their complaint, without any citation to any particular provision, the Doelgers allege

that Defendants breached the 2015 and 2019 Advisory Agreements "by failing to invest the

Doelgers' funds in accordance with the Doelgers' investment objectives" and "by failing to

perform routine portfolio reviews to determine whether their recommended investment strategy

was in the best interest of the Doelgers." Docket No. 1 ¶¶ 264, 265. In their opposition

memorandum, without quoting any specific language, they allege that Defendants violated

Sections 1(A), (C), (D), and (E) of the Advisory Agreements. Docket No. 309 at 46.

Under Massachusetts law, to prove a breach of contract claim, the plaintiff must show

that "a valid, binding contract existed, the defendant breached the terms of the contract, and the

plaintiff[ ] sustained damages as a result of the breach." Brooks v. AIG Sunamerica Life

Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007) (citation omitted). Under New York law, "[t]he

essential elements of a cause of action to recover damages for breach of contract are the

---

[123] Docket Nos. 276-55 at 11 ¶ 8; 276-126 at 11 ¶ 8.

existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." <u>Waldorf v. Waldorf</u>, No. 2021-08659, 2023 WL 8609197, at *1 (N.Y. App. Div. Dec. 13, 2023). However, under either state's law, the Plaintiffs must specify which terms were breached.[124] <u>See</u> <u>Foss v. Marvic</u>, 365 F. Supp. 3d 164, 167 (D. Mass. 2019), <u>aff'd</u>, 994 F.3d 57 (1st Cir. 2021); <u>LMEG Wireless, LLC v. Farro</u>, 140 N.Y.S.3d 593, 596 (2021). The Doelgers have not done so here, and their breach of contract claims fail for this reason alone.

While the Doelgers cite to Sections 1(A), (C),(D), and (E), they do not provide the specific contract language that was breached. Indeed, their claims of breach based on these sections make little sense. For example, Section 1(A) pertains to client information. Docket No. 276-44 at 7 ¶ 1(A). It provides that JPMC will collect information about the client but that the client will notify the bank of any changes to the information provided to the bank and provide information as requested by the bank. <u>Id.</u> It also states that JPMC will rely on the information provided by the client and have no liability for the client's failure to provide JPMC with accurate information. <u>Id.</u> It is hard to imagine what part of this section, which largely places obligations on the Doelgers, JPMC breached.

Section 1(D) provides JPMC with investment discretion. <u>Id.</u> ¶ 1(D). It is a lengthy section with multiple paragraphs, and the Doelgers have not identified which part of this section Defendants allegedly breached. Nor have they explained how JPMC could breach a section of a contract that provides it with "full discretion to make purchases, sales, exchanges, or investments or to take any other action that it deems necessary or desirable as to each Portfolio and the Assets

---

[124] The Doelgers must also prove causation. Their opposition memorandum failed to address Defendants' arguments that the Doelgers lack evidence of causation. In their sur-reply, the Doelgers admit that they did not respond to this argument because it was "ridiculous." Docket No. 338 at 14-15.

invested in any Portfolio." Id. ¶ 1(D)(i). The discretion was also subject to the "annexed Portfolio

Schedule." Id. Here, Mr. Doelger selected the MLPEI Strategy, which the Portfolio Schedule

specified was to invest in MLPs.[125]

The Doelgers do argue that JPMC breached the contract by not presenting portfolios in

line with the Doelgers' investment objectives and "materially" failing to update the Doelgers'

information and objectives. Docket No. 309 at 46-47. Such arguments overlap with language in

Sections 1(C) and (E) but no specific contract language is provided, and no specific statements of

fact are relied on to support the points made.[126] Even if the Doelgers are suggesting that the

alleged failure to identify portfolios constitutes a breach, the language of the contract provides

otherwise. Section 1(C)(i) only required JPMC to identify and present to the client one or more

portfolios available through the program for investment of assets. Docket No. 276-44 at 7 ¶

1(C)(i). JPMC was not required to determine itself that those portfolios were in line with the

Doelgers' stated investment objectives. Rather, the client was solely responsible and had final

decision-making authority for making such choices. Id.

