# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

YOON DOELGER and
PETER DOELGER,

        Plaintiffs,

    v.

JPMORGAN CHASE BANK, N.A. and
CHICKASAW CAPITAL MANAGEMENT, LLC,

        Defendants.

Civil Action No. 1:21-cv-11042-AK

**REQUEST FOR ORAL ARGUMENT**

**PLAINTIFFS' MEMORANDUM OF LAW OBJECTING TO THE MAGISTRATE
JUDGE'S REPORT AND RECOMMENDATION ON SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

I.   Yoon and Peter Doelger ................................................................................................ 2

II.  Peter's Investments in MLPs and Efforts To Diversify ............................................. 3

III. JPM Employees Forged Documents and Made False Statements ........................... 4

IV.  The Big Boy Letter (A Work of Fiction) ..................................................................... 10

V.   Defendants' Fiduciary Duties (Which They Breached) ............................................ 11

     A.  Baker and Others Admit Defendants Were Plaintiffs' Investment Advisers .................. 11

     B.  Defendants Wanted To Keep Plaintiffs In Debt, a Blatant Conflict of Interest ............. 11

     C.  JPM Advised Plaintiffs to Stay in MLPs as They Declined, All the Way To the End ... 12

ARGUMENT ........................................................................................................................ 13

I.   The Court Should Reject the RR On Breach of Fiduciary Duty ............................... 13

     A.  The RR Errs in Finding Defendants Had No Fiduciary Duties ...................................... 13

     B.  The RR's Recommendation on "Duplicative Claims" Is Wrong as a Matter of Law ..... 17

     C.  The RR Overlooks Defendants' Obligations To Plaintiffs and Defendants' Breaches .. 19

II.  The RR's 93A Analysis Fails to Consider Defendants' Conduct ............................. 22

III. Declaratory Judgment And Recission Claims Must Be Tried ................................. 23

IV.  The RR's Contract View Conflicts with Defendants' Expert ................................... 24

V.   The RR Errs On Negligence Claims (Counts III & IV) ............................................. 26

     A.  Chickasaw Did Not Limit Its Liability .......................................................................... 26

     B.  The "Waiver of Liability" Clause Is Unenforceable as a Matter of Law ....................... 26

     C.  The RR's Improper Factual Finding on Yoon's Testimony ........................................... 26

     D.  The RR Penalizes Plaintiffs for Not Addressing Arguments Defendants Never Raised 27

     E.  Plaintiffs Do Detail Material Negligent Misrepresentations ......................................... 27

VI.  Defendants' "Causation" Theory Is Science Fiction, Not Law..............................................28

VII. The RR's Factual Finding on "Vulnerable Adult" Is Improper .............................................28

VIII. The RR Errs by Not Striking the Baker Declaration..............................................................30

CONCLUSION..............................................................................................................................30

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Aberman v. PNC Bank. Nat'l Ass'n.*,
   No. 22-80983-CIV, <u>2022 U.S. Dist. LEXIS 227855</u> (S.D. Fla. Dec. 19, 2022).....................30

*AmTrust N. Am., Inc. v. KF&B, Inc.*,
   No. 17-cv-5340, <u>2020 U.S. Dist. LEXIS 167624</u> (S.D.N.Y. Sept. 14, 2020) ..................14, 18

*Armstrong v. White Winston Select Asset Funds*,
   <u>647 F. Supp. 3</u>d (D. Mass. 2022) ....................................................................................27

*Arthus D. Little, Inc. v. Dooyang Corp.*,
   <u>147 F.3d 47</u> (1st Ci<u>r. 1998</u>)...........................................................................................23

*Baker v. Goldman Sachs & Co.*,
   <u>656 F. Supp. 2d 226</u> (D. Mass. 2009) ............................................................................18

*Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*,
   <u>983 So. 2d 717</u> (Fla. Dist. Ct. App. 2008) .....................................................................30

*Bullmore v. Banc of Am. Sec. LLC*,
   <u>485 F. Supp. 2d 464</u> (S.D.N.Y. 2007)......................................................................14, 18

*Bullmore v. Ernst & Young Cayman Islands*,
   <u>45 A.D.3d 461</u> (N.Y. App. Div 1st Dep't 2007)...........................................................1, 14

*Clinical Tech., Inc. v. Covidien Sales, LLC*,
   <u>192 F. Supp. 3d 223</u> (D. Mass. 2016) ............................................................................26

*Cooke v. Brousseau*,
   No. 94-0843, 1996 Mass. Super. LEXIS 701 (Jan. 26, 1996) ...............................................23

*Endicott Constr. Corp. v. E. Amanti & Sons, Inc.*,
   <u>2017 U.S. Dist. LEXIS 110485</u> (D. Mass. June 1, 2017) ......................................................23

*GPIF-I Equity Co., Ltd. v. HDG Mansur Inv. Servs., Inc.*,
   No. 13-civ-547, <u>2014 U.S. Dist. LEXIS 55193</u> (S.D.N.Y. Ap<u>r. 21, 2014</u>) ...........................18

*Grasso v. Grasso*,
   <u>131 F. Supp. 3d 1303</u> (M.D. Fla. 2015).........................................................................30

*Grp. Int'l, Inc. v. Sherman*,
   <u>76 Mass. App. Ct. 421</u> (App. Ct. 2010) ........................................................................26

*Guarriello v. Family Endowment Partners, LP*,
   14-cv-13351, 2016 U.S. Dist. LEXIS 195250 (D. Mass. Aug. 10, 2016) ............................18

*Hannigan v. Bank of Am., N.A.*,
   48 F. Supp. 3d 135 (D. Mass. 2014) ........................................................................23

*Hanson v. Teti*,
   No. 09-65 15-CA, 2011 Fla. Cir. LEXIS 4090 (Fla. 20th Cir. Ct. June 29,
   2011) .................................................................................................................30

*Hays v. Ellrich*,
   471 Mass. 592 (2015) ...........................................................................................14

*JP Morgan Chase Bank v. Winnick*,
   350 F. Supp. 2d 393 (S.D.N.Y. 2004).......................................................................17

*Kattar v. Demoulas*,
   433 Mass. 1 (2000) ...............................................................................................22

*Lifespan Corp. v. New Eng. Med. Ctr., Inc.*,
   731 F. Supp. 2d 232 (D.R.I. 2010).....................................................................14, 26

*O'Hara v. Diageo-Guinness, USA*,
   306 F. Supp. 3d 441 (D. Mass. 2018) .......................................................................17

*Patsos v. First Albany Corp.*,
   433 Mass. 323 (2001) ............................................................................................14

*PRCM Advisers LLC v. Two Harbors Inv. Corp.*,
   No. 20-cv-5649, 2023 U.S. Dist. LEXIS 140700 (S.D.N.Y. Aug. 10, 2023)......................18

*Robinhood Fin. LLC v. Sec'y of the Commonwealth*,
   492 Mass. 696 (2023) ...................................................................................1, 13, 14

*S.S. v. Dep't of Child. & Fam. Servs.*,
   805 So. 2d 879 (Fla. Dist. Ct. App. 2001) .................................................................30

*SEC v. Cutter Fin. Grp. LLC*,
   No. 23-cv-10589, 2023 U.S. Dist. LEXIS 222580 (D. Mass. Dec. 14, 2023)................ *passim*

*Tomasella v. Nestlé USA, Inc.*,
   962 F.3d 60 (1st Cir. 2020) .....................................................................................23

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979)..........................................................................................1, 13

*UBS Fin. Servs., Inc. v. Aliberti*,
   483 Mass. 396 (2019) ............................................................................................18

*Zorbas v. United States Trust Co., N.A.*,
    48 F. Supp. 3d 464 (E.D.N.Y. 2014) .............................................................17, 18

**Statutes**

15 U.S.C. § 80b-1 *et seq.* (Investment Advisers Act of 1940) ............................... *passim*

15 U.S.C. § 80b-15 ...........................................................................................24

Fla. Sta. § 415.102 .....................................................................................29, 30

Fla. Sta. § 415.1111 ..........................................................................................30

Mass. Gen. L. 93A ..................................................................................... *passim*

**Other Authorities**

*Comm'n Interp. Regarding Standard of Conduct for Inv. Advisers*, Rel. No. IA-
    5248 (June 5, 2019)......................................................................................13, 15

*In the Matter of Comprehensive Cap. Mgmt., Inc.,* Advisers Act Release No. 3-
    20700 (Jan. 11, 2022)........................................................................................14

*In the Matter of Titan Global Capital Mgmt. USA LLC,* Advisers Act Release No.
    6380 (Aug. 1, 2023) ......................................................................................23, 26

Rest. (2d) of Torts § 541 ......................................................................................17

**Rules and Regulations**

12 C.F.R. § 9.101(a)......................................................................................13, 15

Fed. R. Civ. P. 72(b) ...........................................................................................1

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs Yoon and Peter Doelger submit these objections to the Magistrate Judge's Report and Recommendation on Summary Judgment (Doc No. 383) (the "RR") pursuant to <u>FRCP 72(b)</u>. If the Court were to adopt the RR, it would create new law that conflicts with well settled federal and state law holding unequivocally that investment advisers have fiduciary duties to their clients, including from the U.S. Supreme Court, the Massachusetts Supreme Judicial Court (the "SJC") and various New York courts.[1] Despite Defendants' admissions they were investment advisers to Plaintiffs, the RR concludes (without discussing this controlling law) that both JPM and Chickasaw had no fiduciary duties to Plaintiffs.[2] As Judge Casper emphatically stated in a recent decision rejecting the same arguments Defendants are making here: ***<u>"Courts do not allow investment advisers to contract around their fiduciary obligations to their clients."</u>***[3]

The RR also improperly concludes that the so-called "Big Boy Letter" JPM drafted to include several statements JPM knew were untrue, and had an elderly man sign, is enforceable and can be invoked by not just JPM, but also, Chickasaw (though it was not even a party to it) to disclaim liability, and not just as to Peter but also as to Yoon (who was also not a party to it). The RR effectively turns the Big Boy Letter into an enforceable hedge clause. Similarly, the RR relies on a "waiver of liability" clause (also a hedge clause) to limit Defendants' liable to acts of gross negligence, which is expressly forbidden under applicable authority.

The RR also makes improper findings of fact on a heavily disputed record: by Plaintiffs' count ***73 percent*** or 478 of 660 Statements of Facts ("SOFs") are disputed. For example, the RR

---

[1] *See e.g., Robinhood Fin. LLC v. Sec'y of the Commonwealth*, <u>492 Mass. 696, 700</u> (2023); *Transamerica Mortg. Advisors, Inc. v. Lewis*, <u>444 U.S. 11, 17</u> (1979); *Bullmore v. Ernst & Young Cayman Islands*, <u>45 A.D.3d 461, 464</u> (N.Y. App. Div 1st Dep't 2007) ("*Bullmore I*").

[2] As used herein JPM means JP Morgan Chase Bank, N.A. and Chickasaw means Chickasaw Capital Management.

