## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER DOELGER and YOON DOELGER, ) Plaintiffs, ) v. ) JPMORGAN CHASE BANK, N.A. and ) CHICKASAW CAPITAL MANAGEMENT, ) LLC, ) Defendants. ) | Civil Action No. 21-CV-11042-AK |

## MEMORANDUM AND ORDER RE: MAGISTRATE JUDGE BOAL'S REPORT AND RECOMMENDATION ON THE PARTIES' MOTIONS TO STRIKE AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**ANGEL KELLEY, D.J.**

On June 23, 2021, Plaintiffs Peter and Yoon Doelger ("the Doelgers") commenced this action against Defendants JPMorgan Chase Bank, N.A. ("JPMC") and Chickasaw Capital Management, LLC ("Chickasaw"). [Dkt. 1]. Plaintiffs allege that Defendants breached their obligations to the Doelgers as their investment advisers. [Id. at 1]. The Court referred the case to Magistrate Judge Jennifer Boal ("M.J. Boal") for full pretrial proceedings and report and recommendation on dispositive motions. [Dkt. 170]. Defendants subsequently moved for summary judgment [Dkt. 273], and Plaintiffs opposed the motion. [Dkt. 309]. Defendants then moved to strike portions of Yoon Doelger's declaration [Dkt. 323], and Plaintiffs filed their own Motion to Strike the James Baker ("Baker") and Daniel Jacobs ("Jacobs") declarations. [Dkt. 335]. M.J. Boal issued a Report and Recommendation ("R&R") on March 25, 2024, denying the Plaintiffs' Motion to Strike the Baker and Jacobs declarations and recommending that

Defendants' Motion for Summary Judgment be granted in its entirety.  [Dkt. 383].  Plaintiffs

filed objections[1] to the R&R [Dkt. 391], and Defendants opposed the Doelgers' objections.

[Dkt. 398].  Upon thorough review and consideration of the Plaintiffs' numerous objections to

the R&R, Plaintiffs' objections are overruled, the Court **ADOPTS** the Report &

Recommendation in its entirety, and **GRANTS** Defendants' Motion for Summary Judgment.

## I.      MOTIONS TO STRIKE

### A.  Legal Standard—Review of a Magistrate Judge's Disposition

A district court may refer dispositive and non-dispositive motions to a magistrate judge

for an R&R.  See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72.  On a non-dispositive matter, the

district judge must "modify or set aside any part of the order that is clearly erroneous or is

contrary to law."  Fed. R. Civ. P. 72(a).  Under the "clearly erroneous" standard, the district

judge must accept the magistrate judge's findings of fact and the conclusions drawn from them

"unless, after scrutinizing the entire record, [the court] 'form[s] a strong, unyielding belief that a

mistake has been made.'"  Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 4 (1st Cir. 1999)

(quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).  Under the

"contrary to law" requirement, a district judge must review pure questions of law de novo, see

PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010), and factual findings for clear

error.  Phinney, 199 F.3d at 4.  Factual findings are clearly erroneous when "the reviewing court

on the entire evidence is left with the definite and firm conviction that a mistake has been

committed."  In re IDC Clambakes, Inc., 727 F.3d 58, 63-64 (1st Cir. 2013).

---

[1] This memorandum will first address the factual objections raised by the Plaintiffs, followed by an examination of the legal objections.

B.      **Legal Standard—Motion to Strike**

Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used

to support or oppose a motion [for summary judgment] must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  In deciding a motion for

summary judgment, "a court may take into account any material that would be admissible or

usable at trial . . . [but] inadmissible evidence may not be considered."  Horta v. Sullivan, 4 F.3d

2, 8 (1st Cir. 1993).  If evidence cannot be presented in a form that would be admissible at trial,

the Court may not rely on it.  Gorski v. N.H. Dep't. of Corr., 290 F.3d 466, 475-76 (1st Cir.

2002).

It is well-settled that a motion to strike is the correct way to challenge affidavit evidence

in a summary judgment motion.  Facey v. Dickhaut, 91 F. Supp. 3d 12, 19 (D. Mass. 2014).

Accordingly, the moving party must clearly identify the parts of the affidavit they object to and

the reasons for their objections, and the court will ignore only the inadmissible parts of the

affidavit and consider the rest.  Casas Off. Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668,

682 (1st Cir. 1994).

C.      **Defendants' Motion to Strike**

As an initial matter, Defendants moved to strike the declaration of Yoon Doelger

("Yoon") [Dkt. 323] in support of Plaintiffs' Opposition to Defendants' Motion for Summary

Judgment.  Defendants contend that this Court should refrain from considering Yoon's

declaration when considering Defendants' Motion for Summary Judgment because she makes 1)

statements precluded by spousal immunity; 2) "statements that are not made on personal

knowledge . . . ; (3) statements that are otherwise hearsay . . . ; (4) inconsistent statements that

trigger the sham affidavit doctrine . . . ; and 5) statements that constitute argument rather than facts." [Id. at 1-2].

The R&R concluded that, in many instances, the statements at issue in Yoon's declaration are not relevant to resolving the arguments the parties raise at summary judgment. [Dkt. 383 at 5]. Rather than rule on every issue raised by the Defendants' Motion to Strike, M.J. Boal ruled on specific portions of the declaration, as needed. [Id.]. M.J. Boal ultimately concluded several statements and paragraphs constituted hearsay.[2] [Id. at 11 n.58, 12 n.70, 38].

The R&R states that Yoon's statement that Peter Doelger ("Peter") "told her that it 'was never true' that there was 'a letter that said that he had $100 million,'" was hearsay and could not be considered. [Id. at 11 n.58]. The R&R additionally concludes that paragraphs 50, 72, 77, 121, 135, and 138 from Yoon's declaration constitute impermissible hearsay. [Id. at 12 n.70]. Plaintiffs had relied on those paragraphs to support their argument that Baker's August 28, 2015, email inaccurately described conversations between him and Peter. [See Dkts. 300-5 at 8-22; 322 at 52]. Lastly, M.J. Boal found that paragraph 88 of Yoon's declaration contradicts her deposition testimony regarding whether she was present when Peter signed the 2015 account application documents on August 10, 2015. [Dkt. 383 at 38]. Thus, Yoon's affidavit cannot be relied on for this point and to the extent she relies on her husband's statements, that is hearsay, without any applicable exception to the hearsay rules. [Id.].

Plaintiffs objected to M.J. Boal's striking the portion of Yoon's declaration related to the August 10, 2015, meeting "without addressing the relevant case law." [Dkt. 391 at 33 n.193]. They cite to Armstrong v. White Winston Select Asset Funds, 647 F. Supp. 3d 36, 40 (D. Mass.

---

[2] Hearsay is defined as a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "[H]earsay evidence cannot be considered on summary judgment." Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007).

2022), but it is not clear for what purpose.  Nevertheless, <u>Armstrong</u> is consistent with M.J. Boal's finding that Yoon's declaration statement (that Peter did not receive the 2015 General Terms) should be disregarded because it contradicted her testimony that she was not present when Peter signed the 2015 Advisory Agreement.  [Dkt. 383 at 38].

The sham affidavit rule applies when an affidavit submitted in connection with a motion for summary judgment contradicts that witness's prior deposition testimony.  <u>Armstrong</u>, 647 F. Supp. 3d at 40.  When there is an apparent contradiction, as there is here, "a satisfactory explanation is required" in the contradictory, post-deposition affidavit.  <u>Mahan v. Bos. Water & Sewer Comm'n</u>, 179 F.R.D. 49, 55 (D. Mass. 1998); <u>see also</u> <u>Colantuoni v. Alfred Calcagni & Sons, Inc.</u>, 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").  And as later stated in <u>Mahan</u>, "[i]f a party simply could offer a contradictory, post-deposition affidavit to defeat summary judgment without providing a 'satisfactory explanation' for the contradiction, the purpose of summary judgment would be defeated."  179 F.R.D. at 53 (internal quotations omitted).

A non-dispositive motion referred to a magistrate judge, such as a motion to strike, is governed by the clear-error standard.  <u>See</u> Fed. R. Civ. P. 72(a).  Because the conclusions reached in the R&R were not clearly erroneous, the Court adopts M.J. Boal's reasoning and **AFFIRMS** the R&R as to Plaintiffs' Motion to Strike.

### D.    The Doelgers' Motion to Strike

The Doelgers moved to strike the declarations of JPMC investment advisors James Baker and Daniel Jacobs.  [Dkt. 335].  In their brief opposing the R&R, however, Plaintiffs only raise

one objection to M.J. Boal's conclusions regarding their Motion to Strike [Dkt. 391 at 36], which

the Court will address.  In their Motion to Strike, Plaintiffs argued that Baker's declaration

should be stricken because it is not based on personal knowledge, and it contradicts both Baker's

prior statements and statements by JPMC compliance officers.  [Dkt. 335-1 at 8-12].  M.J. Boal

concluded that the two substantive paragraphs in Baker's declaration were, as Baker noted, based

on his experience working at JMPC for over thirteen years.  [Dkts. 383 at 3; 321-15 ¶¶ 2-4].

Thus, the information Baker provided in those paragraphs was based on his personal knowledge.

[Dkt. 383 at 3 ("The text of these paragraphs alone rebuts the Doelgers' arguments that Baker

lacked personal knowledge.")].  Plaintiffs objected to this and repeated their argument that

Baker's declaration conflicts with statements from JPMC compliance officers.  [Dkt. 391 at 36].

For support, Plaintiffs cite to correspondence between JPMC employees discussing approval of

Baker's investment request on behalf of Peter, given certain suitability limits.  [See Dkt. 391 at

36 n.231 (citing Dkt. 331 ¶¶ 288, 334-37); see also Dkt. 322  at 152].  The email correspondence

does not conflict with Baker's declaration, which states that it was his understanding that

exceptions could be made to the suitability limits "on a case-by-case basis."  [Dkt. 321-15 ¶ 3].

After reviewing the R&R for clear error, the Court finds none.  Plaintiffs' objections are

overruled, and the R&R is **AFFIRMED** as to the Doelgers' Motion to Strike.

## II.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard—Review of a Magistrate Judge's Recommendations

Where a magistrate judge has issued an order on a dispositive matter referred by a district

judge and a party timely objects, "the district judge must determine de novo any part of the

magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).

"Absent objection . . . [a] district court ha[s] a right to assume that [the affected party] agree[s] to

the magistrate's recommendation." <u>Templeman v. Chris Craft Corp.</u>, 770 F.2d 245, 247 (1st Cir. 1985). "[A] party's written objections to the magistrate's report and recommendation must be specific, concise and supported by legal arguments and citations to the record. Broad, yet unsupported objections will not be permitted and failure to make specific and documented objections may foreclose de novo review." <u>Crooker v. Van Higgins</u>, 682 F. Supp. 1274, 1281-82 (D. Mass. 1988).