Assuming the purported material failure to update claim relies on Section 1(E), the

opposition fails to explain how the provision was breached. It states that JPMC kept the Doelgers

in MLPs. Docket No. 309 at 47. However, this was an investment strategy selected by Mr.

Doelger and, given that the contract provides that the client was solely responsible for

investment decisions, the Doelgers have not created a genuine issue of material fact that would

prevent the granting of summary judgment to JPMC on this count. With respect to Chickasaw,

there is no dispute that it was not a party to the subject contracts. Therefore, it is entitled to

---

[125] Def. SOF ¶ 82; Pl. Resp. ¶ 82.
[126] The Doelgers rely on SOF ¶¶ 580 and 591 but these statements of fact either do not directly support the statements in the memorandum or are not supported by the evidence cited.

summary judgment on this claim as well.

            3.      <u>Breach Of The Covenant Of Good Faith And Fair Dealing</u>

"Under both New York and Massachusetts law, a covenant of good faith and fair dealing is implied in every contract." <u>Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec.</u>, 450 F. Supp. 3d 20, 27 (D. Mass. 2020) (citations and internal quotation marks omitted). In both jurisdictions, "the covenant provides that neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." <u>Id.</u> "The implied covenant does not . . . operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits." <u>Id.</u> (alteration in original).

Defendants provided a detailed refutation complete with evidentiary support of the complaint's allegations of any breach of the covenant of good faith and fair dealing. Docket No. 304 at 43-44. In response, Plaintiffs only offer three conclusory sentences without citations. Docket No. 309 at 48. For example, they state, without citation, that "the record is replete with examples of JP Morgan's breach of the covenant of good faith and fair dealing." Docket No. 309 at 48. This Court should not have to scour the record to find those examples. <u>Endicott Constr. Corp. v. E. Amanti & Sons, Inc.</u>, No. 1:14-CV-12807-LTS, 2017 WL 3028877, at *15 n.166 (D. Mass. July 14, 2017). In addition, Chickasaw was not a party to the Advisory Agreements. There is no claim for a breach of good faith and fair dealing in the absence of a contract. Accordingly, there can be no claim against Chickasaw on this theory.

The Doelgers have not met their burden to show that a genuine issue of material fact

prevents the award of summary judgment on this claim.[127] Defendants' motion with respect to this claim should be granted.

    D.    <u>Tort Claims</u>[128]

        1.    <u>Choice-Of-Law</u>

Whether tort claims are to be governed by a choice-of-law provision depends on the intention of the parties reflected in the phrasing of specific clauses and the facts of each case. <u>See McAdams v. Massachusetts Mut. Life Ins. Co.</u>, No. 99-30284-FHF, 2002 WL 1067449, at *12 (D. Mass. May 15, 2002). When the fundamental source of any duty owed by a defendant to a plaintiff is derived from a contractual relationship, including a claim for breach of fiduciary duty, then the choice-of-law provision should apply to non-contract claims. <u>Alantra LLC v. Apex Indus. Tech. LLC</u>, 636 F. Supp. 3d 223, 238 n.5 (D. Mass. 2022).

Defendants argue that the choice-of-law provision governs analysis of the breach of fiduciary claims. Docket No. 304 at 44 n.62. By its terms, however, that provision applies only to the interpretation of the agreement itself. <u>See</u> Docket No. 276-55 at 10 ¶ 8 ("this Agreement shall be governed by the law of the State of New York").

Plaintiffs argue that Massachusetts law should apply to the tort claims. Docket No. 309 at 36. Under Massachusetts law, which follows the Restatement (Second), rights and liabilities in tort are determined by the state law which, with respect to that issue, has the most significant relationship to the parties and the occurrence. <u>Jenny B. Realty LLC v. Danielson, Inc.</u>, 456 F.

---

[127] This Court also notes that the Doelgers have not responded to Defendants' argument that the good faith and fair dealing claim is duplicative of their contract claim and/or impermissibly seeks extra-contractual rights. These arguments provide alternative reasons to grant summary judgment for Defendants on this claim.

[128] Defendants make a statute of limitations argument that affects all of their tort claims. Because this Court finds that summary judgment in favor of the Defendants is warranted on the merits, it does not address Defendants' timeliness argument.