[3] *SEC v. Cutter Fin. Grp. LLC*, No. 23-cv-10589, <u>2023 U.S. Dist. LEXIS 222580 at *12</u> (D. Mass. Dec. 14, 2023) (emphasis added).

ignores substantial and material evidence that JPM (and its affiliate) are the parties that knowingly made false statements in the Big Boy Letter and not Peter; thus JPM could not have relied on them. James Baker, Plaintiffs' main JPM adviser, fabricated most of the information in the very first paragraph of the letter to obtain internal approval.  The source of Baker's lies is an email Defendants do not dispute Baker altered (SOF ¶¶ 312-14). Emblematic of the RR's improper fact finding is its reliance on <u>Baker's statements from the very email he altered to determine facts in dispute</u>. RR p. 12. Also emblematic of the RR's improper fact finding is its conclusion that Peter was not impaired in part because he "rowed."  But the medical record the RR relies on to conclude Peter rowed from "2015 through 2020" (RR pp. 5, 44) actually says that by 2018, Peter had declined to the point where he had to give up rowing: "He says his mood if anything is tending towards depression, **as he faces giving up his lifelong passion of rowing.**" (Ex. 108 at -0128) (emphasis added). Such improper fact finding is throughout the RR.

<u>STATEMENT OF FACTS</u>

I.   **YOON AND PETER DOELGER**

The following is not disputed:  Plaintiffs are an elderly couple (Yoon is 77 and Peter is 86) who have been together for over 40 years; Yoon is a native Korean speaker, not fluent and not comfortable speaking English, a homemaker with no business or finance education or experience; Yoon was added to the primary account in 2019, but never signed the Big Boy Letter.[4] The RR concludes Peter that had significant investment experience, but ignores that he always relied on investment advisers and ignores Yoon altogether.[5] RR p.36.

Peter's mental capacity and financial and technical capability are in substantial dispute. His financial and technical background are set forth in the Paul Roberts Aff. ¶¶ 2-6 and in the Yoon

---

[4] SOF (Doc No. 331) ¶¶ 198-202, 204, 372-73.
[5] SOF ¶¶ 6(Resp.), 18(Resp.)

Decl. ¶¶ 11, 15-19.[6] Peter does not have an educational or professional background in the oil and gas industry or finance and investing; nor does he have a working understanding of most modern technology – he does not even know how to use text messages, a computer, or check email.[7] Facts on Peter's cognitive decline are vast.[8] Dr. Dale Panzer, Plaintiffs' medical expert, opined:

- "While it has been argued that Peter was a 'big boy' in 2015…, **he was clearly more vulnerable**, *more demented and persistently paranoid…*." Ex. 525 (Panzer Report) 20-21.

- "[JPM] should have been aware by no later than the second half of 2019 that Peter's cognitive abilities had substantially declined. By this time, Peter was exhibiting signs including memory loss, poor judgment, difficulty with abstract thinking, and confusion, among others, which should have been apparent to [JPM]."[9]

The RR makes limited reference to Peter's dementia and cognitive decline except to note that none of the doctors who examined Peter noted in their medical files any concerns about his ability to manage his finances, information Dr. Panzer says that would not typically be included in the medical files.[10] In addition, the RR overlooks the following material facts:

- Defendants' medical expert admitted that a person with dementia cannot make financial decisions without complication. Ex. 541 (Doc No. 301-335) at 122:7-16.

- JPM had an elder escalation policy (the "Elder Policy") and its stated purpose was "to identify potential red flags observed with respect to elder and vulnerable clients." SOF ¶¶ 551-54.

- JPM knew of several red flags, including Peter's memory loss, erratic and irrational behavior.[11]

- Defendants' expert Gillespie said the red flags here warranted escalation to Baker's superiors.[12]

- Despite this, JPM took no steps to follow its policy or otherwise protect Peter. SOF ¶ 565.

## II.   PETER'S INVESTMENTS IN MLPS AND EFFORTS TO DIVERSIFY

Facts concerning Peter's background with JPM are set forth in the SOF ¶¶ 234-49. Prior to 2015, Peter had some MLPs in a brokerage account with JPM ("Brokerage Account"), and Peter's

---

[6] SOF ¶¶ 3(Resp.), 204.  All declarations and affidavits herein are referred to as "Decl." and "Aff.", respectively.
[7] SOF ¶ 207; Yoon Decl. (Doc No. 300-9) ¶¶ 11, 15, 19; *see* Peter as a "vulnerable adult" *infra* Argument § VII.
[8] SOF ¶¶ 208-19, the Yoon Decl. ¶¶ 28-31.
[9] Panz. Decl. (Doc No. 300-8) ¶ 5; *see* Panz. Decl. ¶¶ 26, 45; Ex. 525 (Doc No. 301-319)(Panzer Report) at 21 of 73.
[10] RR p.18; *see* SOF ¶¶ 553-64; SOF ¶ 12(Resp.); Ex. 532 (Doc No. 301-326) (Panzer Rebuttal Report) at 9 (of 31).
[11] SOF ¶¶ 555-58, 561-5; Ex. 525 (Doc No. 300-319) at 20-2 (of 73); Panzer Decl. (Doc. No. 300-3) ¶¶ 20-23, 26, 39.
[12] Ex. 540 (Doc No. 301-375) (Gillespie Tr.) 65:22-66:20.

advisory MLP portfolio was managed by Atlantic Trust ("AT"), with JPM as the account custodian.[13] Chickasaw and JPM became the managers and investment advisers of Peter's advisory MLP portfolio in 2015 ("Advisory Account"). SOF ¶¶ 96-97, 277.

Importantly, in September 2014, Peter told JPM he "would like to diversify, but ha[d] questions about tax-efficient ways to do so" and sought guidance on this from his existing advisers at JPM, Doug Moon and James Baker.[14] Moon asked Market Manager Daniel Curtin for assistance; Curtin glibly responded: "<u>Death is the best tax planning for MLPs</u>."[15] The RR ignores this; it instead includes a different late 2014 email that does not address diversification. RR p.8-9.

## III.   JPM EMPLOYEES FORGED DOCUMENTS AND MADE FALSE STATEMENTS

On August 10, 2015, Plaintiffs attended a lunch meeting with Baker along with Ed Kelly and Geoffrey Mavar from Chickasaw. SOF ¶ 269. For all of 2015, Baker specifically targeted Peter for the Chickasaw MLP program and bragged about it in his review.[16] The RR omits this and states "Mr. Doelger and JPMC discussed the idea of switching MLP managers." RR p.9. Targeting Peter was unsurprising given JPM's hyper-competitive culture in the Boston office where it put "winning" business over the interest of their clients. SOF ¶¶ 220-33.

This was the first time Plaintiffs met Chickasaw. SOF ¶ 270. Kelly and Mavar gave a one-hour presentation on MLPs, and then left them with Baker. SOF ¶ 271. At the meeting, Kelly and Mavar did not ask Peter any questions about his investment objectives or why he was invested in MLPs, or attempt to ascertain his financial picture, and Baker did not tell Peter he was

---

[13] SOF ¶ 242. The RR's ruling on admissibility of Ex. 180 (Doc No. 276-180) (purporting to show gains 2009-2014) is erroneous. RR p.8 n.41. JPM created the document after fact discovery with unsubstantiated/unreliable information. SOF ¶ 63(Resp.). The increased value of the MLPs during that period was fueled in large part by JPM pushing the LOC on Peter to purchase additional MLPs and not actual gains. SOF ¶¶ 237-241.

[14] SOF ¶ 250; Exs. 217 (Doc No. 301-69), 218 (Doc No. 301-70).

[15] SOF ¶ 250 (emphasis added); Curtin also joked: "Maybe we should role play on how to use this planning tool?" *Id.*

[16] SOF ¶ 69(Resp.); Ex. 310 (Doc No. 301-143) at 3 (of 7).

overconcentrated or that he should diversify.[17] Instead, Baker encouraged Peter to invest in MLPs with Chickasaw – Kelly testified Baker was trying to secure Peter's account.[18] The RR omits this.

What happened next is heavily disputed but not materially mentioned in the RR. Five days before the meeting, a set of "prefill" account opening documents was requested for Peter, showing an investment size of $1 million.[19] For existing clients, the "prefilled" information was to be "pulled from existing systems"; *i.e.*, information JPM already had on file.[20] In Peter's case, the information would have been based on Peter's JPM Brokerage Account, for which JPM was required to account for Peter's total and liquid net worth. SOF ¶ 267; Ex 502 at 36.

Three days before the meeting, JPM circulated the requested account opening documentation ("Account Opening Docs") internally, showing an investment size of **$1 million**, and Peter's liquid net worth as **$50 million**.[21] The $50 million number likely came from application documents Peter provided in 2014.[22] Baker never responded with any corrections. SOF ¶ 268.

At the end of the August 10, 2015 meeting, after Kelly and Mavar left, Baker had Peter sign the Account Opening Docs.[23] Baker did not give a copy to Plaintiffs after Peter signed them.[24]

On September 10, 2015 – one month later – Dittrich sent an internal email attaching what he called "the completed documents for Peter Doelger's MLPEI account" (the "Modified Docs").[25] These documents state Peter's liquid net worth as **$100 million**, **twice** what was listed on the Account Opening Docs. *Compare* Ex. 41 (JPMC00066425) *with* Ex. 44 (JPMC00067158).

During the month from when Peter first signed the documents to when the "completed"

---

[17] SOF ¶¶ 272-75.
[18] SOF ¶¶ 272, 276.
[19] SOF ¶ 265; *see also* Ex. 41 (Doc No. 276-41), Ex. 278 (Doc No. 301-120) (Dittrich Tr.) 107:12-111:18.
[20] SOF ¶ 266; Ex. 247 (Doc No. 301-96) (Baker Tr.) 86:5-17.
[21] SOF ¶ 268; Ex. 41 at JPMC00066410, JPMC00066425 (Doc No. 276-41 at 2,17).
[22] SOF ¶ 295; Ex. 20 (Doc No. 276-20).
[23] SOF ¶ 277. The RR incorrectly states the documents were signed on "August **15**." RR p.11 n.58 (emphasis added).
[24] SOF ¶ 280.
[25] SOF ¶ 303; Exs. 53 (Doc No. 276-53), 44 (Doc No. 276-44).

documents were first circulated internally at JPM, they spontaneously changed to show Peter's net

worth went from $50 to $100 million (among other changes). The circumstances surrounding this

change are set forth in detail in the SOF ¶¶ 294-333. Material evidence includes:

- Baker told Dittrich and Moon that he had Peter sign the Account Opening Docs even though he did not have a final plan on the size or structure of the investment, as he "didn't want that to slow [JPM] down once [they] have a plan." SOF ¶ 292; Ex. 46.

- Baker told Chickasaw immediately after meeting he needed to "clear some operational hurdles (taxes, timing and *our internal suitability*) to determine the size of the account."[26] Baker told Chickasaw he needed "to clear some internal compliance/risk/*suitability/bite-size* hurdles."[27]

- The day after the meeting, Moon sent Baker a 2012 personal financial statement ("PFS") for Peter showing a (total) net worth of $33.8 million, even lower than the $50 million (liquid) net worth originally shown on the Account Opening Docs. SOF ¶ 99; Ex. 256.

- At least 7 documents from 2009 to 2014 showed Peter's net worth from $20 to $50 million.[28] JPM had no document with Peter's liquid net worth anywhere near $100 million.[29] Peter's actual estimated total net worth around that time was $35.5 million ($21.5 million liquid).[30]

- Baker suspected (and by October 2015 knew) that JPM held "all" of Peter's material assets "outside of personal use real estate."[31] Peter's applicable holdings totaled around $37 million.[32]

- There is no digital record of the Modified Docs prior to September 10, 2015. SOF ¶ 305.

- The Summary – a detailed log of all steps taken during the account opening process – shows no log or record of any changes to the Account Opening Docs between Friday, August 7 (when they showed Peter's liquid net worth as **$50 million**) and Monday, August 10, 2015 (when Peter signed them). SOF ¶ 279; Ex. 252.