The Court notes "[f]ailure to raise objections to the Report and Recommendation waives the party's right to review in the district court and those claims not preserved by such objection are precluded on appeal." <u>Davet v. Maccarone</u>, 973 F.2d 22, 31 (1st Cir. 1992); <u>see also</u> <u>Crooker</u>, 682 F. Supp. at 1281 ("[D]istrict court judges on a de novo review of a magistrate's report and recommendation may entirely ignore arguments not presented to the magistrate."). Additionally, "[p]arties must take before the magistrate, 'not only their best shot but all of their shots.'" <u>Stauffer v. Internal Revenue Serv.</u>, 285 F. Supp. 3d 474, 478 (D. Mass. 2017) (quoting <u>Borden v. Sec'y of Health & Hum. Servs.</u>, 836 F.2d 4, 6 (1st Cir. 1987)). In conducting its de novo review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**B. Legal Standard—Summary Judgment**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (citing <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record presents no "genuine dispute as to any material fact and the mov[ing party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider 1) whether a factual dispute exists; 2) whether the factual

dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence;" and 3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." Anderson, 477 U.S. at 256.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" Rakes v. United States, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting Celotex, 477 U.S. at 325). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. Mendes v. Medtronic, Inc., 18 F.3d 13, 15 (1st Cir. 1994) (citing Celotex, 477 U.S. at 325). "[C]onclusory allegations, improbable inferences, and unsupported speculation [are] insufficient to discharge the nonmovant's burden." Rockwood v. SKF USA Inc., 687 F.3d 1, 9 (1st Cir. 2012) (internal quotations omitted). The nonmoving party's failure "to make a sufficient showing on an essential element of [their] case" for which they have the burden of proof "renders all other facts immaterial." Celotex, 477 U.S. at 323. Under those circumstances, "the moving party is 'entitled to a judgment as a matter of law.'" Id. (quotations omitted).

### C.  Objections to Factual Findings in the R&R[3]

Before reaching the R&R's legal conclusions, Plaintiffs object that the R&R omits key facts and makes improper findings of fact.  To begin, Plaintiffs argue that the R&R insufficiently discusses Peter's mental health decline.  [Dkt. 391 at 9].  This is simply not true.  The R&R includes a concise summary highlighting the ordeals Peter struggled with during the relevant time.  [Dkt. 383 at 18-19].  The R&R details how, in 2014, doctors noted that Peter had a history of cognitive defects and had recently experienced an altered mental status.  [Id. at 18].  The R&R also notes that by 2020, Peter was diagnosed with having major depression and a suspected cognitive problem.  [Id.].

Plaintiffs also claim that the R&R overlooks five material facts: 1) "Defendants' medical expert admitted that a person with dementia cannot make financial decisions without complication;" 2) "JPM had an elder escalation policy . . . and its stated purpose was 'to identify potential red flags observed with respect to elder and vulnerable clients;'" 3) "JPM knew of several red flags, including Peter's memory loss, erratic and irrational behavior;" 4) "Defendants' expert Gillespie said the red flags here warranted escalation to Baker's superiors;" and 5) despite the red flags, "JPM took no steps to follow its policy or otherwise protect Peter." [Dkt. 391 at 9].  However, these five facts are either not material, the Plaintiffs mischaracterize them, or they are not supported by the evidence cited.

First, Defendants' medical expert, Dr. Ziv Cohen, stated that "it would be highly unlikely for someone with diagnoseable dementia to be able to handle their finances and work without complication."  [Dkt. 301-335 at 5].  Plaintiffs omit the fact that Dr. Cohen also said that he

---

[3] The Court assumes familiarity with the relevant procedural and factual background of this case, as it is detailed in the R&R.  [Dkt. 383 at 2-19].  Unless otherwise noted, all capitalized terms have the meanings ascribed to them in the R&R.

thought "the record in specifics and in its totality" did not indicate Peter had diagnoseable dementia during the relevant time.  [Id. at 4].  Regardless, these statements are not material or in dispute; therefore, the R&R did not improperly overlook this fact.

Next, the existence of a JPMC elder escalation policy and its purpose are not disputed [see Dkt. 331 at 274-75]; therefore, this does not present a genuine material fact in dispute.

Third, the record Plaintiffs cite does not support the contention that JPMC knew of "Peter's memory loss, erratic and irrational behavior," constituting red flags.  [Dkt. 391 at 9; see also id. at n.11].  For example, based on one email Plaintiffs rely on, Plaintiffs state, "Baker expressed annoyance at Peter's desire to engage in long and repetitive conversations."  [Dkt. 331 at 276].  However, in the 2015 email Baker wrote to a colleague, he states, "[I] don't have the time [today] to get dragged into another 45 minute macroeconomic discussion (which is what I just did with [Peter] yesterday)."  [Dkt. 301-77 at 2].  A conversation on the same topic is not necessarily repetitive; a fair reading of Baker's email merely suggests that he was trying to avoid a long phone conversation with Peter.  Plaintiffs also point to a 2016 email Baker wrote to assert that he was aware of "changes in Peter's energy levels" and Peter's desire to have Yoon more involved in conversations regarding their finances "in light of recent health challenges."  [Dkt. 331 at 277].  Plaintiffs' carefully worded language is misleading and vague as to whether the health challenges were related to Peter's mental health or something else, but the email they cite specifies: "[Peter] seemed to be doing ok ***following the eye surgery***—less energy than usual but that's it. . . . Following the surgery Peter really wants to have Yoon more involved in these conversations."  [Dkt. 276-74 at 2 (emphasis added)].  Plaintiffs also cite to another email Baker wrote in 2017 to claim that "Baker acknowledged that Peter had strongly held illogical beliefs regarding his assets."  [Dkt. 322 at 278].  Again, Plaintiffs mischaracterize the record.  At the end

of an email exchange with a colleague discussing a roundabout approach to unwinding a swap, Baker wrote, "Thanks for the flexibility here in accommodating the client. [Peter's] thoughts on his cash balance aren't always the most logical, but he feels strongly about them." [Dkt. 301-24 at 2]. Here, Baker simply was confirming that the monies to be used were not from Peter's deposit accounts, as he had a strong preference against doing so. None of the emails Plaintiffs rely on suggest JPMC knew or even believed Peter was behaving erratically or irrationally, or that he was demonstrating memory loss.[4]

In support of the fourth objection regarding red flags warranting escalation to superiors, Plaintiffs mischaracterize the statements of Chickasaw's expert, Phillip Gillespie ("Gillespie"), who Chickasaw retained to offer his opinion "as to whether Chickasaw fulfilled its 'suitability' obligation to the plaintiffs . . . as a sub-advisor in the managed account program sponsored and managed by [JPMC]." [Dkt. 301-323 at 4]. Gillespie did not say, "the red flags [in Peter's situation] warranted escalation to Baker's superiors." [Dkt. 391 at 9]. Rather, Plaintiffs' counsel described a hypothetical scenario in which a client in his 80s speaks to his investment advisor less frequently and the wife speaks to the advisor more frequently and tells him her husband is forgetful; Counsel then asked Gillespie whether those details were a red flag in that situation; and Gillespie replied, "Potentially, yes. . . . Depends on the context but . . . it would be something that you would want to think about." [Dkt. 301-334 at 67-68]. Setting aside the fact that Gillespie hedged his answer to a hypothetical and not to the Doelgers' actual situation, Gillespie was retained to opine on Chickasaw and its suitability obligation to the Doelgers; *not* on whether JPMC had fulfilled its obligations.

---

[4] The Court also notes that Plaintiffs did not raise this point before M.J. Boal; therefore, it is waived anyway. Davet, 973 F.2d at 31 ("Failure to raise objections to the Report and Recommendation waives the party's right to review in the district court.").

Plaintiffs state that the fifth material fact the R&R overlooks is that JPMC did not follow its own policy or "otherwise protect Peter." [Dkt. 391 at 9]. Plaintiffs cite to paragraph 565 of the Statements of Fact, which states Baker was aware "Peter exhibited several of the signs in the Elder Escalation Form, Baker did not submit the form until February of 2021." [Dkt. 331 at 281]. The filled-out escalation form cited, however, states the opposite. Under the "Signs of Potential Diminished Capacity" section, Baker wrote, "None observed. Client's lawyer claimed in a Demand Letter dated 2/18/2021 that Client's mental health was 'in decline.'" [Dkt. 276-156 at 2]. In response to the question "How did JPM/employee learn of the activity/behavior," Baker answered, "Demand Letter from Attorney/Son-in-Law dated 2/18/2021. No first hand observation of any behavior." [Id. at 3]. The record does not support Plaintiffs' objection.

Plaintiffs next allege that the R&R ignores the fact that Peter was seeking guidance from his investment advisers at JPMC, Baker and Douglas Moon, regarding diversifying his portfolio [Dkt. 391 at 10] and that, in an internal email between manager Daniel Curtin and Moon, Curtin jokes that "Death is the best tax planning for MLPs." [Id.]. Relying on this quoted line of the email, it appears Plaintiffs are implying that Peter's advisers did not take his request seriously, but this is a mischaracterization of the email exchanges Plaintiffs cite. In response to Peter's expressed desire to discuss strategies to minimize tax obligations when selling highly appreciated MLPs, Moon held an internal meeting with colleagues "to generate ideas for Peter regarding his investment portfolio in MLPs." [Dkt. 301-69 at 2]. When they fell short of ideas, Moon reached out to Curtain [Dkt. 301-70 at 2], but the evidence cited does not indicate whether the JPMC advisers followed up with Peter or if they advised him on what to do. Neither Curtin's response to Moon's email nor the context in which it was made suggest Peter's investment advisers were glib when Peter was seeking their guidance. Because these facts are insufficient to reach any

kind of conclusion, without more they are not material to any issue and the R&R appropriately omitted them.

Plaintiffs' next objection is that the R&R omits the fact that Baker "targeted" Peter for the Chickasaw MLP Program "[f]or all of 2015." [Dkt. 391 at 10-11]. Once again, the evidence Plaintiffs rely on does not support their assertions that he was targeted. Plaintiffs point to a few emails Baker wrote in relation to a lunch meeting Chickasaw representatives Ed Kelly ("Kelly") and Geoffrey Mavar ("Mavar") had with JPMC employees in Boston to discuss their MLP strategy. [Dkts. 301-85 at 2; 301-86 at 2]. Kelly subsequently followed up and reached out to Baker asking whether there was "any interest in arranging a client meeting in early June." [Dkt. 301-83 at 3]. Baker replied, "I'll check with the team and see if we have any interested clients/prospects that are available on the 3rd." [Id. at 2]. The following day, Baker again emailed Kelly and wrote, "[T]hanks for your offer to help out with our existing client. . . . Once you have had a chance to run the analysis on this portfolio we can determine if it makes sense to try to schedule an in-person meeting." [Id.]. Nothing in these emails suggests JPMC "specifically targeted" Peter, and certainly not for "all of 2015;" the emails are dated in May 2015. [Dkt. 391 at 10].

In further support of their argument that Baker specifically targeted Peter for the Chickasaw MLP Program "[f]or all of 2015," Plaintiffs point to a lunch meeting in August 2015. [Dkt. 391 at 10]. Plaintiffs argue that the R&R omits the fact that Kelly and Mavar did not ask Peter questions about his interest in MLPs, his investment objectives, or determine his financial snapshot at the meeting. [Id.]. Based on the presentation deck [Dkt. 276-42], the lunch meeting appears to have been an informational presentation—at that point, asking those questions would have been outside of the services the Chickasaw representatives were there to provide. The

record does not support Plaintiffs' assertion that Baker did not tell Peter at the meeting that he should diversify.  [See Dkt. 391 at 10-11].  Rather, Kelly never heard Baker say Peter and Yoon should not be investing in MLPs.  [Dkt. 301-248 at 56].  Baker stayed with Peter and Yoon for approximately another half hour after Kelly and Mavar left the room [Dkt. 276-47 at 2], and there is nothing in the record mentioning what they discussed during that time.  Similarly, the record does not support Plaintiffs' claim that Baker encouraged Peter to invest in MLPs with Chickasaw.  [See Dkt. 391 at 4-5].  This is a mischaracterization of what Kelly said at his deposition.  Kelly was simply under the impression that Baker thought Chickasaw would successfully manage Peter's existing MLP portfolio.  [See Dkt. 301-248 at 55 ("[Baker] thought that we could do a good job for [Peter's] portfolio and he already had a portfolio.")].