Supp. 3d 307, 316 (D. Mass. 2020). Here, the Doelgers lived at least part of the year in Massachusetts and assert that "almost every relevant event in this dispute occurred" at JPMC's Boston office. Docket No. 309 at 35.

In any event, Defendants allow that, with respect to claims of breach of fiduciary and negligent misrepresentation, Massachusetts law and New York law are comparable. Docket No. 304 at 44 n.62, 56 n.101. In addition, with respect to the Doelgers' negligence/gross negligence claim, "both Massachusetts and New York courts will uphold tort claims to recover economic losses caused by the negligent breach of a contractual obligation." Szulik v. State St. Bank & Tr. Co., 935 F. Supp. 2d 240, 270 (D. Mass. 2013). Where the "outcome would be the same regardless of which state's law applies, there is no conflict and the court need not resolve the choice of law question." Jenny B. Realty, 456 F. Supp. 3d at 314.

2.    Breach Of Fiduciary Duty – Count I

In their opposition memorandum, the Doelgers argue that Defendants breached fiduciary duties arising from (1) Defendants' role as investment advisors and various regulations; (2) the "Advisory Agreement[129]" and Defendants' own internal policies; and (3) the nature of the relationship between JPMC and the Doelgers. Docket No. 309 at 37.

To succeed on a claim for breach of fiduciary duty under either New York or Massachusetts law, a plaintiff must allege the following: "(1) [the] existence of a fiduciary duty arising from a relationship between the parties, (2) breach of that duty, (3) damages, and (4) a causal relationship between the breach and the damages." Szulik, 935 F. Supp. 2d at 275 (citing Kriegel v. Bank of Am., N.A., Civil Action Nos. 07cv12246–NG, 08cv11598–NG, 2010 WL

_____

[129] The Doelgers do not specify whether they are referring to the 2015 or 2019 Advisory Agreement. It appears that "Advisory Agreement" is defined in their brief as the 2015 Advisory Agreement. See Docket No. 309 at 17. However, the claims fail under either agreement.

3169579, at *12 (D. Mass. Aug. 10, 2010); <u>Musalli Factory For Gold & Jewelry v. JPMorgan Chase Bank, N.A.</u>, 261 F.R.D. 13, 26 (S.D.N.Y.) 2009).

a.   <u>Duplicative Claims</u>

A cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim does not survive as a matter of law. <u>Alantra</u>, 636 F. Supp. 3d at 238 (New York law); <u>Cumins Ins. Society, Inc. v. BJ's Wholesale Club, Inc.</u>, 455 Mass. 458, 474 (2009) ("Plaintiffs who are unable to prevail on their contract claims may not repackage the same claims under tort law."). "Claims are duplicative where they are premised upon the same facts and seek the same damages for the alleged conduct." <u>Alantra</u>, 636 F. Supp. 3d at 238 (internal quotations and citations omitted). Here, the substance of the Doelgers' breach of contract claim and their breach of fiduciary claim based on the Advisory Agreements are identical.[130] There is no actionable tort for breach of a fiduciary duty where there is a written agreement covering the specific subject matter of the alleged fiduciary duty. <u>Zorbas v. U.S. Trust Co.</u>, 48 F. Supp. 3d 464, 478 (E.D.N.Y. 2014). Accordingly, summary judgment should be granted for Defendants on any claim for breach of fiduciary duty that is duplicative of the Doelgers' breach of contract claim.

b.   <u>Other Types Of Fiduciary Claims</u>[131]

The Doelgers, in their opposition, attempt to establish a fiduciary duty outside of the Advisory Agreements. First, they argue that a fiduciary relationship exists between the Doelgers and Defendants solely due to Defendants' roles as investment advisors as governed by various

---

[130] <u>Compare, e.g.</u>, Count I (Breach of Fiduciary Duty) Docket No. 1 ¶¶ 250, 253 with Count II (Breach of Contract) <u>Id.</u> ¶¶ 264-65.

[131] The Doelgers allude to Mr. Doelger's mental health in conjunction with Defendants' fiduciary duties. <u>See</u> Docket No. 309 at 27. However, as discussed elsewhere in this opinion, the Doelgers have not shown a genuine issue of material fact as to whether Defendants were aware of Mr. Doelger's decline.