- Defendants' witnesses Baker, Moon, and Dylan Dittrich (who initiated the prefill document process) all testified that *they made no changes* to the Account Opening Docs between their generation (showing a net worth of $50 million) and when Peter signed them (a 3-day period).[33]

- For a different client, advisers working with Moon and Dittrich altered the client's liquid net after he had signed in order to pass a "suitability check." SOF ¶ 287.

- Baker is the only one who ever claimed Peter's net worth was $100 million; he had access to the Account Opening Docs throughout the period they were modified (and stood to personally

---

[26] Ex. 47 (Doc No. 276-47) (emphasis added).

[27] SOF ¶¶ 292-93; Ex. 264 (Doc No. 301-110) (emphasis added).

[28] SOF ¶ 295.

[29] SOF ¶ 295.

[30] SOF ¶ 301.

[31] SOF ¶ 300; Ex. 304 (Doc No. 301-137). This fact undercuts the significance of the RR's conclusion "JPMC understood that Peter held assets with other financial institutions." RR p.11. The RR also ignores that Peter's other assets were a very small percentage of his total assets, which JPM knew. SOF ¶ 104(Resp.).

[32] SOF ¶ 307; Ex. 254 (Doc No. 301-101).

[33] SOF ¶ 278. Thus, JPM has put forth no conclusive evidence that the documents were changed in the 3-day period.

benefit from approval). SOF ¶¶ 220, 357-58, 361-64.

- Tellingly, Baker himself does not state with certainty that he did not manipulate the document after Peter signed it, stating "I believe I followed my normal practice" and "I have no recollection" of committing fraud.[34] Given the seriousness of the allegation, that is not a denial.

In omitting these facts, the RR makes a sweeping conclusion that JPM did not swap out the $50 million net worth page after Peter signed the documents.  This is unquestionably a disputed fact.

Likely due to this forgery, at no point in August/September 2015 did Baker obtain a balance sheet or PFS from Peter. SOF ¶ 99(Resp.); Ex. 247 180:23-185:10. Baker simply called Peter:

- On August 27, 2015, Curtin (Baker's supervisor) asked Baker if he got Peter's "exact net worth."

- Baker said he and Moon called Peter that day and "pressed him on his net worth and told him we would need more details to move forward."

- Baker added that Peter "*didn't provide a concrete number because I honestly don't think he knows an exact number*. He asked us to touch base with his accountant [Bruce Haverberg] about it, which we will. *I'd estimate it somewhere in the $80-100 MM range*."[35]

- Moon (also on the call) testified Peter *never said* that he was worth $80 million or more.[36]

- To not expose his lie, Baker never bothered to call Haverberg.[37] Defendants' expert Palzer said this was a "boo boo".[38]  Haverberg testified Peter was never worth close to $100 million.[39]

Despite these facts (<u>including Baker saying Peter did not know his net worth</u>), the RR concludes that "Mr. Doelger represented to Baker that his net worth was in the range of $100 million;" relying only on the forged document (discussed above) and Baker's self-serving declaration.[40] The RR states "the admissible evidence [Plaintiffs] cite to does not contradict this statement of fact" without acknowledging the above evidence.[41] Peter's actual liquid net worth in August 2015 and what JPM understood it to be is unquestionably a material fact in dispute.

---

[34] Doc No. 276-181 ¶ 20.
[35] SOF ¶¶ 99(Resp.), 296, 297; Ex. 49 (Doc No. 276-49) (emphasis added).
[36] SOF ¶ 298; Ex. 536 (Doc No. 301-330) (Moon Tr.) 147:19-150:4.
[37] SOF ¶ 299; Haverberg Aff. (Doc No. 300-1) ¶¶ 5-6. Haverberg confirmed a month later Peter had no other significant liquid assets except at JPM, but Baker did nothing. SOF ¶ 300; Ex. 304.
[38] Ex. 539 (Palzer Tr.) 210:17-212:2.
[39] SOF ¶ 99(Resp.); Ex. 542 (Doc No. 301-336) (Haverberg Tr.) 158:23-159:8, 178:14-18; *see* Haverberg Aff. ¶ 4.
[40] RR p.11 n. 58 (citing SOF ¶ 103, which refences Exs. 43 (Doc No. 276-43) and 181 (Doc No. 276-181)).
[41] RR p.11 n. 58; *see also* SOF ¶¶ 99(Resp.), 100(Resp.).

Peter's liquid net worth matters because of JPM's suitability policies. Under its Advisory Schedule, the MLP Program was subject to two suitability limits: for the MLP Program specifically, an investment limit equal to 5% of the client's liquid net worth; and across all of the Advisory Program strategies, a hard investment limit equal to 50% of their liquid net worth.[42] So, when an adviser began opening a new account, JPM ran a "suitability check" to see if the investment exceeded 5% net worth.[43] JPM only allowed above the 5% suitability restriction if an exception were granted.[44] Clients were flatly prohibited from exceeding the 50% limit. SOF ¶ 288.

So, whether Peter's liquid net worth was $50 million or $100 million, Peter's proposed $33 million investment in the MLP Program far exceeded the 5% suitability restriction, and would require further scrutiny to go forward, if at all.[45] If his liquid net worth was $50 million, a $33 million investment would exceed the 50% hard cap and be forbidden. SOF ¶¶ 288, 291. Defendants dispute whether the 50% suitability limit was in fact a hard cap or whether exceptions could be made;[46] the RR acknowledges this fact is in dispute without further discussion. RR p.13.

It is a disputed fact to what extent Baker was aware of these suitability restrictions.[47] Thus, he told Chickasaw he needed to clear "internal suitability" and "bite-size" hurdles to "determine the size of the account" after the Account Opening Docs had already been signed.[48]

Incredibly, the Account Opening Docs are not even the only documents Baker fraudulently modified to get around suitability limits. On August 26, 2015, Baker received worksheets from Haverberg, valuing Peter's MLPs in the AT account at about $32.6 million.[49] The next day, Baker

---

[42] SOF ¶¶ 285, 288; Ex. 240 at -9460 ("50% suitability limit across all Advisory Program Strategies"), -9464.
[43] SOF ¶ 286; Ex. 242 (Doc No. 301-365) at 2 (of 8).
[44] SOF ¶ 288.
[45] SOF ¶¶ 288, 308, 323; *see generally* ¶¶ 334-37.
[46] SOF ¶ 288. Defendants provide no evidence other than Baker's "understanding." Ex. 561 (Doc No. 321-15) ¶ 3.
[47] SOF ¶ 289.
[48] SOF ¶ 292-93; Exs. 47, 264.
[49] SOF ¶ 310.

emailed Curtin (copying his boss, John Beggans) saying approval "seem[ed] to be stuck in risk no man's land" and was concerned they "could lose this opportunity." SOF ¶ 311.

On August 28, 2015, Baker emailed Supervisory Manager Jeff Lee (copying Beggans), stating that "[Peter] currently holds a portfolio of *$33 MM* of MLPS. These MLPS are managed by Atlantic Trust and custodied at J.P. Morgan.  ...  He wants to move ***his entire $33 MM portfolio*** to our OAP:MLPEI (Chickasaw) strategy."[50] Baker and Curtin then discussed how they could get around compliance to get approval from the "business side."[51] Hours after his email to Lee, Baker called Burke to discuss getting approval.[52] After getting off the phone with Burke, Baker forwarded the Lee email to him, but only after making multiple material modifications to the email he was forwarding, changing it (*inter alia*) to say that Peter had **$45 million** in MLPs at AT and would only be moving $33 million of it to Chickasaw, which Baker knew was untrue.[53] The RR makes no mention of this, and instead relies on some of Baker's (disputed) statements in the very email he altered.[54] RR. p.12. A redlined portion of the two emails (Ex. 267) shows Baker's lies:

> Peter's estimated net worth is ~$90 - 100 MM and he currently holds a portfolio of $~~33~~45 MM of MLPS. These MLPS are managed by Atlantic Trust and custodied at J.P. Morgan. Peter has become frustrated with his existing manager and asked if we could help make introductions to some other managers in the space. He met with the Chickasaw team and came away very impressed. He wants to move ~~his entire~~ $33 MM of his portfolio ~~to~~into our OAP:MLPEI (Chickasaw) strategy.

This is documentary evidence that Baker falsely represented the size of the deal to get approval.[55]

In any event the RR's reliance on the altered email (Ex. 50) is improper fact finding.[56]

---

[50] Ex. 265 (Doc No. 301-111) (emphasis added).
[51] SOF ¶ 313; Ex. 265.
[52] SOF ¶ 314; Ex. 269 (Doc No. 301-382).
[53] SOF ¶ 314; Exs. 265, 266 (Doc No. 301-112), 267 (Doc No. 301-113); *see also* SOF ¶¶ 316-19.
[54] Ex. 50 (Doc No. 276-50) and Ex. 265 are the same email and the RR quotes from it extensively regarding Peter's investment experience without acknowledging that Baker subsequently altered it to include lies. RR. pp.12-13.
[55] Approval relied on a "manager diversification benefit" based on false numbers. *See* Ex. 271; *infra* Fact § IV.
[56] Baker's email does not say that Peter told him the information and it lacks foundation anyway (does not say where he got it or who "we" is). Ex 50. Plaintiffs dispute Baker's statements on Peter's experience.  Yoon's knowledge and her testimony on what Defendants said is not hearsay (statement of a party opponent), as the RR concludes. RR n. 70.

## IV.    THE BIG BOY LETTER (A WORK OF FICTION)

By September 3, 2015, Baker's team "need[ed] to document and work with risk to get to a place of comfort and possibly a big boy letter."[57] The same day, Beggans bragged to Burke that "***Peter Doelger will sign any letter that we draw up***."[58] The RR makes no mention of this.

Importantly, all of the material statements contained on the first page of the Big Boy Letter[59] are JPM's representations to Peter that Peter is ***not*** asked to confirm or agree to (this language does not appear until page 2),[60] and came from Baker and Moon,[61] including information that JPM knew to be untrue, and which Baker had personally fabricated (SOF ¶¶ 314, 330, 333):

- That Peter held $45 million in MLPs at AT.  The actual value at that point, known to JPM, was $26.9 million (as the custodian), $18 million less. SOF ¶¶ 242, 258, 331.