Plaintiffs also allege that days before the meeting between Baker, Kelly, and Mavar on August 10, 2015, JPMC employees altered or forged account opening documents for Peter's MLPEI account.  [Dkt. 391 at 11].  Plaintiffs provide many details they point to as circumstantial evidence that demonstrates that the opening documents were fraudulently changed to show Peter's net worth was $100 million instead of $50 million, among other changes.  [Id. at 11-13].  For example, Plaintiffs allege that Moon sent Baker a copy of Doelger's 2012 balance sheet on August 11, 2015; there is no record showing the Account Opening Documents were changed between August 7 and August 10, 2015; and Baker had access to the Account Opening Documents throughout the period they were modified.  [Id. at 12-13].

Plaintiffs argue that all these important facts were omitted from the R&R, and that M.J. Boal wrongly concluded that JPMC "did not swap out the $50 million net worth page after Peter signed the documents."  [Id. at 13].  The R&R addressed Plaintiffs' assertions in a footnote 56; [see Dkt. 383 at 10], but the Court finds that all the alleged facts Plaintiffs raise are either

immaterial or do not support Plaintiffs' conclusion—especially when viewed in light of additional facts. The Court agrees with the R&R that Plaintiffs have not produced evidence that the net worth balance page was swapped. In an August 5, 2015, email from a JPMC analyst, Dylan Dittrich ("Dittrich"), to the Boston account opening team, Dittrich asked them to prefill account opening documents for the MLP Energy & Infrastructure Opportunistic Advisory Program for Peter. [Dkt. 276-41 at 2]. The unsigned draft of the account opening documents that the account opening team prefilled states that Peter's investment amount is $1 million and that both his liquid and net worth are $50 million. [Id. at 17]. An internal account opening summary initiated by Jesse Martinez, Jr. the following day states that Peter's liquid net worth was $100 million and that his initial funding amount was $30 million. [Dkt. 301-346 at 4]. This suggests that the account opening documents were changed before Peter signed anything four days later.

At the August 10, 2015, lunch meeting with the two Chickasaw representatives, Peter "signed account opening documents on the spot." [Dkt. 276-47 at 2]. The signed copy of the account opening documents, dated August 10, 2015, states that both Peter's liquid and total net worth are $100 million, and the investment amount was $30 million. [Dkt. 276-43 at 15]. Between August 10, 2015, and September 11, 2015, however, it was not clear the exact amount Peter would invest with Chickasaw. [See Dkts. 301-248 at 52-54 (Kelly confirming that between August 10 and September 11, it had not been determined how much money Peter would initially put into the Chickasaw account); 276-46 at 2 (Email from Baker to Moon and Dittrich stating, "[Peter] also signed account docs as I didn't want that to slow us down once we have a plan."); 276-47 at 2 (Email from Baker to Kelly stating, "I just need to clear some operational hurdles . . . to determine the initial size of the account.")]. One month later, Dittrich once again emailed the

account opening team in Boston and sent them "the completed documents for [Peter's] MLPEI account" [Dkt. 276-53 at 2], which stated that Peter's investment amount was $30 million and that both his liquid and net worth were $100 million.  [Dkt. 276-45 at 15].  While it is true that the net worth and investment amount numbers in the prefilled draft and the signed copy of the account opening documents are not the same, the record does not support Plaintiffs' assertion that Defendants swapped out pages.

Plaintiffs next object to M.J. Boal's finding of fact that Peter "represented to Baker that his net worth was in the range of $100 million." [Dkts. 383 at 11; 391 at 13].  Plaintiffs argue that Peter's net worth and JPMC's understanding of what it was is clearly a disputed material fact.  [Dkt. 391 at 13].  While Plaintiffs challenge this conclusion [Dkt. 331 at 53], they only cite to two specific paragraphs of Yoon's declaration, which M.J. Boal correctly struck because the statements were hearsay and could not be considered.  [Dkt. 383 at 11 n.58].  On the other hand, Defendants cite to the 2015 Advisory Agreement, dated August 10, 2015 that Peter signed, which states that both his liquid and total net worth are $100 million.  [Dkt. 276-43 at 15].  Plaintiffs point out that a day after the August 2015 lunch meeting, on August 11, 2015, Moon sent Baker a balance disclosure sheet from 2012 that Peter signed, stating that his total net worth was $33,800,000.  [Dkts. 301-103 at 2; 301-8 at 2].  Of course, this does not establish what Peter's net worth was in 2015.

Nothing in the record suggests Peter gave Baker an updated personal financial statement in August or September 2015, that Baker obtained a balance sheet or personal financial statement from Peter generally, or that Baker contacted Bruce Haverberg, Peter's accountant, to obtain Peter's net worth.  [Dkt. 300-1].  Because nothing in the record appears to establish Peter Doelger's actual net worth in August 2015, the Court must reach the same conclusion as the

R&R: Peter represented to Baker that his net worth was in the range of $100 million, and nothing

in the record appears to contradict this statement of fact, such as evidence produced by Plaintiffs

that Peter's net worth was something other than that amount.  As M.J. Boal points out, "the

document itself states Mr. Doelger's net worth was $100,000,000.  He signed the document on

August 15, 2015, and explicitly certified its accuracy."  [Dkt. 383 at 11 n. 58].

        Relatedly, Plaintiffs object that the R&R acknowledges but fails to discuss the fact that

parties dispute whether the 50% suitability limit in the MLP Program was a hard cap or whether

exceptions could be made.  [Dkt. 391 at 14].  But this is not a material issue of fact: Irrespective

of whether Peter's net worth was $50 million or $100 million, the proposed $33 million

investment for Peter in the MLP Program far exceeded the 5% liquid net worth suitability

restriction for that advisory program.  [Dkts. 301-89 at 3-6; 331 at 152-53].  Therefore,

Plaintiffs' objection is overruled.

        Plaintiffs also allege that Baker significantly altered an email he had written to

Supervisory Manager Jeff Lee ("Lee") before forwarding it to Jeff Burke ("Burke") (East Region

Head of the J.P. Morgan Private Bank), and that the R&R failed to mention this.  [See Dkt. 391

at 15].  Specifically, Baker's August 28, 2015, email to Lee states that Peter's MLP portfolio was

$33 million and the forwarded version to Burke states Peter's MLP portfolio was $45 million.

[Id.].  Based on this, Plaintiffs assert that the R&R's reliance on the altered email is an erroneous

finding of fact.  [Id.].  However, the R&R relies on Baker's original email to Lee stating that

Peter "currently holds a portfolio of $33 [million]" of MLPs [Dkt. 276-50 at 2], and not the

altered email.  Therefore, the Court overrules Plaintiffs' objection.

        While the redline does suggest that Baker may have changed the email he forwarded to

Burke, it is not incontrovertible proof that Baker falsely represented the size of the proposed

investment to get around suitability limits.  [Dkt. 391 at 15].  There are emails Baker and others

sent that conformed with the modified version of the email that Baker forwarded to Burke, which

suggests he was not trying to obfuscate what he was doing or "get around" internal procedures.

For example, on August 27, 2015, at 6:52 pm, Baker emailed Ed Kelly about transitioning

Peter's Atlantic Trust MLP account and wrote, "we should be able to fund a $33 MM

account . . . [Peter] would continue to hold the other $15 MM of MLPS in a side pocket account

and look to draw that down/move that into the Chickasaw portfolio over time."  [Dkt. 301-110 at

2].  On August 27, 2015, at 7:33 pm John Beggans (CFA and Managing Director) emailed

Daniel Curtin and Jeffrey Burke and wrote, "[Peter] custodies about $50mm in MLPs here now

that is managed by Atlantic Trust. . . .  [There will be] about $33mm of in-kind MLPs to go to

Chickasaw."  [Dkt. 301-115 at 2].  The total market value of Peter's current MLP holdings on

May 20, 2015, appears to have been approximately $47 million.  [Dkts. 301-83 at 2; 301-84 at

2].  In sum, the R&R's reliance on Baker's email to Lee was not an improper finding of fact, and

the redline of the two emails is not documentary evidence of any wrongdoing.  For those reasons,

Plaintiffs' objection is overruled.

Plaintiffs raise several objections regarding facts surrounding the MLPEI Letter (also

referred to as the "Big Boy Letter").  [Dkt. 391 at 16-17].  First, Plaintiffs object that the R&R

does not mention the fact that Beggans wrote to Burke that "Peter Doelger will sign any letter we

draw up."  [Dkt. 391 at 16 (quoting Dkt. 301-11)].  Plaintiffs do not explain why they raise this

objection or how it is relevant.  Nor do Plaintiffs support their objection with any citations to the

record or case law.  Nevertheless, in the context of the email in its entirety, this comment is not

the smoking gun Plaintiffs claim it is.  Beggans sent an email updating Burke and letting him

know that Peter called the previous night around 6:30 pm seeking guidance and hoping for a

verbal decision by the end of the day regarding whether he could transfer $33 million of his MLP positions to Chickasaw.  [Dkts. 301-10 at 2-3; 301-11 at 2].  Beggans commended Baker for managing Peter's expectations well and assuring him that they would do their best.  [Dkt. 301-11 at 2].  Beggans further mentioned that Peter would likely be willing to sign any letter their team drafted ***if they were 99% sure of the direction they wanted to take***, which would allow them to start working with Peter's accountant to begin the process.  [Id.]  Beggans apologized to Burke for the urgency and noted that Peter was starting to push for an answer.  [Id.].  Given this context, Beggans' comment is neither nefarious on its face nor material.  Thus, the Court overrules Plaintiffs' objection.

Next, Plaintiffs claim that the R&R "overlooks all evidence that the Big Boy Letter was fraudulent," and that JPMC was in a better position than Peter to know the truth about Peter's net worth and other financial representations.  [Dkt. 391 at 16].  Plaintiffs allege three statements in the MLPEI Letter were false: 1) Peter held $45 million in MLPs at Atlantic Trust; 2) Peter was leaving $12 million with Atlantic Trust; and 3) Peter's liquid net worth was approximately $100 million.  [Id.].

To support the claim that Peter only held $26.9 million in MLPs at Atlantic Trust and JPM knew this, Plaintiffs rely on an account summary for an account ending in 1009, for the period of September 1, 2015, to September 30, 2015.  [Dkt. 301-129 at 5].  First, the account summary Plaintiffs rely on states that the current market value of the account was over $28.9 million.  [Id.].  Second, a list of Peter's MLP holdings on May 20, 2015, stated they were worth over $47 million.  [Dkts. 301-83 at 2; 301-84 at 2].  It is also important to note how quickly and drastically Peter's assets fluctuated in value.  [Compare Dkt. 301-116 at 5 (showing the ending market value of the account ending in 1009 to be over $35 million on August 31, 2015) with Dkt.