35

regulations. Docket No. 309 at 37-40. However, even if correct, the Doelgers have not established how those authorities apply to the scope of fiduciary duties here and how those duties were breached in this case.

Second, relying on common law, the Doelgers argue that a "special trust relationship developed between the parties" that created fiduciary duties on the part of Defendants. Docket No. 309 at 41-42. The special trust relationship also existed allegedly because the Doelgers had little to no investment experience. Id. However, the Doelgers' factual assertions here are generally unsupported.[132] Indeed, the undisputed facts show otherwise. For example, Peter Doelger signed an account opening application that stated he had 20+ years' experience in trading stocks and bonds, 15+ years' experience trading options, and 10+ years' experience trading structured products, emerging markets, and hedge funds/private placements.[133] He also signed the MLPEI Letter which states that he represented to JPMC that he was "financially knowledgeable and sophisticated, and capable of making [his] own assessment of the investment risks associated with an investment in the MLPEI offering without relying on us."[134]

Even if the Doelgers' assertions had a basis in fact, they are simply insufficient to establish a common law fiduciary duty. A plaintiff's "subjective beliefs and conclusory allegations that a 'special' relationship existed are insufficient to establish a fiduciary duty." Zorbas, 48 F. Supp. 3d at 487. A "plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature." Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995) (internal

---

[132] The Doelgers rely on Pl. SOF ¶¶ 247-49 which provide only that JPMC advised the Doelgers on MLPs, a BIND pharmaceutical investment, and foreign currency transactions. Docket No. 309 at 42.
[133] Def. SOF ¶ 16; Pl. Resp. ¶ 16.
[134] Docket No. 276-67 at 3-5.

quotation marks and citation omitted). For all these reasons, the Doelgers have not established that a non-contractual fiduciary duty existed here.

c.   <u>Breach</u>

The Doelgers argue that they have established "the myriad ways the duties owed to them by Defendants were breached." Docket No. 309 at 43-44. However, they do not explain which or what type of duties Defendants owed, let alone provide any description of how the listed actions violated those duties. They also have not identified how each Defendant specifically breached them. Rather, they state in conclusory fashion "[e]ach of these actions constitutes a material breach of Defendant's [sic] fiduciary duties." <u>Id.</u> at 44. For example, they assert that Baker never faxed the MLPEI Letter to Paul Roberts, Mr. Doelger's lawyer, and instead emailed it. <u>Id.</u> at 43. It is unclear what duty was breached by this action and what damages flowed as a consequence. Indeed, Mr. Doelger signed the MLPEI Letter after his lawyer received the email and stated prior to investing in the MLPEI offering he had "received the applicable offering documentation and [had] made [his] own analysis and investigation and consulted such investment, legal, tax, accounting and other advisers as [he] deemed necessary."[135]

For all these reasons, summary judgment should be granted for Defendants on the Doelgers' breach of fiduciary duty claims.

3.    Negligence/Gross Negligence - Count III<br>And Negligent Misrepresentation - Count IV

a.   <u>Waiver Of Liability</u>

Defendants argue that the Doelgers waived any negligence claims when they agreed to be bound by the General Terms. Docket No. 304 at 54-55. The General Terms limit JPMC's

---

[135] Docket No. 276-67 at 4.

liability to actions of "gross negligence or willful misconduct."[136] "Where the language of the exculpatory agreement expresses in unequivocal terms the intention of the parties to relieve a defendant of liability for the defendant's negligence, the agreement will be enforced." <u>Banco Espirito Santo de Investimento S.A. v. Citibank, N.A.</u>, No. 03 Civ. 1537(MBM), 2003 WL 23018888, *11 (S.D.N.Y. Dec. 22, 2003) (citation omitted); <u>see also</u> <u>Cormier v. Cent. Mass. Chapter of the Nat'l Safety Council</u>, 416 Mass. 286, 288 (1993) (enforcing terms of release under which defendant exempted itself from liability for its own negligence).