- That Peter was leaving $12 million with AT, thus benefitting from a diversification of "manager concentration risk," which it says *Peter wanted*. Ex. 67 at -7437 ("you would like to diversify…"). JPM fabricated the $12 million and knew there be no such diversification.[62]

- That Peter's liquid net worth was approximately $100 million. The Big Boy Letter, whose preparation and approval involved multiple employees, including the legal department,[63] explicitly ***does not*** say that Peter made this representation, rather that it is "given."[64] This is because JPM was aware that ***Peter did not know his net worth*** and said get it from Haverberg.[65]

The RR overlooks all evidence that the Big Boy Letter was fraudulent and that JPM, ***not Peter***, was in "the best position to know the truth of those representations."[66] Even if JPM had a basis to rely on its own representations as to Peter's liquid net worth in the Big Boy Letter, just one year later, in 2016, Baker assisted Peter in completing a detailed PFS which revealed a nearly 100% accurate total net worth of $39.4 million ($20.9 million liquid).[67] Defendants' own expert

---

[57] SOF ¶ 320; Ex. 272 (Doc. No. 301-10); *see also* Ex. 291 (Doc. No. 301-128).
[58] SOF ¶ 322; Ex. 273 (Doc. No. 301-11) (emphasis added).
[59] Ex. 67 (Doc. No. 276-67) at -7437.
[60] Ex. 67 at -7438.
[61] SOF ¶ 332-33.
[62] SOF ¶ 331.
[63] SOF ¶ 321.
[64] Ex. 67 at -7437.
[65] SOF ¶¶ 297-98.
[66] RR p.27.
[67] SOF ¶¶ 425-26; Ex. 327 (Doc. No. 301-21) at -5029 (the "2016 PFS").

testified, despite the Big Boy Letter, Defendants' fiduciary duties required a complete suitability re-assessment upon receiving that information, but JPM never did so.[68] He also said that Baker should have been fired for knowingly presenting Peter with the Big Boy Letter full of falsehoods.[69]

## V.   DEFENDANTS' FIDUCIARY DUTIES (WHICH THEY BREACHED)

### A. Baker and Others Admit Defendants Were Plaintiffs' Investment Advisers

JPM understood Plaintiffs looked only to them for financial advice.[70] Defendants were their investment advisers and owed them fiduciary duties, including following their policies.[71]

### B. Defendants Wanted To Keep Plaintiffs In Debt, a Blatant Conflict of Interest

Peter had a line of credit ("LOC") JPM pushed on him and secured with his MLPs.[72] He could not pay down the LOC without selling assets; however, if Peter sold his MLPs, Defendants would make less in interest and advisory fees.[73] JPM never explained this to Plaintiffs.[74] JPM had two primary goals: 1) to increase (or at least maintain) Peter's LOC usage; and 2) to increase the interest and fees Peter paid.[75] With the loan balance remaining high  and the MLP values dropping, Peter was constantly at margin call, and Baker and others lobbied JPM's credit risk department to increase the applicable loan/value percentage or seek exceptions to maintain the loan balances (and keep Peter overleveraged).[76] Peter's overleveraged position led to two transactions JPM recommended that resulted in significant losses to Plaintiffs (and gains to JPM): a cross-currency swap in January 2017 and an interest rate cap around March 2018.[77] JPM did not materially

---

[68] SOF ¶ 400; Ex. 540 (Doc No. 301-375) (Gillespie Tr.) 252:13-262:1 ("some process should have been triggered to reevaluate suitability at that point"), 293:3-15 ("I've said before, I will stand by it, it should have triggered a suitability analysis, a subsequent suitability analysis."). Yet, Baker did nothing. SOF ¶ 591; Ex. 247, 238:1-25; SOF ¶ 127 (Resp).
[69] Ex. 540, 262:2-263:15.
[70] SOF ¶ 380-82.
[71] SOF ¶¶ 381-99; Ex. A to Serritella Declaration filed herewith (excerpt of transcript of FINRA oral argument).
[72] SOF ¶¶ 239-41 (In 2009 Peter had no debt and JPM encouraged to get the LOC and use it for investments); 402-03.
[73] SOF ¶¶ 404-07
[74] SOF ¶ 402-419.
[75] SOF ¶¶ 411-15; *see also* Ex. 345 at -7889.
[76] SOF ¶¶ 416-18.
[77] SOF ¶¶ 428, 432-33, 435-36, 438, 440-41, 444-46, 452-56.

disclose the risks of these transactions, or even that JPM as counterparty would profit directly form

Peter's losses.[78] Peter lost over $1.2 million to JPM as a result.[79] The RR omits these conflicts.

**C.  JPM Advised Plaintiffs to Stay in MLPs as They Declined, All the Way To the End**

Between 2015 and 2020, Plaintiffs lost almost everything they had invested with JPM – of

the initial $33 million investment, only $400,000 remained.[80] Through this catastrophic decline,

Defendants repeatedly advised Plaintiffs against selling their MLPs, while they made <u>millions of</u>

<u>dollars</u> off of Plaintiffs through adviser fees and the LOC.[81] Particularly egregious highlights:

- JPM "recommended" Plaintiffs get a home equity line of credit ("HELOC") on their Boston home.[82] This is a prohibited elder/vulnerable customer sales practice and violated JPM's own policies.[83] JPM pushed this while discouraging selling MLPs, which it misrepresented were producing significant income despite year-over-year losses in the millions.[84] SOF ¶¶ 478-80.
- In 2019, Baker was informed internally that Plaintiffs should reduce their MLP exposure by half. SOF ¶ 484. No one ever told Plaintiffs this. SOF ¶ 485.
- As oil markets were crashing in early 2020, Baker repeatedly told Plaintiffs not to sell, that "we're fine" and it would be "aggressive" and "extreme" to sell all MLPs. SOF ¶ 507; Ex. 471.

The RR makes no mention of any of this, instead finding "Baker encouraged the Doelgers

to sell MLPs and/or pay down the LOC" based on limited disputed evidence.[85] The RR overlooks

that Plaintiffs <u>did</u> pay down debt and reduce exposure to MLPs; at one point they even sold $2

million in MLPs instead of taking out a HELOC, like JPM wanted. SOF ¶¶ 108(Resp), 131(Resp),

133(Resp). Defendants never recommended Plaintiffs sell all/substantially all of the MLPs;

according to Baker, that would have been "aggressive" and "extreme." *Id.*, SOF ¶ 472-3, 493, 507.

David Tilkin, Plaintiffs' expert on standards and practices, submitted an affidavit opining

---

[78] SOF ¶¶ 420-56.
[79] SOF ¶¶ 437, 453-54.
[80] SOF ¶ 508.
[81] SOF ¶¶ 423-508.
[82] SOF ¶ 477.
[83] SOF ¶ 587.
[84] SOF ¶ 478-80.
[85] RR p.16. Exhibits cited are from disputed SOF ¶¶ 66, 108, 131, and show <u>Plaintiffs'</u> concerns (*e.g.* Exs. 74, 114).

that Defendants' actions were not in line with industry standards and their suitability obligations.

Doc No. 300-2. On this motion, Defendants did not submit affidavits from their experts rebutting

Tilkin. As discussed herein, Defendants expert Gillespie agreed with several of Tilkin's opinions.

**ARGUMENT**

**I.   THE COURT SHOULD REJECT THE RR ON BREACH OF FIDUCIARY DUTY**

  **A.  The RR Errs in Finding Defendants Had No Fiduciary Duties**

The central issue is whether Defendants breached their fiduciary duties. In prior briefing,

Plaintiffs set forth how Defendants had fiduciary duties pursuant to (i) controlling law concerning

investment advisers, (ii) Defendants' admissions and (iii) Defendants' own documents:

| 1. Case law/regulations | 2. Defendants' admissions | 3. Defendants' documents |
|---|---|---|
| *Robinhood* (SJC); NY Cts | Expert Palzer- SOF¶ 399 | JPM Advisory Agreements[86] |
| *Cutter* (D. Mass) | Expert Gillespie- Ex.529 at 13-16 | AIMS (Ex. 30) |
| *Transamerica* (SC) | JPM 30(b)(6)- SOF¶ 388 | JPM Fiduciary Policy (Ex. 423) |
| SEC - 2019 Act Release | James Baker- SOF¶ 389 | JPM Presentation (Ex. 479) |
| OCC - 12 C.F.R. § 9.101(a) | Ed Kelly- SOF¶ 98 | Chickasaw Manual (Ex. 509) |

The RR ignores **all** this and concludes Defendants had no fiduciary duties here. RR pp.34-37.

  **1.  The RR Ignores Controlling Law**

    **a.  Under State Law, Defendants, As Investment Advisers, Were Fiduciaries**

JPM admitted it was Plaintiffs "primary investment adviser."[87] JPM admitted it provided

Plaintiffs with investment advice.[88] At a recent FINRA hearing, counsel for JPM said 5 times that

JPM was "the investment adviser" and he said 4 times JPM gave investment advice to Plaintiffs.[89]

Defendants' expert Gillespie acknowledged both Defendants were Plaintiffs' investment advisers.

Ex. 540, 85:4-18 (JP Morgan was "functionally acting as an investment advisor … in a fiduciary

capacity.").[90] The RR ignores these admissions sufficient to establish Defendants as fiduciaries.

---

[86] The "Advisory Agreements" refers to the agreements enter by Peter in 2015 (reflected in the Account Opening Docs and the signature pages of the Modified Docs,) and Plaintiffs together in 2019 (Ex. 125) (Doc No. 276-125).
[87] SOF ¶¶ 380-82.
[88] SOF ¶¶ 375-79, 384-86.
[89] Ex. A, 12:6-10, 13:4-6, 14:16-17, 45:3-7, 46:3-13, 48:18-49:3, 106:15-17.
[90] Ex. 540 (Gillespie Tr.) 137:13-138:2; 312:18-313:5; *see also* Ex. 529 (Doc No. 301-323) at 9, 11, 12, 24 (of 34).

In a 2023 case, the SJC made clear that "***Investment advisers***, because of their trusted advisory role, ***generally must comply with the full complement of fiduciary duties*** of 'utmost good faith, and full and fair disclosure of all material facts, and shoulder an affirmative obligation to employ reasonable care to avoid misleading clients." *Robinhood*, 492 Mass. at 700 (emphasis added; quotes omitted); *see also Hays v. Ellrich*, 471 Mass. 592, 601 (2015); *Patsos v. First Albany Corp.*, 433 Mass. 323, 333-34 (2001) ("where the account is discretionary… the broker assumes broad fiduciary obligations that extend beyond individual transactions."). Similarly, in New York, "**Professionals such as investment advisors, who owe fiduciary duties to their clients**, may be subject to tort liability for failure to exercise reasonable care, **irrespective of their contractual duties**, since in these instances, **it is policy, not the parties' contract, that gives rise to a duty of due care."** *Bullmore I*, 45 A.D.3d at 464 (emphasis added and internal quotation marks omitted); *Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2007)("*Bullmore II*") ("**investment advisors owe fiduciary duties to their clients**, much as general partners owe fiduciary duties to limited partners.") (internal citation omitted; emphasis added); *AmTrust N. Am., Inc. v. KF&B, Inc.*, No. 17-cv-5340, 2020 U.S. Dist. LEXIS 167624, *5 (S.D.N.Y. Sept. 14, 2020) ("[T]he relationship of an investment advisor with one to whom she provides advice is fiduciary in nature independent of contract.").

**These duties cannot be limited by contract or waived**. *See Lifespan Corp. v. New Eng. Med. Ctr., Inc.*, 731 F. Supp. 2d 232, 241 (D.R.I. 2010) ("under Massachusetts law, 'the fact that [the parties] entered into an … agreement … does not relieve [Lifespan] of the high fiduciary duty' imposed by tort law."); *Cutter*, 2023 U.S. Dist. LEXIS 222580 at *12 (Casper, J.).[91]

---

[91] *In the Matter of Comprehensive Cap. Mgmt., Inc.*, Advisers Act Release No. 3-20700, at 4 (Jan. 11, 2022) ("CCM"). Defendants ignored this authority and cited cases readily distinguishable. *See* Sur-Reply, Doc No. 338 at 9-12 (of 19).

The RR fails to discuss these cases or explain why the Court should deviate from them.

### b. The RR Misapplies Federal Law

The RR acknowledges Chickasaw is a registered investment adviser ("RIA") under the Advisers Act. RR pp.9-10. But the RR omits the legal implication of this. It is black letter law that the Advisers Act imposes fiduciary duties on RIAs. The SEC has repeatedly affirmed RIAs owe fiduciary duties.[92] Defendants' expert Gillespie, a lawyer, noted: "It is well established law that the Advisers Act creates a federal fiduciary duty that investment advisers owe their clients…. encompass[ing] both a 'duty of care' and a 'duty of loyalty.'" Ex. 529 at 16 (of 34).