301-129 at 5 (showing the ending market value of the account ending in 1009 to be nearly $29 million on September 30, 2015)].  Based on this and the fact that the MLPEI letter was drafted and reviewed over the course of several days at the end of September 2015 [see Dkts. 301-125 at 2; 301-126; 276-61], the Court finds that there is not sufficient evidence in the record to indicate what documents JPMC employees relied on to devise the $45 million figure included in the MLPEI Letter or to establish whether they knew the $45 million figure was accurate at the time of signing.  For the same reasons, the Court rejects Plaintiffs' assertion that JPMC employees knowingly "fabricated" that Peter was leaving $12 million of his MLP portfolio with Atlantic Trust.  [Dkt. 391 at 16].

Plaintiffs also allege that JPMC knew Peter's liquid net worth was not approximately $100 million.  [Id.].  However, the record does not support this.  The 2015 Advisory Agreement Peter signed indicates Peter's liquid net worth was $100 million.  [Dkt. 276-43 at 15].  Peter signed the MLPEI letter, confirming he had a "liquid net worth of approximately $100,000,000." [Dkt. 276-60 at 3; see also Dkt. 301-137 at 2 (email from Moon dated October 8, 2015, stating that he spoke with Bruce Haverberg about obtaining a new balance sheet and that Haverberg "[f]elt comfortable saying that JPM[C] ha[d] all [of Peter's] material assets outside of personal use real estate."); but see Dkt. 301-14 at 2 (email from Prad Wadhwa dated September 10, 2015, stating that they "have vision on ~$62.5MM in assets, which are with [JPMC]"); Dkt. 301-96 at 55-56 (Baker's deposition where he says he knew Peter had a "variety of investments" and "significant assets" that he held "away from [JPMC].")).  As the R&R points out, "The purpose of the [MLPEI Letter] was to have [Peter] confirm the representations in the letter, and he was in the best position to know the truth of those representations."  [Dkt. 383 at 27].  The Court agrees and overrules Plaintiffs' objection.

Plaintiffs next object to the R&R's omission that JPMC did not disclose the risks of a cross-currency swap and an interest rate cap to Peter or that JPMC, as counterparty, "would profit directly from Peter's losses." [Dkt. 391 at 18]. Peter signed the Swap Communications Representation Letter [Dkt. 276-83 at 4], which asked Peter to acknowledge that JPMC was "acting in its capacity as a counterparty and is not undertaking to assess the suitability of any [s]wap for [Peter]." Id. at 3. Peter chose not to appoint a "Designated Evaluation Agent," an independent third party who could have helped him determine whether to enter into the swap transaction with JPMC. [Id.]. Peter also signed the Rate Cap Transaction Confirmation agreement letter [Dkt. 276-106 at 7], which details the relationship between JPMC and Peter. The letter states that JMPC "is not acting as a fiduciary for or an adviser to [Peter] in respect of [the rate cap transaction]." [Id. at 5]. In addition, the agreement notes that the parties are "not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into [the rate cap transaction]," and that the parties are "capable of assuming, and assume[] the risks" of the transaction. [Id.]. Because Plaintiffs fail to explain why these omissions are a material issue of fact or to establish that JPMC owed Peter a duty to disclose this information, the Court overrules Plaintiffs' objection.

Plaintiffs object to the R&R's failure to mention that Defendants repeatedly advised Plaintiffs against selling their MLPs between 2015 and 2020 and instead suggested alternatives to address their decline in investments and increasing debt. [Dkt. 391 at 18]. Plaintiffs highlight three instances. First, Plaintiffs argue JPMC recommended Plaintiffs get a home equity line of credit (HELOC) on their Boston home, which they allege is a violation of JPMC's own policies. [Id.]. The December 2018 email Plaintiffs cite to is one Baker directed to Peter and Yoon to "summarize the status of [their] assets and liabilities and potential next steps." [Dkt. 301-233 at

2].  While Baker did recommend getting a HELOC on the Doelgers' Boston home, he noted that it would be used to "meet short-term cash flow needs . . . and/or draw on it to pay off" the Doelgers' securities-based LOC.  [Id. at 3].  This recommendation is not a violation of JPMC policies.[5]

Second, in 2019, Scott Schnipper emailed Baker to suggest moving proceeds from Peter's MLPs into Brent Crude oil; specifically, a structured note JPMC was launching.  [Dkt. 301-239 at 2].  "[R]educing half the MLP exposure and rolling that will give you a better mix of risk return," wrote Schnipper.  [Id.].  He also noted the correlation between MLPs and Brent Crude: "very similar exposure, but crude has downside protection".  [Id.].  The Court agrees with Defendants that Plaintiffs did not provide any "evidence to show [Schnipper's proposed] alternate investment was relevant to or advisable for the Doelgers," or that the information is material more generally.  [Dkt. 331 at 242-43].

Third, Plaintiffs claim that Baker repeatedly told Plaintiffs in early 2020 not to sell their MLPs and that it would be "aggressive" and "extreme."  [Dkt. 391 at 18].  Plaintiffs mischaracterize the testimony and document they cite.  At her deposition, Hee-Jean Kim ("Kim"), Yoon's daughter, recalled a phone call with Baker on March 17, 2020 regarding the declining value of the Doelgers' MLPs.  "[Baker] said it would be an extreme measure [to sell everything off] . . . ."  [Dkt. 301-338 at 19].  After Kim pushed Baker to give her parents advice on what to do, "[her] understanding of [what Baker said]" was that "because [her] parents had debt, that selling was okay, that it could be something they could do."  [Id. at 20].  On March 17,

---

[5] Plaintiffs point to two manuals.  The February 2019 Registered Representative Compliance Manual ("2019 RR Manual) states, "Registered representatives should carefully consider the risk of a product with the age and retirement status of the customer in mind. . . . Certain products or strategies pose risks that may be unsuitable for elders," including "[m]ortgaging home equity for investment purposes."  [Dkt. 301-316 at 73].  The July 2019 Wealth Management Written Supervisory Procedures Manual notes "common sales practice violations" and related red flags [Dkt. 301-317 at 22], including "[u]sing home equity to invest in securities."  [Id. at 24 ("You may not recommend this strategy to any client, including seniors or vulnerable adults")].

2020, Baker emailed Trey Eppes and summarized a meeting he had had with the Doelgers that morning.  [Dkt. 301-283].  Baker wrote, "[Doelgers] wanted to sell all MLPs.  I discussed market is likely to be highly volatile in the nearterm [sic]. . . . Given the leverage and risk of margin call and their discomfort with the positions ***I said selling all the positions was an aggressive but suitable decision***."  [Id. at 2 (emphasis added)].  In sum, Plaintiffs' selective quoting and mischaracterization of the record fails to raise a material issue of fact.  Consequently, the Court overrules Plaintiffs' objection.

### D.  Objections to the R&R's Conclusions Regarding Plaintiffs' Claims

#### 1.  Declaratory Judgment (Count VI) and Rescission (Count VII)

Plaintiffs have four objections related to the declaratory judgment and rescission claims. First, they argue that the R&R uses the MLPEI Letter to shield Defendants, thereby turning it into a hedge clause.  [Dkt. 391 at 29].[6]  This is a conclusory statement without justification or supporting argument of any kind.  This is an improper objection the Court need not address.  See Vélez-Padro v. Thermo King De Puerto Rico, Inc., 465 F.3d 31, 32 (1st Cir. 2006) ("Conclusory objections that do not direct the reviewing court to the issues in controversy do not comply with [Fed. R. Civ. Pro.] Rule 72(b)"); Brenner v. Williams-Sonoma, Inc., No. 13-CV-10931, 2016 WL 5661987, at *1 (D. Mass. Sept. 28, 2016) ("Waiver of de novo review by failing to file proper objections does not entitle a party to 'some lesser standard' of review." (quoting Thomas v. Arn, 474 U.S. 140, 149-50 (1985)).

---

[6] Plaintiffs also contend that the R&R incorrectly does not mention the case law Plaintiffs cite regarding hedge clauses.  [Id.].  However, the R&R does not need to, since the MLPEI Letter does not contain a hedge clause.  The SEC defines a hedge clause as, "a clause in an advisory agreement that purports to limit an adviser's liability under that agreement."  Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers, Investment Advisers Act Release No. 5248, 2019 WL 3779889, at *4 n.31 (June 5, 2019).  The MLPEI Letter does not seek to limit JPMC's own liability.  Rather, it seeks to indemnify JPMC from any incorrect "confirmations, statements, or agreements" Peter made to JPMC.  [Dkt. 276-60 at 4].

Second, Plaintiffs object to the fact that the R&R found it immaterial that Baker allegedly caused Peter to not have enough time to consult his attorney, Paul Roberts ("Roberts") before signing the MLPEI Letter on October 1, 2015.  [Dkt. 391 at 23].  As the R&R notes, this fact is in dispute, but the Court agrees that whether Baker first faxed the MLPEI Letter to Peter's lawyer on September 24, 2015,[7] or merely emailed it on September 30, 2015, is not a material fact.  [Dkt. 383 at 26, n.118].

"In general, an unconscionable contract has been defined as one which is so grossly unreasonable as to be unenforc[ea]ble because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  King v. Fox, 7 N.Y.3d 181, 191, 851 N.E.2d 1184, 1191 (2006).  To establish that the MLPEI Letter was unconscionable, Plaintiffs must show that the contract was both substantively and procedurally unconscionable when it was made.  Boursiquot v. United Healthcare Servs. of Del., Inc., 98 Mass. App. Ct. 624, 630 (2020); see also Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10-11, 534 N.E.2d 824, 828 (1988) (stating that procedural unconscionability entails "an examination of the contract formation process and the alleged lack of meaningful choice").  Procedural unconscionability occurs when the "circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise."  Boursiquot, 98 Mass. App. Ct. at 630 (quoting Machado v. System4 LLC, 471 Mass. 204, 218, 28 N.E.3d 401, 414 (2015).

Based on a review of the record and the circumstances, that is not the case here.  The record does not indicate Baker used deceptive or high-pressured tactics to force Peter to sign.

_____

[7] The Court notes, however, that the record strongly indicates Baker never faxed Roberts the MLPEI Letter.  At the request of JPMC's counsel, an IT person "retrieve[d] any faxes he could locate by searching the emails [Roberts] received in September 2015.  He was able to locate three total faxes.  None of those faxes were from JP Morgan and none of them concerned Peter or Yoon."  [Dkt. 300-4 at ¶ 9].

Peter knew well in advance there would be a meeting with the Chickasaw representatives.  [Dkt. 276-40 at 2 (August 6, 2015, email from Baker to Moon stating, "Peter asked me to schedule a meeting with the Chickasaw team ASAP . . . so we have one scheduled on Monday with Peter, Yoon and the Chickasaw team")].  Baker emailed Peter's lawyer a copy of the MLPEI Letter the day before Peter signed it.  [Dkt. 276-61].  Moreover, Peter could have chosen to reschedule the October 1, 2015, meeting to have additional time to consult with his lawyer before signing.  See Elite Parfums, Ltd. v. Rivera, 872 F. Supp. 1269, 1273 (S.D.N.Y. 1995) (rejecting the argument that the defendant had no time to consult a lawyer or get the agreement translated when the plaintiff's representative told the defendant that he only had a "few hours" to sign; Roberts v. Smith Barney, Harris Upham & Co., 653 F. Supp. 406, 418 (D. Mass. 1986) (finding that failure "to inform [plaintiffs] of their legal rights or to tell them to consult an attorney" were insufficient allegations to establish an unconscionable procedural defect in the formation of the contract). Peter, not Baker, was in the best position to know whether he had had sufficient time to review the MLPEI Letter and whether he had discussed it with his attorney.  Therefore, the Court does not find that the circumstances surrounding the signing of the letter were procedurally unconscionable.