Here, the Doelgers do not dispute the legal effect of the language itself. Rather, they argue that the waivers should not apply because they did not see those terms prior to the commencement of this lawsuit and never agreed to them at any point. Docket No. 309 at 18. However, the Doelgers have not shown a genuine issue of material fact on this issue. They rely on Yoon Doelger's declaration. <u>Id.</u> Paragraph 88 states that neither she nor Mr. Doelger were given the documents in 2015 when he opened the account. Docket No. 300-9 ¶ 88. However, she testified at her deposition that she was not present when Mr. Doelger signed the 2015 account application documents. Docket No. 324-4 at 27. Her affidavit therefore may not be considered on this point as it contradicts her deposition testimony and, to the extent she is relying on her husband's statements, her assertion is hearsay.

By signing the 2015 Advisory Agreement, Mr. Doelger acknowledged that he "received," "reviewed," "underst[ood]," and "agree[d] to" the General Terms.[137] Mr. Doelger's acceptance of the General Terms binds both Doelgers.[138] In order to add Mrs. Doelger to the account, the

---

[136] Docket No. 276-62 at 9 ¶ 11.
[137] Docket No. 276-55 at 7 § (ii), 11 § 8.
[138] <u>See</u> Docket No. 276-62 at 1 § 1 (A joint owner is bound by "all Obligations, whether or not [she] incurred the Obligation").

Doelgers both signed an account application and the 2019 Advisory Agreement.[139] That agreement states that it is "subject to and incorporates the J.P. Morgan General Terms for Accounts and Services."[140] Within that agreement is also a clause that provides that the Doelgers "received," "reviewed," "understood," and "agree[d]" to the General Terms.[141]

In any event, any dispute about whether the Doelgers received and reviewed the General Terms is not material to resolving the issue. Parties are presumed to know the contents of the contracts they sign. Steelmasters, Inc. v. Loc. Union 580 of Int'l Ass'n of Bridge, Structural Ornamental & Reinforcing Iron Workers, AFL-CIO, 2008 WL 312096, at *4 (E.D.N.Y. 2008) (enforcing terms incorporated by reference despite party's claim that it never received a copy of the document containing the incorporated terms); Awuah v. Coverall N. Am., Inc., 703 F.3d 36, 44 (1st Cir. 2012); Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 20 (1st Cir. 2009) (citations omitted) ("Absent fraud, a person is deemed to know the contents of a contract that he or she signs.").

Accordingly, the General Terms apply to any claim for negligence including negligent misrepresentation and Defendants may be granted summary judgment on those claims on this basis alone.

b.      Gross Negligence

In terms of gross negligence, in their complaint, the Doelgers only mention "gross negligence" in the caption of the claim. Docket No. 1 at 44. "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. . . . It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise

---

[139] Docket No. 276-126 at 11; see also Docket No 176-125 at 5 § (ii).
[140] Docket No. 276-126 at 11 ¶ 8.
[141] Docket No. 276-126 at 17.

ordinary care." <u>Altman v. Aronson</u>, 231 Mass. 588, 591 (1919). "It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected." <u>Id.</u> Gross negligence, however, "falls short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong." <u>Id.</u> at 592.

The Doelgers provide no argument to support a claim of gross negligence. They simply state that "there are disputed issues of fact concerning several material misrepresentations and omissions Defendants made to Plaintiffs, including informing Plaintiffs that they were making all income on the MLP Investments when they were not and concealing warnings about Chickasaw." Docket No. 309 at 51. They make this argument in terms of proving negligence and gross negligence. However, they do not make any attempt show why the cited paragraphs evince gross negligence, and indeed, they do not.

Accordingly, the Doelgers have not met their burden to show that there is a triable issue of fact that Defendants committed gross negligence.

E.    <u>Chapter 93A – Count VIII</u>

The Doelgers allege that Defendants engaged in deceptive trade practices in violation of M.G.L. c. 93A.[142] Docket No. 1 ¶¶ 315-20. Defendants argue that New York law applies and therefore the Doelgers' Chapter 93A claim should be dismissed. Docket No. 304 at 60. Defendants also assert that the Doelgers' 93A claims are "impossible to discern," and even assuming, <u>arguendo</u>, a claim is delineated appropriately, the Doelgers have not adduced sufficient evidence for the claim to survive summary judgment. <u>Id.</u> at 61.