Likewise, JPM's primary regulator, the OCC holds banks acting as investment advisers have fiduciary duties to their clients: "***if a bank is providing investment advice for a fee, then it is acting in a fiduciary capacity***."[93] The OCC: "[t]he fiduciary's fundamental duty is to administer an account ***solely in the client's interest***."[94] The RR errs by failing to acknowledge this authority.

### 2. The RR Errs In Ignoring Defendants' Admissions That They Were Fiduciaries

Defendants' own admissions put the issue to rest. JPM's 30(b)(6) witness testified JPM "had a duty of loyalty and a duty of care specifically in regards to the investments that were contracted."[95] Kelly from Chickasaw testified it has "a fiduciary responsibility to" all clients.[96] Defendants admitted in response to SOF ¶¶ 531 and 532 that Chickasaw had fiduciary duties: "**Defendants do not dispute that Chickasaw believed that it had fiduciary duties to Peter… and Yoon when she became a co-account owner**" (emphasis added). Defendants' experts admitted both Defendants had fiduciary duties.[97] Defendants' expert Gillespie stated, "**So J.P.**

---

[92] *See Comm'n Interp. Regarding Standard of Conduct for Inv. Advisers*, Rel. No. IA-5248, (June 5, 2019) ("2019 Release") at 2.
[93] 12 C.F.R. § 9.101(a) (emphasis added).
[94] *See* Comptroller's Handbook on Personal Fiduciary Activities, at 31, pub-ch-personal-fiduciary.pdf (occ.gov).
[95] SOF ¶ 388 (Ex. 205 (Doc No. 301-62) (Baker 30(b)(6) Tr.), 14:1-22).
[96] SOF ¶ 98(Resp.); Ex. 430 (Doc No. 301-248) (Kelly Tr.), 75:9-16.
[97] SOF ¶ 399; Ex. 540 85:4-18, 118:7-18, 137:13-138:2. *See also* Ex. 540 313:1-5

**Morgan Chase Bank in providing investment advisory services is acting as a fiduciary.**
**Right? A: I don't think there's a debate about that.**" *Id*. The RR omits these admissions.

### 3. The RR Overlooks Defendants' Documents Saying They Were Fiduciaries

The Advisory Agreements expressly provides JPM had a fiduciary duty to Plaintiffs:
"Portfolio investments will be as determined by the Bank with considerations of availability and
***applicable fiduciary standards***."[98] The AIMS expressly provided Chickasaw "is a fiduciary of the
Client"[99] JPM's own policies state advisers like Baker are fiduciaries under the Chickasaw
managed MLP program. SOF ¶¶ 392-96. Chickasaw's manual: "As a ***fiduciary***, [Chickasaw] owes
its clients more than honesty and good faith alone.[100] The RR omits all this material evidence.

### 4. The RR Errs in Concluding There Is No Common Law Fiduciary Duty

The facts (which the RR omits) show Defendants had a "special trust relationship" with
Defendants. JPM acknowledged Peter is not a "professional investor,"[101] and Baker repeatedly
told his colleagues that Plaintiffs relied on JPM's counsel on *all* accounts:

- 2015: "I initiated a weekly macroeconomic and market dialogue with Peter in late 2014 that
  **has led him to view us as his primary investment advisor.**"[102]

- 2018: Peter had "[n]o accounts anywhere else – **we're his sole investment advisor.**"[103]

- 2020: "**We are their primary financial advisors, bank and investment advisor.**"[104]

Moon acknowledged Peter made investment decisions "contingent on [JPM's]
counsel."[105]. JPM held Baker out an "investment specialist" "[r]esponsible for developing
[Plaintiffs'] investment plan and working with [them] to implement [their] investment strategy."[106]

---

[98] SOF ¶ 387; Ex. 41 at § 1.D(i) (emphasis added); *see also* Ex. 540, 312:18-313-5.
[99] SOF ¶ 95(m) (Ex. 30 (Doc No. 276-30) at -2249).
[100] SOF ¶ 511; Ex. 509 (Doc No. 301-311) at 1-2.
[101] SOF ¶ 205 (citing Ex. 337 (Doc No. 301-166)).
[102] SOF ¶ 380 (emphasis added) (quoting Ex. 310 at 1-2).
[103] SOF ¶ 381 (emphasis added) (quoting Ex. 402 (Doc No. 301-221)).
[104] SOF ¶ 382 (emphasis added) (quoting Ex. 461 (Doc No. 301-274)).
[105] SOF ¶ 379 (quoting Ex. 204 (Doc No. 301-61)).
[106] SOF ¶ 375.

JPM told Plaintiffs Baker was their "dedicated investment professional, a member of your JPMorgan team."[107]. JPM gave investment advice on all their investments.[108] The record shows more than what the RR says were just Plaintiffs' "subjective beliefs and conclusory allegations."[109]

The RR references Peter's disputed investment experience (RR p.36), but does not explain how this reduced Defendants' duties, and has nothing to do with Yoon. The RR's reliance on the Big Boy Letter to limit both Defendants' duties to Peter and Yoon (who never signed it and made no representations in it) effectively turns it into an unenforceable hedge clause, *infra* Argument § III.[110] This cannot apply to Yoon and Chickasaw.[111] For Peter, facts are disputed whether JPM relied on the statements;[112] JPM could not have relied on statements it knew were false.[113]

## B. The RR's Recommendation on "Duplicative Claims" Is Wrong as a Matter of Law

That the Chickasaw fiduciary duty claim may be duplicative of the contract claim is contradicted by the RR's conclusion that the contract claim must be dismissed because Chickasaw was not a party to the Advisory Agreements. RR p.32.

For JPM, the only case it cites for its sweeping proposition is *Zorbas v. United States Trust Co., N.A.*, 48 F. Supp. 3d 464, 487-88 (E.D.N.Y. 2014). But *Zorbas* held:

> **Plaintiff concedes that U.S. Trust was not acting in an advisory capacity with respect to the Investment Account**…. Therefore, any fiduciary duties that may apply to professional investment advisors, and that Plaintiff cites in support of his argument

---

[107] SOF ¶ 375.

[108] SOF ¶¶ 247-49, 380-82.

[109] RR p.36.

[110] RR p.36 (using the Big Boy Letter to argue supposed sophistication invalidates fiduciary duty).

[111] SOF ¶¶ 122-23, 373.

[112] SOF ¶¶ 307-328, 334-337, 345-352.

[113] *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) (where a "business entit[y] … has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject …. he will not be heard to complain'") (internal quotations omitted); *O'Hara v. Diageo-Guinness, USA*, 306 F. Supp. 3d 441, 452 (D. Mass. 2018) ("recipient of a fraudulent misrepresentation … required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation") (quoting Rest. (2d) of Torts § 541).

that U.S. Trust's "comprehensive" wealth management role and general "expertise" gave rise to an independent fiduciary duty, do not apply to U.S. Trust.[114]

The RR ignores a key distinction here: *Defendants were investment advisers and gave investment advice.*[115] *Zorbas* acknowledged "a fiduciary duty may be found notwithstanding the existence of a contract – specifically, when there is a relationship of higher trust than would arise from the . . . agreement alone." *Id.* at 479 (internal quotation marks omitted). The RR fails to address the settled law that "a duty to act with care and loyalty [are] independent of the terms of the contract."[116]

The RR wrongly adopts Defendants' position that they can eliminate their duty of care and loyalty by either not mentioning (or worse, removing) such duties in written agreements.[117] Defendants rely only on the 2019 Release,[118] but the 2019 Release says no such thing.[119] After the briefing here, Judge Casper rejected the exact same argument:

> The Court is skeptical that the advisory agreement actually purports to limit the scope of the adviser-client relationship or of Defendants' fiduciary duties to their clients.…. Putting that aside, the only legal support Defendants cite for the proposition that the scope of their fiduciary obligations should be limited by the terms of the investment advisory agreements is [the 2019 Release]. That very guidance, however, indicates that "the adviser and its client may shape [their] relationship by agreement, *provided that there is full and fair disclosure and informed consent.*" 84 Fed. Reg. 33671 [emphasis in original]. **Courts do not allow investment advisers to contract around their fiduciary obligations to their clients.**

*Cutter*, 2023 U.S. Dist. LEXIS 222580 at *11-12 (emphasis added). Accepting the RR would allow

---

[114] 48 F. Supp. 3d at 487-88 (emphasis added).

[115] Ex. A, 12:9-10 ("The investment advisor is the bank. The record makes that inescapably clear.") (emphasis added).

[116] *See also PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-cv-5649, 2023 U.S. Dist. LEXIS 140700, at *31-32 (S.D.N.Y. Aug. 10, 2023) (citation and quotation marks omitted); *GPIF-I Equity Co., Ltd. v. HDG Mansur Inv. Servs., Inc.*, No. 13-civ-547, 2014 U.S. Dist. LEXIS 55193, at *16-17 (S.D.N.Y. Apr. 21, 2014); *AmTrust N. Am., Inc.*, 2020 U.S. Dist. LEXIS 167624, at *5 ("The duty is created by the nature of the services provided rather than by the contractual promise."); *Bullmore II*, 485 F. Supp. 2d at 470-71; *Guarriello v. Family Endowment Partners, LP*, 14-cv-13351, 2016 U.S. Dist. LEXIS 195250 (D. Mass. Aug. 10, 2016), at *25; (citations omitted); *Baker v. Goldman Sachs & Co.*, 656 F. Supp. 2d 226, 236 (D. Mass. 2009) (noting that "[a] fiduciary duty is an extra-contractual duty.")(citations omitted); *UBS Fin. Servs., Inc. v. Aliberti*, 483 Mass. 396, 406 (2019).

[117] RR p.34; Defendants' Reply (Doc No. 321-18) ("Reply") at 24-25 (of 36).

[118] Relied on by both Defendants because it is widely accepted that SEC/Advisers Act requirements are instructive on industry standards for all investment advisers (including those regulated by the OCC). Reply at n.16 and 21-22 of 36.

[119] *See* Sur-Reply, Doc No. 338 at 7-9 (of 19).

investment advisers to circumvent their fiduciary duties and thereby breach them with impunity. As *Cutter* emphatically stated, that is not the law.

### C. The RR Overlooks Defendants' Obligations To Plaintiffs and Defendants' Breaches

#### 1. The RR Errs in Failing to Address the Duty of Care and the Duty of Loyalty

Investment advisers, such as Defendants, have a duty of loyalty (put client interests ahead of their own) and a duty of care (*e.g.*, ongoing <u>monitoring</u> and <u>suitability</u> obligations).[120] The <u>2019 Release</u> sets forth these obligations in detail. Defendants and their expert Gillespie rely on the 2019 Release.[121] Gillespie: "[a] foundational element of an adviser's duty of care is the duty to provide investment advice that is 'suitable' for the client."[122] Defendant's expert Palzer: duty of care requires fiduciary to "ensure that investment advice 'is suitable to the client's objectives, needs and circumstances.'"[123] Gillespie confirmed (despite the Big Boy Letter), JPM had a "continuing suitability obligation."[124] Plaintiffs' expert Tilkin discussed suitability extensively.[125] Defendants chose not to submit their expert's reports, or even address suitability, which is puzzling given that JPM conceded in a recent submission to FINRA that **"suitability" is the "key issue" to be decided in this "Federal Case"**.[126] The RR did not discuss Tilkin or suitability at all.