Plaintiffs next turn to the substantive conscionability of the letter.  They argue that the R&R misreads the MLPEI Letter, which they allege has unconscionable misrepresentations that *JPMC* made to Peter.  [Dkt. 391 at 29].  It is the other way around.  *Peter* made representations to JPMC, which were then included in the MLPEI Letter.  [Dkt. 276-60].  By signing the letter, JPMC was asking Peter to confirm that information was correct.  [See Dkt. 276-60 at 3-4 ("You have informed us . . ."; "you have represented to us . . ."; "You confirm that . . .")].  At the end of the letter, JPMC included a paragraph indemnifying them from any misrepresentations "***made by***

*[Peter]* as reflected in [the] letter are incomplete or incorrect in any respect." [Id. at 4 (emphasis added)]. Therefore, the MLPEI Letter was not substantively unconscionable.

Finally, Plaintiffs argue that the R&R misapplies 15 U.S.C. § 80b-15, a provision of the Investment Advisers Act of 1940 ("Advisers Act"). [Dkt. 391 at 30]. According to Plaintiffs, because JP Morgan Securities, LLC ("JPMS") is subject to the Advisers Act and is party to the MLPEI Letter, the letter is invalid. [Id.]. This is another unsupported, conclusory objection that the Court need not address. Nonetheless, Plaintiffs cannot rescind the MLPEI Letter as to JPMS, since JPMS is not a party to this lawsuit. [See Dkt. 383 at 28 n.121].

### 2. Breach of Contract (Count II) and Breach of the Covenant of Good Faith and Fair Dealing (Count V)

Plaintiffs' first objection regarding the contract-based claims is that the R&R incorrectly summarizes Section 1(C)(i) of the 2015 Advisory Agreement. [Dkt. 391 at 30]. They argue that this section does not state that the client is responsible for ensuring the portfolio aligns with their investment objectives and instead merely requires the client to select one of the portfolios presented to them. Id. However, Section 1(C)(i) states that the "Client is solely responsible for selecting Portfolios, and [the] Client retains final decision-making authority and responsibility with respect thereto." [Dkt. 276-44 at 7]. Furthermore, while Section 1(B) stated JPMC would "assist [the Doelgers] in the review, evaluation, and/or formulation of [the Doelgers'] investment objective," they were still "solely responsible for making all decisions regarding the adoption and implementation of all investment objectives." [Id.]. The client was "solely responsible for monitoring its investment objectives." [Id.].

Plaintiffs also argue that the R&R "ignores the authorities on how [investment discretion] must be exercised," and that by breaching its fiduciary duties, JPMC was also breaching Section 1(D)(i) of the 2015 Advisory Agreement. [Dkt. 391 at 31]. Just like in their opposition to

Defendants' Motion for Summary Judgment, Plaintiffs do not explain in their objections "how JPMC could breach a section of a contract that provides it with 'full discretion to make purchases, sales, exchanges, or investments or to take any other action that it deems necessary or desirable as to each Portfolio and the Assets invested in any Portfolio.'"  [Dkt. 383 at 30-31 (quoting Section 1(D)(i) of the 2015 Advisory Agreement [Dkt. 276-44 at 7])].  Furthermore, Defendants' obligations were limited to investing "subject to the annexed Portfolio Schedule" [Dkt. 276-44 at 7], which was limited to investing in "publicly traded partnerships, limited liability companies and corporations, predominantly in the energy sector," since Peter had selected the MLPEI Strategy.  [Dkts. 276-55 at 16; 300-6 at ¶82].  Therefore, Plaintiffs' objections do not support Plaintiffs' breach of contract[8] claim and are overruled.

### 3.   The Negligence Claims (Counts III & IV)

Plaintiffs raise five objections regarding the negligence claims.  First, Plaintiffs argue that the R&R wrongly dismissed the negligence claims against Chickasaw based on the limitation of liability clause in JPMC's General Terms.  [Dkt. 391 at 32].

---

[8] Plaintiffs object to M.J. Boal's finding on causation by arguing that the Defendants' causation theory is baseless and unsupported by law.  [Dkt. 391 at 28].  They assert that the Defendants' claim—that the Plaintiffs were not damaged because another adviser would have acted just as poorly—is speculative and lacks legal precedent.  [Id.].  They also point out that the Defendants' argument disregards Yoon, based on an unfounded belief that she was always with her husband.  [Id.].  The Plaintiffs emphasize that the theory lacks factual support and is essentially "science fiction" rather than a valid legal argument.  [Id.].  Again, Plaintiffs mischaracterize Defendants' arguments, which were that the Plaintiffs cannot prove causation because there is no reason to believe Peter would have abandoned his MLP investment strategy even if the Defendants had not made the MLPEI program available, as Peter had committed to a leveraged, concentrated MLP strategy long before 2015 and continued with it despite recommendations to reduce risk and MLP concentration.  [Dkt. 277 at 24].  Defendants are not asserting that "Plaintiffs weren't damaged because another adviser would have behaved as badly as Defendants."  [Dkt. 391 at 28].  Rather, Defendants argue that other investment advisers would have acted similarly to Baker and Atlantic Trust due to the limited scope of their engagement.  [Dkt. 277 at 24-25].  Peter hired them specifically to manage an MLP portfolio, which restricted their discretion to only managing the MLPs.  Given the contractual limitations, they did not have the authority to Peter's portfolio; their role was confined to managing the MLPs and warning him about the associated risks.  The remainder of Plaintiffs' paragraph under the causation heading consists of conclusory, unsupported statements.

First, Chickasaw was not a party to the Advisory Agreements, which incorporated the General Terms.  [Dkts. 276-55 at 11; 276-126 at 11].  Therefore, Chickasaw cannot be dismissed on that basis.  This Court nonetheless grants summary judgment for Defendants on the negligence claims as to Chickasaw because they are duplicative of Plaintiffs' breach of contract claim.  As clearly stated in <u>Zorbas</u>, "a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated."  <u>Zorbas v. U.S. Tr. Co., N.A.</u>, 48 F. Supp. 3d 464, 491 (E.D.N.Y. 2014) (quoting <u>Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC</u>, 692 F.3d 42, 58 (2d Cir. 2012)); <u>see also</u> <u>Anderson v. Fox Hill Vill. Homeowners Corp.</u>, 424 Mass. 365, 368, 676 N.E.2d 821, 823 (1997) (stating that a "failure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made").  Plaintiffs have not established any duties separate and apart from the Advisory Agreements [Dkts. 276-55; 276-126] or the Agreement for Investment Management Services (the "AIMS") [Dkt. 276-30] and the term sheet associated with the Advisory Account (the "2015 Term Sheet") [Dkt. 276-57], which govern the relationship between Plaintiffs and Chickasaw.  Consequently, the Doelgers' objection regarding the negligence claims against Chickasaw is overruled.[9]

Plaintiffs next object that the R&R limits Defendants' liability of gross negligence based on a limitation of liability clause in the General Terms, which Plaintiffs argue is a hedge clause

---

[9] In Plaintiffs' third Notice of Supplemental Authority [Dkt. 415], they argue that the R&R misapplied New York law in recommending the dismissal of the tort claims against the Defendants.  In support, Plaintiffs cite <u>Ria R Squared, Inc. v. DW Partners, LP</u> ("<u>DW Partners</u>"), a real estate case where, on appeal, an order dismissing several claims, including breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing, was reversed to reinstate all claims except for negligent misrepresentation.  <u>DW Partners</u>, No. 1757, 2024 WL 4045729 (N.Y. App. Div. Sept. 5, 2024).  The <u>DW Partners</u> court reinstated certain claims as not duplicative because they involved distinct duties and actions beyond mere breach of contract. However, <u>DW Partners</u> is inapposite here because Plaintiffs have not alleged bad faith actions beyond mere non-performance of contractual obligations.

and is thus unenforceable.  [Dkt. 391 at 32].  They argue that even if the General Terms are

enforceable, the limitation of liability clause is not.  [Id.].  Plaintiffs allege that if the Court were

to adopt the R&R's recommendation on this issue, "it would be the first court in the country to

enforce such a hedge clause."  [Id.].

     The SEC defines a hedge clause as, "a clause in an advisory agreement that purports to

limit an adviser's liability under that agreement."  Comm'n Interpretation Regarding Standard of

Conduct for Inv. Advisers, Investment Advisers Act Release No. 5248, 2019 WL 3779889, at *4

n.31 (June 5, 2019).  A hedge clause is not per se unenforceable.  See id.  "[W]hether a hedge

clause violates the Advisers Act's antifraud provisions depends on all of the surrounding facts

and circumstances, including the particular circumstances of the client (e.g., sophistication)."  Id.

> [A]n adviser violates the antifraud provisions of the Advisers Act, for example,
> when (i) there is a contract provision waiving any and all of the adviser's
> fiduciary duties or (ii) there is a contract provision explicitly or generically
> waiving the adviser's Federal fiduciary duty, and in each case there is no language
> clarifying that the adviser is not waiving its Federal fiduciary duty or that the
> client retains certain non-waivable rights (also known as a "savings clause").

Priv. Fund Advisers; Documentation of Registered Inv. Adviser Compliance Revs., Investment

Advisers Act Release No. 6383, 2023 WL 5527515, at *118 (Aug. 23, 2023).  The scope of an

adviser's fiduciary duty "may be shaped by agreement."  In re Comprehensive Cap. Mgmt., Inc.,

Investment Advisers Act Release No. 5943, 2022 WL 103533, at *3 (Jan. 11, 2022).

     Here, the clause at issue in the General Terms indicates, "[e]xcept as otherwise provided

by law, [JPMC's] sole liability and that of Morgan Affiliates to [the Doelgers] . . . shall be any

direct damages [Plaintiffs] incur because of [JPMC or Morgan Affiliates'] gross negligence or

willful misconduct."  [Dkt. 276-62 at 9].  The phrase "[e]xcept as otherwise provided by law,"

serves as a savings clause stating that JPMC and its affiliates are still liable for any duties owed

to its clients under federal and state laws.  Therefore, the clause in the General Terms does not waive a fiduciary duty and does not violate the antifraud provisions of the Advisers Act.[10]

Ultimately, the R&R rightly notes that the waiver of liability is enforceable.[11]  As Defendants point out, none of the cases or SEC settlement agreements Plaintiffs cite hold that fiduciaries cannot limit the scope of their liability to acts of gross negligence.  [Dkt. 398 at 33 n.127].  Thus, Plaintiffs' objection is overruled.