1.    <u>Choice-Of-Law</u>

In a recent case, the First Circuit ruled that a plaintiff could proceed with a Chapter 93A

---

[142] The Doelgers do not specify under which section they bring their 93A claim. Presumably, the claim is brough under section nine.

claim, despite a New York choice-of-law clause in a contract. See Kleiner v. Cengage Learning Holdings II, Inc., 66 F.4th 28, 32 (1st Cir. 2023). In Kleiner, the parties entered into a contract that stated that the "Agreement shall be construed and governed" according to New York law. Id. at 29. The clause did not "otherwise select any state's law as governing the parties' rights and obligations that are created by statute" or mandate that all disputes had to be resolved using New York law. Id. at 32. The First Circuit determined that the Chapter 93A claim could move forward because the agreement did not suggest "that the parties agreed that New York law would govern the adjudication of a claim that [the defendant] breached a statutory duty imposed by Massachusetts law." Id.

The same analysis applies here. JPMC's General Terms only apply to an interpretation of the contracts in this case. The applicable provision does not control the resolution of a claim that Defendants breached a statutory duty imposed pursuant to Massachusetts law. Accordingly, the Chapter 93A claim is not precluded by the choice-of-law provision.

The parties also make conflicting arguments as to whether Florida or Massachusetts law applies with respect to this claim. See Docket No. 304 at 60; Docket No. 309 at 35. This Court need not resolve that issue with respect to the Chapter 93A claim because it fails on the merits.

2.    Analysis

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, §2(a). A successful claim under Chapter 93A requires a showing of (1) a deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by the plaintiff, and (3) a causal connection between the defendant's deceptive act or practice and the plaintiff's injury. Casavant v. Norwegian Cruise Line, Ltd., 76 Mass. App. Ct. 73, 76 (2009), aff'd, 460 Mass. 500 (2011); Hershenow v. Enterprise Rent-A-Car Co. of Bos., Inc., 445 Mass. 790, 797 (2006)).

"It is well settled that a simple, or even intentional, breach [of contract] is insufficient in itself to constitute an unfair or deceptive trade practice under Chapter 93A." Findability Scis., Inc. v. Soft10, Inc., No. 20-CV-12236-DJC, 2023 WL 2529544, at *7 (D. Mass. Mar. 15, 2023) (alteration in original). "In order to transform a breach of contract into a Chapter 93A claim, the breach must be both knowing and intended to secure unbargained-for benefits to the detriment of the other party. Id. "Massachusetts courts have consistently held that conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." Id. In addition, in the financial and investment services context, a defendant is not liable for giving bad advice. Baker v. Goldman, Sachs & Co., 771 F.3d 37, 54 (1st Cir. 2014). Negligent misrepresentations give rise to a Chapter 93A liability only if they are "extreme or egregious." Id. (internal citations and quotations omitted). In addition, the SJC "has clearly articulated the standard that if a Chapter 93A claim is 'derivative of' other claims which fail as a matter of law, the Chapter 93A claim 'must also fail.'" Gattineri v. Wyman MA, LLC, 93 F.4th 505, 511 (1st Cir. 2024) (citing to Park Drive Towing v. City of Revere, 442 Mass. 80 (2004).

The Chapter 93A claim does not contain any of the required specifics. Docket No. 1 ¶¶ 315-20. Even in their opposition to Defendants' motion for summary judgment, including Defendants' claim that the Chapter 93A allegations lack specifics, the Doelgers provide none. Instead, they assert the following:

> Plaintiffs have set forth a slew of unethical and unscrupulous conduct by Defendants, including false statements and fraudulent conduct by Baker and others, undisclosed conflicts of interest and several other breaches of fiduciary duties, breaches of the covenant of good faith and fair dealing, and a host more. Any disputes Defendants have are factual and should not be determined on summary judgment.

Docket No. 309 at 55. The Doelgers have therefore failed to provide any specifics, legal or

factual, as to what conduct constitutes a violation of Chapter 93A. Although they submitted 462

statements of fact, they cite to none of them with respect to the defense of their Chapter 93A

claim in their opposition memorandum. This Court should not have to hunt for such evidence for

this particular claim.[143] Endicott Constr., 2017 WL 3028877, at *15 n.166. Accordingly, this

Court recommends that summary judgment with respect to the Chapter 93A claim be granted.