Under the duty of loyalty, "an investment adviser must not place its own interest ahead of its client's interests."[127] There must be "full and fair disclosure and informed consent."[128] The RR

---

[120] Ex.526 (Doc No. 301-320) at 21-29 (of 115); Tilkin Aff. (Doc No. 300-2) ¶ 27; Ex. 540 (Gillespie Tr.) 250:21-253:1, 312:18-315:14; https://www.youtube.com/watch?v=ZjLRCdnwJD8&t=2s (2 minute video of Gary Gensler on how investment advisers serve in a "position of trust" and must act for the benefit of their clients, not their own).
[121] Ex. 529 (Doc No. 301-323) at 17-19 (of 34).
[122] Ex. 529 at 16 (of 34).
[123] SOF ¶ 399; Ex. 531 (Doc No. 301-374) at 34-35 (of 127); *see also* Ex. 503 (Doc No. 301-39) at 65-66 (of 172) (OCC handbook emphasizing the importance of suitability). JPM acknowledged that, as part of its fiduciary duty, it had to consider and follow its own policies and procedures. SOF ¶ 390. Gillespie confirmed that investment advisers must have written policies which they are expected to follow. SOF ¶ 399. JPM had policies concerning obligations to Plaintiffs, including a suitability policy, conflict policy, and elder exploitation policy. SOF ¶ 391.
[124] Ex. 540 252:13-254:17; *see* generally SOF ¶ 400; Ex. 529 at 21-22 (of 34).
[125] *See, e.g.*, Tilkin Aff. at ¶ 27, Ex. 526 (Doc No. 301-320) at 6-8, 95-99 (of 115).
[126] Ex. B; *see also* Ex. A, 51:14-19 ("key issue of suitability").
[127] 2019 Release at 21.
[128] 2019 Release at 9.

seemed to suggest (incorrectly) that general disclosures of hypothetical conflicts are sufficient, without addressing whether this comports with the duty of loyalty.[129] It does not.[130] None of the potential conflicts supposedly disclosed are specific to Plaintiffs. The OCC likewise states: "**The duty of loyalty is of paramount importance** and underlies the entire administration of personal fiduciary accounts."[131] JPM understood its duty of loyalty meant "a responsibility to disclose <u>and manage</u> conflicts that may arise" and "to act in the client's best interest."[132]

## 2. The RR Ignores Over A Dozen Examples of Defendants' Breaches

For the duty of loyalty, Plaintiffs put forth substantial evidence that Defendants were looking out for their own interests (profiting substantially at the expense of Plaintiffs). SOF ¶ 389. For example, (i) JP Morgan lied repeatedly and falsified documents to further its own interests of getting the "win" to Peter's detriment,[133] SOF ¶¶ 285-374, (ii) JPM admittedly did not want Peter to pay down the LOC or "discourage [its] use,"[134] (iii) JPM recommended unsuitable swap and rate cap transactions to Peter and profited from his losses ($1.2 million) as the counterparty,[135] (iv) JPM recommended Plaintiffs get a HELOC from JPM to prop up failing MLPs (so JPM could maintain its profits);[136] and (v) JPM regularly violated OCC regulations and its own policies

---

[129] RR p.7; Ex. 84 (Doc No. 276-84) at 5 (of 35), Ex. 93 (Doc No. 276-93) at 17-18 (of 31) (in both "the Bank's . . . duties . . . *may* conflict with its rights as a secured party") (emphasis added); *see also* Ex. 41 (Advisory Agreement) at -6427 ("Conflicts of interest *may* arise . . . . Conflicts *may* result, for example, [followed by a list of four examples] . . . . Other conflicts *may* result . . . .") (emphasis added).

[130] *See* Sur-reply, Doc No. 338 at 8-9 (of 19); <u>2019 Release</u> (there must be "full and fair disclosure and informed consent" (at 9) and "the use of 'may' would be inappropriate if it simply precedes a list of all possible or potential conflicts…." (at 25)). Defendants' expert said that such disclosures are insufficient. Ex. 540, 102:4-108:21. Baker acknowledged to his colleagues JPM was causing "confusion" in its dual roles. SOF ¶ 470. Also, the RR (p.7) fails to address how a disclaimer in loan documents concerning foreclosure on collateral in any way generally limited JPM's fiduciary duties. It does not. (<u>2019 Release</u> at 6 (fiduciary duty "applies to the entire adviser-client relationship")).

[131] *See* Comptroller's Handbook on Personal Fiduciary Activities, at 31, <u>pub-ch-personal-fiduciary.pdf (occ.gov)</u>.

[132] SOF ¶ 389.

[133] After the Big Boy Letter was signed, JPM celebrated Baker's dishonest behavior as a model for advisers nationwide. SOF ¶ 358. Indeed, Moon knew Baker told lies, stating "Best of all, Jimmy spins a great yarn." *Id. See also* SOF ¶ 505 (Baker "framing" JPM's denial of the HELOC instead of telling Plaintiffs the real reasons).

[134] SOF ¶¶ 411-419.

[135] SOF ¶¶ 420-56.

[136] SOF ¶¶ 476-79.

designed to protect against conflicts of interest.[137] In 2020, the OCC fined JPM $250 million in

for the same transgressions at issue here.[138] Tilkin opined these actions were highly improper.[139]

The RR did not mention any of this, including the critical HELOC.

Non-exhaustive examples of Defendants' breaches of fiduciary duties that the RR ignores:

- The Account Opening Docs were altered after Peter signed them.[140]

- Baker faked his emails to include lies about Peter's finances to get the account approved, a fireable offense.[141] These lies were included in the Big Boy Letter prepared by JPM.[142]

- JPM steamrolled compliance who did not approve/seriously questioned the investments.[143]

- The 2016 PFS showed Peter's liquid net worth to be $80 million less than what Baker had represented a year earlier; Baker did not alert anyone, because he knew this truth all along.[144]

- Baker's 3 supervisors failed to oversee him and never bothered to speak with Plaintiffs.[145]

- Chickasaw flouted its suitability obligations, even under its own manuals, instead relying on JPM to perform all required tasks without confirming they were done (they were not).[146]

- JPM maintained inaccurate information about Plaintiffs, including investment objectives, in violation of firm policies and industry standards; Baker knowingly recorded false information on OCC mandated annual account reviews.[147]

- For years, JPM advised to keep an overconcentrated portfolio even as it continued to decline substantially, withholding material information concerning the investments.[148]

- JPM informed Baker given Chickasaw's poor performance, Plaintiffs should reduce their MLP exposure by half; but Baker kept this secret and never told Plaintiffs. SOF ¶¶ 484-85.

- Baker repeatedly pushed a HELOC (that would benefit JPM) over selling MLPs.[149] This was a conflict of interest, and an expressly prohibited elder/vulnerable customer sales practice in violation of JPM's own policies. SOF ¶¶ 587-88; Ex. 514 at 72; Ex. 515 at 23.

---

[137] SOF ¶¶ 566-71; *see e.g.*, Exs. 214, 215, 216, 219, 353, 354, 383.

[138] OCC Assesses $250 Million Civil Money Penalty Against JPMorgan Chase Bank, N.A.: "The OCC found the bank's risk management practices were deficient and it lacked a sufficient framework to avoid conflicts of interest. These deficiencies constituted unsafe or unsound practices and resulted in a violation of 12 CFR 9.9."

[139] *See, e.g.*, Tilkin Aff. at ¶¶ 6, 26 and 28; Ex 526 at 21-24 (of 115).

[140] SOF ¶¶ 277-9.

[141] SOF ¶ 312-4; Ex. 540, 262:2-263-6 (Gillespie testifying that Baker should be fired for putting a lie in the letter).

[142] SOF ¶¶ 330-33.

[143] SOF ¶¶ 327-28, 334-7.

[144] SOF ¶¶ 425-27, 591.

[145] SOF ¶¶ 598-658.

[146] SOF ¶¶ 520-25, 528-30, 536-50. Tilkin opined that Chickasaw's actions were not industry standard and improper. *See, e.g.*, Tilkin Aff. ¶¶ 7, 29-30; Ex. 526 at 66-82 (of 115); Ex. 527 (Doc No. 301-321) *generally*.

[147] SOF ¶¶ 572-586; Ex. 526 at 42-48 (of 115); SOF ¶ 127 (Resp).

[148] E.g., SOF ¶¶ 457-491; 108 (Resp.); 131 (Resp.); Yoon Decl. *generally*.

[149] *E.g.*, SOF ¶¶ 477-80, 488; 108 (Resp.); 131 (Resp.); *see* Yoon Decl. *generally*.

- JPM misrepresented to Plaintiffs that the MLP distributions were 100% income.[150]

- JPM failed to perform ongoing suitability evaluations for Plaintiffs. SOF ¶¶ 572-97, 660.

- As Plaintiffs were about to lose everything, JPM said it would be "aggressive" and "extreme" to sell and saw "upside" to holding. SOF ¶¶ 506-508.

Tilkin opined that these actions (and many others) are not industry standard and are grossly improper.[151] Defendants' own expert agrees that many of them were improper, including not performing a complete suitability re-evaluation in 2016.[152] The RR failed to address all of this.

Baker also failed to inform supervisors of signs of Peter's diminished capacity as per JPM's Elder Policy (such signs include memory loss, poor judgment and confusion).[153] Dr. Panzer opined that JP Morgan should have known many of these signs by at least 2019. [154] Defendants' expert acknowledged the red flags could warrant escalation. Ex. 540, 64:24-66:20. Defendants proffer no evidence (from Baker or otherwise) contradicting Yoon's testimony that she told Baker multiple times that Peter had memory problems and thus it must be taken as true.  SOF ¶¶ 562.  The RR instead states Baker was never told Peter's exact diagnosis or undergoing treatment (p.19) but overlooks JPM's failure to comply with its Elder Policy, a duty of care breach (Defendants acknowledged that following such policies was obligatory).[155]123

## II.   THE RR'S 93A ANALYSIS FAILS TO CONSIDER DEFENDANTS' CONDUCT

The RR incorrectly reasons that because it denied other claims, 93A must also be dismissed. But 93A "is a statute of broad impact which creates new substantive rights … [that] makes conduct unlawful which was not unlawful under the common law…"[156] The RR recognizes Plaintiffs "submitted 462 statements of fact" (which Plaintiffs also summarized in the fact section

---

[150] SOF ¶¶ 473, 478.
[151] *E.g.*, Tilkin Aff at. ¶¶ 5-10, 27; Ex. 526 at 6-8, 61-66, 91-93 (of 115); Ex. 534 (Doc No. 301-328) at 15-19 (of 21).
[152] Ex. 540, 252:13-263-6.
[153] SOF ¶¶ 551-66.
[154] Panz. Decl. ¶¶ 5, 26, 45; *see also* Ex. 525 at 21.
[155] SOF ¶¶ 390, 399; Ex. 205 (JPM 30(b)(6) Tr.) 20:20-22:1; Ex. 540 (Gillespie Tr.) 56:9-20.
[156] *Kattar v. Demoulas*, 433 Mass. 1, 12 (2000) (internal quotations omitted).

of their briefs).[157] Plaintiffs did not restate those facts again under the 93A heading (there are not

enough pages),[158] but, as Defendants' explained "courts look to the 'entirety of' the conduct, 'not

each action viewed in isolation.'"[159] "[W]hether a particular set of acts, in their factual settling, is

unfair or deceptive is a question of fact"[160] typically inappropriate for summary judgment.[161]

Plaintiffs describe the entirety of the conduct. Defendants themselves discerned many bases for

93A liability.[162] The worst conduct is set forth herein in the immediately prior Argument § I(C)(2).

## III.   DECLARATORY JUDGMENT AND RECISSION CLAIMS MUST BE TRIED

The RR uses the Big Boy Letter to shield Defendants, thereby turning it into a hedge clause.

The RR ignores Plaintiffs' case law[163] and incorrectly finds immaterial l that Baker made it so that

Peter had insufficient time to consult his attorney.[164] Baker never faxed the letter as he told

superiors he would, and only emailed it, without indicia of significance, the night before.[165]

The RR misreads the Big Boy Letter's language, which was actually unconscionable

misrepresentations from JPM to Peter. It is JPM that represents to Peter his assets;[166] it is JPM that

lied about the "diversifying manager concentration risk" Peter wanted.[167] The $100 million figure

---

[157] RR p.43; Opp., Doc No. 309, at 10-33 (of 58); Sur-Reply, Doc No. 338 at 16-17 (of 19).
[158] *Endicott Constr. Corp. v. E. Amanti & Sons, Inc.*, 2017 U.S. Dist. LEXIS 110485, at *15 n.166 (D. Mass. June 1, 2017) does not apply. There, the nonmovant did not cite evidence contradicting the moving party's statements of fact. Here, Plaintiffs comprehensively and specifically dispute nearly every statement, and provide their own.
[159] MSJ (Doc No. 277) at 61 (of 68); *see Hannigan v. Bank of Am., N.A.*, 48 F. Supp. 3d 135, 142 (D. Mass. 2014). *See also Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 71 (1st Cir. 2020).
[160] *Arthus D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 54 (1st Cir. 1998).
[161] *Cooke v. Brousseau*, No. 94-0843, 1996 Mass. Super. LEXIS 701, at *7 (Jan. 26, 1996) ("[S]ummary judgment is rarely appropriate…whether a given practice is unfair and deceptive… depends on the circumstances of each case…").
[162] Defendants' own Reply summarizes some of the 93A allegations: "Plaintiffs' suggestion that internal JPMC communications contained false statements" and Defendants' "purported misrepresentations about facts" but arguing (incorrectly) that "no competent evidence suggests any of the statements were false." Reply at 31 (of 36).
[163] *See, e.g., In the Matter of Titan Global Capital Mgmt. USA LLC, Advisers Act Release No. 6380*, at 7-8 (Aug. 1, 2023) (Ex. 564) ("Titan")  (holding that an indemnity provision is a hedge clause).
[164] RR p.26 n.118. Roberts did not advise Peter on the Big Boy Letter. SOF ¶ 115(Resp.); *see also* SOF ¶ 114(Resp.).
[165] SOF ¶¶ 345-48.
[166] The Big Boy Letter incorrectly values the MLPs in the AT Account which JPM custodied and was in "the best position to know the truth of those representations" (RR p.27). *See supra* Fact § IV**Error! Bookmark not defined.**.
[167] Ex. 67 (Doc No. 276-67) at -7437 (quotation marks omitted).

is a misrepresentation by JPM to Peter.[168] The only representation on wealth arguably attributable to Peter is on the next page.[169] Peter is not "confirming" the lies; JPM is lying to Peter to unconscionably induce him to sign. Finally, the RR misapplies 15 U.S.C. § 80b-15 to the Big Boy Letter. J.P. Morgan Securities, LLC (a JPM affiliate), subject to the Advisers Act, is a party to the letter, so the letter is invalid. The RR cites no authority that a hedge clause can be parsed.

## IV.    THE RR'S CONTRACT VIEW CONFLICTS WITH DEFENDANTS' EXPERT

The contract claim is simple. JPM breached Sections 1(A),(C),(D) & (E) of the Advisory Agreements.[170] Those sections do not "largely place[] obligations on the Doelgers."[171] Defendants' own expert testified the sections place ongoing fiduciary obligations on JPM, including suitability, loyalty and care.[172] The RR incorrectly summarizes 1(C)(i). It does not say the client is responsible for whether a portfolio is in line with their investment objectives, just that the client was to select one of the portfolios presented to them.[173] JPM had to present the client a portfolio "[b]ased upon" the investment objectives JPM was obligated to assist in formulating.[174] Defendants' own expert agrees.[175] JPM had an ongoing contractual obligation (consistent with industry standard, and affirmed by Defendants' expert) to assist with objectives.[176] The Doelgers'

---

[168] Peter told Baker he did not know and thus could not have "given" it. SOF ¶ 297; *see supra* Fact § III-IV.

[169] Ex. 67 at -7438 ("You confirm . . . you have total assets of at least $50 million") (emphasis added).

[170] Opp. at 38 (of 58); Advisory Agreements §§ 1(A),(C),(D), and (E) all appear verbatim in the Account Opening Docs and Modified Docs (Ex. 44 at -7150-51 and Ex. 41 at -6417-18, respectively), and the 2019 agreement (Ex. 125 10-11 (of 20)). Relevant portions of §§ 1(A),(C), and (D) also appear in SOF ¶ 81a), (c), and (d).

[171] RR p.30.

[172] Ex. 540, 307:12-315:14.

[173] § 1(C)(i) actually reads: "Based upon the information provided by Client and Client's investment objectives with respect to the Assets, the Bank will identify and present to Client one or more possible opportunistic portfolio strategies.... Client acknowledges that Client is solely responsible for selecting Portfolios and determining the amount to be invested in each Portfolio...." JPM had twenty-two (22) different portfolios available. SOF ¶ 283.

[174] §§ 1(B), (C)(i). SOF ¶ 81(b), (c); Ex. 44 at -7150, Ex. 41 at -6417, Ex. 125 at 10 (of 20).

[175] Ex. 540 (Gillespie Tr.) 309:18-310:15.

[176] § 1(B) (SOF ¶ 81(b); Ex. 44 at -7150, Ex. 41 at -6417, Ex. 125 at 10 (of 20)); Ex. 540 (Gillespie Tr.) 308:19-309:9, 310:8-15.

investment objectives are disputed.[177] 1(C)(i) discusses client information about risks and objectives[178] because, as Defendants' expert recognized, such information is necessary to evaluate suitability; 1(A), (C)(i) and 1(E) are a contractual confirmation of JP Morgan's "continuing obligation to reevaluate suitability."[179] 1(C)(i) requires JPM present suitable portfolios, consistent with JPM's obligation under the AIMS to only accept clients determined suitable for the program.[180] It is undisputed the program was not suitable.[181] JPM thus breached 1(C)(i). 1(A) requires JPM "rely, on the information provided by Client." Whether Peter ever provided JPM information he had $100 million is highly disputed.[182] Plaintiffs gave JPM a net worth far less on multiple occasions.[183] JPM breached the Advisory Agreements by failing to rely on actual net worth information in determining suability under 1(A) and (C)(i). Even if JPM believed Peter had $100 million, JPM failed to "update Client's financial information" and perform a new suitability analysis when it undisputably knew he had less (*e.g.*, 2016 PFS with Baker), in breach of 1(E).[184] Last, the RR acknowledges 1(D)(i) provides JPM "investment discretion" but ignores the authorities on how such discretion must be exercised.[185] JPM's fiduciary breaches thus also breached 1(D)(i).

The bad faith claim (Count V) should survive because there is "a dishonest purpose,

---

[177] SOF ¶¶ 34(Resp.), 508. Baker himself gave conflicting statements and testimony on what Plaintiffs objectives were. SOF ¶ 107(Resp.). Whether the purported investment objective listed in the annual account reviews (AARs) are a valid investment objective is also disputed. SOF ¶ 581.

[178] The information provided by the client furthers JPM's collection of "information about Client's financial circumstances, investment objectives, risk tolerance, and requirements for the Account" required by § 1(A).

[179] Ex. 540 (Gillespie Tr.) 307:12-308:9, 313:6-15, 314:1-315:14 ("part of the duty of care is generally understood to include a suitability obligation, yes. And I not[e] that above it, [JPM] specifically said that they are doing that.").

[180] Ex. 30 at -2253; SOF ¶¶ 94(n), 525, 529.

[181] Ex. 67 at -7437; SOF ¶ 583.

[182] *See supra* Fact § III.

[183] SOF ¶¶ 295, 426, 592, 595-96.

[184] §1(E); SOF ¶¶ 426-27, 591-92, 595-96; Ex. 540 (Doc No. 301-375) (Gillespie Tr.) 252:13-262:1, 293:3-15.

[185] The contract, industry standards, and mountains of caselaw hold advisory discretion mandates compliance with "applicable fiduciary standards." § 1(E); Ex. 540 (Gillespie Tr.) 312:15-313:15 ("[JPM] in providing investment advisory services is acting as a fiduciary. . . . I don't think there's a debate about that."); caselaw *supra* §I(A)(1)(a).

conscious doing of wrong, or breach of duty through motive of self-interest or ill will."[186]

## V.   THE RR ERRS ON NEGLIGENCE CLAIMS (COUNTS III & IV)

### A.  Chickasaw Did Not Limit Its Liability

The RR dismisses the negligence/negligent misrepresentation claims against Chickasaw based on the limitation of liability clause in JPM's General Terms.[187] But Defendants, and the RR, admit the General Terms only apply to claims against JPM.[188]

### B.  The "Waiver of Liability" Clause Is Unenforceable as a Matter of Law

The RR recommends limiting Defendants' liability to gross negligence because "the Doelgers do not dispute the legal effect of the language" in the limitation of liability clause. RR p.38. But Plaintiffs' opposition made clear that such a "waiver of liability" (per the RR p.37) is an unenforceable hedge clause.[189]  Fiduciary duties, including duties of loyalty and care (negligence), cannot be limited by contract by such a hedge clause.[190] To Plaintiffs' knowledge, **if this Court were to adopt the RR, it would be the first court in the country to enforce such a hedge clause**, which would upend the investment industry and thwart consumer protections.

### C.  The RR's Improper Factual Finding on Yoon's Testimony

The RR finds Plaintiffs were given the General Terms when Peter signed based on Yoon's deposition testimony "that she was not present when Mr. Doelger signed the 2015 account application documents." RR p.38. But it is undisputed that Yoon was at the August 10, 2015 meeting at which Peter signed the Advisory Account documents.[191] Yoon explained she was

---

[186] *Clinical Tech., Inc. v. Covidien Sales, LLC*, 192 F. Supp. 3d 223, 237 (D. Mass. 2016) (quotation omitted).  *See* Targus *Grp. Int'l, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 435-36 (App. Ct. 2010); *see also* Sur-reply p.8 n 6.

[187] RR p.39 ("Defendants may be granted summary judgment on those claims on this basis alone.") (emphasis added).

[188] MSJ at 48 (of 68) n.75 ("The General Terms limit JPMC's liability"); RR pp.32, ("Chickasaw was not a party to the Advisory Agreements"), 37-39 (finding the Advisory Agreements incorporated the General Terms by reference).

[189] "Defendants' contention that a gross negligence standard applies to Plaintiffs' claims must be rejected, regardless of whether the General Terms are enforceable." Opp., Doc No. 309, at 40 (of 58). *See also*, SOF ¶ 86(Resp.).

[190] *Cutter*, 2023 U.S. Dist. LEXIS 222580 at *12*; *Lifespan Corp.*, 731 F. Supp. 2d at 241; Titan at pp. 7-8; CCM at pp. 4-5; 2019 Release at pp. 10-11.

[191] SOF ¶¶ 73, 79, 269, 277.

confused by unclear questions.[192] The motion to strike briefing addresses this point.[193]

**D. The RR Penalizes Plaintiffs for Not Addressing Arguments Defendants Never Raised**

Plaintiffs did not distinguish negligence/gross negligence and argue how their allegations reach the level of gross negligence because <u>Defendants did not make this argument</u>.[194] Defendants blended negligence/gross negligence and failed to show there are no disputed facts.[195] The four allegations in the Complaint that Defendants discuss[196] do indeed have evidentiary support:

- Defendants' failure to inquire on investment objectives or invest consistent with them.[197]
- Defendants' failure to perform accurate portfolio reviews.[198]
- Investing in undiversified and unsuitable investments.[199]
- Defendants' recommending maintaining exposure to MLPs.[200]

Chickasaw admitted it never inquired or even knew Plaintiffs' finances or investment objectives, which is not industry standard.[201] Also, Chickasaw cannot farm out its duties to JPM,[202] without Plaintiffs' knowledge or consent,[203] and not be accountable when they are never fulfilled.

**E. Plaintiffs Do Detail Material Negligent Misrepresentations**

Plaintiffs detail at least three material negligent misrepresentations:

- <u>Return of Capital as Income</u>: Defendants concede they called distributions "income," and if that was proper is disputed.[204] Defendants misstate McPheeters' testimony, who admitted there are "mixed interpretations," and Haverberg's testimony.[205] Defendants point to boilerplate disclosures that only apply to the two account statements.[206] Baker's personal emails on "income" make no distinction.[207] The money they were receiving was not newly generated.

---

[192] Second Yoon Decl. ¶ 6 (Doc No. 334-3 at 2).
[193] Doc No. 334 at 12-13 (of 20). The RR errs in striking this portion of Yoon's testimony without addressing the relevant case law. *See, e.g.*, *Armstrong v. White Winston Select Asset Funds*, <u>647F. Supp. 3d 36, 40</u> (D. Mass. 2022).
[194] MSJ at 53-56 (of 68) focusing on various "threshold issues" before addressing supposed lack of evidentiary support.
[195] MSJ at 53-56 (of 68).
[196] MSJ at 55-56 (of 68).
[197] *See, e.g.*, SOF ¶¶ 99(Resp.), 107(Resp.), 127(Resp.), 148(Resp.).
[198] *See, e.g.*, SOF¶¶ 572-86, 659.
[199] *See, e.g.*, SOF ¶¶ 108(Resp.), 131(Resp.), 283-84, 458, 460, 488.
[200] *See, e.g.*, SOF¶¶ 131(Resp.), 133(Resp.), 374.
[201] SOF ¶¶ 502, 520-23, 525, 529-32, 537, 542-43; *see, also*, Tilkin Aff. at 7, 12 ¶¶ 7, 29-30.
[202] Ex. 30 at -2253; SOF ¶¶ 94(n), 525, 529.; Ex. 526 at 67-68 (of 115).
[203] Yoon Decl. ¶¶ 59, 88, 90.
[204] *See, e.g.*, SOF ¶¶ 473, 478.
[205] SOF ¶¶ 52-53(Resp.).
[206] SOF ¶ 55; Exs. 63 (Doc No. 276-73) (defined terms on -1762), 133 (Doc No. 276-133) (defined terms on -0826).
[207] *See* SOF ¶¶ 473, 478.

Defendants did not explain, and Yoon did not understand, this, which Defendants do not dispute.[208]

- Misrepresenting the Performance of the MLPs: Baker purposefully removed the S&P 500 from a presentation to Plaintiffs because it showed underperformance of MLPs by over 30%.[209]

- Withholding Suitable Recommendations in Favor of Unsuitable Ones:  JPM's internal senior expert, Schnipper, told Baker the investments underperformed, and he recommended Plaintiffs half their exposure.[210] JPM kept this secret, and instead pushed a HELOC (despite JPM's prohibition on them for seniors).[211] This omission alone caused $10 million in losses.[212]

Even assuming a higher standard applies, the RR's conclusion that the above facts would not "evince gross negligence" is erroneous as a matter of law. Intentionally withholding material information from a client rises to the level of fraud, let alone gross negligence.

## VI.    DEFENDANTS' "CAUSATION" THEORY IS SCIENCE FICTION, NOT LAW

A RR footnote mentions "causation" but stops short of recommending dismissal based on Defendants' argument.[213] Despite Plaintiffs losing millions of dollars while Defendants were managing their money, Defendants argued they were not damaged because another adviser would have behaved as badly as Defendants. Defendants cite no legal authority for this outlandish theory, because there is none. The sole basis that Peter would, in an alternate universe, stay with AT and be exploited, is disputed, and based on inadmissible double hearsay from 2 emails by people who never spoke to Peter.[214] Notably, Defendants ignore Yoon, due to their ignorant belief she was "attached to her husband in every step of the way."[215] Still, the theory lacks factual support.[216]

## VII.   THE RR'S FACTUAL FINDING ON "VULNERABLE ADULT" IS IMPROPER

The RR acknowledges by 2014 Peter was "concerned that people were using radio

---

[208] Yoon Decl. ¶¶ 70, 72.
[209] SOF ¶¶ 464-8.
[210] SOF ¶ 484.
[211] SOF ¶¶ 479-80, 485, 486, 488-89, 587.
[212] Ex. 528 at 24, 86 (of 189) (Over $9.6 mil. total combing losses from both accounts January through March 2020).
[213] RR p.30 n. 124.
[214] SOF ¶¶ 109 (citing SJ Exs. 48, 51, 269). The emails include the Big Boy Letter lies. *Supra* Fact § IV.
[215] Ex. 540 91:13-15.
[216] SOF ¶¶ 133(Resp.), 250, 406, 458, 460, 481-2, 486-7, 508; Ex. 218.

frequencies or radiation to attack him," had a documented "history of confusion, vertigo, and cognitive defects," and "had experienced recent and <u>rapidly progressive dementia</u> with an altered mental status."[217] But the RR makes a factual finding that Peter was not a vulnerable adult because at some points *of unknown frequency*, Peter travelled, swam, and rowed.[218] The very medical record (from 2018) the RR relies on actually shows Peter was declining and could no longer row: "He says his mood if anything is tending towards depression, **as he faces giving up his lifelong passions of rowing."** Ex. 108 at -0128. Also, Peter's dementia is rapidly progressive and episodic;[219] Baker acknowledged Peter was illogical[220] and bizarrely changed phone numbers;[221] by 2020 he "had difficulty recalling the month or the town he was residing in, was unable to recall a short story after hearing it or draw the face of a clock, and struggled to alphabetize letters."[222] Baker does not deny that **Yoon told him multiple times that Peter was having memory problems**.[223] The RR also ignores Dr. Panzer's opinion that doctors who evaluated Peter would not be expected to note concerns regarding his ability to manage finances. SOF ¶ 162(Resp.).

The RR fails to evaluate Peter's vulnerable state at specific points, instead accepts general statements on unspecified times to find there was no point when Peter's "ability to perform the normal activities of daily living or to provide for his . . . own care or protection [was] impaired." Fla. Sta. § 415.102(28). Florida courts hold the episodic nature of dementia, with periods of clarity,

---

[217] RR p.18 (emphasis added).
[218] RR p.44. Supposed "lucid" conversations in 2015-2020 are based on one 2019 email with no reference to "lucidity," (Ex. 121 (Doc No. 276-121)) and Baker's statement on undated "geo-politics and current events" chats (Ex. 181 ¶ 6). SOF ¶ 14.
[219] SOF ¶¶ 210, 215, 217; Dr. Panzer Decl. ¶¶ 8-14, 47.
[220] SOF ¶ 561.
[221] SOF ¶ 564.
[222] SOF ¶ 218.
[223] The evidence cited does not dispute the specific statement. SOF ¶ 562; Ex. 181 ¶¶ 62-68.

does not mean an individual is not vulnerable for the entire period.[224] The record shows terrible episodes at key times: on September 3, 2015, Peter's paranoia about radio waves made him confront an innocent man, and landed him in the hospital, with diagnoses of paranoia, cognitive defects, and dementia. SOF ¶¶ 215-16. Symptoms so severe doctors expressed a need to hospitalize Peter[225] is more evidence of vulnerability than whether he could have gone for a swim months later or before. This was less than 4 weeks after Peter signed the Account Opening Docs, 1 week after he told Baker he didn't know his own net worth, and just 4 weeks before he signed the Big Boy Letter![226] The RR's case law deals with far less.[227] The RR's and Defendants' other cases are inapposite and deal with other sections of the law.[228] Plaintiffs allege breaches of fiduciary duties,[229] which are expressly covered by the statute. Fla. Sta. § 415.102(8)(b)(1).

## VIII.   THE RR ERRS BY NOT STRIKING THE BAKER DECLARATION

Instead of striking ¶ 3 of the Baker Decl., the RR relies on it.[230] RR p.13. Baker's supposed understanding of the 50% limit conflicts with statements from compliance.[231] Baker provides no explanation as to his "understanding." Such vagaries are inappropriate for summary judgment.

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Court reject the RR.

[224] *Hanson v. Teti,* No. 09-65 15-CA, 2011 Fla. Cir. LEXIS 4090, at *12, 20 (Fla. 20th Cir. Ct. June 29, 2011) (holding "intermittent mental impairment" from dementia, with "weeks or even months with clear thoughts," was sufficient to establish an individual was a "vulnerable adult" under Florida law).
[225] SOF ¶ 216 (citing Ex. 275 at -0009 (doctor notes "[Peter] had almost been committed for psychiatric care")).
[226] SOF ¶¶ 117, 277, 297.
[227] *Arberman v. PNC Bank, Nat'l Ass'n.* concerned no more than "cognitive and physical decline consistent with that of an aging individual."  No. 22-80983-CIV, 2022 U.S. Dist. LEXIS 227855, at *6-8 (S.D. Fla. Dec. 19, 2022).
[228] *Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*, 983 So. 2d 717 (Fla. Dist. Ct. App. 2008) and *S.S. v. Dep't of Child. & Fam. Servs.* 805 So. 2d 879, 880 (Fla. Dist. Ct. App. 2001) on irrelevant neglect allegations, requiring alleged perpetrator be a caregiver (Fla. Sta. § 415.102(16); *see also Grasso v. Grasso*, 131 F. Supp. 3d 1303, 1313 (M.D. Fla. 2015) (distinguishing *Bohannon* and claims brought for "abuse" from those brought for "exploitation.").
[229] Doc No. 1 ¶ 325 tracks the statutory language of Fla. Sta. § 415.1111 but inadvertently says "and" not "or." Plaintiffs' allegations were clearly exploitation. Doc No. 1 ¶ 324, and claim caption, "Elder Financial Exploitation."
[230] This conflicts with the RR's conclusion that it is disputed if JPM universally applied the 50% hard limit. RR p.13.
[231] *See* Doc No. 335-1 at 8-9 (of 13); SOF ¶¶ 288, 334-37.

Dated:  New York, New York
        April 8, 2024

Respectfully submitted,

YOON DOELGER and PETER DOELGER

By their attorneys,

/s/ James R. Serritella
James R. Serritella*
Justin Stone*
Hannah Freiman*
KIM & SERRITELLA LLP
110 W. 40th Street, 10th Floor
New York, NY 10018
T - (212) 960-8345
jserritella@kandslaw.com
*Admitted Pro Hac Vice

Joshua W. Gardner (BBO No. 657347)
GARDNER & ROSENBERG P.C.
One State Street, Fourth Floor
Boston, Massachusetts 02109
T - (617) 390-7570
josh@gardnerrosenberg.com

31

### <u>CERTIFICATE OF SERVICE</u>

I certify that on this date the foregoing brief with all accompanying papers was filed electronically with the Clerk of the Court by CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of this Court's CM/ECF electronic filing system.  Parties may access this filing through the Court's system.

 Date: April 8, 2024                                                    <u>/s/ James R. Serritella </u>
                                                                                James R. Serritella

32