Plaintiffs also object to one of M.J. Boal's findings of fact regarding Yoon's testimony. [Dkt. 391 at 32-33].  In their Opposition to the Motion for Summary Judgment, Plaintiffs argue that they did not review the General Terms before the commencement of this lawsuit and that they never agreed to them.  [Dkt. 309 at 18].  Thus, the liability waiver contained in the General Terms should not apply.  [Id.].  To support this claim, Plaintiffs rely on Yoon's declaration in which she states that neither she nor Peter were given the General Terms at the meeting on August 10, 2015, that they attended when Peter opened the advisory account.  [Dkt. 300-9 ¶ 88]. The R&R found that Yoon's deposition conflicted with her declaration as to whether she even

---

[10] The R&R correctly notes that the Advisers Act does not apply to JPMC anyway, as it is a bank.  [Dkt. 383 at 28 ("The Advisors Act governs investment advisors. See 15 U.S.C. § 80b-1. The definition of investment advisors expressly excludes banks. 15 U.S.C. § 80b-2(a)(11)"].

[11] Lee v. Allied Sports Assocs., Inc., 349 Mass. 544, 550, 209 N.E.2d 329 (1965) ("It is the rule in [Massachusetts] that the failure to read or to understand the contents of a release, in the absence of fraud or duress, does not avoid its effects."); Sharon v. Newton, 437 Mass. 99, 105, 769 N.E.2d 738 (2002) ("Massachusetts law favors the enforcement of releases."); Greenleaf Arms Realty Tr. I, LLC v. New Bos. Fund, Inc., 81 Mass. App. Ct. 282, 292, 962 N.E.2d 221, 230 (2012) ("Exculpatory clauses in . . . fiduciary-related contracts are enforceable in the Commonwealth."); Sjogren v. Bd. of Trs. of Dutchess Cmty. Coll., 189 N.Y.S.3d 237, 239 (App. Div. 2023) (stating that an exculpatory agreement that unequivocally expresses parties' intent "to relieve a defendant of liability for its own negligence," will be enforced); see, e.g., Habberstad v. Revere Sec. LLC, 183 A.D.3d 532, 532 (N.Y. App. Div. 2020) (enforcing clause relieving a fiduciary "of liability for acts and omissions other than willful misconduct"); Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., No. 03-CV-1537, 2003 WL 23018888, at *11 (S.D.N.Y. Dec. 22, 2003) (finding that plaintiff could only recover against defendant "upon specific factual allegations" of "willful malfeasance, bad faith, gross negligence or reckless disregard of" the defendant's duties and obligations because of agreements limiting the defendant's liability to those causes of action); Cormier v. Cent. Mass. Chapter of the Nat'l Safety Council, 416 Mass. 286, 288 (1993) (finding that waiver form plaintiff signed, releasing defendant from "any and all liability, loss, damage, costs, claims and/or causes of action, including but not limited to all bodily injuries," was sufficient to bar plaintiff's negligence claim (internal quotations omitted)).

attended the August 10, 2015, meeting.  [Dkt. 383 at 38].  Thus, her affidavit could not be used to establish that the Doelgers never saw the General Terms in 2015.  [Id.].

Plaintiffs object to this factual finding, however, and argue that Yoon did attend the meeting.  The record suggests she did in fact attend that meeting [See Dkts. 276-46 at 2 (email from Baker to Douglas Moon and Dylan Dittrich dated August 10, 2015, summarizing meeting and mentioning Yoon's attendance); 276-47 at 2 (email from Baker to Ed Kelly dated August 11, 2015 summarizing meeting and mentioning Yoon's attendance)], but this is insufficient to support the claim that Peter did not receive or review the General Terms.  Not only are there contradictions between Yoon's declaration and her deposition, but also throughout her deposition Yoon could not remember details or dates in which events took place.[12]  It is clear Yoon does not have a memory that the Court can rely upon.  Based on her own testimony, it does not seem like Yoon understood or was paying attention to what was happening during the meetings she recalls attending.  [See, e.g., Dkt. 321-10 at 11 (34:9-35:2) (stating that at meetings she attended with Peter and his advisers at JPMC, Yoon stayed silent because she did not understand what they were discussing), 21 (77:8-12, 22-25) (stating she became involved in financial discussions with advisers at JPMC in 2015, "[b]ut the conversation and meeting and business structure, that I don't remember.  Even if I [was] involved, I never understood"), 26 (94:21-95: 6) (referencing an email in which Baker noted Yoon asked questions about the Doelgers' portfolio at a meeting, Yoon said, "Strange thing is I don't remember.  Even though Jimmy Baker gave me something, I would have not—I don't understand"), 31 (114:12-17, 116:10-16) (stating that at a November 2017 meeting, she was not aware of what Peter, Roberts, Haverberg, Moon, and Baker were

_____

[12] See, e.g., Dkt. 321-10 at 7 (20:7-21:7),10 (30:16-20), 14 (48:25-49:8), 16 (56:10-20), 18 (63:11-24), 19-20 (69:21-70:19), 23 (83:10-23), 27 (98:13-18), 31 (115:19-116:3), 37 (138:22-139:3), 40 (151:16-20), 46 (174:6-176:11), 57 (218:22-219:8), 60 (230:12-231:11), 93 (362:24-363:4).

talking about because her "mind was far away")].  Therefore, the Court cannot rely on Yoon's declaration or deposition as evidence that during the August 10, 2015, meeting she would have actually known or been aware of whether Peter received or reviewed the General Terms.

As the R&R points out, the 2015 Advisory Agreement contains a provision in which Peter "received," "reviewed," "underst[ood]," and "agree[d] to" the General Terms.  [Dkts. 276-55 at 7; 383 at 38].  Plaintiffs have been unable to point to evidence in the record that contradicts this.  Therefore, the Court also agrees with M.J. Boal's conclusion that Peter accepted the General Terms and that they bind Yoon as well.  [See Dkts. 276-62 at 7 § 1 (A joint owner is bound by "all Obligations, whether or not [she] incurred the Obligation"); 383 at 38].

Plaintiffs object to the R&R's conclusion that they did not "evince gross negligence." [Dkts. 383 at 40; 391 at 34].  Plaintiffs admit that they did not make an argument distinguishing negligence and gross negligence.  [Dkt. 391 at 33].  However, they claim they did not do so because Defendants did not.  [Id.].  This is not true.  Defendants explicitly argued that Plaintiffs were unable to point to evidence establishing that Defendants engaged in gross negligence and made the distinction between negligence and gross negligence.  [Dkt. 304 at 55].  Defendants then identified five "allegations that lack[ed] evidentiary support" for a negligence claim.  [Id. at 55-56].  By providing the standard for gross negligence, it is implied that if these five allegations cannot establish negligence, they also cannot rise to the level of gross negligence.  [See id. at 56 ("For the reasons provided above . . . Plaintiffs cannot show that Defendants' purportedly negligent or grossly negligent actions caused them injury.")].

Plaintiffs also object to the R&R's conclusion because they believe they did provide an argument to support a claim of gross negligence by pointing to "at least three material negligent misrepresentations."  [Dkt. 391 at 33].  In their objections, Plaintiffs provide more details

regarding the three alleged disputed issues of fact [id. at 33-34], but they still fail to show how these examples establish gross negligence.  [See Dkt. 383 at 40 ("[Plaintiffs] do not make any attempt [to] show why the cited paragraphs evince gross negligence, and indeed, they do not.")].  Plaintiffs merely make the unsupported, conclusory statement that the R&R's conclusion regarding the "three material negligent misrepresentations" is "erroneous as a matter of law." [Dkt. 391 at 33-34].  Therefore, the Court overrules this objection.

### 4.   The Florida Adult Protective Services Act Claim (Count IX)

Plaintiffs object that the R&R found that Peter "was not a vulnerable adult" under the Florida Adult Protective Services Act ("FAPSA").  [Dkts. 391 at 35; 383 at 43].  But the record does not establish Peter was a "vulnerable adult" within the meaning of the statute.  In enacting FAPSA, the Florida legislature intended "to provide for the detection and correction of abuse, neglect, and exploitation through social services and criminal investigations and to establish a program of protective services for all vulnerable adults in need of them."  Fla. Stat. § 415.101(2) (2010).  The Legislature intended for FAPSA "to place the fewest possible restrictions on personal liberty and the exercise of constitutional rights" and "encourage[s] the constructive involvement of families in the care and protection of vulnerable adults."  Id.  Under FAPSA, a "vulnerable adult" is defined as someone "whose ability to perform the normal activities of daily living[13] or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging."  Fla. Stat. § 415.102(28) (2023).

Specifically, Plaintiffs object to the R&R's finding because it is based on the fact that "at some points *of unknown frequency*, Peter traveled, swam, and rowed."  [Dkt. 391 at 35].  For

---

[13] "Activities of daily living" are defined as, "functions and tasks for self-care, including ambulation, bathing, dressing, eating, grooming, toileting, and other similar tasks."  Fla. Stat. § 415.102(2) (2023).

support, Plaintiffs argue that the R&R relies on conversations that took place in 2015-2020 "based on one 2019 email" and "Baker's statement on undated 'geo-politics and current events' chats." [Id. at 29 n. 218; Dkt. 383 at 44 n.145-47]. The record, however, suggests Peter often discussed geopolitics and current events with his financial advisers over the years.[14] Furthermore, it is not disputed that from "2015 through 2020, the Doelgers traveled and lived between their homes in Boston Massachusetts; Palm Beach, Florida; and Paris, France." [Dkt. 331 at ¶ 7].].

To rebut the R&R's conclusion that Peter was not a vulnerable adult, Plaintiffs make three claims. First, they state that "Peter's dementia is rapidly progressive and episodic." [Dkt. 391 at 35]. To support this, Plaintiffs rely on the results of a CT scan and an MRI scan of Peter's brain that were conducted on May 5, 2014, and June 10, 2014, respectively. [Dkts. 301-2, 301-4]. The "impression" section of the CT report summarized the findings: "Mild involutional changes and chronic ischemic change. No acute abnormality." [Dkt. 301-2 at 2]. In his report, Defendants' medical expert, Dr. Ziv Cohen ("Cohen"), wrote the following:

> These findings are nonspecific and essentially ruled out any acute pathological processes in his brain. They are common findings in normal healthy elderly persons but could be consistent with dementia if symptoms are present. These CT scan findings themselves, however, do not indicate dementia.

---

[14] [See, e.g., Dkts. 276-21 at 2 (June 20, 2014, email from Paul McPheeter to Peter stating, "Agree w/ your view on the escalation in Iraq helping on the crude oil price front"); 276-22 at 2 (August 4, 2014, email from Moon to Dittrich summarizing an email between Moon, Baker, and Peter during which they discussed "China & global implications if hard landing" as well as "Interest rates in U.S. & Europe"); 301-64 at 2 (November 11, 2014 email from Baker to Moon stating Baker talked to Peter "for ~45 minutes on MLPS, Japan, China, Alibaba, Oil, etc."); 276-37 at 2 (July 31, 2015 email from Baker to Moon stating that at a meeting that day "Peter admitted that he is still fascinated with shorting China"); 286-74 at 2 (February 2, 2016, email from Baker to Moon summarizing a meeting between Baker, Peter, and Yoon in which Baker observed, "[Peter] is increasingly negative on Chinese and global growth and is becoming more concerned that the Saudis [sic] oil policy has changed from a business decision to one that is increasingly based on geopolitics and pride."); 276-90 at 2 (January 11, 2017, email from Baker to Catherine Lynch summarizing Peter's views on geopolitics and current events); 276-111 at 2 (internal document detailing a meeting in Palm Beach, Florida between James Baker and Plaintiffs on December 5, 2018, in which they "[d]iscussed global economy, markets, and progress on home sale."); 301-246 at 2 (May 2, 2019 email from Baker to Trey Eppes summarizing a meeting with the Doelgers and their account, stating that Baker had "[d]iscussed oil and market outlook with Peter")].

[Dkt. 321-13 at 7].  In his report, Plaintiffs' medical expert, Dale Panzer ("Panzer"), merely summarized the CT report and stated, without explanation, that "CT scan imaging over time was consistent with dementia," but he included a CT scan from November 24, 2020 as a part of his report and does not distinguish when he believes the imaging begins to indicate dementia.  [Dkt. 301-319 at 5].  Regarding the results in the June 10, 2014 MRI report, Cohen noted that the "findings are indicative of vascular disease leading to small strokes.  This finding can be seen in individuals without any symptoms or illness, but could also be consistent with vascular problems leading to dementia."  [Dkt. 321-13 at 7].  Panzer wrote that the findings from the MRI scan all "have an association with cognitive change."  [Dkt. 301-319 at 5].  In other words, the MRI and CT reports *could* indicate dementia, but they do not support Plaintiffs' claim that Peter's dementia at that time was rapidly progressive and episodic.

Second, Plaintiffs claim "Baker acknowledged Peter was illogical."  [Dkt. 391 at 29]. This is not supported by the record.  After explaining the need for a more complicated approach to unwind a currency swap Peter wished to complete, Baker noted in an email to a colleague, "Thanks for the flexibility here in accommodating the client.  His thoughts on his cash balances aren't always the most logical, but he feels strongly about them."  [Dkt. 301-24 at 2].  Baker's comment regarding Peter's preference to not use any money from his deposit accounts to unwind a cross-currency swap does not mean Baker believed Peter was illogical generally.  Plaintiffs' assertion is a leap and inference that the record does not support.

Third, Plaintiffs allege that "by 2020 [Peter] 'had difficulty recalling the month or the town he was residing in, was unable to recall a short story after hearing it or draw the face of a clock, and struggled to alphabetize letters.'"  [Dkt. 391 at 29 (citing SOF)].  The excerpts from the document Plaintiffs cite does not paint the full picture.  The document includes notes that

neuropsychiatrist Angela Scicutella, M.D., Ph.D., took regarding a Zoom telehealth conference

with Peter on September 28, 2020.  [Dkt. 301-33 at 2].  While Dr. Scicutella's notes include the

information in the quoted language Plaintiffs cite, she also wrote, "[Peter] reads the newspaper,

takes walks and swims in the family's heated pool . . . has been using a rowing machine and

watching football on TV.  *[Patient] is able to do his own [activities of daily living*]."  [Id.

(emphasis added)].  Dr. Scicutella's assessment, based on a limited neurobehavior exam,

indicated that Peter's "clinical picture is [consistent with] major depression with psychotic

features."  [Dkt. 301-33 at 3].  Additionally, she diagnosed Peter with "major depression with

psychotic features" and suspected a cognitive issue as well.  [Id. at 4].  This assessment is

insufficient to establish Peter was a "[v]ulnerable adult" under FAPSA.  Fla. Stat. § 415.102(28).

The R&R thoughtfully considered all the evidence Plaintiffs cite.  [See Dkt. 383 at 18-

19].  The Court agrees that none of this evidence establishes that Peter's ability to perform

"normal activities of daily living" was impaired during the relevant time.  [See Dkt. 383 at 44].

As the R&R points out, the record shows Peter traveled and moved around between 2015 and

2020.  [See Dkt. 331 ¶ 7].  Peter did indeed swim and row.  [Id. at ¶ 9; see also Dkt. 301-32 at 2

(October 26, 2020, Dr. Scicutella notes of Zoom evaluation of Peter stating that he "does swim

for about 1.5 hours/day and enjoys that activity")].  Peter was able to have sophisticated, lucid

conversations about world politics.  [Id. ¶ 14; supra n.10].  More importantly, the record

indicates Peter had questions and expressed opinions about how to manage his finances over the

years.[15]

---

[15] [See e.g., Dkts. 276-26 at 3 (September 10, 2014, email from Baker to Peter stating, "I just wanted to follow-up on your question about the potential risks of moving some of your outstanding USD credit obligations onto a Euro-based credit facility."); 276-35 at 2 (June 9, 2015 email from Baker to Kelly stating, "I spoke to [Peter] today and he did express interest once again in meeting your [Chickasaw] team"); 301-99 at 2 (August 5, 2015 email from Baker to Kelly providing background about Peter, including, "[Peter] has been very interested in the recent M&A sector

Plaintiffs also object that the R&R "ignores Dr. Panzer's opinion that doctors who evaluated Peter would not be expected to note concerns regarding his ability to manage finances." [Dkt. 391 at 35]. Plaintiffs fail to support their objection with specific facts or legal citations. Instead, Plaintiffs cite to the Unified Statement of Facts, in which they say the same thing: "managing one's own finances would not ordinarily be the topic of medical records from a doctor." [Dkt. 331 at 91].[16] Even so, Plaintiffs cannot then assume that if doctors did evaluate Peter's ability to manage finances, they would conclude he could not do so. The fact doctors might not normally test or evaluate a patient for financial competency does not help establish Peter was a vulnerable adult under FAPSA. It is also certainly noteworthy that while his family

---

and in particular the Kinder Morgan roll-up"); 276-72 (December 23, 2015 email from Emily Granoff, an investment specialist, to Baker with the subject line "Peter wants more MLPs"); 276-74 at 2 (February 2, 2016 email from Baker to Douglas summarizing a meeting with Peter and Yoon in which Baker writes, "We discussed paying down the line [of credit] by $2 MM to reduce [Peter's] interest costs. He was very concerned that if he were to pay down the line he may not have access to this cash in the future if a need were to arise."); 276-82 at 2 (November 15, 2016 email from Baker to Richard Freund following up on an email from the previous year stating, "Our client [Peter] never completed the Dodd-Frank paperwork that you provided last fall, but now wants to revisit a similar trade and is ready to complete the necessary paperwork"); 276-92 at 2 (April 19, 2017 email from Moon to Baker summarizing a meeting he had with Peter stating, "[Peter] [a]sked about the Euro & Pound. . . . He's bullish on the U.S. economy. Thinks the equity market is frothy. . . Not worried about MLPs"); 301-23 at 3 (June 30, 2017, email from Joseph Bigda to Baker stating, "I spoke with Peter a couple of times today. He was ready to trade if the EUR broke through 1.15. Since the EUR sold off a bit this am and held in around 1.1410 he is happy to wait."); 301-212 at 2 (May 4, 2018 email from Baker to Roberts outlining topics that would be discussed during a conference call, including, "Renewal of the [Doelgers'] line of credit—was scheduled for August, but at Peter's request [was] just renewed early out to August of 2019"); 301-29 at 2 (March 13, 2019 email from Moon to three people in which he summarized a meeting with the Doelgers noting, "[The Doelgers] recognize the primacy of the MLP portfolios in driving their risk exposure. . . . Yoon is interested in lowering their exposure and therefore volatility, but Peter is less certain about selling. He is very open to alternative means of future returns and income")].

[16] In contrast, Defendants point out that "none of the doctors who evaluated Mr. Doelger from August 2015 through March 2020 recorded in his medical files any concerns about his ability to manage his own finances" [Dkt. 331 at 91], which M.J. Boal cites. [Dkt. 383 at 18]. For support, Defendants quote a sentence from Dr. Charles Morris' notes, dated September 14, 2016. [Dkt. 276-81 at 3-4]. Dr. Morris wrote that he reviewed Peter's social and family history with him and that "He works at MIT currently. [Peter] is married, is able to handle finances and work without complication." [Dkt. 276-81 at 4]. That statement appears to be Dr. Morris' impression based on what Peter relayed to him or is a summary of what Peter told him rather than an assessment of Peter's financial capacity. In addition to noting that Peter was able to manage his finances and work, Dr. Morris also wrote that "At times, [Peter] was tangential, and worked in references to Michael Bloomberg and Donald Trump during his narrative." [Id.]. Reviewing Dr. Morris' notes in totality, it appears Peter's self-assessment at this time would not have been the most reliable.

members expressed concern about Peter's delusions, anxiety, and paranoia,[17] the Court did not

find anything in the record demonstrating his family members, attorney, or accountant raised any

concerns to his healthcare providers or Defendants about Peter's ability to manage the couple's

finances or to care for himself.[18]  Whether Peter could "perform the normal activities of daily

living" is something doctors *would* normally be expected to opine on—especially if a patient's

family members[19] expressed concerns.

Relatedly, Plaintiffs object that the R&R did not evaluate Peter's mental health at specific

points, and instead wrongly accepted "general statements on unspecified times."  [Dkt. 391 at

35].  Yet Plaintiffs fail to cite to a specific part of the R&R that they object to and also fail to

support their argument, making this an improper objection.  See Crooker v. Van Higgins, 682 F.

Supp. 1274, 1281-82 (D. Mass. 1988) ("[A] party's written objections . . . must be specific,

concise and supported by legal arguments and citations to the record.  Broad, yet unsupported

objections will not be permitted . . . .").  Moreover, the records supporting the R&R's

conclusions regarding Peter's "ability to perform 'the normal daily activities of daily living'" do

---

[17] [See, e.g., Dkts. 301-3 at 2 (June 3, 2014, notes from Dr. Wolf stating that prior to Peter's visit, Dr. Wolf spoke to his daughter who told him that she and Yoon "both felt that [Peter] was changed over the last 2 months and that he was having paranoid feelings, which was not something he had done previously"); 301-12 at 5 (September 3, 2015 medical discharge instructions, in which the healthcare provider noted that during a follow up conversation with Yoon, she said "[Peter] was always a little paranoid and that these episodes seem to be worsening.  She says that he is a high functioning individual that has no issues with caring for himself.")].

[18] In September 2015, Peter even gave his doctor permission to speak to his attorney Roberts [Dkt. 302 at 6], but nothing in the record indicates Roberts had or raised concerns about Peter's ability to manage his business or financial affairs.

[19] The Court also notes that Peter's daughter, Emily Doelger, was a physician [Dkt. 301-33 at 2] who seems to have stayed abreast of how her father was doing.  For example, Emily communicated frequently with Peter's lawyer in 2015 [see Dkt. 276-71 at 3-6 (itemized bill from Atty. Roberts)]and at Emily's behest Dr. Sciutella evaluated Peter in 2020 [Dkt. 301-33 at 2].

provide specific dates.[20]  The R&R rightly concluded that the Doelgers did not provide any legal authority or citations that undermined those findings of fact in their Opposition to the Motion for Summary Judgment.  [See Dkt. 383 at 44].

Plaintiffs make a conclusory[21] objection that the R&R's case law is inapposite and deals with "other sections of the law."  [Dkt. 391 at 36].  It is not the Court's responsibility to guess what Plaintiffs mean by this or to address wholly underdeveloped arguments.  In sum, Plaintiffs' objections regarding the R&R's findings as to whether Peter was a "vulnerable adult" under FAPSA are overruled.

### 5.   Chapter 93A (Count VIII)

Plaintiffs object to the R&R conclusion that because it denied the other claims, the 93A claim also had to be dismissed.  [Dkt. 391 at 22].  Plaintiffs seem to imply that the R&R should have evaluated Defendants' conduct in its entirety rather than assessing each action individually. [Dkt. 391 at 23].  However, Plaintiffs do not provide a specific objection, and they do not provide any supporting citations to the record or case law to support this objection.  Therefore, the Court does not address this objection and overrules it.

### 6.   Breach of Fiduciary Duty (Count I)

Plaintiffs raise three main objections to the R&R regarding their breach of fiduciary duty claim.  They allege that the R&R incorrectly found 1) Defendants do not have fiduciary duties; 2) Plaintiffs' fiduciary duty claim is duplicative of their breach of contract claim; and 3) the

---

[20] [See Dkts. 276-26 at 2 (September 11, 2014, email from Moon to Baker stating Peter's house in Palm Beach had a mortgage, but that "[h]is Boston and [P]aris homes [were] not levered"); 276-72 at 2 (December 23, 2015 email from Emily Granoff to Baker stating that Peter was swimming in the Atlantic that morning); 276-21 at 2 (June 20, 2014, email from Paul McPheeters to the Doelgers mentioning "the escalation in Iraq" and agreeing with Peter's analysis of how it will impact oil prices); 276-121 at 2 (June 17, 2019, email from Baker to Trey Eppes mentioning discussion with Peter regarding "interest rates, oil prices, the Fed, and the Red Sox")].

[21] "Conclusory objections that do not direct the reviewing court to the issues in controversy" do not trigger Rule 72(b).  Velez-Padro v. Thermo King De P.R., Inc., 465 F.3d 31, 32 (1st Cir. 2006).

Case 1:21-cv-11042-AK   Document 418   Filed 09/27/24   Page 40 of 44

R&R overlooks Defendants' obligations to Plaintiffs and Defendants' breaches.  [Dkt. 391 at 19-
28].  To begin, neither the R&R nor Defendants dispute that Defendants had fiduciary duties to
Plaintiffs.  [Dkt. 398 at 26].  Therefore, this objection and the related objections[22] are overruled.

The R&R also correctly concluded there is no common law fiduciary duty based on a
"special trust relationship."  [Dkt. 383 at 36-37].  To state a claim for breach of fiduciary duty
under Massachusetts law, plaintiffs must show "(1) the existence of a duty of a fiduciary nature,
based upon the relationship of the parties, (2) breach of that duty, and (3) a causal relationship
between that breach and some resulting harm to the plaintiff."  Amorim Holding Financeria v.
C.P. Baker, 53 F. Supp. 3d 279, 295 (D. Mass. 2014) (quoting Hanover Ins. v. Sutton, 46 Mass.
App. Ct. 153, 705 N.E.2d 279, 288–89 (1999)).  "A fiduciary relationship exists when a party
places special trust and confidence in another who knowingly accepts the responsibility."  Salois
v. Dime Sav. Bank of NY, No. CIV.A. 95-11967-PBS, 1996 WL 33370626, at *9 (D. Mass.
Nov. 13, 1996).  Plaintiffs argue the special trust relationship was based on the Doelgers' lack of
experience in investing and reliance on their investment advisers.  [Dkt. 309 at 34].  While Peter
may not have been a professional, he was nonetheless a sophisticated investor with decades of
experience in trading investments.  [See, e.g., Dkt. 276-6 at 3 (2009 brokerage account
application Peter signed on July 15, 2019, which indicates that he had 20+ years' experience
trading stocks and bonds, 15+ years' experience trading options, and 10+ years' experience
trading structured products, emerging markets, and hedge funds/private placements, and that the
primary source of his income was "[i]nvestments.")].  Peter also regularly consulted his attorney

---

[22] Plaintiffs also object that the R&R incorrectly ignores controlling law that states Defendants have fiduciary duties
to Plaintiffs, ignores Defendants' admissions they were fiduciaries, and overlooks Defendants' documents stating
they were fiduciaries.  [Dkt. 391 at 19-22].

and accountant about his investments.[23]   And as the R&R notes, "[e]ven if the Doelgers'
assertions had a basis in fact, they are simply insufficient to establish a common law fiduciary
duty."  [Dkt. 383 at 36].  There is no "relationship of higher trust" here that rises above the
agreements between the parties.  Zorbas v. U.S. Tr. Co., 48 F. Supp. 3d 464, 479 (E.D.N.Y.
2014) (internal quotations and citations omitted); see also Morton v. Aizenberg, No. 21-CV-7782
(NSR), 2024 WL 1892435, at *3 (S.D.N.Y. Apr. 29, 2024) (under New York Law "[m]anagers
of discretionary investment accounts, such as Defendants here, 'owe their clients a fiduciary
duty,' but only insofar as that duty is 'embodied in their agreement with their clients, to manage
the account in a manner that comports with the client's investment objective.'") (quoting Zorbas,
48 F. Supp. 3d at 488-89)); Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir.
1995) ("courts have repeatedly cautioned that the plaintiff alone, by reposing trust and
confidence in the defendant, cannot thereby transform a business relationship into one which is
fiduciary in nature.") (internal quotations and citations omitted).

   Next, this Court adopts the R&R's analysis and conclusion that a breach of fiduciary duty
is a duplicative claim of a breach of contract claim since both claims are based on "the same
facts and seek the same damages."  [See Dkt. 383 at 35 (quoting Alantra LLC v. Apex Indus.
Techs. LLC, 636 F. Supp. 3d 223, 238 (D. Mass. 2022)); compare Dkt. 1 ¶¶ 250, 253 (Count I –
Breach of Fiduciary Duty) with id. ¶¶ 264-65 (Count II – Breach of Contract)].  "Where a

---

[23] [See, e.g., Dkts. 276-32 at 2 (December 11, 2014, email from Baker to Moon stating that Peter's accountant,
Bruce Haverberg ("Haverberg"), was advising him to take some losses from his BIND position and that Peter asked
Baker to call Haverberg with him together); 276-33 at 2 (Haverberg's summary of professional services rendered
from December 1, 2014 through January 31, 2015, including "[u]pdate and review of MLP schedules," "numerous
discussions regarding MLP investments" and "discussions and analysis of year end opportunities of selling MLP
interests"); 276-71 at 6 (2015 bill from Roberts detailing professional services rendered, including a phone call with
Peter regarding MLPs on September 24, 2015); 301-186 at 2 (November 22, 2017, email from Moon to Baker
summarizing a meeting attended by Plaintiffs, Roberts, and Haverberg (by phone) where MLP position was
discussed)].

fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract." Alitalia Linee Aeree Italiane, S.P.A. v. Airline Tariff Pub. Co., 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008). There is no contradiction with R&R's conclusion regarding the fiduciary duty claims and its conclusion that the contract claim should be dismissed as to Chickasaw because it was not a party to the Advisory Agreement. The R&R states "summary judgment should be granted for Defendants *on any claim for breach of fiduciary duty that is duplicative* of the Doelgers' breach of contract claim." [Dkt. 383 at 35]. In other words, the R&R was recommending granting summary judgment *only* for the breach of fiduciary claims that were based on the Advisory Agreements— the other breach of fiduciary claims were not dismissed on that basis. Instead, the R&R recommended granting summary judgment for any of the other breach of fiduciary duty claims because "[Plaintiffs] do not explain which or what type of duties Defendants owed, let alone provide any description of how the listed actions violated those duties. They have also not identified how each Defendant specifically breached them." [Id. at 37].

Lastly, Plaintiffs argue that the R&R "[o]verlooks [d]efendants' [o]bligations to Plaintiffs and Defendants' [b]reaches." [Dkt. 391 at 25]. First, Plaintiffs state that Defendants rely on the Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers, Investment Advisers Act Release No. 5248, 2019 WL 3779889 (June 5, 2019) and that the R&R does not discuss Tilkin's discussion of suitability. [Dkt. 391 at 25]. Specifically, Plaintiffs rely on Tilkin's opinion that "Defendants' actions were not in line with industry standards and their suitability obligations" [Dkt. 390 at 19-20], as evidence of Defendants' breach of obligations toward the Doelgers. However, Tilkin's affidavit is inadmissible for proving a breach, as an expert witness cannot testify to a legal conclusion. See Snyder v. Wells Fargo Bank, NA, 594 Fed. Appx. 710,

714 (2d Cir. 2014) (noting that while an expert "may opine on an issue of fact within the jury's province," they "may not give testimony stating ultimate legal conclusions based on those facts"); Marx & Co., Inc. v. Diners' Club Inc., 550 F.2d 505, 509-10 (2d Cir. 1977) (holding that "conclusions as to the legal significance of various facts" were "testimony concerning matters outside [the expert's] area of expertise."); Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc., No. 1:23-CV-04942 (AT), 2024 WL 3638329, at *9 (S.D.N.Y. Aug. 2, 2024) ("[C]ourts exclude expert testimony that provides legal opinions, legal conclusions, or interprets legal terms; those roles fall solely within the province of the court.").  Furthermore, Plaintiffs fail to specify which investments were unsuitable, how they were unsuitable, or provide any evidentiary or legal support for their conclusory statement.  See Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 48 (S.D.N.Y. 2016) ("[N]o expert may supplant the role of counsel in making argument . . . [or] the role of the [factfinder] [in] interpreting the evidence.").

Plaintiffs next argue that Defendants have duties of care and of loyalty [id. at 25-26] but fail to specify how Defendants have allegedly breached those duties.  Even though the R&R pointed out that Plaintiffs failed to "provide any description of how the listed actions violated" the duties Defendants allegedly owed [Dkt. 383 at 37], Plaintiffs once again make the same mistake and state in conclusory fashion that the thirteen listed actions are "[n]on-exhaustive examples of Defendants' breaches of fiduciary duties."  [Dkt. 391 at 27].

Lastly, Plaintiffs argue that Baker "failed to inform supervisors of signs of Peter's diminished capacity as per JPM's Elder Policy."  [Id. at 28].  Yet neither the Doelgers nor their family or representatives told Defendants that Peter was suffering from any form of cognitive decline, diagnosed with any mental health condition, or receiving any form of treatment for a mental health condition.  It seems as if Plaintiffs expected Defendants to surmise Peter was

struggling with his mental health based solely on Yoon's having told Baker several times that Peter had memory problems.  [Dkts. 300-5 ¶93; 321-10 at 45 (173:4-6, 15-17) (Yoon Doelger stating in her deposition that starting in 2018, "when he called me. Jimmy Baker ask [sic], how is Peter doing? So I said, well, he's just doesn't [sic] remember things")].  Ultimately, this is central point to this action—whether there was reason for the defendants to know that Peter was suffering mental and cognitive decline, sufficient to render him unable to make the financial decision that he did.  As unfortunate as it is, the Court finds there is no evidence in the record to supports Plaintiffs claim.

For all of these reasons, Plaintiffs' objections regarding the breach of fiduciary duty claim are overruled.

## III.   CONCLUSION

For the reasons stated above, the Court **ADOPTS** Magistrate Judge Boal's R&R in its entirety.  Accordingly, Plaintiffs' objections to the Magistrate Judge's Boal's R&R are **OVERRULED**, and Defendants' Motion for Summary Judgment is **GRANTED**.

**SO ORDERED.**

Dated: September 27, 2024                     */s/ Angel Kelley*
                                              Hon. Angel Kelley
                                              United States District Judge