  F.  Elder Financial Exploitation In Violation
      Of Florida Statute §415 – Count IX

  The Doelgers assert a claim of elder financial exploitation in violation of Florida law.

They allege specifically that Mr. Doelger was, for purposes of the statute, a vulnerable adult and

that Defendants exploited the Doelgers by investing their assets in high-risk investments and

made misrepresentations to get them to do so. Docket No. 1 at ¶¶ 322-25.

  Assuming, arguendo, that such a claim is properly before this Court, it fails on the

merits.[144] Florida's Adult Protective Services Act ("FAPSA"), creates a private cause of action

for a "vulnerable adult who has been abused, neglected, or exploited as specified in this chapter."

Fla. Stat. § 415.1111.

  First, there is no evidence of record to show that Mr. Doelger was a "vulnerable adult"

under Florida law. A "vulnerable adult" is defined as someone "whose ability to perform the

normal activities of daily living or to provide for his or her own care or protection is impaired

due to a mental, emotional, sensory, long-term physical, or developmental disability or

dysfunction, or brain damage, or the infirmities of aging." Fla. Stat. § 415.102(28). A plaintiff

must show more than cognitive and physical decline. See, e.g., Arberman v. PNC Bank, Nat'l

---

[143] In their sur-reply, the Doelgers cite to many of their statements of fact without linking them to the Chapter 93A claim, let alone any other claim. See Docket No. 338 at 15-17.
[144] This Court elects not to resolve the choice-of-law issue with respect to this claim, but instead makes a recommendation on the merits.

Ass'n., 22-80983-CIV, 2022 WL 18402402, at *3 (S.D. Fla. Dec. 19, 2022), aff'd, No. 23-10182, 2023 WL 3910573 (11th Cir. June 9, 2023).

There is no evidence of record that Mr. Doelger's ability to perform the "normal daily activities of daily living" were impaired during the relevant time. To the contrary, the record shows that Mr. Doelger travelled between 2015 and 2020.[145] He swam and rowed.[146] He engaged in lucid conversations about world politics.[147] In response, the Doelgers do not provide any legal authority or citations to any of the statement of facts. See Docket No. 309 at 56. Rather, they point to paragraph 31 of the Yoon Declaration. Even if it were proper to consider that paragraph, Mrs. Doelger provides no dates pertaining to her husband's infirmities. Accordingly, the Doelgers' FAPSA claim fails on this basis alone.

Defendants also challenge whether the Doelgers' claim satisfy the other prongs of the statute: namely whether Defendants abused or neglected Mr. Doelger, whether they were caregivers, and whether they exploited Mr. Doelger. In their memorandum, the Doelgers present no meaningful opposition to these arguments. They provide no legal authority or citation to the statement of facts. Rather, they present mere conclusions tracking occasionally the language of the statutory definitions. See Docket No. 309 at 55-57. More is required. See, e.g., Bohannon v. Shands Teaching Hosp. and Clinics, Inc., 983 So.2d 717, 721 (Fla. Dist. Ct. App. 2008) (claim legally insufficient that tracks the statutory definitions but unsupported by the facts). For all these reasons, this Court recommends that summary judgment be granted for Defendants on this claim.

---

[145] Def. SOF ¶ 7; Pl. Resp. ¶7.
[146] Def. SOF ¶ 9; Pl. Resp. ¶ 9.
[147] Def. SOF ¶ 14; Pl. Resp. ¶ 14.

## V.  RECOMMENDATION

For the foregoing reasons, this Court recommends that Judge Kelley grant Defendants'
motion for summary judgment. Should Judge Kelley adopt my recommendation in its entirety,
then JPMC's counterclaims would remain to be resolved at trial.

## VI.  REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party
who objects to these proposed findings and recommendations must file specific written
objections thereto with the Clerk of this Court within 14 days of service of this Report and
Recommendation. The written objections must specifically identify the portion of the proposed
findings, recommendations, or report to which objection is made, and the basis for such
objections. See Fed. R. Civ. P. 72. The parties are further advised that the United States Court of
Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b)
will preclude further appellate review of the District Court's order based on this Report and
Recommendation. See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999);
Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983
F.2d 343 (1st Cir. 1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge